**From:** CustomerService=turbocourt.com@smtp.turbocourt.com on behalf of TurboCourt Customer Service
**To:** Nelly Preca
**Subject:** E-Filing Status: Form Set # 2620443 Filed
**Date:** Wednesday, May 09, 2018 9:31:02 AM

---

PLEASE DO NOT REPLY TO THIS EMAIL.

Your AZTurboCourt Form Set #2620443 has been accepted and FILED at Maricopa County - Superior Court and is part of the official court record.

Here are your filing details:
Case Number: CV2016-007692
Case Title: Long, Et.Al. Vs. State Of Arizona, Et.Al.
Filed By: Nelly Preca
AZTurboCourt Form Set: #2620443
Keyword/Matter #: 92015 - AJF - LONG
Filing date and time: May 08, 2018 12:01 PM MST

Forms:
Summary Sheet (This summary sheet will not be filed with the court. This sheet is for your personal records only.)

Attached Documents:
Response: DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT
Exhibit/Attachment (Supporting): EXHIBIT 1
Exhibit/Attachment (Supporting): EXHIBIT 2

Fees Paid:

Total Filing Fees: $0.00
Provider Fee: $6.50
Total Amount Paid: $6.70

YOU MUST log back on to http://turbocourt.com/ to view and/or print a copy of your file stamped copy.

If you have questions about your filing, please contact AOC Support Services, phone number 602-452-3519 or 1-800-720-7743, or e-mail pasupport@courts.az.gov. Please have your AZTurboCourt Form Set # available.

To view the link above:
Click on the link OR
1) Highlight the website address "URL" above, then Right Click on highlighted "URL" and select Copy.
2) Open a NEW internet browser window.
3) Right Click inside the address field in the new internet browser window and select

Paste.

Thank you for using TurboCourt!

Joel B. Robbins (011065)
Anne E. Findling (010871)
**ROBBINS & CURTIN, P.L.L.C.**
301 E. Bethany Home Road, Suite B-100
Phoenix, Arizona 85012-0001
Telephone: (602) 285-0100
Facsimile: (602) 265-0267
joel@robbinsandcurtin.com
anne@robbinsandcurtin.com

Krista Carman (021700)
CARMAN LAW FIRM
246 S. Cortez Street
Prescott, AZ 86303
E: kcarman@carmanlf.com

*Attorneys for Plaintiffs*

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

KENNETH and CORA LONG, husband and wife, individually, and as statutory beneficiaries for Nicholas Long, deceased; and on behalf of the estate of NICHOLAS LONG,

Plaintiffs,

vs.

STATE OF ARIZONA, a body politic, CORIZON HEALTH, INC., an Missouri corporation, doing business in the State of Arizona,

Defendants.

Case No. CV2016-007692

**REPLY IN SUPPORT OF MOTION FOR LEAVE TO AMEND COMPLAINT**

(Assigned to the Honorable Rosa Mroz)

On February 8, 2018, in accordance with the pretrial schedule, Plaintiffs served their comprehensive expert disclosures, which was the fifteenth supplement to plaintiffs'

initial disclosure. *See* **Exhibit 1,** Plaintiff's Fifteenth Supplemental Rule 26.1 Disclosure Statement (Expert Disclosures)**.** In that disclosure statement, Plaintiffs set forth the factual basis for their claim that Defendants and Medical Director Chris Johnson, D.O., were deliberately indifferent to Plaintiffs' son's serious medical needs. *Id.* at pp. 5-10. The disclosure predates the current discovery dispute and established the record for Plaintiff's constitutional claim. *Compare* **Exhibit 1** *with* Defendants' Response to Plaintiffs' Motion for Leave to Amend Complaint (5/8/2018) at p. 2.

Plaintiffs' disclosure specifically references the role of Corizon's medical director and identifies that medical director (Chris Johnson, D.O.) by name. *Id.* at 9-10. After disclosing the factual basis for the constitutional claim, Plaintiffs sought amendment of the complaint. Plaintiffs' requested to amend their complaint followed Plaintiff's disclosure two weeks later on February 21, 2018. The depositions of Defendants' providers and the comprehensive disclosure of expert opinions, not Defendants' Motion to Compel or the alleged *Lang* dispute, prompted the requested amendment, which was a reasonable next step in the litigation.

In contrast to Plaintiffs' disclosures, as of February 8, 2018, Defendants had not provided a substantive disclosure of any medical personnel since its initial disclosure statement of October 24, 2016. Defendants' initial disclosure had the following generic disclosure for 84 individuals, including Drs. Vukcevic, Anderson, Riaz, and Johnson:

> Corizon Health, Inc. is a Defendant in this matter. One or more of its agents, employees and/or records custodians, known or unknown, may have knowledge about the care and treatment of Decedent. It is anticipated that each will testify regarding his/her care and treatment, and any opinions that may have been formulated during his/her examination and the basis for those opinions. It is anticipated that staff will testify consistent with the Corizon medical records, and with any reports, and deposition, if taken.

**Exhibit 2,** Defendants' Initial Rule 26.1 Disclosure Statement (10/24/2016), pp. 1, 21-23, 29.

Defendants did not disclose that Dr. Johnson was the medical director and the medical records provided by Defendants document:

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

(1) Dr. Johnson administratively discharged Nicholas Long on January 6, 2015, after Nicholas had been transferred for emergency care;

(2) Dr. Johnson authorized a pharmacy order on December 30, 2014;

(3) Dr. Johnson gave telephone orders on as on-call physician.

Dr. Johnson's role as medical director is nowhere in the records. *See* **Exhibit 3,** Depo. of Chris Johnson, D.O., (12/20/2017) 83:4 to 83:19; 94:3 to 97:14.

Plaintiff's counsel takes seriously the allegations lodged against her in the Motion to Compel and has worked diligently to provide defense counsel with disclosures on the issue and to keep discovery on track, including immediately offering dates for depositions after the March 8, 2018 hearing. Yet the defense has been remarkably slow in taking these depositions, including unilaterally postponing depositions originally scheduled for April 26, 2018 that the parties had agreed to by March 23, 2018. Instead of taking the depositions as scheduled, the defense cancelled the depositions without explanation. The depositions are now reset for June 6, 2018.

To ensure that the depositions of Ms. Bishop and Ms. Villadares actually go forward, Plaintiffs served deposition subpoenas on both witnesses for the times set by defense counsel. Out of an abundance of caution, in a letter accompanying the subpoenas, Plaintiffs referred Ms. Bishop and Ms. Villadares to defense counsel if they had any questions. Plaintiffs' acted out of prudence and not as an admission that either Ms. Bishop or Ms. Villadares were "*Lang*-protected witnesses." *See* Response at p. 2, fn 1.

Plaintiffs dispute that any violation of *Lang v. Superior Court,* occurred in this case. It is certainly not apparent from Defendants' disclosure that either Ms. Bishop or Ms. Valladares fall within *Lang,* or that "improper" contacts occurred. *See* **Exhibit 4,** Defendants' Fourth Supplemental Rule 26.1 Disclosure Statement (03/23/2018), pp. 1, 3-6,

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ◆ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

12. Plaintiffs also leave for another date the issue of whether *Lang* applies to Dr. O'Steen as the defense has argued.[1]

**I. The Constitutional Claim against Dr. Johnson is Legally Sufficient and is not Time-Barred.**

When a cause of action accrues is generally a question of fact for the jury. *See Walk v. Ring*, 202 Ariz. 310, 316 (2002). As was more fully set forth in the motion to amend and the First Amended Complaint, the claim against Dr. Johnson did not accrue until his participation in the case was revealed by Dr. Vukcevic at his September 6, 2017 depositions. Plaintiffs did not and could not have known that Dr. Johnson was a decision maker behind the Defendants' failure to treat their son. *See Long v. County of Los Angeles,* 442 F.3d 1178, 1185 (9th Cir. 2006) ("Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment.")

This is not a case where Plaintiffs were dilatory or sat on their rights. Plaintiffs timely filed their lawsuit against Defendants. On their first disclosure, Defendants listed eighty-four individuals who participated in Nicholas Long's care. Defendants referred Plaintiffs generally to the medical records but did not disclose its own internal documents that would have led Plaintiffs to name Dr. Johnson. Defendants would surely have objected had Plaintiffs named eighty-four individual defendants.

A federal civil rights claim can be brought against an individual. Under some circumstances, such as when the actor is an employee of the State, naming an individual person is a required element of the claim.

Here, Plaintiffs acted reasonably and diligently in investigating their claim. Defendants did not disclose Dr. Johnson's participation in the case. Therefore, a question of fact exists supporting the requested amendment.

---

1 Defendants materially misrepresent the record in implying that Gary Norris had any contact with any witnesses. Contrary to the response, there is absolutely no evidence that Mr. Norris had any

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ◆ Fax: (602) 265-0267

**II. Defendants Suffers No Prejudice with the Proposed Amendment.**

As the timeline in this case clearly establishes, the proposed amendment of Plaintiffs' complaint was unrelated to the alleged "*Lang"* issue. Plaintiffs' comprehensive disclosure shows that Plaintiffs were building the record for the amendment with their comprehensive expert disclosure. That disclosure resulted from the depositions of four doctors, all of whom participated in some way in Nicholas Long's care. There is nothing "suspect" about basing a requested amendment on a comprehensive disclosure that included Plaintiffs' experts and was served in compliance with the Court's pretrial schedule.

Defendants argue that the five months beginning September 6, 2017, during which Plaintiffs deposed Dr. Vukcevic, Dr. Anderson, Dr. Riaz, and finally Dr. Johnson on December 20, 2017, are evidence of "undue delay, dilatory action or undue prejudice." Plaintiffs first requested depositions in October 2016. Any "undue delay, dilatory action or undue prejudice" is the result of the difficulty in getting Defendants to schedule and attend depositions. There is nothing unreasonable in Plaintiffs' actions in seeking amendment of their complaint.

Nor should the Court decline to allow the amendment because Defendants "might" choose to remove this case to federal court. The Court may take judicial notice that these Defendants are currently embroiled in extensive litigation alleging that Defendants repeatedly failed to provide constitutionally mandated care to inmates. *See Parsons v. Ryan,* 754 F.3d 657 (9th Cir. 2014). There are strategic reasons that Defendants may choose not to remove. *See Agster v. Maricopa County,* 422 F.3d 836, 839 (9th Cir. 2005) (state peer review privilege not available in claim for violation of federal civil rights)

Whether Defendants are going to remove this case or not, the current discovery dispute should not govern whether the amendment is granted. There is no "prejudicial

---

role other than facilitating counsel's communications with Dr. O'Steen and performing administrative tasks.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

choice" here. This Court has done nothing more than order discovery, which Defendants have been in no hurry to schedule. There have been no substantive findings. Briefing the issue is not particularly onerous, especially in light of Defendants' own disclosures regarding the alleged "improper" contacts.

**CONCLUSION**

If not now – when? If, as the Defendants suggest, this Court waits until after the *Lang* issue is fully briefed and decided, and then allows the amendment, Plaintiffs will suffer grossly unfair and disproportional prejudice. As Magistrate Judge Duncan observed at a recent *Parsons v. Ryan* hearing:

> And I think that the frustration that I have felt in this case must just be so small compared to the suffering that seems to occur out in the prison yards because of people who are not getting this basic healthcare.

For the above stated reasons, Plaintiffs respectfully request that this Court grant the Motion to Amend.

**RESPECTFULLY SUBMITTED**: May 21, 2018

**ROBBINS & CURTIN, p.l.l.c.**

By: /s/Anne E. Findling
Joel B. Robbins
Anne E. Findling
*Attorneys for Plaintiffs*

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

**CERTIFICATE OF SERVICE**

I hereby certify that on May 21, 2018, I electronically transmitted the attached document to the Clerk's Office using the Maricopa County Clerk of Superior Court's Online eFiling System for filing and automatic transmittal of the eFiled document to the assigned judge, the Honorable Rosa Mroz, and that a copy of the foregoing has been served by e-service on counsel for all parties, as designated below:

Anthony J. Fernandez
Vincent J. Montell
QUINTAIROS, PREIETO, WOOD & BOYER, P.A.
2390 E. Camelback Road, Suite 440
Phoenix, Arizona 85016
E: afernandez@qpwblaw.com
E: vmontell@qpwblaw.com
E: rebecca.stanton@qpwblaw.com
*Attorneys for Defendants, State of Arizona & Corizon*

Krista Carman
CARMAN LAW FIRM
246 S. Cortez Street
Prescott, AZ 86303
E: kcarman@carmanlf.com
*Co-Counsel for Plaintiffs*

By: /s/Kimberly M. Gonzalez
Kimberly M. Gonzalez

**EXHIBIT 1**

Joel B. Robbins (011065)
Anne E. Findling (010871)
ROBBINS & CURTIN, P.L.L.C.
301 E. Bethany Home Road, Suite B-100
Phoenix, Arizona 85012-0001
Telephone: (602) 285-0100
Facsimile: (602) 265-0267
joel@robbinsandcurtin.com
anne@robbinsandcurtin.com

Krista Carman (021700)
CARMAN LAW FIRM
246 S. Cortez Street
Prescott, AZ 86303
E: kcarman@carmanlf.com

*Attorneys for Plaintiffs*

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

KENNETH and CORA LONG, husband and wife, individually, and as statutory beneficiaries for Nicholas Long, deceased; and on behalf of the estate of NICHOLAS LONG,

Plaintiffs,

vs.

STATE OF ARIZONA, a body politic, CORIZON HEALTH, INC., an Missouri corporation, doing business in the State of Arizona,

Defendants.

Case No. CV2016-007692

**PLAINTIFFS' FIFTEENTH SUPPLEMENTAL RULE 26.1 DISCLOSURE STATEMENT**

***(Expert Opinions)***

(Assigned to the Honorable Rosa Mroz)

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

Pursuant to Rule 26.1 of the Arizona Rules of Civil Procedure, Plaintiffs Kenneth Long and Cora Long, by their attorneys undersigned, submit the following **Fifteenth Supplemental** Rule 26.1 Disclosure Statement (supplements in **bold**, deletions notated by ~~strikethrough~~).

## I. FACTUAL BASIS FOR EACH CLAIM

Nicholas Long was admitted to the Arizona Department of Corrections on March 12, 2014, to serve a sentence for selling six prescription pills to a neighbor to pay his cell phone bill. The maximum end date of his sentence was March 13, 2019.

Nicholas was naïve and guileless. His disciplinary tickets in prison were for playing basketball when he was supposed to be working with the grounds crew and refusing to shave.

At intake, Nicholas (5'10") weighed 153 lbs. He reported a history of Bipolar Disorder (a mood disorder) that had been previously treated with medication. He also reported stomach issues for which he requested Prilosec (omeprazole), a medication commonly used for Gastroesophageal Reflux Disease (GERD). Nicholas was transferred to ASPC-Yuma to serve his sentence.

On March 28, 2014, Nicholas submitted a Health Needs Request (HNR) to request Prilosec "for his stomach." A progress note of April 3, 2014 documents Nicholas's weight to be 160 lbs. Nicholas was assessed as having GERD and a prescription for Prilosec was ordered.

On June 28, 2014, Nicholas (at the time 180 lbs.) was seen by a nurse for a chief complaint of 10/10 abdominal pain, intermittent, for one week. The pain was described as sharp. He was tachycardic. The record does not include referral to an appropriate provider or any GI work-up.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

Nicholas's October 7, 2014 HNR for "really bad" stomach cramping, diarrhea, pain, and inability to sleep, and his October 10, 2014 HNR report of "severe pain" resulted in being placed on the "nurse's line" on October 12, 2014. Records document bloody stool, inability to urinate, anorexia, diarrhea, weakness, dizziness and vomiting. He described his pain as 9/10 to 10/10. His weight was down 24 pounds since his last assessment. His abdomen was described as tender, hyperactive bowel sounds present, guarding present, with confirmed blood in his stool. The record does not include referral to an appropriate provider or any GI work-up. No CT was done and no surgical consult was obtained.

His condition deteriorated and on November 6, 2014 he was admitted to Yuma Regional Medical Center for possible acute colitis. He was discharged on November 11, 2014 with instructions to continue Levaquin. Nicholas was transferred to ASPC-Florence. He continued to have stomach cramps and diarrhea. He was weak and required supplemental nutrition.

Nicholas's GI symptoms continued. He had trouble eating. His stools were grossly abnormal, with bleeding and diarrhea.

On November 26, 2014, Nicholas was admitted to Tempe St. Luke's Hospital. A CT revealed circumferential large bowel mucosal thickening consistent with infectious or inflammatory colitis, likely ulcerative colitis. Nicholas was reported to having signed out against medical advice, apparently because he was unable to eat. There's no record of a mental health consult or contact with Nicholas's family. Protocols for addressing his condition were ignored.

On December 11, 2014, Nicholas was admitted to Tempe St. Luke's Hospital with admitting diagnosis of rectal bleeding and ulcerative colitis. He was seen by Dr. Gaidici and Vasic.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

Decedent was again brought to Tempe St. Luke's hospital from January 23, 2015 to January 24, 2015 where he was noted to be refusing to eat (reportedly he was on a "hunger strike"). The label clearly infected the treatment he was given. Although the records show that he complained that he was unable to eat and that his medication was causing side effects, he was stigmatized and denied appropriate care apparently on someone's assumption that his conduct was willful. Again, the protocols for addressing these issues were disregarded.

It wasn't until late January that mental health became involved and it wasn't until Nicholas was critically ill and unable to understand his condition that he saw a psychiatrist.

Nicholas was ultimately admitted to Mountain Vista Medical Center after becoming unresponsive from starvation and dehydration on February 3, 2015. Abdominal surgery revealed severe adhesions and perforations. He had subtotal colectomy, placement of ileostomy, enterorrhaphy and lysis of adhesions.

Nicholas underwent further procedures at Mountain Vista with gastrostomy tube placement, abdominal lavage, vacuum assisted wound closure, and porcine graft closure of the abdominal wall. Postoperative course was complicated by failure to be weaned from ventilator requiring tracheostomy on February 21, 2015, and by the growth of vancomycin-resistant enterococci from his urine. Nicholas was eventually discharged to Promise Hospital for continued care on February 24, 2015.

On May 25, 2015, Nicholas arrived via EMS to Banner Desert Medical Center from Promise Hospital at approximately 9:27 a.m. On arrival Nicholas is completely unresponsive. Complications ultimately led to Nicholas's death on May 25, 2015 at 10:10 a.m.

The Arizona Department of Corrections (ADC) promulgates department orders that govern an inmate's access to health care. Department Order 1101, Inmate Access to Health Care provides:

> This Department Order requires inmates to be provided opportunities for reasonable and appropriate access to medical, mental health, and dental health care at reasonable fees. The Department Order also requires appropriate and uninterrupted health care be provided to inmates with chronic health conditions. Security, program, transportation and Health Services staff cooperate and coordinate their activities to provide scheduled and emergency health care.

The Order requires Corizon to "ensure that medical and mental health care providers have available to them the resources to provide constitutionally mandated and appropriate referrals for inmates who appear for treatment.

For non-emergent needs, inmates access medical care through a system of written Health Needs Requests (HNR). Medical services provided by providers outside the prison system are arranged through Corizon. The Order requires Corizon to track and regularly see patients with chronic medical needs.

Corizon's responsibility to inmates extends to ensuring "all efforts are taken to maintain the inmate's life while on the prison complex." Inmates retain the right to refuse treatment, but if the inmate's decision is life-threatening, Corizon must follow § 1101.11 (1.2.1), which initiates the chain of command to ensure that the inmate is mentally competent and makes a knowing, fully informed decision, including seeking court authority for treatment.

Policy requires notification to the Facility Health Administrator (FHA), the ADC Contract Monitor, and the Warden. A significant incident report must be completed, and the Department's General

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

Counsel must be contacted. Contact with General Counsel initiates the involvement of the Office of the Attorney General in petition for court mandated treatment.

Corizon's duties also extend to inmates on hunger strikes. An inmate is considered to be on a hunger strike when:

> The inmate communicates the fact to staff and is observed by staff to be refraining from eating for a period of time, ordinarily in excess of 72 hours.
>
> Staff observes the inmate to be refraining from eating for a period in excess of 72 hours.

Even if an inmate does not specifically say that he is on a hunger strike, any time staff observes that an inmate has not eaten for more than 72 hours, the inmate must be referred for a medical evaluation.

Policy requires that the inmate be monitored to ensure that "legal and medical procedures are pursued to preserve the inmate's life." Just as with life-threatening refusals of treatment, hunger strikes must be reported through the chain of command, looping in medical, security, chaplaincy, mental health, and the attorney general to obtain a court order. Decision making capacity must be determined and stringent conditions of confinement imposed:

> If the inmate is determined to have the capacity to make decisions his/her medical status shall be monitored as follows:
>
> > The inmate shall be moved to a single occupant cell and shall be provided with regularly scheduled meals and an adequate supply of drinking water.
> >
> > Security staff shall confiscate store purchased food or other private food supplies from the inmate. Confiscated items shall be held for the duration of the hunger strike. The inmate shall not be allowed to purchase any food items from the inmate store while under hunger strike management.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

> Health Services staff shall take and record the inmate's weight, intake and output, and vital signs at least once every 24 hours. Other medical procedures, including mental health assessments, shall be repeated as medically indicated.
>
> The inmate shall be monitored in accordance with the Health Services Technical Manual. At the discretion of the inmate's attending medical provider, the inmate shall undergo additional medical and lab testing.
>
> > An interdisciplinary clinical staffing panel as outlined in the Health Services Technical Manual shall determine any potential issues and attempt to resolve them. The inmate shall be informed of the medical consequences of the hunger strike and shall be asked to sign a Refusal to Submit to Treatment form acknowledging understanding the consequences.
> >
> > The inmate's treating physician shall make the determination regarding the potential need to have the inmate placed on a medical watch, to include the monitoring intervals.

When medically mandatory, an inmate on a hunger strike must be moved to an acute care facility.

Even if an inmate refuses needed medical treatment, Corizon's responsibility extends to ensuring "that every possible avenue is explored to encourage cooperation by inmates in completion of their own care." To that end, ADC adopted HSTM ch. 7, § 1.8, Clinical Staffing of Special Problems. HSTM ch. 7, § 1.8.

Section 1.8 is triggered when an inmate "present[s] with a complex issue(s) or series of health issues" and when an interdisciplinary approach is required. The process provides "a mechanism and forum to ensure a cooperative effort between the

facilities administration and treating clinicians in responding to a specific inmate's health needs especially in situations of treatment refusals."

Clinical staffing provides a mechanism and forum to problem-solve a complex issue and is especially applicable in cases of combined medical and mental health issues or when a patient presents with "multiple and incessant complaints." Staffing includes the provider, the FHA, the Correctional Registered Nurse Supervisor II (CRNS II), Psychologist or Psych. Associate, the Unit Deputy Warden, the Unit Medical Records Librarian, and any other staff deemed appropriate.

The agenda of a Section 1.8 staffing is defined by policy and includes participation of the inmate:

> The Staffing will be scheduled to last approximately one hour and, unless otherwise indicated, will proceed as follows:
>
> - The FHA will provide general directions to the other members, paying particular attention to the need for confidentiality and the reason and authority for including a non-medical individual in a meeting which will most likely reveal clinical information.
>
> - The unit provider will present the case to the committee paying particular attention to his/her observations, laboratory, and other clinical findings.
>
> - The remainder of the members will query the provider, seeking to determine the current status of the inmate and developing a base of information.
>
> - The inmate will be brought into the meeting room and the FHA will describe the clinical staffing process. The attending provider will provide the issue(s) to be discussed.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

- The inmate will be asked to provide their concern(s) relative to the clinical staffing topic.

- Upon completion of the inmate's presentation, the FHA will provide a synopsis of the problem and the inmate will be asked to leave while the clinical staffing members discuss their case. The inmate shall be called back and the consensus statement arrived at for resolution of any issues and/or improved treatment(s) will be provided to the inmate. A statement of understanding or misunderstanding (refusal) shall be included in the minutes of meeting as well as a S.O.A.P. entry.

- The attending provider shall provider shall provide a "S.O.A.P." note entry as to the staffing and recommendations.

- A copy of the minutes shall be forwarded to the Health Services Division Administrator.

Corizon communicated to outside providers that Nicholas Long was on a hunger strike. Dr. Vukcevic denied that Nick was on a hunger strike. Dr. Vukcevic's denial is supported by Corizon's own records that include statements by Nicholas that he wanted treatment, he wanted to eat, and he wanted to get better.

The medical director is responsible for final clinical judgment and decisions regarding inmate care. The medical director has administrative responsibilities and responsibilities for continuous quality improvement. The medical director was also responsible for clinical supervision of the providers and compliance with policies and procedures.

Corizon's medical director at ASPC-Florence was Chris Johnson, D.O. Dr. Johnson, who was trained as a general surgeon, was hired by Corizon as a primary care provider in June 2014. Although Dr. Johnson completed his residency training in 2010, he had not

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

**practiced medicine as a general surgeon nor had he practiced medicine as a primary care physician before being hired by Corizon. In addition, other than his primary medical education, Dr. Johnson has no additional training in psychiatry.**

**Dr. Johnson had virtually no experience in either primary care or correctional medicine. He was promoted within a few days of his employment from provider to medical director.**

## II. THE LEGAL THEORY UPON WHICH EACH CLAIM IS BASED

Defendant, State of Arizona, has a non-delegable duty of care, custody, and control of inmates within the state prison system. This non-delegable duty includes providing appropriate medical care for serious medical needs.

Defendant, State of Arizona, also has a duty to ensure, through appropriate monitoring, that reasonable and necessary medical care is being provided by contracted and subcontracted medical providers duly licensed and acting within the scope of those licenses according to the community standard of care to inmates within the ADC and the Arizona state prison system is delivered.

Defendant, State of Arizona, breached its duty to Plaintiffs' decedent by failing to provide appropriate medical care for his serious medical needs.

Defendant, State of Arizona, further breached its duty to Plaintiffs' decedent by failing to adequately monitor the contracted medical services being provided to Plaintiffs' decedent and others.

As a result of these breaches, Plaintiffs' decedent failed to receive competent medical care for his serious medical needs resulting in his death. By virtue of the non-delegable duty set forth above, Defendant State of Arizona is vicariously liable for the medical negligence of Defendant Corizon Health, Inc.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

Defendant State of Arizona is vicariously liable for the conduct of its employees, including Defendant Corizon Health, Inc., under the doctrine of *respondeat superior*.

Defendant Corizon Health, Inc. has a duty to provide reasonable healthcare in accordance with the community standard of care by appropriately licensed medical personnel acting within the scope of their respective licenses.

Defendant Corizon Health, Inc. breached that duty by failing to provide necessary medical care to Plaintiffs' decedent within the community standard of care.

Defendant Corizon Health, Inc. and its employees and agents failed to properly recognize, assess, diagnose or treat Plaintiffs' decedent's serious medical condition resulting in his death.

Defendant Corizon Health, Inc. and its employees and agents failed to exercise that degree of care that a reasonable provider would exercise under the same or similar circumstances.

Defendant Corizon Health, Inc. created policies and procedures that resulted in its employees failing to practice within the scope of their respective licenses.

1. Defendant Corizon Health, Inc.'s negligence includes:

   a. Failing to properly assess Plaintiffs' decedent after he made his medical needs known;

   b. Failing to establish proper policy, procedures, custom and practice for identifying inmates who require a higher level of care than can be provided at the prison complex;

   c. Failing to provide appropriate personnel and to train that personnel in the recognition of conditions requiring a higher level of medical care than can be provided at the prison complex;

d. Failing to properly assess Plaintiffs' decedent when his medical condition had obviously deteriorated;

e. Failing to investigate Plaintiffs' decedent's declining medical condition and waiting until his condition was life-threatening before taking action;

f. Failing to ascertain the source of Plaintiffs' decedent's complaints;

g. Failing to act on objective signs of an increasingly serious medical condition until it was too late for effective treatment;

h. Violating the policies and procedures of the State of Arizona with respect to inmates thought to be on "hunger strike";

i. Violating the policies and procedures of the State of Arizona with respect to inmates who are refusing medical treatment;

j. Violating the policies and procedures of Corizon with respect to inmates thought to be on "hunger strike,"

k. Violating the policies and procedures of Corizon with respect to inmates who are refusing medical treatment;

l. Withholding adequate nutrition and hydration to the point that Nicholas Long became severely malnourished.

Ordinary care required Defendant Corizon Health, Inc. to refer Plaintiffs' decedent to a qualified and properly equipped medical professional who could conduct an adequate and proper medical examination, properly and competently diagnose Nicholas Long's medical condition, and provide for competent and adequate treatment.

As a result of the breach of Defendant Corizon Health, Inc.'s duties to Plaintiffs' decedent as more fully set forth above, Defendant Corizon Health,

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

Inc. caused Plaintiffs' decedent to be denied timely, appropriate and competent medical care resulting in his death.

Ordinary care required Defendants to comply with the relevant policies and procedures of Defendant State of Arizona and Defendant Corizon. Specifically, Defendants violated Department Order 1101.12 Refusal of Treatment and 1101.13 Inmate Hunger Strike. Had Defendants complied with these policies, Nicholas Long would have received both the mental health and medical care that he needed to prevent his death.

Pursuant to A.R.S. § 12-611, *et seq.*, liability for wrongful death exists if a person's death is caused by "wrongful act, neglect or default." In this matter, Defendants' "wrongful act, neglect or default" includes negligence as set forth above.

Plaintiff seeks compensation pursuant to A.R.S. § 12-613, which provides:

> In an action for wrongful death, the jury shall give such damages as it deems fair and just with reference to the injury resulting from the death to the surviving parties who may be entitled to recover, and also having regard to the mitigating or aggravating circumstances attending the wrongful act, neglect or default.

Plaintiffs are entitled to maintain an action for wrongful death against Defendants for such losses and injuries suffered by all statutory beneficiaries of decedent.

As a result of the wrongful acts of Defendants as set forth above, Plaintiffs and other statutory beneficiaries suffered damages including loss of love, companionship, and support.

## III. WITNESSES EXPECTED TO TESTIFY AT TRIAL

1. Kenneth Long
   c/o Robbins & Curtin, pllc
   301 E. Bethany Home Road, Suite B-100
   Phoenix, Arizona 85012
   (602) 285-0100

It is anticipated that Kenneth Long will testify regarding his relationship with his son, and his recollection of the events leading up to, including and following the death of his son, Nicholas Long. He is expected to testify about the bodily injuries and pain suffered by his son, and the resulting provider care and management. He is expected to testify as to how this has affected his entire family and how it will continue to affect them.

This witness will also testify with regard to any communications he had with employees and/or representatives of Defendant State of Arizona and Defendant Corizon.

2. Cora Long
c/o Robbins & Curtin, pllc
301 E. Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
(602) 285-0100

It is anticipated that Cora Long will testify regarding her relationship with her son, and her recollection of the events leading up to, including and following the death of her son, Nicholas Long. She is expected to testify about the bodily injuries and pain suffered by her son, and the resulting provider care and management. She is expected to testify as to how this has affected her entire family and how it will continue to affect them.

This witness will also testify with regard to any communications she had with employees and/or representatives of Defendant State of Arizona and Defendant Corizon.

3. Each of the below medical providers and their employees are expected to testify as to the nature, extent and severity of Nicholas Long's injuries, the treatment rendered, and the causal relationship between said injuries and the subject death, including but not limited to the staff members listed below. They are also expected to further testify that the medical bills

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

incurred by decedent were reasonable in their amounts and represented treatment that was necessary:

a. Corizon Health, Inc.
950 W. Elliot Road, Suite 220
Tempe, Arizona 85284

(1) Jesus Vazquez, MA, NCC, LAZ (Lead Psych Associate)
(2) Ben Shaw (Mental Health Director)
(3) Zoran Vukcevic, M.D.
(4) Mark Faust, PA-c
(5) Laurie Wharem, LPN
(6) Stacy. Vineyard, RN
(7) Pamela Roos, LPN
(8) Jonathan Vasquez, LPN
(9) Jennifer Miller, RN
(10) Elijah Jordan, MD
(11) Maribel Rangel, LPN
(12) Suzanne Feeley, RN
(13) Karen B. Barcklay-Dobson, MD
(14) Valerie Jones, RN
(15) Richard Schumaker, LPN
(16) Lauri Sanders, RN
(17) B. Barnett, RN
(18) Jennifer Kessler, RN
(19) Robert Andrew Anderson, DO (Psychiatrist)
(20) D. Doench, RN (sp)
(21) Julie Hampton, BSN
(22) R. Rae, LPN
(23) Brin Hofer (x-ray technician)
(24) Paraan Broenauenca, RN (sp)
(25) Andrew Hamilton, CRN
(26) Carol C. Taylor, RN, CAN (RN Supervisor)
(27) Gregory Campbell, RN
(28) Ola Osinloye, FNP
(29) Stephanie Oplinger, RN
(30) S. Bishop, RN
(31) Theresa Starling, RN
(32) D. Lucas, DA
(33) D.B. Cochran, DMD
(34) Migdalia Uribe, DA II
(35) Martha Ortega (Director Assistant)
(36) Justin Weiss, MD

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

(37)   S. Bigler, RN
(38)   S. Forlemu, LPN
(39)   C. Myers, RN
(40)   M. Meza, RN
(41)   A. Kriser, RN
(42)   Gary Gleason, CEPT
(43)   Barbara Hansen, RN
(44)   D. Bisling, RN
(45)   D. Starks, RN
(46)   Peter Bishop, Psy
(47)   Yolanda James, LPN
(48)   B. Butler, RN
(49)   Erika Mears, RN
(50)   Marcela Meza, RN
(51)   Jennifer Anderson, Psy. Nurse
(52)   Mahlon Round (intake)
(53)   Felix B. Breon
(54)   Jawad Riaz, MD
(55)   Michael S. King
(56)   Nicole Newman
(57)   Jakeline Valladores
(58)   Dr. Stephen Graham
(59)   Darcee Bishop, RN
(60)   Yarira Lizarraga, RN
(61)   Tabetha Smith, RN
(62)   Chris Johnson (Provider infirmary discharge)
(63)   Eva Olszewski, RN
(64)   Crystal Mamon
(65)   Kyra Quinones
(66)   Dorene L. Acuna, RN
(67)   Philip Brandon Daou

Employees and/or former employees of Corizon are expected to testify in accordance with medical records.  It is anticipated that current and/or former employees may be critical of care provided to inmates by Corizon and the adequacy of resources made available to providers and medical staff.  It is further anticipated that former employees of Corizon may testify that the conditions created by Corizon for the treatment of inmates led providers and/or medical staff to separate from their employment with Corizon.

**Plaintiff anticipates that Zoran Vukcevic, M.D. will testify in accordance with his deposition.**

**Plaintiff anticipates that Chris Johnson, D.O. will testify in accordance with his deposition.**

**Plaintiff anticipates that Jawad Riaz, M.D. will testify in accordance with his deposition.**

**Plaintiff anticipates that Robert Anderson, M.D. will testify in accordance with his deposition.**

b. Garcia Laboratories
2195 Spring Arbor Road
Jackson, Michigan 49203

(1) Lorena P. Kielhorn, MD

c. Yuma Regional Medical Center
2400 S. Avenue A
Yuma, Arizona 85364

(1) Christal Ott, RN (Case Management)
(2) Bharat Magu, MD
(3) Mohamad Altriki, MD
(4) Timothy Jordan, MD
(5) Jessie Morland, RN
(6) Aburieda A. Akam, MD
(7) Maxine E. Millard, RN
(8) Alfrieda Madrigal, LPN
(9) Karin Vonkriegenbergh, ARRT
(10) Luis Perez, ARRT
(11) Guadalupe Lopez, RN

d. Tempe St. Luke's Hospital
1500 S. Mill Avenue
Tempe, Arizona 85281

(1) Muhammad Vasiq, MD
(2) Sharon Albright, RN (Discharge nurse)
(3) Maria Asztalos, PA
(4) Florin Gaidici, MD

Dr. Gaidici was a treating physician at Tempe St. Luke's Hospital. It is anticipated that he will testify consistent with his medical records. It is also anticipated that he will testify as follows:

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

Dr. Gaidici has only vague recollection of Nicholas Long. As a result, his testimony will be limited to the medical records. He will testify that he has treated inmate patients at Tempe St. Luke's in the past. He is aware that the prison provides medical care, but he has no information as to the extent of the treatment available. He rarely communicates directly with providers at the prison. Unless there is documentation in the chart, he has no recollection of talking to Dr. Vukcevic or any other representative of Corizon. Dr. Gaidici will further testify that he performed a colonoscopy on Nicholas Long, but ended the procedure when he saw the severity of the disease. At that point, Dr. Gaidici felt that he had sufficient information and continuing the procedure presented more risk than was justified by any potential benefit. Based on the records Dr. Gaidici has reviewed, his last contact with Nicholas Long occurred during the December 11, 2014 admission to Tempe St. Luke's. Dr. Gaidici has not reviewed any additional records and is not expected to opine on any other aspect of Nicholas Long's medical care.

(5) Angela Dunbar, RN
(6) Jeremy Marsh RN (staff nurse)
(7) Cheryl Clark
(8) Donald Paquei, MD
(9) Kimberly K. Gormeey, RN
(10) Eostacia Jorvig, RN (staff nurse)
(11) James Vandenberg, RPH
(12) Janet Morstian, RN
(13) Stephen Colvin, MD
(14) Diana Heinzen, RN
(15) Ali Baghai, CRNA
(16) James Cason, MD (director)
(17) Nancy A. Mucha, NP
(18) Stacy Kelly (coder/abstractor)
(19) Barb Clements, RN
(20) Dave Hoec
(21) Nadim T. Zyadeh, MD
(22) Eileen Belcar, RN
(23) Ashley M. Fisher, RN
(24) Thomas Gladys, RN

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

e. Florence Hospital at Anthem
4545 N. Hunt Highway
Florence, Arizona 85132

(1) Amish, Shah, MD
(2) Brett Belous, MD
(3) Jeffrey Rivera, RN
(4) Lauren King, RN
(5) Rachelle Dunham, RN
(6) Travis Newman, Medic
(7) Chandra Hernandez
(8) Jennifer Jarvis, R/T
(9) Daniel Shearer
(10) Kathryn Slobodzian (Technician)
(11) Tiffany Jones, ECT
(12) Storey Alexander, HUS
(13) Freddie Gameros, ECT
(14) So-Heung Lee, R/T
(15) Lisa Ramos

f. Mountain Vista Hospital
1301 S. Crismon Road
Mesa, Arizona 85209

(1) Muhammad Vasiq, MD
(2) Abraham Owusu-Dommey, MD
(3) Pilu Dali, MD
(4) Zubair Tahir, MD
(5) Eva C Tretter, RN
(6) Billy N Bravo, MD
(7) Maria Asztalos, PA
(8) Doris Valtierra, NSG (unit sec/clerk)
(9) Arioro Casiro, DO
(10) Stephen Colvin, MD
(11) Craig Bruner
(12) Genie Mciver (dietician)
(13) Christopher Proper, RN (staff nurse)
(14) Alana Harrison, DO (RES)
(15) Robin J. Cain, RN
(16) Dashani S. Kavathia, MD
(17) David Brewer
(18) Juliet Rader, RN
(19) Gail A. Freeman, RN

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

(20) Ray Schmac, Rph
(21) Alexander Ryan, DO (RES)
(22) Diane M. Aberle, RN
(23) Arturo Castro, DO
(24) Dashant S. Kavathia, MD
(25) Celestine Tchikounzi, DO
(26) Guangming Guo, MD (director)
(27) Melanie Peters, RN
(28) Ryan Antokal, RN
(29) Rosbie Cuenco, RN
(30) Johannah Mahana, RN
(31) Kelli Maddox, RN
(32) Anita M. Laks, RN
(33) Ty Porter, RN
(34) Ann Kallenberger, NA
(35) Heather Baer, NA
(36) Nancy Ocker, RN
(37) Tina Ingwer, RN
(38) Tracy Hormell, RN
(39) Ihouma Igwe, RN
(40) Jennifer Hannah, RN
(41) Denise Thompson, RN
(42) Ofelia Fernando, RN
(43) Rick Mackay, RN
(44) Farid Ghebleh, MD
(45) Kenneth Anaeme, MD
(46) Jesus Mireles Escareno, MD
(47) Nancy Nocha, NP
(48) Sherrie C. Onkey, RN
(49) Agnes Marciano, RN
(50) Shannon M Broderick, RN
(51) Courtney A. Michell, RN
(52) Nicole Henley, RN
(53) April L. Bielanski, RN
(54) David Rich
(55) Megan N. Haines (Diet Rep)
(56) Ralph Dsilva, MD
(57) Mark E. Boolware, MD
(58) Susan E. McGovern
(59) Patsy Tenorio, RN
(60) Deanna S. Boitnott, RN
(61) Kenny Rader, RN
(62) Jenny Huang, RN

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

(63) Marilyn R. Schatz, NP
(64) Erin Folsom, DO (res)
(65) Pio Siola, MD (sp)
(66) Wesley High, DO (res)
(67) Nancy Ocker, RN
(68) Yasih S. Shareef, DO
(69) Barry Schafer, RN
(70) Ann Hannosh, RN
(71) David Brewer
(72) Nicole Henley, RN
(73) Sherrie L. Linkey, RN
(74) Michele Kadaskaprolet, Rph
(75) Tina Ingwer, RN
(76) Alison Waeschle, RN
(77) Sara Badaglialacqua, RPH
(78) Amy Kruczay
(79) Christine Andersen
(80) Beverly Trievel

g. Promise Hospital of Phoenix
433 E 6th Street
Mesa, Arizona 85203

(1) Tochukwu Samuel Nwafor, MD
(2) Yvonne Saul (sp)
(3) P. Carter
(4) R. Edwards (sp)

h. Banner Desert Medical Center
1400 S. Dobson Road
Mesa, Arizona 85202-4707

(1) Svetlana Reznikova-Steinway, M.D.
(2) Amy J. Callies, RN
(3) Angela R. Stewart
(4) Nathan Clarke Page, MD
(5) Chetan Subhash Gujrathi, MD
(6) Stephen J. Giebel, MD
(7) Jayson Luma, MD
(8) Brad Harrison, MD
(9) Robert L. Thomas, MD
(10) Jaime L. Schultis, RN
(11) Kelley Armendariz, RN (Chart Reviewer: internal)

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

(12) Charlotte Lewis, RN
(13) Taraneh Davis, RN

i. Pacific Mobile Diagnostics, Inc.
615 East Palo Verde Drive
Phoenix, Arizona 85012

(1) R. Paul Cory, MD
(2) Earl Maes, MD
(3) Roger McClellan, MD

j. LabCorp Phoenix
5005 S. 40th Street
Suite 1200
Phoenix, Arizona 85040-2969

(1) Brian Poirier, MD

k. ColMed Medical Laboratories
1724 W. 4th Street
Tempe, Arizona 85281

(1) Arthur Sitelman, M.D.

l. Office of the Medical Examiner
701 W. Jefferson Street
Phoenix, Arizona 85007

(1) Christopher K. Poulos, M.D.

m. ADOC Staff

(1) Tracy Williams, COII
(2) Sgt. T Stalder (3142)
(3) S. Storm, COII (3575)
(4) Chris Bathrick, COII (incident commander)
(5) Ruth Duarte (recorder)
(6) Edwardo Vega (Responder)
(7) Enrique Rodriquez (6833)
(8) Ricardo Vergara (9680)
(9) Angel Correa (9363)
(10) Robert Ortega, Lt.
(11) Lizbeth Garcia, COII (first incident commander)

(12) Enrique Gonzalez, COII (second incident commander)
(13) N. Jones
(14) Luis Mendez, COII (8304)
(15) Guadalupe Medina (recorder)
(16) Ricardo Maravilla
(17) D. Bojorquez, COII

4. Roseanne Mason
Cottonwood, AZ

Ms. Mason is Cora Long's mother. She resides in Cottonwood, Arizona, and is expected to testify regarding her observations of the impact that Nicholas Long's death had on his parents. Ms. Mason will testify that she was very close to her grandson and that before he was incarcerated she would see him frequently, sometimes daily. She still sees Nicholas's brother Dakota regularly.

She is expected to testify that before his incarceration, Nicholas was a very helpful young man who would frequently do chores for her. She observed that he would help not only her but also others. She observed that Nick was very loving, kind, and nurturing to his brother Dakota. She is expected to testify that Nicholas was always ready and willing to help her.

This witness is also expected to testify that she kept in contact with Nicholas during his incarceration through both telephone calls and letters. She also saw him at the hospital. She is expected to testify that she was shocked by how he looked. She will testify regarding her observations of how Cora and Kenneth reacted in seeing their son wasting away.

This witness may testify in the form of opinions based on her perceptions and observations.

5. Any and all healthcare providers may be called to testify as an expert regarding the reasonableness of the medical bills, causation of the injuries, together with the treatment and the prognosis for the injuries.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

6.      Any and all custodians of records as needed to establish foundation for any exhibits.

7.      Any and all witnesses listed by Defendants and supplements.

8.      Any person listed in the Discovery documents of this case including, but not limited to, Interrogatories, Depositions and Response to Requests for Production.

9.      All witnesses listed by the Defendant(s) or Plaintiff(s) even if withdrawn.

*Plaintiffs reserve the right to supplement as discovery continues.*

## IV.   ADDITIONAL PERSONS HAVING RELEVANT INFORMATION

At this time, Plaintiffs are unaware of any persons other than those listed as witnesses, who may have knowledge or information relevant to the Complaint.

*Plaintiffs reserve the right to supplement as discovery continues.*

## V.   PERSONS WHO HAVE GIVEN STATEMENTS

Plaintiffs are unaware of any person, who has given a statement concerning the subject matter of this lawsuit, except as found in the police emergency response and medical provider records.

*Plaintiffs reserve the right to supplement as discovery continues.*

## VI.   EXPERT WITNESSES

~~Plaintiffs have not yet determined the expert witnesses they may call at trial. Plaintiffs will disclose their expert witnesses in accordance with the Court's pretrial schedule.~~  Plaintiffs anticipate that Nicholas Long's treating medical providers may provide opinions based on the records they have reviewed and those they have generated in the course of their respective treatment of Nicholas Long.

Plaintiffs include with this disclosure the declaration of Meyer Solny, M.D., based on his preliminary review of the records. Plaintiff reserves the

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

right to supplement Dr. Solny's affidavit and to provide any additional preliminary declarations after Defendants have disclosed un-redacted records, the contract documents between Defendant State of Arizona and Defendant Corizon, the policies and procedures of Defendant State of Arizona, the policies and procedures of Defendant Corizon, and the results of contract monitoring by Defendants' representatives.

**As of the time of this disclòsure, the depositions of several key Corizon employees have not been taken. These depositions, including the facilities healthcare administrator, medical director, regional employees, and others are necessary for Plaintiff's experts to finalize their opinions. Plaintiff, therefore, reserves the right to supplement and amend the following expert disclosures as discovery continues.**

~~Plaintiffs anticipate that they may retain experts in the following areas: correctional practices; correctional medicine; medical care; mental health care; internal medicine and/or gastroenterology; psychiatry and/or psychology; nursing; pathology; forensic pathology; surgery and/or GI surgery; economic damages; long term acute care.~~

1. Michael Champion, MD
   1253 S. Beretaine Street, Suite 3121
   Honolulu, HI 96814-1822

Dr. Champion is an expert in the delivery of mental health care in correctional settings, including systems for delivery of constitutionally required care in prison. His qualifications to render an opinion are set forth in his CV attached as Exhibit "56." He is expected to testify consistent with his report attached as Exhibit "57."

2. John T. O'Steen, MD
   1155 N. Pinal Parkway Drive
   Florence, AZ 85232

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

The Declaration under Oath of John O'Steen, M.D., dated June 26, 2017, is attached and incorporated. (Exhibit 33).

Dr. O'Steen will testify that he is familiar with the applicable standard of care and is otherwise qualified to render the opinions set forth below.

Dr. O'Steen has been provided with the following documents:

- **ADOC Health Services Records;**
- **Corizon Medical Records;**
- **Yuma Regional Medical Records;**
- **Tempe St. Luke's Medical Records;**
- **Florence Hospital Records;**
- **Mountain Vista Records;**
- **Promise Hospital;**
- **Banner Desert Medical Records;**
- **Maricopa County Autopsy Report;**
- **Hsu, Rebecca, MD – Private Autopsy Report;**
- **ADOC Health Services Technical Manual (013219 - 13802);**
- **Corizon General Health Services P&P (013803-13856);**
- **Correctional Health Care P&P (013567 - 13916);**
- **Plaintiff's Second Supplemental Disclosure Statement;**
- **Deposition Transcript of Zoran Vukcevic, MD;**
- **Deposition Transcript of Robert A. Anderson, DO;**
- **Deposition Transcript of Jawad Riaz, MD;**
- **Deposition Transcript of Christopher Johnson, MD.**

Dr. O'Steen will testify that the care given to Nicholas Long by Corizon Health, and specifically Zoran Vukcevic, M.D., was below the standard of care for a primary care provider practicing in a general practice with incarcerated adults. Dr. O'Steen will further testify that the breaches of the standard of care as set forth in his opinions were a cause of Nicholas Long's death, and that, but for the breaches in the standard of care, Mr. Long would not have died. Dr. O'Steen holds his opinions to a reasonable degree of medical probability.

A brief summary follows. Nicholas Long was admitted to the Arizona Department of Corrections on March 12, 2014. At intake, Nicholas (5'10") was

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

reported to weigh 153 pounds. On March 17, 2014, his weight was recorded to be 160 lbs. At intake, Mr. Long reported a history of Bipolar Disorder that had been previously treated with medication. He also reported stomach issues for which he requested Prilosec (omeprazole).

On June 28, 2014, Mr. Long was seen by a nurse for a chief complaint of 10/10 abdominal pain, intermittent, for one week. The pain was described as sharp.

On October 7, 2014, he submitted a HNR for "really bad" stomach cramping, diarrhea, pain, and inability to sleep.

On October 10, 2014, Mr. Long submitted an HNR with a report of "severe pain" resulting in being placed on the "nurse's line" on October 12, 2014.

Records document bloody stool, inability to urinate, anorexia, diarrhea, weakness, dizziness and vomiting. He described his pain as 9/10 to 10/10. His weight was down 24 pounds since his last assessment. His abdomen was described as tender, hyperactive bowel sounds present, guarding present, with confirmed blood in his stool.

On November 6, 2014 Mr. Long was admitted to Yuma Regional Medical Center for severe colitis, leukocytosis and fever. On November 7, 2014, he was evaluated to be at nutritional risk. Mr. Long was treated with IV antibiotics and fluids. Stool cultures were negative, and his symptoms were reported as resolved after three days. Mr. Long was discharged on November 10, 2014 with diagnoses of unspecified noninfectious gastroenteritis and colitis, dehydration, leukocytosis, and fever, with instructions to continue Levaquin.

Two weeks later, Mr. Long was transferred from ASPC-Yuma to ASPC-Florence. He was admitted to the Infirmary under the care of Zoran Vukcevic,

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

M.D. On admission, he was febrile (T 101.3), tachycardic (P 137), and weighed 115 lbs.

On November 26, 2014, Mr. Long was admitted to Tempe St. Luke's Hospital for severe protein malnutrition, fever, and severe abdominal pain with bloody stool. A CT revealed circumferential large bowel mucosal thickening consistent with infectious or inflammatory colitis, likely ulcerative colitis.

Gastroenterologist Florin Gaidici performed a partial colonoscopy. He stopped the colonoscopy after he discovered severe disease, with a diagnosis of active chronic colitis with ulceration. Dr. Gaidici noted that Mr. Long would "very likely" require a biologic substance due to the severity of his disease but did not feel that he would need surgery with total colectomy.

Mr. Long left Tempe St. Luke's against medical advice. He returned to ADC on November 30, 2014 and was readmitted to the Infirmary.

On December 9, 2014, Mr. Long submitted an HNR for medical care:

> I would like to see the doctor for a check-up and about my med's as soon as possible please.
>
> Thank you.

On December 10, 2014, Mr. Long's medications were changed to Prilosec, Phenergan, and Zantac. His prescription for steroids was discontinued.

On December 12, 2014, Mr. Long was readmitted to Tempe St. Luke's. The admitting assessment was lower GI bleeding related to chronic ulcerative colitis. Discharge instructions included continued medication with mesalamine.

Mr. Long again returned to ASPC-Florence Central Unit Infirmary under Dr. Vukcevic's care. Medication was changed from mesalamine to

Balsalazide. On December 15, 2014, Flagyl was added to Mr. Long's medications. Mr. Long poorly tolerated the balsalazide, reporting that it made him nauseous.

On December 29, 2014, Mr. Long was tachycardic and refusing the balsalazide.

By January 6, 2015, Mr. Long was reporting poor tolerance to mesalamine. As a result, he was receiving no medication for ulcerative colitis. He continued to be tachycardic and febrile.

From January 7 to January 21, 2015, Mr. Long lost another four pounds and weighed just 109 lbs. Throughout this period, he remained weak, cachectic, and tachycardic without significant medical intervention. A nutritional consult was ordered, but there is no indication that one was completed.

On January 23, 2015, Mr. Long was again transferred to Tempe St. Luke's. On admission Dr. Vasiq noted Nicholas' condition and reported that he called the prison medical director to see if there were court orders to treat. He records that he was told there were no court orders for treatment.

Dr. Nadim Zyadeh saw Nicholas for a GI consult at Tempe St. Luke's. Mr. Long was severely malnourished. His labs were abnormal and Dr. Zyadeh assessed him as having:

> 1. Acute abdomen with severe leukocytosis, likely secondary to severe ulcerative colitis flare-up; however, toxic megacolon has to be excluded.
>
> 2. Ulcerative colitis.
>
> 3. Severe protein-calorie malnutrition.

Mr. Long was again returned to the prison infirmary.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

On January 27, 2015, Dr. Jawad Riaz, consulted by telemedicine. The note charts that Mr. Long was in general population and being seen for a routine follow-up exam. Dr. Riaz ordered mirtazpine. Mr. Long was to return to clinic in three months or as needed.

On February 2, 2015, Mr. Long was referred to psychiatrist Robert Anderson, D.O. for a capacity evaluation. Mr. Long was not able to meaningfully participate in then evaluation and was, in fact, emaciated and cachectic with "labs suggestive of a man whose life is in critical danger if supportive medical services are not applied, within the near future." Dr. Anderson concluded that it was "highly questionable" that Mr. Long was even "able to cognitively process information present to him."

Mr. Long was later found to have perforated his colon, likely prior to his transfer to Mountain Vista Medical Center. Mr. Long's perforation in the infirmary resulted in sepsis and went unrecognized while under Dr. Vukcevic's care.

Mr. Long was ultimately admitted to Mountain Vista Medical Center after becoming unresponsive from starvation and dehydration on February 3, 2015. Abdominal surgery revealed severe adhesions and perforations. He had subtotal colectomy and placement of ileostomy.

Mr. Long underwent further procedures at Mountain Vista with gastrostomy tube placement, abdominal lavage, vacuum assisted wound closure, and porcine graft closure of the abdominal wall. Postoperative course was complicated by failure to be weaned from ventilator requiring tracheostomy on February 21, 2015, and by the growth of vancomycin-resistant enterococci in his urine. Mr. Long was eventually discharged to Promise Hospital for continued care on February 24, 2015.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ◆ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

On May 25, 2015, Mr. Long arrived via EMS to Banner Desert Medical Center from Promise Hospital at approximately 9:27 a.m. He was pronounced dead on May 25, 2015 at 10:10 a.m.

The standard of care for a primary care physician practicing in a general practice in a correctional setting requires the primary care physician to advocate for his patient and to pursue all avenues to save his patient's life. The physician must appreciate and understand when a patient such as Mr. Long is dying and to do whatever is necessary to preserve his life. Dr. Vukcevic failed to function as an advocate for Nicholas Long. Dr. Vukcevic failed to pursue available avenues for treatment. Dr. Vukcevic needed to understand that Mr. Long was dying and serve as his advocate.

As a result of Dr. Vukcevic's failures to meet basic standards of care, Nicholas Long was never provided with adequate medical care and the appropriate standard of care for treatment of ulcerative colitis was never met.

Dr. O'Steen will also testify, based on his experience and training, that the position of medical director within correctional healthcare is an important position that requires experience in both supervision and primary care. The medical director is responsible for assuring that the policies and procedures are followed. The medical director is also responsible for being aware of patients with difficult or complex medical conditions.

Based on the records currently available, Dr. O'Steen will testify that that the decision to promote Dr. Johnson to the position of medical director was not reasonable based on Dr. Johnson's lack of experience in medicine and in administration. It was apparent from Dr. Johnson's deposition that Dr. Johnson did not seem to understand the seriousness of Mr. Long's medical condition.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

Dr. Johnson did not adequately supervise the care being provided to Mr. Long. Dr. Johnson should have become actively involved in Mr. Long's care as Mr. Long's condition deteriorated and he became critically ill. Dr. Johnson demonstrated a lack of training, a lack of experience, and a lack of attention to Mr. Long's care.

On January 27, 2015, Jawad Riaz, M.D. saw Nicholas Long via telemedicine for what is described as routine scheduled psychiatric follow-up. Dr, Riaz charts that he discussed the case with Dr. Vukcevic. Dr. Riaz Charts that "Provider believes that IM is attempting to harm himself." Neither Dr. Johnson nor Dr. Vukcevic conveyed the urgency of Mr. Long's condition to Dr. Riaz. It appeared that Dr. Riaz, who saw Mr. Long through telemedicine had a perfunctory appointment with Mr. Long. He did not take an adequate history and spent only a limited time with Mr. Long. The result of the contact was only the prescription of Rimeron and a three-month follow-up, which was inadequate under the situation.

Dr. O'Steen will testify that he reviewed Dr. Vukcevic's deposition transcript. He questions Dr. Vukcevic's statement that Dr. Vukcevic was the only doctor for 10,000 inmates. This statement conflicts with Dr. O'Steen's understanding and familiarity with the Florence Complex. He also questions the statement that there were two thousand inmates in the Central Unit.

Dr. O'Steen disagrees with Dr. Vukcevic that Mr. Long was seen by appropriate behavioral health associates. Mr. Long was not seen by a qualified psychiatrist who was able to diagnose and treat major mental disorders such as bipolar disorder until January 27, 2015 and then only through telemedicine. Mr. Long should have been seen by a psychiatrist when he began to waste away and refuse treatment rather than waiting until he was moribund. Although Dr. Vukcevic apparently agrees that Mr. Long should

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

have been seen by a psychiatrist, this was not followed through on in a timely fashion.

At deposition, Dr. Vukcevic questioned Mr. Long's weight. The medical record documents Mr. Long's weight at 160 lbs. The record also documents drastic weight loss. Progressive weight loss is a manifestation of severe untreated ulcerative colitis and is not, as Dr. Vukcevic testified, extra intestinal in nature. Significant weight loss, wasting, and death are not common in appropriately treated ulcerative colitis.

Dr. O'Steen will testify that Dr. Vukcevic should have paid attention to Mr. Long's intolerance to medicine and tried something else that might have worked. Whether the cause of ulcerative colitis is well understood, there are effective treatments.

Dr. O'Steen will further testify that Dr. Vukcevic clearly did not advocate sufficiently for Mr. Long. This is one of the primary responsibilities of primary care physicians. In this case, Dr. Vukcevic should have more forcefully advocated against the decisions of Corizon that led to the provision of inadequate health care for Mr. Long.

When Mr. Long's body mass index dropped to 15, which Dr. Vukcevic admitted was "his most critical phase," Dr. Vukcevic should have intervened more forcefully.

When the Tempe St Luke's Gastroenterologist stated that Mr. Long did not need prednisone any more he was essentially washing his hands of this young man due to Mr. Long's refusal to follow his recommendations during the first Tempe St. Luke's admit. Mr. Long was clearly improperly treated with prednisone after his release from Tempe St. Luke's and proper administration should have been reinforced rather than stating he did not need it anymore. A second opinion was not even scheduled until well after Mr. Long was found

unresponsive requiring emergency transport to the hospital despite Dr. Vukcevic's own admission that he was wasting away and suffering from severe malnutrition.

Dr. Vukcevic should have had frequent and repeated conversations with Mr. Long, documented in the medical record by the attending physician regarding his worsening medical condition. Mr. Long's understanding of the consequences of his actions should not have been delegated to mental health tech's or nurses. Adequate health care requires both delivery of care and adequate notes in the medical record.

Dr. O'Steen agrees with Dr. Vukcevic that Corizon failed Nicholas Long.

3. Meyer N. Solny, MD, FACG, AGAF
1 East 68th Street
New York, NY 10065-4918

Dr. Solny is an expert in Gastroenterology. His qualifications to render an opinion are set forth in his CV attached as Exhibit "58." Dr. Solny has been provided with the following documents:

- ADOC Health Services Records;
- Corizon Medical Records;
- Yuma Regional Medical Records;
- Tempe St. Luke's Medical Records;
- Florence Hospital Records;
- Mountain Vista Records;
- Promise Hospital;
- Banner Desert Medical Records;
- Maricopa County Autopsy Report;
- Hsu, Rebecca, MD – Private Autopsy Report;
- Complaint (conformed);
- Plaintiff's Initial Disclosure;
- Deposition Transcript of Zoran Vukcevic, MD;
- Deposition Transcript of Robert A. Anderson, DO;
- Deposition Transcript of Jawad Riaz, MD;
- Deposition Transcript of Christopher Johnson, MD.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

Dr. Solny is expected to testify consistent with his report attached as Exhibit "59."

4. Daniel Spitz, MD
   Professor of Pathology
   34051 S. Gratiot, Suite 202
   Clinton Township, MI 48035

Dr. Spitz is an expert in forensic pathology and toxicology. His qualifications to render an opinion are set forth in his CV attached as Exhibit "60." Dr. Spitz has been provided with the following documents:

- **ADOC Health Services Records;**
- **Corizon Medical Records;**
- **Yuma Regional Medical Records;**
- **Tempe St. Luke's Medical Records;**
- **Florence Hospital Records;**
- **Mountain Vista Records;**
- **Promise Hospital;**
- **Banner Desert Medical Records;**
- **Maricopa County Autopsy Report;**
- **Toxicology Report;**
- **Death Certificate;**
- **Plaintiff's 14th Supplemental Disclosure;**
- **Deposition Transcript of Zoran Vukcevic, MD;**
- **Deposition Transcript of Robert A. Anderson, DO;**
- **Deposition Transcript of Jawad Riaz, MD;**
- **Deposition Transcript of Christopher Johnson, MD.;**
- **Medical Chronology.**
- 

Dr. Spitz is expected to testify consistent with his report attached as Exhibit "61."

5. Michelle Berman
   6415 E. Sunnyside Drive
   Scottsdale, AZ 85254

Ms. Berman is an expert in dietitian nutrition. Her qualifications to render an opinion are set forth in her CV attached as Exhibit "62." Ms. Berman has been provided with the following documents:

- **002 – Corizon Medical Records;**
- **004 – Tempe St. Luke's Medical Records;**
- **005 – Florence Hospital Records;**
- **006 - Mountain Vista Records;**
- **Medical Chronology;**
- **Plaintiff's 14th Supplemental Disclosure.**
-

Ms. Berman is expected to testify consistent with her report attached as Exhibit "63."

6. Lori Milus, RN, MSN, BC
6415 E. Sunnyside Drive
Scottsdale, AZ 85254

Ms. Milus is an expert in Nursing. Her qualifications to render an opinion are set forth in her CV attached as Exhibit "64." Ms. Milus has been provided with the following documents:

- **ADOC Health Services Records;**
- **Corizon Medical Records;**
- **Yuma Regional Medical Records;**
- **Tempe St. Luke's Medical Records;**
- **Florence Hospital Records;**
- **Mountain Vista Records;**
- **Promise Hospital;**
- **Banner Desert Medical Records;**
- **Maricopa County Autopsy Report;**
- **Death Certificate;**
- **Plaintiff's 14th Supplemental Disclosure;**
- **Deposition Transcript of Zoran Vukcevic, MD;**
- **Deposition Transcript of Robert A. Anderson, DO;**
- **Deposition Transcript of Jawad Riaz, MD;**
- **Deposition Transcript of Christopher Johnson, MD.;**
- **Medical Chronology.**

Ms. Milus is expected to testify consistent with her Declaration Under Oath attached as Exhibit "65."

*Plaintiffs reserve the right to supplement as discovery continues.*

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

## VII. COURSE OF TREATMENT

### A. Nicholas Long is Admitted to ADC and Housed at ASPC-Yuma from March 18, 2014 through November 10, 2014.

Nicholas Long was admitted to the Arizona Department of Corrections on March 12, 2014, to serve a sentence for selling six prescription pills to a neighbor to pay his cell phone bill. The maximum end date of his sentence was March 13, 2019, but a release date of October 27, 2017 was expected. Nicholas was a minimum custody inmate.

Nicholas was naïve and guileless. His disciplinary tickets in prison were for playing basketball when he was supposed to be working with the grounds crew or refusing to shave. Nicholas was a high school graduate but led a relatively sheltered life with his family in rural Arizona. He depended on and was close to his parents, particularly his mother. Nicholas' father had been incarcerated in California and missed significant time with Nick when he was younger.

At intake, Nicholas (5'10") was noted to weigh 153 lbs. (BMI est. 22), which is considered within the range of normal weight. He reported a history of Bipolar Disorder (a mood disorder) that had been previously treated with medication. He also reported stomach issues for which he requested Prilosec (omeprazole), a medication commonly used for Gastroesophageal Reflux Disease (GERD). Nicholas was transferred from intake to ASPC-Yuma to serve his sentence.

On March 28, 2014, Nicholas submitted a Health Needs Request (HNR) to request Prilosec "for his stomach." A progress note of April 3, 2014 documents Nicholas's weight to be 160 lbs. (BMI 23). Nicholas was assessed as having GERD and a prescription for Prilosec was ordered.

Below is ADC Record in March 17, 2014 noting Nicholas' weight:

| 03/17/2014 | 01:01 AM | | | 5 ft 10 in | 160 lb |
|---|---|---|---|---|---|

*See Corizon Medical Records at 000679.*

On June 28, 2014, Nicholas (at the time 160 lbs.) was seen by a nurse for a chief complaint of 10/10 abdominal pain, intermittent, for one week. The pain was described as sharp. He was tachycardic. The record does not include referral to a provider or any GI work-up.

Nicholas' October 7, 2014 HNR for "really bad" stomach cramping, diarrhea, pain, and inability to sleep, and his October 10, 2014 HNR report of "severe pain" resulted in being placed on the "nurse's line" on October 12, 2014.

Records document bloody stool, inability to urinate, anorexia, diarrhea, weakness, dizziness and vomiting. He described his pain as 9/10 to 10/10. His weight was down 24 pounds (BMI 20) since his last assessment. His abdomen was described as tender, hyperactive bowel sounds present, guarding present, with confirmed blood in his stool. The record does not include referral to a provider or any GI work-up. No CT was performed, and no surgical consult was obtained.

Nicholas' condition deteriorated and on November 6, 2014 he was admitted to Yuma Regional Medical Center (YRMC) for severe colitis, leukocytosis and fever. On November 7, he was evaluated to be at nutritional risk. Nick was treated with IV antibiotics and fluids. Stool cultures were negative, and his symptoms were reported as resolved after three days. Nicholas was discharged on November 10, 2014 with diagnoses of unspecified

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

noninfectious gastroenteritis and colitis, dehydration, leukocytosis, and fever, with instructions to continue Levaquin.

B. Nicholas Long is Transferred to ASPC-Florence, Central Unit on November 25, 2014.

Two weeks after his hospitalization at YRMC, Nicholas was transferred from ASPC-Yuma to ASPC-Florence. *See Corizon Records.* He was admitted to the Infirmary under the care of Zoran Vukcevic, M.D. On admission, he was febrile (T 101.3), tachycardia (P 137), and weighed 115 lbs. *See Tempe St. Luke's 11/26/2014.*

| 11/26/2014 | 05:52 AM | 101.3 F | 137 | 24 | 5 ft 10 in | 115 lb |
|---|---|---|---|---|---|---|

On November 26, 2014, Nicholas was admitted to Tempe St. Luke's Hospital for severe protein malnutrition, fever, and severe abdominal pain with bloody stool. A CT revealed circumferential large bowel mucosal thickening consistent with infectious or inflammatory colitis, likely ulcerative colitis.

Gastroenterologist Florin Gaidici performed a partial colonoscopy. He stopped the colonoscopy after he discovered severe disease. He did not continue with the procedure out of fear that he would perforate Nicholas' colon. He was, however, able to make the diagnosis of active chronic colitis with ulceration. Dr. Gaidici concluded that Nicholas would "very likely" require a biologic[1] substance due to the severity of his disease but didn't feel that Nicholas would need surgery with total colectomy.

---

1 The term "biologics" refer to medications such as Humira, which can be prescribed for ulcerative colitis.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ◆ Fax: (602) 265-0267

Nicholas was reported to having signed out against medical advice, apparently because he was unable to eat. There's no record of a mental health consult or contact with Nicholas's family. Nick returned to ADC on November 30, 2014 and was readmitted to the Infirmary. Nicholas was quoted as saying:

> "I could not tolerate diet in the hospital, I did not need another colonoscopy, as I know my diagnosis."

Nick remained in the infirmary. On December 9, 2014, Nicholas submitted an HNR for medical care:

> I would like to see the doctor for a check-up and about my med's as soon as possible please.
> Thank you.

On December 10, 2014, Nicholas' medications were changed to Prilosec, Phenergan, and Zantac. Nick's prior prescription for steroids was discontinued.

On December 12, 2014, Nicholas was readmitted to Tempe St. Luke's. *See Tempe St. Luke's Records.* Dr. Muhammad Vasiq, Corizon's representative at the hospital, was the admitting and attending physician. The admitting assessment was lower GI bleeding related to chronic ulcerative colitis. Discharge instructions included continued medication with mesalamine (5-ASA). Id.

Nicholas again returned to ASPC-Florence Central Unit Infirmary under Dr. Vukcevic's care. Medication was changed from mesalamine to Balsalazide. On December 15, 2014, Flagyl was added to Nick's mediations. Nick poorly tolerated the balsalazide, reporting that it made him nauseous.

On December 29, 2014, Nicholas was tachycardiac and refusing the balsalazide. By January 6, 2015, Nicholas was reporting poor tolerance to mesalamine. As a result, he was receiving no medication for ulcerative colitis.

He continued to be tachycardiac and febrile. Labs were ordered with abnormal values for hematocrit (below lower panic level), hemoglobin (below lower panic level), and red blood cells (below lower panic level). MCH, MCHC, Absolute Neutrophil CT, GPLT, RDW, and White Blood Count were also abnormal. Nicholas is described as cachectic.

Nicholas' condition continued to deteriorate on return to the prison. Although he was in the "infirmary," little was done to address the ulcerative colitis disease process. At one point, Dr. Vukcevic apparently sought authority to send Nicholas out to Maryvale Hospital for a GI consult, but Corizon only authorized a "routine" consultation resulting in a planned appointment in mid-February. From January 7 to January 21, Nicholas lost another four pounds and weighed just 109 lbs. (BMI 11.4). Throughout this period, Nicholas remained weak, cachectic, and tachycardic without significant medical intervention. A nutritional consult was ordered, but there is no indication that one was completed.

Nicholas' deterioration would be obvious to a lay person. His 5' 10" frame had reduced by 50% He was described as weak and cachectic (physical wasting and loss of muscle mass). He needed help to walk.

Medically, the objective evidence that Nicholas was critical was undeniable:

| VITAL SIGNS | | | | | |
|---|---|---|---|---|---|
| DATE | TEMP | PULSE | RESP | BP | BMI charted |
| 3/12/2014 | 99 | 66 | 18 | 124/67 | [22] [est.] |
| 11/26/2014 | 101.3 | 137 | 24 | 112/56 | 16.5 |
| 1/7/2015 | 99.3 | 128 | 18 | 106/66 | 16.2 |

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

| | | | | | |
|---|---|---|---|---|---|
| 1/8/2015 | 94.8 | 133 | 20 | 138/100 | 15.8 |
| 1/19/2015 | 97.2 | 127 | 20 | 116/76 | 15.8 |
| 1/23/2015 | 97.5 | 130 | 16 | 122/60 | 15.1 |
| | | | | *Percentage Change in BMI* | *-31%* |

MSSS031B

## Lab Test Order/Procedure

Friday May 25, 2015 10:41:01 AM

Ordered Date: 01/21/2015 Time: 11:00:00 AM
Encounter Type: Lab Test (Unsolicited)
Location: ASPC-F CENTRAL/U MED [A23] Staff: Vukcevic, Zoran, MD
Ordering Practitioner:

| | | | | | |
|---|---|---|---|---|---|
| POTASSIUM, SERUM | 4.9 | MEQ/L | Normal | 3.5-5.1 | Final Results |
| SODIUM, SERUM | 128 | MEQ/L | Below Low Normal | 136-145 | Final Results |

**Lab Test Results**

| Observation Code | Result | Unit | Abnormal Flag | Reference | Result Status |
|---|---|---|---|---|---|
| BUN-BLOOD, UREA, NITROGEN SERUM | 16 | MG/DL | Normal | 7-18 | Final Results |
| CHLORIDE, SERUM | 94 | MEQ/L | Below Low Normal | 98-107 | Final Results |
| CARBON DIOXIDE (CO2) | 28 | MEQ/L | Normal | 22-33 | Final Results |
| CREATININE, TOTAL-SERUM | 0.24 | MG/DL | Below Lower Panic Levels | 0.7-1.3 | Final Results |
| GFR (NON-AFRICAN AMERICAN) | 520 | mL/MIN | HH | 50-300 | Final Results |
| GFR (AFRICAN AMERICAN) | 631 | mL/MIN | HH | 50 300 | Final Results |
| GGLU | 59 | MG/DL | Below Low Normal | 70-105 | Final Results |

On January 23, 2015, Nicholas was again transferred to Tempe St. Luke's. *See Exhibit 4 – Tempe St. Luke's Records.* On admission Dr. Vasiq noted Nicholas' condition and reported that he called the prison medical

director to see if there were court orders to treat. He records that he was told there were no court orders for treatment.

> IMPRESSION:
> 1. Abdominal pain with likely ulcerative colitis exacerbation.
> 2. Extreme cachexia with severe protein-calorie malnutrition.
>
> PLAN: We were admitting the patient to the hospital including the GI evaluation. GI is here to see the patient. We ordered the TPN, PICC line placement, CT of the abdomen and pelvis, and initiated the further workup, but the patient is not willing to stay in the hospital and wants to leave against the medical advice. I personally called and spoke to the prison medical director to see if they have any court orders to hold him in the hospital to try to feed him because he is extremely cachectic and he is still refusing to eat, but the prison authorities does not have any court orders, hence we cannot hold him against his wishes. He will be discharged back to the prison with a continuous watch under the Department of Corrections' medical services and further management as an outpatient.

Dr. Nadim Zyadeh saw Nicholas for a GI consult. Nicholas was severely malnourished. His labs were abnormal and Dr. Zyadeh assessed him as having:

> 1.    Acute abdomen with severe leukocytosis, likely secondary to severe ulcerative colitis flare-up; however, toxic megacolon has to be excluded.
>
> 2.    Ulcerative colitis.
>
> 3.    Severe protein-calorie malnutrition.

Nicholas was again returned to the prison infirmary. His physical condition continued to deteriorate. On February 2, 2015, psychiatrist Robert Anderson was told to see Nicholas. Dr. Anderson had been given limited information and told to see Nicholas for a capacity evaluation. *See Depo. of Robert Anderson, D.O. (9/8/2017) 46:25 to 47:16.* He was "absolutely" shocked when he saw that Nicholas was emaciated and cachectic. *Id.* Nicholas was not able to meaningfully participate in a capacity evaluation and was, in fact, emaciated and cachectic with "labs suggestive of a man whose life is in critical

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

danger if supportive medical services are not applied, within the near future." Dr. Anderson concluded that it was "highly questionable" that Nicholas was even "able to cognitively process information present to him."

Nicholas was ultimately admitted to Mountain Vista Medical Center after becoming unresponsive from starvation and dehydration on February 3, 2015. *See Florence Hospital & Mountain Vista Hospital.* Abdominal surgery revealed severe adhesions and perforations. He had subtotal colectomy, placement of ileostomy, enterorrhaphy and lysis of adhesions.

Nicholas underwent further procedures at Mountain Vista with gastrostomy tube placement, abdominal lavage, vacuum assisted wound closure, and porcine graft closure of the abdominal wall. Postoperative course was complicated by failure to be weaned from ventilator requiring tracheostomy on February 21, 2015, and by the growth of vancomycin-resistant enterococci from his urine. Nicholas was eventually discharged to Promise Hospital for continued care on February 24, 2015. *See Promise Hospital Records.*

On May 25, 2015, Nicholas arrived via EMS to Banner Desert Medical Center from Promise Hospital at approximately 9:27 a.m. *See Banner Hospital Records.* On arrival Nicholas is completely unresponsive.

> **History of Present Illness**
> The patient presents in respiratory arrest. This is a 21 y/o male who was transferred to the ED from outside facility after being found in respiratory arrest and hypoxia. Per EMS, pt began c/o SOB last night and was being given breathing treatments. EMS state that pt went into respiratory arrest today , became hypoxic, multiple intubation attempts in the care facility were not successful. Pt has hx of tracheotomy secondary to respiratory arrest , but I'm not able to obtain any further information in terms of patient's medical history otherwise this time .Tracheotomy was removed 6 weeks ago and per case staff, pt has been immobile and refusing anticoagulation. Per carestaff, pt was dx with IV line sepsis yesterday. Pt arrives to ED with LMA in place. Patient apparently had an abdominal surgery, but I do not have any details of what surgery that was and why he had it.. The onset was just prior to arrival. Witnessed arrest unknown. Pre-arrival Treatment Oxygen intubated (unsuccessful). Preceding symptoms shortness of breath.
>
> **Review of Systems**
> **Additional review of systems information:** Unable to obtain due to: Clinical condition.

Complications ultimately led to Nicholas's death on May 25, 2015 at 10:10 a.m.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

## VIII. INJURIES & DAMAGES ~~AND TREATMENT~~

This claim is brought pursuant to A.R.S. § 12-611, which provides:

> When death of a person is caused by wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action to recover damages in respect thereof, then, and in every such case, the person who or the corporation which would have been liable if death had not ensued shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death was caused under such circumstances as amount in law to murder in the first or second degree or manslaughter.

**A.R.S. § 12-611.**

The measure of damages is found in A.R.S. § 12-613:

> In an action for wrongful death, the jury shall give such damages as it deems fair and just with reference to the injury resulting from the death to the surviving parties who may be entitled to recover, and also having regard to the mitigating or aggravating circumstances attending the wrongful act, neglect or default. The amount recovered in such action shall not be subject to debts or liabilities of the deceased, unless the action is brought on behalf of the decedent's estate.

**A.R.S. § 12-613**.

Damages include the loss of love, affection, comfort, guidance and companionship that the statutory beneficiaries of Nicholas would have received from their son but for his wrongful death. Nicholas is survived by two statutory beneficiaries: his mother, Cora Long, and his father, Kenneth Long. They demonstrated their love for Nicholas with visits to the prison and frequent letters and calls. They fully planned to greet Nicholas at the gates of the prison with open arms to take him home. Kenneth counted on his son

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

coming back home to help care for him. Cora just wanted her son home safe and in good health. Instead, the State's conduct has forever deprived Nicholas' parents' right to watch and further participate in their child's future.

Nicholas's death followed months of agonizing suffering. He presented with a serious medical need to which providers were deliberately indifferent. Nicholas Long suffered serious, painful injuries from the lack of treatment.

For the wrongful death of Nicholas Long, Plaintiffs, Kenneth and Cora Long, as Statutory Beneficiaries are entitled to compensation for 1) the loss of love, affection, companionship, care, protection, and guidance since the death of their son and in the future. Nicholas was a loving, giving person. Anyone who had the pleasure to know him loved him. Nicholas comes from a very close family; 2) the pain, grief, sorrow, anguish, stress, shock, and mental suffering already experienced and reasonably probable to be experienced in the future. Mr. and Mrs. Long still suffers from great sorrow, pain and anguish from the loss of their son; and 3) for exemplary damages to the extent permitted by law.

*Plaintiffs reserve the right to supplement as discovery continues.*

## ~~VIII~~IX. EXHIBITS TO BE USED AT TRIAL

At this time, Plaintiffs have not made a final decision concerning exhibits to be used at trial. Plaintiffs reserve the right to use the following exhibits:

1. ADC Health Unit Records (000001-1818);
2. Corizon Medical Records (2014-03-19 thru 2015-01-29) (001819-3099);
3. Yuma Regional Medical Records (DOS 11-6-2014- THRU 11-10-2014) (003100-3310);

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

4. Tempe St. Luke's Hospital (11-26-2014 thru 11-30-2014 & 12-11-14 thru 12-14-14 & 1-23-15 thru 1-24-15) (003311-3910);

5. Florence Hospital Records (DOS 2-2-2015) (003911-3972);

6. Mountain Vista Records (DOS 2-3-2015 thru 2-24-2015 AND 3-6-2015 thru 3-11-15) (003973-8780);

7. Promise Hospital Medical Record (DOS 2-24-2015 thru 3-6-2015 AND 3-11-2015 thru 5-25-2015) (008781-10379);

8. Banner Desert Records (DOS 5-25-2015) (010380-10440); a. 008a - Affidavit of Provider - Banner Desert Medical Center (010441-10456);

9. Maricopa County Autopsy Report (5-30-2015) (010451-10465);

10. Medical Examiner Photographs GRAPHIC (010466-10502);

11. Death Certificate with Cause of Death (Registered 6-13-2015) (010503);

12. Yavapai County Intake-Medical Screening Record (1st offense - theft - probation) (8-27-2012) (010504-10556);

13. Yavapai County Presentence report (sale of narcotics on probation) (2-25-2014) (010557-10589);

14. Yavapai County Records (010590-10706);

15. ADC Inmate Files (010707-10800);

16. ADC Investigation Report (010801-10882);

17. Affidavit for Collection of Personal Property (6-5-2015) (10883);

18. ADOC Records re Public Records Request (10884-10947);

19. ADOC Policies: 1101- Inmate Access to Healthcare (10948-10978);

20. Affidavit of Meyer Solny, MD (10979-10982) (originally sent on a USB flash drive) resending hard copy;

21. HS Diploma (Nicholas C. Long) (10983);

22. Certificate of Completion Prison Literacy Program (10984);

23. Nicholas Journal Notes (10985-10998);

24. Cora Long Notes in Notebook re Nicholas (10999-11006);

25. Hampton Funeral Cremation Billing Statement (11007);

26. Morgue Photo of Nicholas (11008);

27. ADOC Medical Records (disclosed by defendants) (0011009-13218);

28. ADOC Health Services Technical Manual (previously disclosed by defendants) (013219-13802);

29. Corizon General Health Services P&P (previously disclosed by defendants) (013803-13856);

30. Correctional Health Care P&P (previously disclosed by defendants) (013567-13916);

31. Family Photographs (013917-13924);

32. CV - John T. O'Steen, M.D. (13925-13927);

33. Declaration Under Oath of John O'Steen, M.D. (13928-12935);

34. Letters to Nicholas Long (13936-14012); 034b - Photographs sent with letters (14013-14024);

35. Letters from Nicholas (14025-14027);

36. Inmate Informal Complaint & Response 11-14-2015 (14028-14029);

37. Health Needs Requests (HNR) & Visitation Requests (14030-14040);

38. Food Options - Commissary (Nicholas Long) (14041-14054);

39. Commissary (food) Nicholas Long (14055-14075);

40. ADOC Health Services Technical Manual (Disclosed by Defendants) (14076-14659);

41. Corizon General Health Services P&Ps (Disclosed by Defendants) (14660-14713);

42. Correctional Health Care P&P (Disclosed by Defendants) (14714-14773);

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

43. ADC Department Order 1101 (014774-14800);

**44.** Device Recovery – USB Flash Drive (14801) - (Response to Discovery); **044a – Transcription: Long Nicholas_821740-multiples-0912-Longnicholas_20170919 (15634-15650); 044b - Transcription: Long Nicholas_821766-0912-nurse-Long Nicholas_20170919 (15651-15659); 044c - Transcription: Long Nicholas_821767-0912-mountanvistahospital-Long Nicholas_20170919 (15660-15666); 044d - Transcribed calls disclosed by defendants (15691-16260);**

45. Maricopa Correctional Health Services Response to Subpoena Duces Tecum (014802-14904);

46. Mental Health Technical Manual 2011 (Defendant's Discovery Responses) (015081-15177);

47. 2015 NETs Manual (Defendant's Discovery Responses) (015178-15220);

48. 2015 Prison General Health Services Policies and Procedures (Defendant's Discovery Responses) (015221-15396);

49. 2015 Utilization Management Manual (Defendant's Discovery Responses) (015397-15414)

50. Behavioral Health Onboarding Manual (Defendant's Discovery Responses) (015415-15507);

51. Corizon Health Provider Onboarding Manual - Phase I (Defendant's Discovery Responses) (015508-15576);

52. Corizon Health Provider Onboarding Manual - Phase II (Prisons) (Defendant's Discovery Responses) (015577-15631);

53. Corizon Correctional Healthcare – About Corizon Health (015632-15633);

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

**54. ADC Department Order 1103 Inmate Mental Health (015667-15690);**

**55. Declaration of Todd R. Wilcox (Case 2:12-cv-00601-DKD), Document 1539, filed 04/11/2016 (016261-16322);**

**56. Champion, Michael-CV (1-18) (016323-16333);**

**57. Champion, Michael - Preliminary Expert Report (016334-16342);**

**58. Solny, Meyer - CV - 01-16 (016343-16344);**

**59. Solny, Meyer - Expert Report (016345-16347);**

**60. Spitz, Daniel - CV2018 (016348-16366);**

**61. Spitz, Daniel – Expert Report (16367-16373);**

**62. Berman, Michelle – CV (016374-16375);**

**63. Berman, Michelle - Expert Report (016376-16383);**

**64. Milus, Lori – CV (016384-16386);**

**65. Milus, Lori – Expert Report (016387-16398);**

66. Any collateral source documents;

67. All deposition transcripts and attached exhibits;

68. All disclosure statements, including exhibits, and discovery responses from all parties;

69. All Requests for Admissions from all parties;

70. Any information material from subsequent discovery proceedings;

71. All contents of files of all expert witnesses;

72. Curriculum Vitae for all expert witnesses;

73. Any and all exhibits listed by other parties whether withdrawn and/or delisted by said party;

74. Anatomical models, diagrams and drawings as appropriate;

75. Blow-ups and demonstrative exhibit boards;

76. Any and all exhibits listed by any other party.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

*Plaintiffs reserve the right to supplement as discovery continues.*

## IX. ADDITIONAL DOCUMENTS AND INSURANCE INFORMATION

1. ADOC Inmate File – REDACTED (disclosed by defense). The entire medical file is redacted and Plaintiffs believe the un-redacted version contains materials that may be relevant to the Complaint (010715-10808).

2. Parsons v. Ryan materials. Plaintiff is informed and believes that Nicholas Long's death may have been subject to review as part of the litigation over the adequacy of health care provided to inmates within the Arizona prison system. These materials are relevant to Plaintiff's claims.

3. Plaintiffs incorporate the attached Nicholas Long - Medical Chronology). (Corrected bates sequence 014905-15080)

4. **Plaintiff is informed and believes that Defendant State of Arizona and Defendant Corizon have non-privileged, regular periodic/monthly reviews by the State of Arizona contract monitors of ASPC-Florence medical and mental health care, including CGAR's and CAP's.**

Other than those documents listed as exhibits by either side and mentioned above, Plaintiffs are unaware of other materials that may be relevant to the Complaint or reasonably calculated to lead to the discovery of admissible evidence.

*Plaintiffs reserve the right to supplement as discovery continues.*

**RESPECTFULLY SUBMITTED**: February 8, 2018

ROBBINS & CURTIN, p.l.l.c.

By: Anne E. Findling
Joel B. Robbins
Anne E. Findling
*Attorneys for Plaintiffs*

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

**CERTIFICATE OF SERVICE**

I hereby certify that on February 8, 2018, a copy of the foregoing has been served by U.S. mail on counsel for all parties, as designated below:

Anthony J. Fernandez
Vincent J. Montell
QUINTAIROS, PREIETO, WOOD & BOYER, P.A.
2390 E. Camelback Road, Suite 440
Phoenix, Arizona 85016
E: afernandez@qpwblaw.com
E: vmontell@qpwblaw.com
*Attorneys for Defendants, State of Arizona & Corizon*

Krista Carman
CARMAN LAW FIRM
246 S. Cortez Street
Prescott, AZ 86303
E: kcarman@carmanlf.com
*Co-Counsel for Plaintiffs*

By: ______________________
Kimberly M. Gonzalez

# EXHIBIT 2

Anthony J. Fernandez (Bar No. 018342)
Vincent J. Montell (Bar No. 014236)
**QUINTAIROS, PRIETO, WOOD & BOYER, P.A.**
2390 E. Camelback Road, Suite 440
Phoenix, Arizona 85016
Telephone: (602) 954-5605
Facsimile: (602) 954-5606
afernandez@qpwblaw.com
vmontell@qpwblaw.com
Attorneys for Defendants

RECEIVED
OCT 27 2016
ROBBINS & CURTIN

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| KENNETH and CORA LONG, Husband and wife, individually, and as statutory beneficiaries for Nicholas Long, deceased; and on behalf of the estate of NICHOLAS LONG,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF ARIZONA, a body politic, CORIZON HEALTH, INC., a Missouri corporation, doing business in the State of Arizona<br><br>Defendants. | Case No. CV2016-007692<br><br>**DEFENDANTS' INITIAL RULE 26.1 DISCLOSURE STATEMENT**<br><br>(Assigned to the Honorable Jo Lynn Gentry) |

Defendants Corizon Health, Inc. and the State of Arizona (hereinafter collectively referred to as "Defendants"), hereby submit their **Initial Rule 26.1 Disclosure Statement**.

Further investigation and discovery may bring to light additional information which may have a bearing on Defendants' theories of defense. Accordingly, this disclosure statement is not intended to represent Defendants' complete defense of the case, but is merely a preliminary disclosure statement until further information is obtained regarding the specific claims against Defendants. This provisional disclosure is subject to supplementation, amendment, change and amplification.

B. **Defendants**

   i.   State of Arizona
        c/o Vincent J. Montell and Anthony Fernandez
        Quintairos, Prieto, Wood & Boyer, P.A.
        2390 East Camelback Road, Suite 440
        Phoenix, Arizona  85016

The State of Arizona is a Defendant in this matter. It is anticipated the employees, representatives, and/or agents of the State will testify regarding their understanding of the facts and circumstances alleged in Plaintiffs' Complaint and the provision of healthcare services to inmates. It is anticipated that they will testify consistently with any documents produced and/or authored by the state, as well as any depositions, if taken. (Disclosed in Defendants' Initial Disclosure Statement)

   ii.   Corizon Health, Inc.
        c/o Vincent J. Montell and Anthony Fernandez
        Quintairos, Prieto, Wood & Boyer, P.A.
        2390 East Camelback Road, Suite 440
        Phoenix, Arizona  85016

Corizon Health, Inc. is a Defendant in this matter. One or more of its agents, employees and/or records custodians, known or unknown, may have knowledge about the care and treatment of Decedent.  It is anticipated that each will testify regarding his/her care and treatment, and any opinions that may have been formulated during his/her examination and the basis for those opinions.  It is anticipated that staff will testify consistent with the Corizon medical records, and with any reports, and deposition, if taken. The following is a non-exhaustive list of individuals who provided care and treatment to Decedent:

     a.     Dorene Acuna, RN
     b.     Jessica Aguilera
     c.     Yolanda Alvarez
     d.     Jennifer Anderson
     e.     Robert Anderson, DO
     f.     Julianna Anuma
     g.     Patrick Arnold
     h.     Patsi Aviles
     i.     Karen Barcklay, MD
     j.     B. Barnett, RN
     k.     Darcee Bishop
     l.     Peter Bishop, DO
     m.     Felix Breon
     n.     Christine Brewer, RN
     o.     Ramon Buenanueva, RN
     p.     Jacklyn Busby,
     q.     Gregory Campbell, RN
     r.     Janice Cruz
     s.     Philip Daou
     t.     David Doench, RN
     u.     Alyssa Evans
     v.     Mark Faust, PA-C
     w.     Suzanne Feeley, RN
     x.     Stacey Fenwick
     y.     Monica Flores, RN

z. Amanda Frable, LPN
aa. Cherie Noelle Getts, RN
bb. Andrea Hamilton, CRN
cc. Julie Hampton, BSN
dd. Barbara Hansen, RN
ee. Jason Hoffman, MH Tech
ff. Christopher Johnson, DO
gg. Sarah Johnson
hh. Valerie Jones, RN
ii. Elijah Jordan, MD
jj. Jennifer Kessler, RN
kk. Michael King, Mental Health
ll. Amy Kriser, RN
mm. James Lines, Dentist
nn. Crystal Mamon
oo. Nicole Maranzano, NP
pp. Deborah McGarry, NP
qq. Dr. McQueen
rr. Jennifer Miller, RN
ss. Yelena Miller
tt. Ximena Montes
uu. Maria Mulhern, NP
vv. Nicole Newman, Psych
ww. Eva Olszewski, RN
xx. Stephanie Oplinger, RN
yy. O. Osinloye, NP
zz. Allison Poe
aaa. Matthews Puthuppally, RN
bbb. Kyra Quinones
ccc. R. Rae--, LPN
ddd. Maribel Rangel, LPN
eee. Jawad Riaz, Psychiatrist
fff. Amy Ripley, RN
ggg. Cynthia Ripsin, MD
hhh. Jessica Robertson, RN
iii. Pamela Roos, RN
jjj. Mahlon Roun, Psychology Associate
kkk. Lauri Sanders, RN
lll. Gregory Schumacher, LPN
mmm. Spencer Sego, LPN
nnn. Ben Shaw, Mental Health Director
ooo. Erica Smith, RN
ppp. Tabetha Smith, RN
qqq. Lisa Somerton
rrr. Rebekah Sorter
sss. Daniel B. Starks, RN
ttt. Theresa Starling, RN
uuu. C. Taylor, RN
vvv. Carol Taylor, CAN
www. Etta Thurman, MRL II
xxx. Jakelin Valladares
yyy. Jesus Vasquez, Lead Psych Associate
zzz. Stacy Vineyard, RN
aaaa. Marie Volcy
bbbb. Zoran Vukcevic, MD

cccc. Carly Walker, RN
dddd. Margarita Wellman, RN
eeee. Laurie Wharem, LPN
ffff. Natoyah Wooten, CNA

(Disclosed in Defendants' Initial Disclosure Statement)

**C. Medical Providers**

One or more agents, employees and/or records custodians of the entities and providers listed below, including those listed and those unknown, may have knowledge about the care and treatment of Decedent. It is anticipated that each will testify regarding his/her care, services and treatment and any opinions that may have been formulated during his/her examination and the basis for those opinions. It is anticipated that each will testify consistent with his/her medical records, reports, and deposition, if taken. (Disclosed in Defendants' Initial Disclosure Statement)

i. AZ-Tech Radiology
Casa Grande, Arizona

ii. Banner Desert Medical Center
1400 S. Dobson Rd.
Mesa, AZ 85202
a. Svetlana Reznikova-Steinway, MD
b. Robert Thomas, MD

iii. Garcia Laboratories
2195 Spring Arbor Rd.
Jackson, MI 49203

iv. Mountain Vista Medical Center
1301 S. Crismon Rd.
Mesa, AZ 85209

v. Office of the Medical Examiner
701 W. Jefferson St.
Phoenix, AZ 85007
a. Christopher K. Poulos, MD, Medical Examiner
b. Norman Wade, Laboratory Director

vi. Pacific Mobile Diagnostics, Inc.
615 E. Palo Verde Dr.
Phoenix, AZ 85012

vii. Promise Hospital
433 E. 6th St.
Mesa, Arizona 85203
a. Muhammad Alam, MD
b. Tochukwu Samuel Nwafor, MD

viii. Tempe St. Luke's Hospital
1500 S. Mill Ave.
Tempe, AZ 85281

**PRODUCTION IS NOT MADE, THE NAME AND ADDRESS OF THE CUSTODIAN OF DOCUMENTS SHALL BE INDICATED.**

See section VII above.

DATED this 24th day of October, 2016.

QUINTAIROS, PRIETO, WOOD & BOYER, P.A.

By: ______________________________
Anthony J. Fernandez
Vincent J. Montell
Attorneys for Defendants

**COPY** of the foregoing mailed
This 24th day of October, 2016, to:

Joel B. Robbins
Anne E. Findling
ROBBINS & CURTIN, PLLC
301 E. Bethany Home Road, Suite B100
Phoenix, AZ 85012-0001
*Attorneys for Plaintiffs*

Krista Carman
WARNOCK, MACKINLAY & CARMAN, PLLC
246 S. Cortez Street
Prescott, AZ 86303
*Attorneys for Plaintiffs*

By: ______________

**EXHIBIT 3**

# Transcript of the Testimony of **Christopher Johnson, MD**

**Date:** December 20, 2017

**Case:** Long v. State of Arizona

PREPARED BY:

**Herder & Associates, Inc.**

**1 East Washington Street**

**Suite 500**

**Phoenix, Az 85004**

480-481-0649

www.CourtReportersAz.com

wanted to ask the judge, tell me what -- is there documentation of your chart reviews that -- of the chart reviews you conducted for Dr. Vukcevic?
A. Yes.
Q. What is the nature of the documentation? Did you write a report? Did you sign off on the chart? What would the documentation look like?
A. It was about a four-page form that's filled out, and then the corroborating notes that I was reviewing would have been attached to it as well. So it's kind of a synopsis, almost a statistical report, like how many had a chronic care or a chief condition listed, how many had the appropriate benchmarks, whether they were satisfied or not.
Generally there is 10 reviews or 10 charts reviewed for each different category. So if it was a yard provider, it would be that type of thing, or a chronic care visit versus a scheduled visit. They would get looked at a little bit differently with different benchmarks for each one. Then the IPC notes have a different standard or criteria as well.
Q. How frequently would you be conducting that?
A. Annually.
Q. So for Dr. Vukcevic, did you do that review process twice?

A. I don't recall how many times.
Q. Was it on a staggered basis that you would do the provider reviews?
A. You mean the charts I would review?
Q. Yes.
A. It would be random. I would look at a few from each month, yeah.
Q. Did you have a requirement as to completing them on an anniversary date or a particular date?
A. Yes.
Q. An anniversary date?
A. Yes.
Q. Did Dr. Vukcevic ever express to you concerns with the available provider resources for IPC?
MS. STANTON: Again, outside of the peer review context.
A. I would have to say in conversation?
BY MS. FINDLING:
Q. Yes.
A. Not formally. But yeah, in conversation, yeah, we were always -- feel like we were shorthanded, yes.
Q. In January of 2015, or in that time frame, did Dr. Vukcevic approach you with a specific concern about his ability to deliver the health care he was required to deliver?

A. Not that I recall. Actually, I should say I don't recall. To say not means he didn't. I don't know. I don't recall.
Q. In preparing for your deposition, you reviewed some documents?
A. Yes.
Q. Did you bring those documents with you?
A. No.
Q. Did you review them electronically or were you provided paper copies?
A. It was sent to me electronically and I printed them.
Q. And what was -- you didn't bring them with you?
A. I was not asked to. I'm sorry.
Q. What were you sent?
A. It was copies of verbal orders. There were like four or five documents mostly involving any of my orders with Mr. Long.
Q. Do you have the ability to produce what you were given?
A. Yeah.
Q. If asked?
A. I printed them out, yeah.
(Exhibit No. 9 marked for identification.)

BY MS. FINDLING:
Q. I'm going to hand you Exhibit Number 9. Exhibit Number 9 is a selection of records, to the best of what we could do from our end of records, where it appears that you were either mentioned or participated in some way in Mr. Long's care.
If you want to take a minute -- if you want to take a minute to take a look at it.
I think that what you're looking at is duplicates.
A. Yeah. I was going to say, I'm looking at duplicates.
Q. So the issue is that we did not get the same format for medical records. We have several different formats of the medical records.
A. Okay. Some of these are the same thing that I was sent and asked to review.
Q. Okay.
A. The duplicates throw me off.
Q. Imagine what it's like from our end.
A. I know.
Q. What I noticed is that the field can change, depending on the print date.
A. Yeah, or the number of pages. You go from six or seven to eight. That's a copy of something I read,

Page 93

Q. I didn't get this on the record earlier, the IPCs are Florence Central unit. Correct?
A. Yes.
Q. Tucson. Correct?
A. Tucson.
Q. And then Phoenix, Alhambra or --
A. Lewis.
Q. Lewis?
A. There is actually a women's -- sorry. I don't think of Perryville.
Q. Perryville.
A. I don't do women's. So like Perryville is a fourth. They have a small infirmary there as well.
MS. FINDLING: Okay. Let's take our break. Do you want to do a half hour or do you want to do an hour? It's up to you.
(Off record at 1:19 p.m.)
(On record at 1:50 p.m.)
MS. FINDLING: Earlier you claimed peer review privilege on some questions. And just so we have the record, since there is no common law peer review privilege, are you asserting a statutory privilege? If you don't have the statute cite, can you send it over to me?
MS. STANTON: Yes.

Page 94

MS. FINDLING: Thank you.
BY MS. FINDLING:
Q. I want to talk to you about the exhibit that's been marked as Exhibit 9. It's kind of where we're going to start right now, which I think is what you have.
A. On top.
Q. So you told me earlier in the deposition that as you sit here today, you do have some recollections about Nicholas Long. Correct? Or at least about his case. Is that correct?
A. Yes.
Q. How do you have recollection about Nicholas Long's case as you sit here today? What is it based on?
A. Through the mortality review, and then through reviewing the notes that she asked me to take a look at. Evidently I was called as the on-call provider for some orders, so I have some vague recollections from that as well.
Q. And I asked you this earlier again, but since we are talking specifically about Nicolas, you don't recall any conversations you had about Nicolas before he transferred to ASPC Florence. Is that correct?
A. Correct.
Q. When did you first become aware that Nicolas was

Page 95

a patient at ASPC Florence?
A. I have no idea.
Q. Apart from the medical record, would there be any other record that would show when you first became aware of this patient?
A. Possibly an email.
Q. What is the email address that would have been used in order to contact you with respect to this patient?
A. Chrisjohnson@corizon.com.
Q. And is it -- are there any underscores?
A. I think it's Chris.johnson, yeah.
Q. Chris.Johnson@ --
A. Corizon.com.
Q. Do you still have that email address?
A. It's Presenthealth.com.
Q. Do you still have that email address?
A. Yes.
Q. I also asked you this earlier, but I want to make sure it's clear on the record. You have -- you never saw Mr. Long. Correct?
A. In person, I don't believe so.
Q. Were you the physician, though, that was ultimately responsible for Nicholas Long's care?
MS. STANTON: Form, foundation.

Page 96

A. I'm -- don't understand.
BY MS. FINDLING:
Q. Based on your understanding of your position as site medical director and the way that Corizon works and how responsibility is allocated, were you the physician who was ultimately responsible for Mr. Long's care?
MS. STANTON: Form.
A. Ultimately responsible? I don't -- I don't know that I understand that. I was responsible for the provider that was overseeing his care, but I don't know if the ultimate responsibility fell on me.
BY MS. FINDLING:
Q. Okay.
A. Or would it just continue upward and then it goes on to the CME of the entire corporation eventually.
Q. Again, I'm asking the question based on your understanding. If you don't have an understanding, you can certainly answer that you don't have an understanding.
A. Okay.
Q. But I'm trying to get your understanding of what you understood your relationship was to this patient when you were in the role as the site medical director.
Did you have a chance to answer the question or

do you want a second to think about it?
A. I still don't think I have a grasp of it. So I guess -- I guess yes, technically.
Q. And that would be based on the fact that you have supervisory position over the physician who was handling his care?
A. And that I was the site medical director for this facility, so essentially all 4,000 inmates are my ultimate responsibility.
Q. In the records, there are times that you were called, apparently, for some telephone orders, which I understand happens if you're on call or available to the nursing staff, not typically unusual. Correct?
A. Correct.
Q. Dr. Vukcevic was the primary physician that was providing care. Is that correct?
A. Yes.
Q. Did Dr. Vukcevic consult with you with respect to any issues he was having with Mr. Long's care?
A. Not that I specifically recall.
Q. Okay. So, for example, one thing that could have happened is Dr. Vukcevic could have said, you know, he is not responding to treatment. I need help. I'm going to call my site medical director and I'm going to ask him what his opinions are.

Did Dr. Vukcevic do anything like that?
A. Not that I recall. It has happened that he's -- but I don't specifically remember that happening with Mr. Long or any particular patient. Sometimes, though, the providers will call me and say, I'm having this challenge or that challenge, and we can see what other options or avenues are available.
So I can't say he never spoke to me about it, but I don't recall any specific instance of it.
Q. If Dr. Vukcevic had contacted you with respect to Nicholas Long, is that something that you would have documented in some way?
A. Not necessarily. I may have emailed somebody in response to whatever his challenge was or called somebody, but I don't know that I would have specifically documented it in -- I certainly wouldn't have made an eOMIS note or anything like that.
Q. When the hospital -- when you sent a patient, and this is a more general question, I will ask you kind of the specific question later, but a more general question: When you send a patient out to the hospital for off-site care, and the hospital wants to either have continuity of care or talk to someone at the facility, at the complex, is that typically the site medical director that gets those telephone calls, or the unit provider?

A. The unit provider that was overseeing their care.
Q. I'm going to ask you specifically with respect to Nicholas Long: Do you recall any conversations that you had with any providers other than Dr. Vukcevic with regard to Nicholas Long?
A. I may have spoken with, I think it was Dr. Anderson, after he went and interviewed him for a capacity evaluation.
Q. Okay.
A. He may have called me or let me know, because I think we were challenged with trying to get him seen. So he may have called me to tell me it was already done or his note was in.
Q. And Dr. Anderson was, at the time, a Corizon psychiatrist. Correct?
MS. STANTON: Foundation.
A. Again, I don't know psychologist versus psychiatrist or what. But he was, yeah, a Corizon employee for behavioral health. I'm just not sure the level.
BY MS. FINDLING:
Q. Dr. Anderson, my understanding is that Dr. Anderson is a --
A. Psychiatrist, maybe.

Q. He's a D.O. psychiatrist.
A. Okay.
Q. You weren't aware of that?
A. I don't know that has any relevance, whether he is a D.O. or an M.D. The psychiatrist versus psychologist is the part I wasn't aware of.
Q. Obviously a psychiatrist is a person who can prescribe medications --
A. Yeah.
Q. Medical school?
A. Yeah, I just wasn't sure.
Q. So did you ever have any conversations with any outside providers, not with a Corizon employee, but Tempe St. Luke's, an internist, a GI specialist, a hospitalist, anyone, with respect to Nicholas Long?
A. Not that I recall.
Q. So you have Exhibit 8, and I think we had a discussion as to whether that generally had the items in it. Do I have the wrong number? Is it 9? I'm sorry. I meant 9. It was originally 8, but it's 9.
A. Okay.
Q. We talked about there being notes in the record and that you had reviewed some notes, and it looked to you like some of the notes that you had reviewed was part of Exhibit 9. Correct?

Page 176

STATE OF ARIZONA )
) ss
COUNTY OF MARICOPA )

BE IT KNOWN that the foregoing proceedings were taken before me; that the witness before testifying was duly sworn by me to testify to the whole truth; that the foregoing pages are a full, true and accurate record of the proceedings, and preparation, production and distrubution of the transcript and copies comply with law and code as required by (F)(3), all done to the best of my skill and ability; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my diretion.

I CERTIFY that I am in no way related to any of the parties hereto, nor am I in any way interested in the outcome thereof.

(X) Review and signature was requested.
( ) Review and signature was waived.
( ) Review and signature was not requested.

I FURTHER CERTIFY that I have complied with the ethical obligations set forth in ACJA 7-206 (F)(3) and (J)(1) and (g)(1) and (2). Dated at Tucson, Arizona, this 5th day of January, 2018.

______________________________

Michael A. Bouley, RDR
Certified Reporter
Arizona CR. No. 50235

It is FURTHER CERTIFIED that Herder & Associates, Registered Reporting Firm, has complied with the ethical obligations set forth in ACJA 7-206.

______________________________

Registered Reporting Firm
ARIZONA RRF No. 1062

**EXHIBIT 4**

Anthony J. Fernandez (Bar No. 018342)
Rebecca E. Stanton (Bar No. 032291)
**QUINTAIROS, PRIETO, WOOD & BOYER, P.A.**
2390 E. Camelback Road, Suite 440
Phoenix, Arizona 85016
Telephone: (602) 954-5605
Facsimile: (602) 954-5606
afernandez@qpwblaw.com
rebecca.stanton@qpwblaw.com
*Attorneys for Defendants*

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| KENNETH and CORA LONG, Husband and wife, individually, and as statutory beneficiaries for Nicholas Long, deceased; and on behalf of the estate of NICHOLAS LONG,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF ARIZONA, a body politic, CORIZON HEALTH, INC., a Missouri corporation, doing business in the State of Arizona<br><br>Defendants. | Case No. CV2016-007692<br><br>**DEFENDANTS' FOURTH SUPPLEMENTAL RULE 26.1 DISCLOSURE STATEMENT**<br><br>(Assigned to the Honorable Rosa Mroz) |

Defendants Corizon Health, Inc. and the State of Arizona (hereinafter collectively referred to as "Defendants"), hereby submit their **Fourth Supplemental Rule 26.1 Disclosure Statement**. **Supplemental information is in bold.**

## II. WITNESSES

It is anticipated that the following witnesses may testify at the time of trial. All witnesses are expected to testify in conformity with their depositions, if taken. All healthcare providers are expected to testify in conformity with the medical records and the care they rendered, including all conclusions they formed as a result. All current and former employees should be contacted through defense counsel. Attempts have been made to identify all names in the medical records; additional names will be supplemented if they are discovered at a later time. This disclosure statement is not intended to be a

Ms. Long is a Plaintiff in this matter and was Decedent's mother. It is anticipated that she will testify regarding her recollection of the care and treatment Decedent received by Corizon Health, Inc. and any other healthcare providers. It is anticipated that Ms. Long will testify regarding the facts, acts and/or omissions as well as the circumstances leading up to the incident she claims warrants this cause of action. Ms. Long is also anticipated to testify as to Decedent's prior medical care, his medical and social history, the alleged damages, and any other information relevant to this lawsuit. In addition, she is expected to testify in accordance with her deposition testimony, if taken. (Disclosed in Defendants' Initial Disclosure Statement)

    iii.   Any other wrongful death statutory beneficiaries of Mr. Long
c/o Joel B. Robbins & Anne E. Findling
ROBBINS & CURTIN, PLLC
301 E. Bethany Home Road, Suite B100
Phoenix, AZ 85012-0001

and

c/o Krista Carman
WARNOCK, MACKINLAY & CARMAN, PLLC
246 S. Cortez Street
Prescott, AZ 86303

At this time, Defendants are unaware of the identity of each of Decedent's statutory beneficiaries. Each statutory beneficiary is expected to testify regarding his/her recollection of Decedent's care and treatment and the nature and extent of his/her alleged damages. It is anticipated that each will testify in accordance with his/her deposition testimony. (Disclosed in Defendants' Initial Disclosure Statement)

**B. Defendants**

    i.   State of Arizona
c/o Vincent J. Montell and Anthony Fernandez
Quintairos, Prieto, Wood & Boyer, P.A.
2390 East Camelback Road, Suite 440
Phoenix, Arizona 85016

The State of Arizona is a Defendant in this matter. It is anticipated the employees, representatives, and/or agents of the State will testify regarding their understanding of the facts and circumstances alleged in Plaintiffs' Complaint and the provision of healthcare services to inmates. It is anticipated that they will testify consistently with any documents produced and/or authored by the state, as well as any depositions, if taken. (Disclosed in Defendants' Initial Disclosure Statement)

    ii.   Corizon Health, Inc.
c/o Vincent J. Montell and Anthony Fernandez
Quintairos, Prieto, Wood & Boyer, P.A.
2390 East Camelback Road, Suite 440
Phoenix, Arizona 85016

Corizon Health, Inc. is a Defendant in this matter. One or more of its agents, employees and/or records custodians, known or unknown, may have knowledge about the care and treatment of Decedent. It is anticipated that each will testify regarding his/her care and treatment, and any opinions that may have been formulated during his/her examination and the basis for those opinions. It is anticipated that staff will testify consistent with the

Corizon medical records, and with any reports, and deposition, if taken. The following is a non-exhaustive list of individuals who provided care and treatment to Decedent:

a. Dorene Acuna, RN
b. Jessica Aguilera
c. Yolanda Alvarez
d. Jennifer Anderson
e. Robert Anderson, DO
f. Julianna Anuma
g. Patrick Arnold
h. Patsi Aviles
i. Karen Barcklay, MD
j. B. Barnett, RN
k. Darcee Bishop

**Ms. Bishop is a registered nurse (RN) and is a former employee of Corizon. She is expected to testify as follows: Ms. Bishop has an independent recollection of Mr. Long. She recalls seeing and treating him while he was housed in HU-10 at ASPC-Florence. She recalls that he was sent to the hospital and it was reported to her during shift report that he had refused care in the hospital. She recalls that Mr. Long was provided with Boost supplements, and that at one point an inmate reported that Mr. Long was selling his Boost supplement to other inmates. After that report, Mr. Long's Boost was open and poured into a cup before it was provided to him. She recalls that at one time she overheard Mr. Long telling another inmate that his father had been incarcerated in Arizona. Ms. Bishop is further expected to testify with respect to her charting. She believes she provided reasonable care to Mr. Long.**

**Following her employment with Corizon, Ms. Bishop began working at the Central Arizona Detention Center in Florence, Arizona. John O'Steen, M.D. was her colleague at CADC. Ms. Bishop is expected to testify that Dr. O'Steen approached her at CADC and asked her about Mr. Long, and whether she recalled having Mr. Long as a patient when she worked at Corizon. Ms. Bishop told Dr. O'Steen that she did recall having Mr. Long as a patient. She also recalls that Dr. O'Steen asked her questions about Dr. Vukcevic, including how often Dr. Vukcevic came in to see Mr. Long. Ms. Bishop is expected to testify that she does not recall the exact date of when these conversations occurred, but that they did occur during her employment at CADC, and that they occurred at CADC.**

**Ms. Bishop is further expected to testify that she ended her employment with Corizon due to concerns regarding staffing, leadership, and training.**

l. Peter Bishop, DO
m. Felix Breon
n. Christine Brewer, RN
o. Ramon Buenanueva, RN
p. Jacklyn Busby,
q. Gregory Campbell, RN
r. Janice Cruz
s. Philip Daou
t. David Doench, RN
u. Alyssa Evans
v. Mark Faust, PA-C
w. Suzanne Feeley, RN
x. Stacey Fenwick
y. Monica Flores, RN
z. Amanda Frable, LPN

aa. Cherie Noelle Getts, RN
bb. Andrea Hamilton, CRN
cc. Julie Hampton, BSN
dd. Barbara Hansen, RN
ee. Jason Hoffman, MH Tech
ff. Christopher Johnson, DO
gg. Sarah Johnson
hh. Valerie Jones, RN
ii. Elijah Jordan, MD
jj. Jennifer Kessler, RN
kk. Michael King, Mental Health
ll. Amy Kriser, RN
mm. James Lines, Dentist
nn. Crystal Mamon
oo. Nicole Maranzano, NP
pp. Deborah McGarry, NP
qq. Dr. McQueen
rr. Jennifer Miller, RN
ss. Yelena Miller
tt. Ximena Montes
uu. Maria Mulhern, NP
vv. Nicole Newman, Psych
ww. Eva Olszewski, RN
xx. Stephanie Oplinger, RN
yy. O. Osinloye, NP
zz. Allison Poe
aaa. Matthews Puthuppally, RN
bbb. Kyra Quinones
ccc. R. Rae--, LPN
ddd. Maribel Rangel, LPN
eee. Jawad Riaz, Psychiatrist
fff. Amy Ripley, RN
ggg. Cynthia Ripsin, MD
hhh. Jessica Robertson, RN
iii. Pamela Roos, RN
jjj. Mahlon Roun, Psychology Associate
kkk. Lauri Sanders, RN
lll. Gregory Schumacher, LPN
mmm. Spencer Sego, LPN
nnn. Ben Shaw, Mental Health Director
ooo. Erica Smith, RN
ppp. Tabetha Smith, RN
qqq. Lisa Somerton
rrr. Rebekah Sorter
sss. Daniel B. Starks, RN
ttt. Theresa Starling, RN
uuu. C. Taylor, RN
vvv. Carol Taylor, CAN
www. Etta Thurman, MRL II
xxx. Jakelin Valladares

**Ms. Valladares is a certified nursing assistant (CNA) and is a former employee of Corizon. She is expected to testify as follows: She has an independent recollection of Mr. Long. She provided him care including taking vital signs and assisting him with activities of daily living (ADLs). She recalls that he was in the**

**medical unit for stomach issues, and that his condition worsened over the course of his stay. She recalls that Mr. Long sometimes refused to eat his meals, claiming that he was not hungry or that he could not keep anything down. She recalls that he often had diarrhea and could not make it to the toilet in time. At some point, Mr. Long began wearing diapers which she changed for him. She is expected to testify that he required a lot of one-on-one care. Ms. Valladares is also expected to testify that she recalls that on one occasion she observed Mr. Long eating Cheetos and she informed the nurse. Ms. Valladares is expected to testify that one of her responsibilities included informing a nurse of any care issues she observed, including if a patient displays abnormal vital signs. She believes that she provided reasonable care to Mr. Long.**

**Following her employment with Corizon, Ms. Valladares became employed at Central Arizona Detention Center (now known as Core Civic). John O'Steen, MD is her colleague at Core Civic. Ms. Valladares is expected to testify that Dr. O'Steen specifically approached her and questioned her about Mr. Long on several occasions, including Mr. Long's care and treatment and the adequacy of his treatment. She also recalls that Dr. O'Steen asked her whether Mr. Long was visited by a doctor who did rounds on every individual patient, and that she answered "no." Ms. Valladares is expected to testify that she does not recall the exact date of when these conversations occurred, but that they did occur during her employment at CADC, and that they occurred at CADC. She is further expected to testify that she does not specifically recall if others were present for these conversations.**

**Ms. Valladares is further expected to testify that she had concerns with staffing while employed at Corizon.**

yyy. Jesus Vasquez, Lead Psych Associate
zzz. Stacy Vineyard, RN
aaaa. Marie Volcy
bbbb. Zoran Vukcevic, MD
cccc. Carly Walker, RN
dddd. Margarita Wellman, RN
eeee. Laurie Wharem, LPN
ffff. Natoyah Wooten, CNA

(Disclosed in Defendants' Initial Disclosure Statement)

**C. Medical Providers**

One or more agents, employees and/or records custodians of the entities and providers listed below, including those listed and those unknown, may have knowledge about the care and treatment of Decedent. It is anticipated that each will testify regarding his/her care, services and treatment and any opinions that may have been formulated during his/her examination and the basis for those opinions. It is anticipated that each will testify consistent with his/her medical records, reports, and deposition, if taken. (Disclosed in Defendants' Initial Disclosure Statement)

i. AZ-Tech Radiology
Casa Grande, Arizona

ii. Banner Desert Medical Center
1400 S. Dobson Rd.

**DATED** this 23rd day of March, 2018.

QUINTAIROS, PRIETO, WOOD & BOYER, P.A.

By: ______________________________
Anthony J. Fernandez
Rebecca E. Stanton
*Attorneys for Defendants*

**COPIES** of the foregoing e-mailed and mailed this same day to:

Joel B. Robbins
Anne E. Findling
**ROBBINS & CURTIN, PLLC**
301 E. Bethany Home Road, Suite B100
Phoenix, AZ 85012-0001
*Attorneys for Plaintiffs*

Krista Carman
**CARMAN LAW FIRM**
246 S. Cortez Street
Prescott, AZ 86303
kcarman@carmanlf.com
*Attorneys for Plaintiffs*

By: ______________________________
Nelly Preca

Joel B. Robbins (011065)
Anne E. Findling (010871)
**ROBBINS & CURTIN, P.L.L.C.**
301 E. Bethany Home Road, Suite B-100
Phoenix, Arizona 85012-0001
Telephone: (602) 285-0100
Facsimile: (602) 265-0267
joel@robbinsandcurtin.com
anne@robbinsandcurtin.com

Krista Carman (021700)
CARMAN LAW FIRM
246 S. Cortez Street
Prescott, AZ 86303
E: kcarman@carmanlf.com

*Attorneys for Plaintiffs*

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ◆ Fax: (602) 265-0267

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**
**IN AND FOR THE COUNTY OF MARICOPA**

KENNETH and CORA LONG, husband and wife, individually, and as statutory beneficiaries for Nicholas Long, deceased; and on behalf of the estate of NICHOLAS LONG,

Plaintiffs,

vs.

STATE OF ARIZONA, a body politic; CORIZON HEALTH, INC., a Missouri corporation, doing business in the State of Arizona; CHRISTOPHER LEE JOHNSON, D.O., an individual,

Defendants.

Case No. CV2016-007692

**FIRST AMENDED COMPLAINT**

(Wrongful Death)

**(Jury Trial Requested)**

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

Plaintiffs Kenneth Long and Cora Long, for their complaint on behalf of themselves and the estate of Nicholas Long against Defendants State of Arizona and Corizon Health, Inc., allege as follows:

**PARTIES**

1. Plaintiffs Kenneth Long and Cora Long ("Plaintiffs") are residents of the State of Arizona. They are the natural parents of decedent Nicholas Long.

2. Decedent Nicholas Long was a resident of the State of Arizona. Although incarcerated with the Arizona Department of Corrections at the time of his death, Mr. Long's residence was in Yavapai County, Arizona prior to his incarceration. He died on May 25, 2015.

3. Plaintiff Cora Long is the duly appointed Personal Representative of the Estate of Nicholas Long, deceased, Yavapai Superior Court No. V1300PB201580054.

4. Defendant State of Arizona is a governmental entity organized under the Constitution of the United States. Its subdivisions or agencies include the Arizona Department of Corrections (ADC).

5. Defendant State of Arizona is liable for the acts and omissions of its employees within the scope of their employment, including the Director, officers and other employees of the ADC under the doctrine of *respondeat superior*.

6. Pursuant to A.R.S. §31-201.01(F), any and all causes of action which may arise out of tort caused by the Director, prison officers, or employees of ADC, run only against the State.

7. Defendant State of Arizona has a non-delegable duty of care, custody, and control over the inmates within its custody, including the duty to provide medical care for the serious medical needs of the inmates.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ◆ Fax: (602) 265-0267

8. Effective March 4, 2013, Defendant Corizon Health, Inc. ("Corizon") contracted with Arizona Department of Corrections to provide full service medical, mental health, and dental care (collectively "healthcare") to the inmates housed at ASPC-Douglas, ASPC-Phoenix, ASPC-Eyman, ASPC-Safford, ASPC-Florence, ASPC-Tucson, ASPC-Lewis, ASPC-Winslow, ASPC-Perryville, ASPC-Yuma. Plaintiffs are informed and believe that Defendant Corizon was, and is, a for-profit corporation.

9. Defendant Corizon was, and is, a state actor as that term is used within the jurisprudence of federal civil rights law.

10. Defendant State of Arizona retained monitoring responsibility for Defendant Corizon's provision of health care to inmates within the Arizona Department of Corrections prison system.

11. Defendant State of Arizona requires inmates to be provided opportunities for reasonable and appropriate access to a community standard of health care and appropriate referrals for inmates who present for treatment.

12. Defendant State of Arizona remains ultimately liable for the acts and omissions of Defendant Corizon in providing healthcare to inmates within the ADC and the Arizona prison system.

13. Defendant Chris Johnson DO was the medical director for ASPC-Florence Central Unit for approximately two years beginning in approximately June 2014. Defendant Johnson's identity and participation in the constitutional violation asserted herein were discovered on September 9, 2017, when Zoran Vukcevic, M.D. identified Defendant Johnson as a moving force in the treatment decisions made with respect to Nicholas Long.

14. At the time that Defendant Johnson was made medical director of ASPC-Florence Central Unit, he had been licensed to practice medicine in

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

Arizona for less than one month and had no experience as a primary care physician, in correctional medicine, or in the direction of a complex health care delivery system.

15. Defendant Johnson was, and is, a state actor as that term is used within the jurisprudence of federal civil rights law.

## JURISDICTION AND VENUE

16. The amount in controversy exceeds the jurisdictional threshold of the Court.

17. A timely notice of claim pursuant to A.R.S. § 12-821.01 was served on Defendant State of Arizona on November 20, 2015. More than sixty (60) days have passed since this Notice of Claim was served upon the Defendant. By operation of statute, the claim is deemed denied.

18. This is an action against the State of Arizona. Venue is proper in the Superior Court in and for Maricopa County.

19. Plaintiffs hereby amend their complaint to add claims arising under 42 U.S.C. § 1983, Civil action for deprivation of rights. This Court has general jurisdiction over the claims asserted.

## FACTUAL BACKGROUND

***State of Arizona / Department of Corrections***

20. The Arizona Department of Corrections promulgates department orders that govern an inmate's access to constitutionally mandated health care.

21. Upon information and belief, the contract between the State of Arizona and Corizon requires that Corizon comply with ADC's department orders.

22. Corizon's responsibility to inmates extends to ensuring "all efforts are taken to maintain the inmate's life while on the prison complex." Inmates

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

retain the right to refuse treatment, but if the inmate's decision is life-threatening, Corizon must follow Department Order § 1101.11 (1.2.1), which initiates the chain of command to ensure that the inmate is mentally competent and makes a knowing, fully informed decision, including seeking court authority for treatment.

23. ADC policy requires notification to the Facility Health Administrator (FHA), the ADC Contract Monitor, and the Warden. A significant incident report must be completed, and the Department's General Counsel must be contacted. Contact with General Counsel initiates the involvement of the Office of the Attorney General in petition for court mandated treatment.

24. Corizon's responsibility to inmates extends to inmates that ADC and/or Corizon consider to be on a "hunger strike." ADC policy requires that "hunger strikes" be reported through the chain of command including reporting to the Attorney General to seek court orders for treatment.

25. Even if an inmate refuses needed medical treatment, Corizon's responsibility extends to ensuring "that every possible avenue is explored to encourage cooperation by inmates in completion of their own care."

26. ADC policy also requires Corizon to initiate a multi-disciplinary panel in the event that there is a life-threatening failure of treatment.

***Parsons v. Ryan***

27. On or about March 22, 2012, a prisoner civil rights complaint was filed in the United States District Court, District of Arizona, alleging systemic policies and practices with the Arizona Department of Corrections that resulted in the denial of the constitutional rights of inmates with ADC. Defendant Corizon is also a defendant in the *Parsons v. Ryan* case.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

28. Plaintiffs are informed and believe that Defendant Corizon was, and is, subject to potential civil penalties for non-compliance with certain performance measures related to staffing and referral of inmates for medically indicated care to non-employee ("outside") medical providers, specialists, and hospitals.

29. Plaintiffs are further informed and believe that Defendant Corizon was, and is, subject to potential contractual penalties for non-compliance with certain performance measures related to staffing and referral of inmates for medically indicated referrals to non-employee medical providers, specialists, and hospitals.

30. Plaintiffs are informed and believe that the potential for such penalties has created a financial disincentive for Corizon to initiate policy-mandated procedures.

***Nicholas Long***

31. Nicholas Long was admitted to the Arizona Department of Corrections on March 12, 2014, to serve a sentence for selling six prescription pills to a neighbor to pay his cell phone bill. The maximum end date of his sentence was March 13, 2019.

32. Nicholas was naïve and guileless. His disciplinary tickets in prison were for playing basketball when he was supposed to be working with the grounds crew and refusing to shave.

33. At intake, Nicholas (5'10") was reported to have weighed 153 lbs. He reported a history of Bipolar Disorder (a mood disorder) that had been previously treated with medication. He also reported stomach issues for which he requested Prilosec (omeprazole), a medication commonly used for Gastroesophageal Reflux Disease (GERD). Nicholas was transferred to ASPC-Yuma to serve his sentence.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ◆ Fax: (602) 265-0267

34. On March 28, 2014, Nicholas submitted a Health Needs Request (HNR) to request Prilosec "for his stomach." A progress note of April 3, 2014 documents Nicholas's weight to be 160 lbs. Nicholas was assessed as having GERD and a prescription for Prilosec was ordered.

35. On June 28, 2014, Nicholas (at the time 180 lbs) was seen by a nurse for a chief complaint of 10/10 abdominal pain, intermittent, for one week. The pain was described as sharp. He was tachycardic. The record does not include referral to an appropriate provider or any GI work-up.

36. Nicholas's October 7, 2014 HNR for "really bad" stomach cramping, diarrhea, pain, and inability to sleep, and his October 10, 2014 HNR report of "severe pain" resulted in being placed on the "nurse's line" on October 12. Records document bloody stool, inability to urinate, anorexia, diarrhea, weakness, dizziness and vomiting. He described his pain as 9/10 to 10/10. His weight was down 24 pounds since his last assessment. His abdomen was described as tender, hyperactive bowel sounds present, guarding present, with confirmed blood in his stool. The record does not include referral to an appropriate provider or any GI work-up. No CT was done, and no surgical consult was obtained.

37. His condition deteriorated and on November 6, 2014 he was admitted to Yuma Regional Medical Center for possible acute colitis. He was discharged on November 11, with instructions to continue Levaquin.

38. Nicholas was transferred to ASPC-Florence on or about November 25, 2014. He continued to have stomach cramps and diarrhea. He was weak and required supplemental nutrition.

39. Nicholas's GI symptoms continued. He had trouble eating. His stools were grossly abnormal, with bleeding and diarrhea.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ◆ Fax: (602) 265-0267

40. Sometime after his arrival at ASPC-Florence Central Unit, Nicholas Long came under the primary care of Zoran Vukcevic, M.D.

41. On November 26, 2014, Nicholas was admitted to Tempe St. Luke's Hospital. A CT revealed circumferential large bowel mucosal thickening consistent with infectious or inflammatory colitis, likely ulcerative colitis. Nicholas was reported to having signed out against medical advice, apparently because he was unable to eat. There's no record of a mental health consult or contact with Nicholas's family. Protocols for addressing his condition were ignored.

42. Nicholas was readmitted to Tempe St. Luke's Hospital on December 11, 2014, and again on January 23, 2015. Nicholas was released against medical advice.

43. At the time of his discharge back to the prison, Nicholas was described as extremely weak and cachectic, with increasing weight loss. He was refusing to eat. The attending physician from Tempe St. Luke's personally called and spoke with the medical director, now identified as Defendant Chris Johnson, D.O.

44. Sometime during this period, someone labeled Nicholas as being on a "hunger strike." The label clearly infected the treatment he was given. Although the records show that he complained that he was unable to eat and that his medication was causing side effects, he was stigmatized and denied appropriate care apparently on someone's assumption that his conduct was willful. Again, the protocols for addressing these issues were disregarded.

45. Policy required that Nicholas Long be seen by a psychiatrist before initiation of the process of obtaining court ordered treatment. Plaintiffs are informed and believe that Defendant Corizon and/or Defendant Johnson

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ◆ Fax: (602) 265-0267

refused a request by primary care physician Vukcevic for an urgent behavioral health consultation.

46. At relevant times, Robert Anderson, D.O. worked for Defendant Corizon at ASPC-Florence as a psychiatrist. As a psychiatrist, Dr. Anderson's responsibility was primarily mental health and not providing medical care.

47. On February 2, 2015, Dr. Anderson saw Nicholas Long emergently for a capacity evaluation at the prison. Dr. Anderson had not been informed of the critical nature of Nicholas Long's medical condition. Dr. Anderson was given virtually no information on Nicholas Long before being asked to see him.

48. Dr. Anderson observed a "young man lying in bed . . . extremely lean, in a condition that visually for me said this man is in peril of perhaps perishing if medical services aren't provided very quickly." Nicholas Long was unable to communicate in any meaningful way.

49. A capacity evaluation requires "that the individual [be] able to be verbal, responsive, clear, aware of their environment, responsive, nonpsychotic." Dr. Anderson saw "an individual who could provide nothing [to] do a competent capacity evaluation."

50. From available laboratory reports, based on his experience in family practice, Dr. Anderson concluded that Nicholas Long was a risk of dying if he did not receive emergent medical care.

51. Dr. Anderson assessed that Nicholas Long was suffering from delirium due to malnutrition and dehydration. Dr. Anderson was shocked and disturbed by Nicholas Long's condition.

52. From November 26, 2014 to February 2, 2015, Nicholas Long's medical and physical condition deteriorated as he became malnourished and cachectic. Although he reported that the medications he was being given were

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ◆ Fax: (602) 265-0267

ineffective and, in fact, making him worse, providers failed to provide available alternative treatment.

53. Nicholas was ultimately admitted to Mountain Vista Medical Center after becoming unresponsive from starvation and dehydration. Abdominal surgery revealed severe adhesions and perforations. He had subtotal colectomy, placement of ileostomy, enterorrhaphy and lysis of adhesions.

54. Complications ultimately led to Nicholas's death on May 25, 2015.

**CLAIMS FOR RELIEF**

**Count One**

**NEGLIGENCE**

**(Defendant State of Arizona)**

55. Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

56. The State of Arizona has a non-delegable duty of care, custody, and control of inmates within the state prison system. This non-delegable duty includes providing appropriate medical care for serious medical needs.

57. The State of Arizona also has a duty to ensure, through appropriate monitoring, that reasonable and necessary medical care is being provided by contracted and subcontracted medical providers duly licensed and acting within the scope of those licenses according to the community standard of care to inmates within the ADC and the Arizona state prison system is delivered.

58. The State of Arizona breached its duty to Plaintiffs' decedent by failing to provide appropriate medical care for his serious medical needs.

59. The State of Arizona further breached its duty to Plaintiffs' decedent by failing to adequately monitor the contracted medical services being provided to Plaintiffs' decedent and others.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ◆ Fax: (602) 265-0267

60. As a result of these breaches, Plaintiffs' decedent failed to receive competent medical care for his serious medical needs resulting in his death.

61. By virtue of the non-delegable duty set forth above, Defendant State of Arizona is vicariously liable for the medical negligence of Defendant Corizon Health, Inc. as set forth in Count Two of Plaintiffs' Complaint.

**Count Two**

**NEGLIGENCE**
**(Defendant Corizon Health, Inc.)**

62. Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

63. Defendant Corizon has a duty to provide reasonable healthcare in accordance with the community standard of care by appropriately licensed medical personnel acting within the scope of their respective licenses.

64. Defendant Corizon breached that duty by failing to provide necessary medical care to Plaintiffs' decedent within the community standard of care.

65. Defendant Corizon and its employees and agents failed to properly recognize, assess, diagnose or treat Plaintiffs' decedent's serious medical condition resulting in his death.

66. Defendant Corizon and its employees and agents failed to exercise that degree of care that a reasonable provider would exercise under the same or similar circumstances.

67. Defendant Corizon created policies and procedures that resulted in its employees failing to practice within the scope of their respective licenses.

68. Defendant Corizon's negligence includes:

a. Failing to properly assess Plaintiffs' decedent after he made his medical needs known;

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ◆ Fax: (602) 265-0267

b.   Failing to establish proper policy, procedures, custom and practice for identifying inmates who require a higher level of care than can be provided at the prison complex;

c.   Failing to provide appropriate personnel and to train that personnel in the recognition of conditions requiring a higher level of medical care than can be provided at the prison complex;

d.   Failing to properly assess Plaintiffs' decedent when his medical condition had obviously deteriorated;

e.   Failing to investigate Plaintiffs' decedent's declining medical condition and waiting until his condition was life-threatening before taking action;

f.   Failing to ascertain the source of Plaintiffs' decedent's complaints;

g.   Failing to act on objective signs of an increasingly serious medical condition until it was too late for effective treatment;

h.   Failing to provide adequate nutrition and hydration.

69.   Ordinary care required Defendant Corizon to refer Plaintiffs' decedent to a qualified and properly equipped medical professional who could conduct an adequate and proper medical examination, properly and competently diagnose Mr. Long's medical condition, and provide for competent and adequate treatment.

70.   As a result of the breach of Defendant Corizon's duties to Plaintiffs' decedent as more fully set forth above, Defendant Corizon caused Plaintiffs' decedent to be denied timely, appropriate and competent medical care resulting in his death.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

**Count Three**

**WRONGFUL DEATH**

**(All Defendants)**

71.   Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

72.   Pursuant to A.R.S. § 12-611, et seq., Plaintiffs hereby assert a claim for damages for the wrongful death of Nicholas Long based on the wrongful acts and negligent conduct set forth in Counts One and Two of this complaint.

73.   As a result of the wrongful acts of Defendants as set forth above, Plaintiffs suffered damages including loss of love, companionship, and support.

**Count Four**

**42 U.S.C. § 1983**

**(Federal Civil Rights – Defendant Corizon)**

74.   Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

75.   The Eighth Amendment to the United States Constitution prohibits the infliction of cruel and unusual punishment.

76.   The Fourteenth Amendment protects familial and associational relationships from interference without due process of law.

77.   As set forth herein, Nicholas Long presented with a serious medical need. Specifically, he was suffering from chronic and acute malnutrition, chronic and acute mental illness, and chronic and acute ulcerative colitis.

78.   Defendant Corizon knew that Nicholas Long presented with a serious medical need and knew that failure to treat that serious medical need could result in further significant injury (including death) and unnecessary and wanton infliction of pain.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ◆ Fax: (602) 265-0267

79. Defendant Corizon knew that Nicholas Long likely required treatment with a biologic substance, which would be much more costly than the treatment provided by Defendant Corizon.

80. Defendant Corizon's response to Nicholas Long's serious medical need demonstrated deliberate indifference.

81. Defendant Corizon purposefully acted and/or failed to respond to Nicholas Long's medical need resulting in needless pre-death pain and suffering.

82. Upon information and belief, Defendant Corizon's decision not to follow ADC's policies, as it was required to do, was the product of a conscious choice motivated by financial considerations.

83. The nature and extent of Defendant Corizon's indifference to Nicholas Long's serious medical condition was revealed on September 6, 2017, when primary care provider Vukcevic, who characterized himself as a "whistle blower", testified that he attempted to, but "failed to let's say blow whistle enough or know enough to save [Nicholas Long's] life."

84. Dr. Vukcevic testified that specialist care / outside care was required including parenteral feeding, noting that correctional medicine cannot feed people intravenously.

85. Dr. Vukcevic testified that he attempted to initiate the process for court ordered treatment but was blocked by Defendant Corizon from doing so.

86. Dr. Anderson testified that staffing at ASPC-Florence made it "impossible" to deliver required psychiatric services. Resources for mental health were limited or not available to meet the mental health needs of patients such Nicholas Long.

87. The severity of Nicholas Long's medical and mental health conditions were documented in his medical record.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ◆ Fax: (602) 265-0267

88. As a direct result of the deliberate indifference of Defendant Corizon, Nicholas Long suffered further injury and suffering, and the unnecessary and wanton infliction of pain, including pre-death pain and suffering.

89. As a further direct result of the deliberate indifference of Defendant Corizon, Nicholas Long died.

90. As a further and direct result of the deliberate indifference of Defendant Corizon, Plaintiffs Cora Long and Kenneth Long experienced grief and suffering as set forth herein.

91. The conduct of Corizon as described herein was shocking and disturbing to its own providers.

**Count Five**

**42 U.S.C. § 1983**

**(Federal Civil Rights – Defendants Johnson)**

92. Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

93. On or about November 24, 2014, Nicholas Long was transferred from ASPC-Yuma to ASPC-Florence Central Unit.

94. Defendant Johnson was the site medical director for ASPC-Florence Central Unit.

95. Defendant Johnson was responsible for clinical supervision of the medical providers at ASPC-Florence.

96. Defendant Johnson knew that Nicholas Long was transferred to ASPC-Florence Central Unit with a diagnosis of colitis and diarrhea with bleeding. Defendant Johnson further knew that Nicholas Long had lost substantial weight, including six pounds in the four days preceding his transfer.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

97. Defendant Johnson knew that Nicholas Long was sent out to the hospital and returned to the prison against medical orders. Defendant Johnson knew that Nicholas Long was refusing treatment and that his health was deteriorating. Defendant Johnson knew as early as January 6, 2015, that Dr. Vukcevic was specifically concerned that Nicholas Long needed a psychiatric evaluation.

98. Defendant Johnson further knew that Nicholas Long's medical condition had so deteriorated that he required court ordered treatment.

99. The severity of Nicholas Long's medical and mental health conditions were documented in his medical record.

100. As a direct result of the deliberate indifference of Defendant Johnson, Nicholas Long suffered further injury and suffering, and the unnecessary and wanton infliction of pain, including pre-death pain and suffering.

101. As a further direct result of the deliberate indifference of Defendant Johnson, Nicholas Long died.

102. As a further and direct result of the deliberate indifference of Defendant Johnson, Plaintiffs Cora Long and Kenneth Long experienced grief and suffering as set forth herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

A. For special damages;

B. For lost wages, income, and other economic losses;

C. For general damages for the predeath pain and suffering experienced by Nicholas Long;

D. For other general damages, including but not limited to pain and suffering, loss of enjoyment of life and other emotional trauma;

E. For exemplary damages to the extent permitted by law;

F. For taxable costs and pre- and post-judgment interest to the extent permitted by law;

G. Such other relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED: June 13, 2018

**ROBBINS & CURTIN, p.l.l.c.**

By: /s/Anne E. Findling
Joel B. Robbins
Anne E. Findling
*Attorneys for Plaintiffs*

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ◆ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

**CERTIFICATE OF SERVICE**

I hereby certify that on June 13, 2018, I electronically transmitted the attached document to the Clerk's Office using the Maricopa County Clerk of Superior Court's Online eFiling System for filing and automatic transmittal of the eFiled document to the assigned judge, the Honorable Rosa Mroz, and that a copy of the foregoing has been served by e-service on counsel for all parties, as designated below:

Anthony J. Fernandez
Rebeca Stanton
QUINTAIROS, PREIETO, WOOD & BOYER, P.A.
2390 E. Camelback Road, Suite 440
Phoenix, Arizona 85016
E: afernandez@qpwblaw.com
E: rebecca.stanton@qpwblaw.com
*Attorneys for Defendants, State of Arizona & Corizon*

Krista Carman
CARMAN LAW FIRM
246 S. Cortez Street
Prescott, AZ 86303
E: kcarman@carmanlf.com
*Co-Counsel for Plaintiffs*

By: /s/Kimberly A. Wolf
Kimberly A. Wolf

Anthony J. Fernandez (Bar No. 018342)
Rebecca E. Stanton (Bar No. 032291)
**QUINTAIROS, PRIETO, WOOD & BOYER, P.A.**
2390 E. Camelback Road, Suite 440
Phoenix, Arizona 85016
Telephone: (602) 954-5605
Facsimile: (602) 954-5606
afernandez@qpwblaw.com
rebecca.stanton@qpwblaw.com
*Attorneys for Defendants*

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| KENNETH and CORA LONG, Husband and wife, individually, and as statutory beneficiaries for Nicholas Long, deceased; and on behalf of the estate of NICHOLAS LONG,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF ARIZONA, a body politic, CORIZON HEALTH, INC., a Missouri corporation, doing business in the State of Arizona; CHRISTOPHER LEE JOHNSON, D.O., an individual,<br><br>Defendants. | Case No. CV2016-007692<br><br>**DEFENDANTS STATE OF ARIZONA AND CORIZON HEALTH, INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>(Assigned to the Honorable Rosa Mroz) |

Defendants Corizon Health, Inc. and the State of Arizona (collectively "Defendants" herein), hereby Answer Plaintiffs' First Amended Complaint dated June 13, 2018, as follows:

**PARTIES**

1. Answering paragraph 1, Defendants deny knowledge or information sufficient to form a belief as to the allegations contained therein, and therefore deny same.

2. Answering paragraph 2, Defendants admit that Decedent expired on May 25, 2015 and that he was incarcerated within the Arizona Department of Corrections at that time. Defendants deny knowledge or information sufficient to form a belief as to the balance of the allegations contained therein, and therefore deny same.

3.      Answering paragraph 3, Defendants deny knowledge or information sufficient to form a belief as to the allegations contained therein, and therefore deny same.

4.      Answering paragraph 4, Defendants admit that the State of Arizona is a governmental entity organized under Arizona law and that the Arizona Department of Corrections is a department of the State of Arizona. Defendants deny the remainder of the allegations contained therein.

5.      Answering paragraph 5, Defendants deny the allegations contained therein.

6.      Answering paragraph 6, Defendants deny the allegations contained therein.

7.      Answering paragraph 7, Defendants admit that the State of Arizona has certain responsibilities and/or obligations under the law.  Defendants are without sufficient information to form a belief as to the remainder of the allegations contained therein, and therefore deny same.  Defendants expressly deny any and all allegations of liability or damages.

8.      Answering paragraph 8, Defendants admit that Corizon, Inc. contracted with the State of Arizona to provide certain services at certain Arizona correctional facilities as of March 4, 2013, including the facilities which housed Decedent at the relevant time, and that it is a for-profit corporation. Defendants deny the remainder of the allegations contained therein.

9.      Answering paragraph 9, Defendants deny the allegations contained therein.

10.      Answering paragraph 10, Defendants admit that the State of Arizona has certain obligations with respect to the provision of health care to inmates within the Arizona Department of Corrections.  Those obligations were met with respect to Decedent. Defendants are without sufficient information to form a belief as to the remainder of the allegations contain therein, and therefore deny same.  Defendants expressly deny any and all allegations of liability or damages.

11.      Answering paragraph 11, Defendants admit that the State of Arizona has certain obligations with respect to the provision of health care to inmates within the

Arizona Department of Corrections. Those obligations were met with respect to Decedent. Defendants are without sufficient information to form a belief as to the remainder of the allegations contain therein, and therefore deny same. Defendants expressly deny any and all allegations of liability or damages.

12. Answering paragraph 12, Defendants admit that the State of Arizona has certain obligations with respect to the provision of healthcare to inmates within the Arizona Department of Corrections. Those obligations were met with respect to Decedent. Defendants are without sufficient information to form a belief as to the remainder of the allegations contain therein, and therefore deny same. Defendants expressly deny any and all allegations of liability or damages.

13. Answering paragraph 13, Corizon Health, Inc. admits that Chris Johnson, DO was the Medical Director of ASPC-Florence at the relevant time. Defendants deny the remainder of the allegations contained in this paragraph, including any and all allegations of liability or damages.

14. Answering paragraph 14, these allegations are not directed at Defendants herein. Defendants are without sufficient information to form a belief as to the remainder of the allegations contain therein, and therefore deny same. Defendants expressly deny any and all allegations of liability or damages.

15. Answering paragraph 15, Defendants deny the allegations contained therein.

**JURISDICTION AND VENUE**

16. Answering paragraph 16, Defendants deny knowledge or information sufficient to form a belief as to the allegations contained therein, and therefore deny same.

17. Answering paragraph 17, Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations contained therein, and therefore deny same. Defendants expressly deny any and all allegations of liability or damages.

18. Answering paragraph 18, Defendant denies the allegations contained therein.

19. Answering paragraph 19, Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations contained therein, and therefore deny same. Defendants expressly deny any and all allegations of liability or damages.

**FACTUAL BACKGROUND**

20. Answering paragraph 20, Defendants admit that the Arizona Department of Corrections promulgates Department Orders on a range of topics, including inmate health care. Defendants deny the remainder of the allegations contained in this paragraph.

21. Answering paragraph 21, Defendants admit that the contract between the State of Arizona and Corizon speaks for itself. To the extent that this paragraph contains allegations that are not supported by the contract, those allegations are herein denied.

22. Answering paragraph 22, Defendants admit that inmates have the right to refuse medical treatment. Defendants further admit that the Arizona Department of Corrections Department Orders speak for themselves. Defendants deny the remainder of the allegations contained in this paragraph which are not specifically admitted herein.

23. Answering paragraph 23, Defendants deny the allegations contained therein.

24. Answering paragraph 24, Defendants admit that the Arizona Department of Corrections has a policy concerning hunger strikes, and that it speaks for itself. That policy was met with respect to Decedent. Defendants deny the remainder of the allegations contained in this paragraph which are not specifically admitted herein.

25. Answering paragraph 25, Defendants deny the allegations contained therein.

26. Answering paragraph 26, Defendants admit that the policies of the Arizona Department of Corrections speak for themselves. To the extent that this paragraph contains allegations that are not supported by policy documents, those allegations are herein denied.

27. Answering paragraph 27, Defendants admit that a prisoner civil rights lawsuit was filed in the United States District Court styled *Parsons v. Ryan*, and that it was filed before Corizon began providing health care to inmates within Arizona. Defendants further admit that the court filings speak for themselves. Corizon is not a defendant in the suit.

Defendants deny the remainder of the allegations contained in this paragraph which are not specifically admitted herein.

28.      Answering paragraph 28, Defendants admit that the contract between the State of Arizona and Corizon, and the *Parsons v. Ryan* court documentation speaks for itself. Defendants deny the remainder of the allegations contained in this paragraph which are not specifically admitted herein.

29.      Answering paragraph 29, Defendants admit that the contract between the State of Arizona and Corizon, and the *Parsons v. Ryan* court documentation speaks for itself. Defendants deny the remainder of the allegations contained in this paragraph which are not specifically admitted herein.

30.      Answering paragraph 30, Defendants deny the allegations contained therein.

31.      Answering paragraph 31, Defendants admit the allegations contained therein concerning the time period of Decedent's incarceration and the location of his incarceration. Defendants deny the balance of the allegations contained therein.

32.      Answering paragraph 32, Defendants deny the allegations contained therein.

33.      Answering paragraph 33, Defendants aver that the medical records speak for themselves as to Mr. Long's care, conditions and housing.  To the extent that this paragraph contains allegations that are not supported by the records, those allegations are herein denied. Defendants deny any allegations of liability or damages.

34.      Answering paragraph 34, Defendants aver that the medical records speak for themselves as to Mr. Long's care and conditions.  To the extent that this paragraph contains allegations that are not supported by the records, those allegations are herein denied. Defendants deny any allegations of liability or damages.

35.      Answering paragraph 35, Defendants aver that the medical records speak for themselves as to Mr. Long's care and conditions.  To the extent that this paragraph contains allegations that are not supported by the records, those allegations are herein denied. Defendants deny any allegations of liability or damages.

36.     Answering paragraph 36, Defendants aver that the medical records speak for themselves as to Mr. Long's care and conditions.  To the extent that this paragraph contains allegations that are not supported by the records, those allegations are herein denied. Defendants deny any allegations of liability or damages.

37.     Answering paragraph 37, Defendants aver that the medical records speak for themselves as to Mr. Long's care and conditions.  To the extent that this paragraph contains allegations that are not supported by the records, those allegations are herein denied. Defendants deny any allegations of liability or damages.

38.     Answering paragraph 38, Defendants aver that the medical records speak for themselves as to Mr. Long's care, conditions and housing.  To the extent that this paragraph contains allegations that are not supported by the records, those allegations are herein denied. Defendants deny any allegations of liability or damages.

39.     Answering paragraph 39, Defendants aver that the medical records speak for themselves as to Mr. Long's care and conditions.  To the extent that this paragraph contains allegations that are not supported by the records, those allegations are herein denied. Defendants deny any allegations of liability or damages.

40.     Answering paragraph 40, Defendants admit that Dr. Vukcevic treated Mr. Long while he was at ASPC-Florence. The remainder of the allegations in this paragraph are denied. Defendants deny any allegations of liability or damages.

41.     Answering paragraph 41, Defendants aver that the medical records speak for themselves as to Mr. Long's care and conditions.  To the extent that this paragraph contains allegations that are not supported by the records, those allegations are herein denied. Defendants deny any allegations of liability or damages.

42.     Answering paragraph 42, Defendants aver that the medical records speak for themselves as to Mr. Long's care, conditions and hospitalizations.  To the extent that this paragraph contains allegations that are not supported by the records, those allegations are herein denied. Defendants deny any allegations of liability or damages.

43.     Answering paragraph 43, Defendants aver that the medical records speak for themselves as to Mr. Long's care, conditions and hospitalizations.  To the extent that this paragraph contains allegations that are not supported by the records, those allegations are herein denied. Defendants deny any allegations of liability or damages.

44.     Answering paragraph 44, Defendants deny the allegations contained therein.

45.     Answering paragraph 45, Defendants deny the allegations contained therein.

46.     Answering paragraph 46, Defendant Corizon admits that Dr. Anderson was a Corizon employee at the relevant time, employed as a psychiatrist. Defendants deny the remainder of the allegations contained therein.

47.     Answering paragraph 47, Defendants aver that the medical records speak for themselves as to Mr. Long's care and conditions.  To the extent that this paragraph contains allegations that are not supported by the records, those allegations are herein denied. Defendants deny any allegations of liability or damages.

48.     Answering paragraph 48, Defendants aver that the testimony of Dr. Anderson speaks for itself. To the extent these allegations are directed at Defendants, they are herein denied. Defendants deny any allegations of liability or damages.

49.     Answering paragraph 49, Defendants deny the allegations contained therein.

50.     Answering paragraph 50, Defendants deny the allegations contained therein.

51.     Answering paragraph 51, Defendants aver that the medical records speak for themselves as to Mr. Long's care and conditions.  To the extent that this paragraph contains allegations that are not supported by the records, those allegations are herein denied. Defendants deny any allegations of liability or damages.

52.     Answering paragraph 52, Defendants deny the allegations contained therein.

53.     Answering paragraph 53, Defendants aver that the medical records speak for themselves as to Mr. Long's care and conditions.  To the extent that this paragraph contains allegations that are not supported by the records, those allegations are herein denied. Defendants deny any allegations of liability or damages.

54.     Answering paragraph 54, Defendants admit that Decedent expired on May 25, 2015. Defendants deny the remaining allegations contained in this paragraph, including any allegations of liability or damages.

**Count One**

**NEGLIGENCE**

**(Defendant State of Arizona)**

55.     Answering paragraph 55, Defendants repeat and reiterate their responses to paragraphs 1 – 54 as if fully set forth herein.

56.     Answering paragraph 56, Defendants admit that the State of Arizona has certain duties as prescribed by law, and that those duties were met.  Defendants deny the balance of the allegations contained therein.

57.     Answering paragraph 57, Defendants admit that the State of Arizona has certain duties as prescribed by law, and that those duties were met.  Defendants deny the balance of the allegations contained therein.

58.     Answering paragraph 58, Defendants deny the allegations contained therein.

59.     Answering paragraph 59, Defendants deny the allegations contained therein.

60.     Answering paragraph 60, Defendants deny the allegations contained therein.

61.     Answering paragraph 61, Defendants deny the allegations contained therein.

**Count Two**

**NEGLIGENCE**

**(Defendant Corizon Health, Inc.)**

62.     Answering paragraph 62, Defendants repeat and reiterate their responses to paragraphs 1 – 61 as if fully set forth herein.

63.     Answering paragraph 63, Defendants admit that Corizon has certain obligations and responsibilities with respect to the provision of health case to certain inmates within the Arizona Department of Corrections, and that those responsibilities and obligations were met with respect to Decedent. Defendants deny the balance of the

allegations contained therein.

64. Answering paragraph 64, Defendants deny the allegations contained therein.

65. Answering paragraph 65, Defendants deny the allegations contained therein.

66. Answering paragraph 66, Defendants deny the allegations contained therein.

67. Answering paragraph 67, Defendants deny the allegations contained therein.

68. Answering paragraph 68 (and subparts), Defendants deny the allegations contained therein.

69. Answering paragraph 69, Defendants deny the allegations contained therein.

70. Answering paragraph 70, Defendants deny the allegations contained therein.

**Count Three**

**WRONGFUL DEATH**

**(All Defendants)**

71. Answering paragraph 71, Defendants repeat and reiterate their responses to paragraphs 1 – 70 as if fully set forth herein.

72. Answering paragraph 72, Defendants deny knowledge or information sufficient to form a belief as to the allegations contained therein, and therefore deny same. Defendants deny any allegations of liability or damages.

73. Answering paragraph 73, Defendants deny the allegations contained therein.

**Count Four**

**42 U.S.C. § 1983**

**(Federal Civil Rights - Defendant Corizon)**

74. Answering paragraph 74, Defendants repeat and reiterate their responses to paragraphs 1 – 73 as if fully set forth herein.

75. Answering paragraph 75, Defendants admits the allegations contained therein.

76. Answering paragraph 76, Defendants deny the allegations contained therein.

77. Answering paragraph 77, Defendants deny the allegations contained therein.

78. Answering paragraph 78, Defendants deny the allegations contained therein.

79. Answering paragraph 79, Defendants deny the allegations contained therein.

80. Answering paragraph 80, Defendants deny the allegations contained therein.

81. Answering paragraph 81, Defendants deny the allegations contained therein.

82. Answering paragraph 82, Defendants deny the allegations contained therein.

83. Answering paragraph 83, Defendants deny the allegations contained therein.

84. Answering paragraph 84, Defendants deny the allegations contained therein.

85. Answering paragraph 85, Defendants deny the allegations contained therein.

86. Answering paragraph 86, Defendants deny the allegations contained therein.

87. Answering paragraph 87, Defendants deny the allegations contained therein.

88. Answering paragraph 88, Defendants deny the allegations contained therein.

89. Answering paragraph 89, Defendants deny the allegations contained therein.

90. Answering paragraph 90, Defendants deny the allegations contained therein.

91. Answering paragraph 91, Defendants deny the allegations contained therein.

**Count Five**

**42 U.S.C. § 1983**

**(Federal Civil Rights - Defendants Johnson)**

92. Answering paragraph 92, Defendants repeat and reiterate their responses to paragraphs 1 – 91 as if fully set forth herein.

93. Answering paragraph 93, Defendants aver that the records speak for themselves as to Decedent's housing. To the extent that this paragraph contains allegations that are not supported by the records, those allegations are herein denied.

94. Answering paragraph 94, Defendant Corizon admits that Chris Johnson, DO was the Medical Director of ASPC-Florence at the relevant time. Defendants deny the remainder of the allegations contained in this paragraph, including any and all allegations of liability or damages.

95. Answering paragraph 95, Defendant denies the allegations contained therein.

96. Answering paragraph 96, these allegations are not directed at Defendants herein. Defendants are without sufficient information to form a belief as to the remainder of the allegations contain therein, and therefore deny same. Defendants expressly deny any and all allegations of liability or damages.

97. Answering paragraph 97, these allegations are not directed at Defendants herein. Defendants are without sufficient information to form a belief as to the remainder of the allegations contain therein, and therefore deny same. Defendants expressly deny any and all allegations of liability or damages.

98. Answering paragraph 98, these allegations are not directed at Defendants herein. Defendants are without sufficient information to form a belief as to the remainder of the allegations contain therein, and therefore deny same. Defendants expressly deny any and all allegations of liability or damages.

99. Answering paragraph 99, Defendants aver that the records speak for themselves as to Decedent's condition. To the extent that this paragraph contains allegations that are not supported by the records, those allegations are herein denied.

100. Answering paragraph 100, Defendants deny the allegations contained therein.

101. Answering paragraph 101, Defendants deny the allegations contained therein.

102. Answering paragraph 102, Defendants deny the allegations contained therein.

**GENERAL DENIAL**

1. Defendants deny each and every allegation not specifically admitted above.

**AFFIRMATIVE DEFENSES**

1. Defendants affirmatively assert that Plaintiffs' First Amended Complaint fails to state a claim upon which relief can be granted against them pursuant to Rule 12(b)(6) Ariz. R. Civ. P.

2. Defendants affirmatively assert no loss of chance existed and therefore Plaintiffs have no entitlement to recovery.

3.      Plaintiffs are required to prove that Defendants and their agents, and/or employees failed to exercise that degree of care, skill, and learning required of reasonable and prudent healthcare providers under the same or similar circumstances, and that the failure to do so was the proximate cause of injury sustained by Plaintiffs/Decedent in accordance with ARS Section 12-563.   The care and treatment provided to Plaintiffs/Decedent was appropriate and met the standard of care.

4.      Defendants assert that the alleged damages of Plaintiffs may be as a result of the care rendered by other individuals and/or entities beyond their control. This may include other healthcare providers that provided care and treatment before and/or after the care provided by Defendants.  Defendants are entitled to have their liability apportioned under ARS § 12-2501 in the event any liability is found. *See* ARS §§ 12-2501 – 2509.

5.      Defendants plead the affirmative defense of comparative negligence.

6.      Defendants plead the affirmative defense of contributory negligence and assumption of risk.

7.      Defendants plead the affirmative defense of failure to mitigate damages.

8.      Defendants affirmatively assert that they are not liable for the policies and procedures of an outside provider, facility and/or any non-party at fault.

9.      Defendants allege all affirmative defenses in 8(c) and 12(b) Ariz. R. Civ. P. and Rules 8(c) and 12, F.R.C.P., to avoid waiver.

10.     Defendants reserve the right to amend their affirmative defenses, and to add affirmative defenses in the event future discovery reveals the existence of the need for such.

11.     The State is entitled to immunity pursuant to A.R.S. § 12-820.01, 12-820.02(A), 12-820.04 and 12-820.05.

12.     Defendants affirmatively allege that some or all of Plaintiffs' claims are barred by the applicable statute of limitations.

13.     The State affirmatively alleges that Plaintiffs' claims against the State are barred by Plaintiffs' failure to satisfy the requirements of A.R.S. §12-821.01, concerning the filing of a notice of claim.

14.     There were no acts of negligence by the State.

15.     Defendants affirmatively allege that they did not breach any duty owed to Decedent.

16.      Defendants affirmatively allege the damages alleged by Plaintiffs were not casually connected to the alleged actions of the Defendants.

17.     Decedent was comparatively and contributorily negligence and at fault, including negligent per se.

18.     Defendants hereby reserve their right to assert, as investigation and discovery proceed, any other matter constituting a set-off, avoidance or defense pursuant to Arizona Rules of Civil Procedure 4, 8 and 12 as the result of such ongoing investigation and discovery may warrant. Defendants are not sure which, if any, additional affirmative defenses may be applicable and therefore reserve the right to allege further defenses after discovery is undertaken.

19.     Defendants allege that venue in state court is improper given Plaintiff's constitutional claims.

20.     Plaintiffs are not entitled to any relief under 42 U.S.C. § 1983.

21.     Defendants deny that Plaintiffs, or Decedent, have been denied any right protected by the United States Constitution, the United States Code, or any state constitutions or laws.

22.     Defendants alleges that Defendants, including their agents and employees, were acting under legal process, with good, sufficient and probable cause to be so acting, and that Defendants' actions, including those of their agents' and employees' actions, were in good faith and without malice.

23.     Defendants allege that Defendants, including their agents and employees, acted in good faith at all times, without malice, and without the requisite state of mind necessary for Plaintiffs to prevail on a claim of deliberate indifference.

24.     Defendants allege Plaintiffs have failed to set forth the requisite showing of subjective intent necessary to sustain a cause of action alleging a constitutional violation, thereby warranting dismissal of this lawsuit.

25.     Defendants allege Plaintiffs have failed to set forth a grave deprivation in regard to the allegation that a constitutional violation has occurred, thereby warranting dismissal of this lawsuit.

26.     Defendants allege that there existed no conduct in this case motivated by an evil intent or motive, nor did any conduct involve reckless or callous indifference to the rights of Plaintiffs or Decedent, thereby precluding punitive damages.

27.     Defendants allege that no custom, policy or practice exists or existed which may be shown to be the moving force behind any alleged constitutional violation of Plaintiffs or Decedent.

28.     Defendants allege Plaintiffs have failed to allege that Defendants promulgated a custom and policy or practice which was the moving force behind the alleged violations to Plaintiffs'/Decedent's constitutional rights.

29.     Defendants allege any actions by answering Defendants furthered a legitimate and important governmental interest in maintaining the safety and security of the prison, thereby warranting dismissal of Plaintiffs' claims.

30.     Defendants deny that Plaintiffs have suffered any cognizable injuries or damages as a result of any acts or omissions on the part of Defendants, their agents or employees.

31.     Plaintiffs merely disagree with Decedent's course of medical treatment, which is not actionable under 42 U.S.C. § 1983.

32. Plaintiffs allege only a difference of opinion among Decedent's medical providers, which is not actionable under 42 U.S.C. § 1983.

33. Defendants hereby reserve their right to assert, as investigation and discovery proceed, any other matter constituting a set-off, avoidance or defense pursuant to Arizona Rules of Civil Procedure 4, 8 and 12 as the result of such ongoing investigation and discovery may warrant. Defendants are not sure which, if any, additional affirmative defenses may be applicable and therefore reserve the right to allege further defenses after discovery is undertaken.

WHEREFORE, having fully answered Plaintiffs' First Amended Complaint, Defendants respectfully request:

a) Plaintiffs take nothing by the Complaint;

b) Plaintiffs' First Amended Complaint be dismissed with prejudice;

c) Defendants be awarded their costs and reasonably incurred attorney's fees;

DATED this 2nd day of July, 2018.

QUINTAIROS, PRIETO, WOOD & BOYER, P.A.

By: /s/Rebecca E. Stanton
Anthony J. Fernandez
Rebecca E. Stanton
*Attorneys for Defendants*

**ORIGINAL** efiled and copy mailed this 2nd day of July, 2018, to:

The Honorable Rosa Mroz
**MARICOPA COUNTY SUPERIOR COURT**
East Court Building - 414
101 Jefferson
Phoenix, AZ 85003-2243

Joel B. Robbins
Anne E. Findling
Lauren E. Channell
**ROBBINS & CURTIN, PLLC**
301 E. Bethany Home Road, Suite B100
Phoenix, AZ 85012-0001
*Attorneys for Plaintiffs*

Krista Carman
**CARMAN LAW FIRM**
246 S. Cortez Street
Prescott, AZ 86303
*Attorneys for Plaintiffs*


By  /s/Barbara McKinley

**From:** CustomerService=turbocourt.com@smtp.turbocourt.com on behalf of TurboCourt Customer Service
**To:** Barbara McKinley
**Subject:** E-Filing Status: Form Set # 2689492 Delivered
**Date:** Monday, July 02, 2018 2:58:12 PM

PLEASE DO NOT REPLY TO THIS EMAIL.

AZTurboCourt Form Set # 2689492 has been DELIVERED to Maricopa County - Superior Court.

You will be notified when your documents have been processed by the court.

You MUST log in and check your filing status online at http://turbocourt.com/.

Here are your filing details:
Case Number: CV2016-007692 (Note: If this filing is for case initiation, you will receive a separate notification when the case # is assigned.)
Case Title: Long, Et.Al. Vs. State Of Arizona, Et.Al.
Filed By: Barbara J McKinley
AZTurboCourt Form Set: #2689492
Keyword/Matter #: Long-92015-AJF
Delivery Date and Time: Jul 02, 2018 2:57 PM MST

Forms:
Summary Sheet (This summary sheet will not be filed with the court. This sheet is for your personal records only.)

Attached Documents:
Answer: Defendants State of Arizona and Corizon Health, Inc.'s Answer and Affirmative Defenses to Plaintiffs' First Amended Complaint

Fees Paid:

Total Filing Fees: $0.00
Provider Fee: $6.50
Total Amount Paid: $6.70

If you have questions about your filing, please contact AOC Support Services, phone number 602-452-3519 or 1-800-720-7743, or e-mail pasupport@courts.az.gov. Please have your AZTurboCourt Form Set # available.

To view the link above:
Click on the link OR
1) Highlight the website address "URL" above, then Right Click on highlighted "URL" and select Copy.
2) Open a NEW internet browser window.
3) Right Click inside the address field in the new internet browser window and select Paste.

Thank you for using TurboCourt!

**From:** CustomerService=turbocourt.com@smtp.turbocourt.com on behalf of TurboCourt Customer Service
**To:** Barbara McKinley
**Subject:** E-Filing Status: Form Set # 2689492 Filed
**Date:** Tuesday, July 03, 2018 3:40:22 PM

PLEASE DO NOT REPLY TO THIS EMAIL.

Your AZTurboCourt Form Set #2689492 has been accepted and FILED at Maricopa County - Superior Court and is part of the official court record.

Here are your filing details:
Case Number: CV2016-007692
Case Title: Long, Et.Al. Vs. State Of Arizona, Et.Al.
Filed By: Barbara J McKinley
AZTurboCourt Form Set: #2689492
Keyword/Matter #: Long-92015-AJF
Filing date and time: Jul 02, 2018 2:57 PM MST

Forms:
Summary Sheet (This summary sheet will not be filed with the court. This sheet is for your personal records only.)

Attached Documents:
Answer: Defendants State of Arizona and Corizon Health, Inc.'s Answer and Affirmative Defenses to Plaintiffs' First Amended Complaint

Fees Paid:

Total Filing Fees: $0.00
Provider Fee: $6.50
Total Amount Paid: $6.70

YOU MUST log back on to http://turbocourt.com/ to view and/or print a copy of your file stamped copy.

If you have questions about your filing, please contact AOC Support Services, phone number 602-452-3519 or 1-800-720-7743, or e-mail pasupport@courts.az.gov. Please have your AZTurboCourt Form Set # available.

To view the link above:
Click on the link OR
1) Highlight the website address "URL" above, then Right Click on highlighted "URL" and select Copy.
2) Open a NEW internet browser window.
3) Right Click inside the address field in the new internet browser window and select Paste.

Thank you for using TurboCourt!

Anthony J. Fernandez (Bar No. 018342)
Rebecca E. Stanton (Bar No. 032291)
**QUINTAIROS, PRIETO, WOOD & BOYER, P.A.**
2390 E. Camelback Road, Suite 440
Phoenix, Arizona 85016
Telephone: (602) 954-5605
Facsimile: (602) 954-5606
afernandez@qpwblaw.com
rebecca.stanton@qpwblaw.com
*Attorneys for Defendants*

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

KENNETH and CORA LONG, husband and wife, individually, and as statutory beneficiaries for Nicholas Long, deceased; and on behalf of the Estate of NICHOLAS LONG,

Plaintiff,

v.

STATE OF ARIZONA, a body politic, CORIZON HEALTH, INC., an Missouri Corporation, doing business in the State of Arizona,

Defendants.

Case No. CV2016-007692

**DEFENDANTS' RULE 37 MOTION FOR SANCTIONS**

**(ORAL ARGUMENT REQUESTED)**

**(COURT REPORTER REQUESTED)**

(Assigned to the Honorable Rosa Mroz)

Defendants State of Arizona and Corizon Health, Inc. (collectively "Defendants" herein), by and through undersigned counsel, respectfully submit this Motion for Sanctions pursuant to Arizona Rules of Civil Procedure 37(c), as well as, Defendants' Separate Statement of Facts in Support of Defendants' Motion for Sanctions (filed concurrently).

Pursuant to this Court's Order dated March 8, 2018, this case has been stayed in order for the Parties to conduct limited discovery into the issue of *ex parte* communications between Plaintiffs' expert witness John O'Steen, M.D. and Defendant Corizon's former employees Jakelin Valladares and Darcee Bishop (collectively "the witnesses"). During the

stay, defense counsel deposed Dr. O'Steen, Gary Norris O'Steen (Dr. O'Steen's office manager), Jakelin Valladares and Darcee Bishop on this issue. The depositions revealed the following:

- It is undisputed that Dr. O'Steen initiated case-specific conversations with the witnesses after he was retained by Plaintiffs' counsel.
- It is undisputed that Plaintiffs' counsel was aware of the *ex parte* communications at the time they took place, in June-July of 2017.
- It is undisputed that Dr. O'Steen interviewed the witnesses and gained case-specific information from them, which he emailed to Plaintiffs' counsel in July of 2017.
- It is undisputed that the *ex parte* communications, and the case-specific information reported to Plaintiffs' counsel by Dr. O'Steen, was never disclosed to Defendants.
- It is undisputed that Plaintiffs' counsel did not, at any time, direct Dr. O'Steen to refrain from or stop speaking with the witnesses on case-specific issues.
- It is undisputed that Plaintiffs' counsel noticed the depositions of the witnesses because of the information gained through the interviews conducted by Dr. O'Steen.

The Court's March 8, 2018 Order directs Defendants to file a Motion for Sanctions by July 9, 2018, addressing 1) the applicability of *Lang v. Superior Court*; 2) the applicability of E.R. 5.3, assuming that Dr. O'Steen communications with the witnesses *before* he was retained as Plaintiffs' expert; and 3) options for sanctions. This is that motion.

Firstly, the witnesses (as former Corizon employees) are *Lang*-protected because their alleged acts or omissions can be imputed to Defendant Corizon for purposes of civil liability in this matter. Plaintiffs allege a systemic failure of care over a months-long period of time, including breakdowns in nursing care. The witnesses were a part of Decedent's nursing care team for the critical period of time that the alleged breakdown in care occurred.

Secondly, it is undisputed that Dr. O'Steen conducted *ex parte* interviews after his retention in the matter. In fact, he informed Plaintiffs' counsel of his intention to do so, prior to doing so, and reported back the information he received. He even listed the *ex parte* interviews on his expert invoice. Plaintiffs' counsel never objected to the *ex parte* interviews. Plaintiffs' counsel never told Dr. O'Steen to stop. Plaintiff's counsel never disclosed the case-specific information learned from the *ex parte* interviews to Defendants.

Instead, Plaintiffs' counsel acted on the improper information by noticing the witnesses for deposition. Plaintiffs' counsel's conduct violates the Arizona Rules of Professional Conduct ER 4.2, ER 5.3 and ER 8.4. *See also* the legal ethics expert declaration of Lynda C. Shely, in support of this Motion, attached at **Exhibit A**. Plaintiffs' failure to timely disclose the information gained during the *ex parte* interviews is also a sanctionable violation of Ariz. R. Civ. P. 26.1.

Defendants move for the following sanctions under Rule 37 (c): (1) that John O'Steen, M.D. be stricken as an expert, including any of his opinions disclosed to date; (2) that Plaintiffs' counsel be disqualified from the case; (3) monetary sanctions including Defendants' reasonable expenses and attorney's fees, related to the discovery and litigation of this issue; and (4) dismissal of the case with prejudice.

## I. STATEMENT OF FACTS

This case arises from the death of Nicholas Long ("Decedent") on May 25, 2015, an inmate of the Arizona Department of Corrections at all relevant times. [DSSOF 1, 7, 8]. Prior to his death, from November 25, 2014 to February 2, 2015 (the "relevant care period") Decedent was housed at the Arizona State Prison Complex – Florence ("ASPC-Florence"), in the prison infirmary (the "Infirmary"), to receive treatment for ulcerative colitis. [DSSOF 3]. Defendant Corizon was the contracted provider of medical services for Infirmary inmates, including Decedent, during the relevant care period. [DSSOF 2].

Plaintiffs filed their medical negligence/wrongful death Complaint in Maricopa County Superior Court on May 18, 2016 naming the State of Arizona and Corizon as defendants. [DSSOF 8]. Plaintiffs allege that inadequate care of Decedent's ulcerative

colitis during the relevant care period in the Infirmary led to his death. [DSSOF 3, 4, 51]. The medical care Decedent received from Defendant Corizon (through its employees) in the Infirmary during the relevant care period is the subject of this suit. [DSSOF 4, 51]. Darcee Bishop, RN and Jakelin Valladares, CNA (certified nursing assistant) (collectively "the witnesses") were members of Decedent's Infirmary care team during the relevant care period. [DSSOF 5, 12, 13]. Both were Corizon employees at the time. [DSSOF 6].

Plaintiffs' claims of medical negligence and wrongful death do not arise from a discreet issue or set of issues. [DSSOF 51]. Instead, Plaintiffs allege a systemic breakdown in Decedent's care over the course of more than two months in the prison Infirmary during the relevant care period. *Id.* Plaintiffs allege that during that time, Decedent's "medical and physical condition deteriorated as he became malnourished and cachectic" and that his deteriorating condition, particularly throughout the month of January "would have been obvious to a lay-person." *Id.* They allege he had elevated and increasingly concerning vital signs and declining body mass index throughout this time period, which showed he was in an "undeniably critical" state. *Id.* Plaintiffs blame Decedent's entire Infirmary care team for allegedly failing to properly recognize, assess, and treat his serious medical condition resulting in his death. [DSSOF 51, 52, 53].

Plaintiffs also allege that Decedent's Infirmary care team failed to provide a multi-disciplinary approach (including adequate nursing care) to treat his illness. [DSSOF 54]. Plaintiffs are specifically critical of Decedent's Infirmary nursing care. [DSSOF 55]. Plaintiffs disclosed a nursing standard of care expert who opined that Corizon nursing staff generally violated the standard of care by allowing their personal feelings about Decedent to interfere with care provided. [DSSOF 55]. The expert also opined that the Corizon nurses fell below the standard of care where they were "unable, or unwilling, to elevate concerns with patient care within an established chain of command," including with respect to medication refusals. *Id.* <u>The nursing expert specifically cites to a medication refusal documented by Ms. Bishop as evidence upon which she relied in concluding that Corizon nurses fell below the standard of care</u>. *Id.* She opined that nurses are required to take

concerns about quality of care up the chain of command. *Id.* Dr. O'Steen, Plaintiff's physician standard of care expert, agreed with Plaintiffs' nursing expert that any licensed healthcare professional (including nurses and nursing assistants) is required to elevate concerns about care up the chain of command. [DSSOF 46]. He also testified that Decedent was so critical towards the end of January that any member of his care team should have taken action by calling 911. *Id.* This would include Jakelin Valladares, who cared for Decedent on January 29, 2015. [DSSOF 13].

Ms. Bishop and Ms. Valladares both terminated their employment with Corizon after the relevant care period in which they provided care to Decedent in the Infirmary. [DSSOF 17, 19]. Both thereafter went to work at Central Arizona Florence Correctional Complex (formerly known as Central Arizona Detention Center, hereinafter referred to as "CADC"), a detention center in Florence, Arizona, as a nurse and nursing assistant, respectively. *Id.*

On October 24, 2016, Defendants disclosed Ms. Bishop and Ms. Valladares as members of Decedent's Corizon care team during the relevant care period. [DSSOF 10]. Defendants disclosed that the witnesses were Corizon employees at the relevant time, and, as such, were and are only to be contacted through defense counsel. *Id.* Defendants also disclosed the witnesses' charting which showed that each provided care to Decedent between December of 2014 and January of 2015 in the Infirmary. [DSSOF 11, 12, 13]. Ms. Valladares' charting shows numerous instances of abnormal vital signs and decreasing weight and body mass index throughout the months of December of 2014 and January of 2015. [DSSOF 13]. Ms. Bishop cared for Decedent through January 18, 2015. [DSSOF 12]. On that date, she charted that she declined to assist Decedent in making soup and adjusting his pillow. *Id.*

Plaintiffs retained John O'Steen, MD as a standard of care expert witness in March of 2017. [DSSOF 14]. Dr. O'Steen is the Medical Director at CADC, and works (or has worked) with both of the witnesses through their employment relationship at CADC.

[DSSOF 18, 20]. Each of the witnesses testified that, as Medical Director, Dr. O'Steen is above her in the chain of command. *Id.*

On May 14, 2017, Dr. O'Steen sent a letter Plaintiffs' counsel in which he claimed to have had conversations with some of his CADC co-workers about their work at Corizon. [DSSOF 21]. In particular, he claimed that he had spoken with a former Corizon CNA "about two years" prior specifically about a patient he believed to be Decedent. *Id.* At that point, Plaintiffs' counsel was on notice that Dr. O'Steen was in contact with a member of Decedent's Infirmary care team. *Id.*

On June 21, 2017, Plaintiffs' counsel emailed the following to Dr. O'Steen's business manager, Gary Norris O'Steen:

> **"Is Dr. O'Steen able to provide names of any witnesses, nurses that may be willing to testify?"** [DSSOF 22].

On June 25, 2017, Gary Norris responded on behalf of Dr. O'Steen, writing:

> **"Dr. O'Steen said that he will speak to a number of potential witnesses at his place of employment this week to see if they would be willing to testify. It will be towards the end of the week before he can speak with them all."** [DSSOF 23].

Plaintiffs' counsel did not intervene to instruct Dr. O'Steen not to speak with former Corizon employees involved in the case. [DSSOF 24].

On July 17, 2017, Dr. O'Steen emailed Plaintiff's counsel and reported that he had spoken to former employees Jakelin Valladares and Darcee Bishop about Decedent. [DSSOF 25, 26, 27, 28]. He reported that he had interviewed the witnesses concerning their personal recollections of Decedent, his condition and his medical care. *Id.* He reported that "[Ms. Bishop] might testify to [Decedent's] lack of cooperation with treatment which of course is the defense that Corizon will be using." [DSSOF 27]. With respect to Ms. Valladares, Dr. O'Steen disclosed to Plaintiffs that she "resigned her position with Corizon [] because of what she perceived to be a lack of proper care for [Decedent]," and that she told him she had watched him "deteriorate with 'nothing being

done.'" [DSSOF 28]. He also disclosed that he had spoken to two additional former Corizon employees who also made negative remarks about Corizon, but who were not involved in Decedent's care. [DSSOF 25]. Plaintiffs' counsel still did not instruct Dr. O'Steen to refrain from speaking with the witnesses about the case. [DSSOF 24].

At deposition, Ms. Valladares recalled having approximately five conversations with Dr. O'Steen about Decedent, all of which were initiated by Dr. O'Steen identifying Decedent by name, "Nicholas Long." [DSSOF 47]. She testified that it made her uncomfortable that he was inquiring about a specific patient by name. *Id.* She testified that he was her boss, and she did not feel like she could refuse to talk to him. *Id.* He asked her to describe Decedent's medical condition, and asked her whether he refused meals. *Id.* He asked her whether she was concerned about Decedent's care. *Id.* He also asked her whether she believed she had provided Decedent with the "right care." *Id.*

At deposition, Ms. Bishop testified that Dr. O'Steen approached her while they were both working at CADC and asked her whether she remembered "Nicholas Long" from her work at Corizon. [DSSOF 48]. She said she did, and he asked her what she remembered about him. *Id.* She testified that prior to that encounter, she had never discussed Decedent with Dr. O'Steen. *Id.* She testified that Dr. O'Steen had multiple conversations with her about Decedent. *Id.* She also testified that he asked her how often Dr. Vukcevic (another Corizon employee) came in to see Decedent in the Infirmary. *Id.*

At no time did Plaintiffs disclose the information gained and reported by Dr. O'Steen about the expected testimony of the witnesses, or disclose the fact that Plaintiff's expert had conducted *ex parte* interviews of the witnesses. [DSSOF 29, 30, 31, 36].

Dr. O'Steen listed his interviews of the witnesses as a line-item on his expert invoice to Plaintiffs' counsel. [DSSOF 32]. Plaintiffs' counsel paid the bill in full without contest. [DSSOF 33].

In January of 2018, Plaintiffs requested the depositions of the witnesses. [DSSOF 34]. At that point in the litigation, Plaintiffs had only taken four (4) depositions, all of Corizon physicians involved in Decedent's care. *Id*. Rather than contacting the witnesses

directly, Plaintiffs sought to arrange the depositions through defense counsel. [ DSSOF 35]. It was in contacting the witnesses to arrange deposition that defense counsel first learned of the *ex parte* communications between Dr. O'Steen and the witnesses. [DSSOF 37, 38]. Defense counsel brought the issue to the Court's attention, after conferring with Plaintiff's counsel regarding the issue. [DSSOF 39, 40, 41]. The Court ordered a four-month stay in the case, to permit discovery into the *ex parte* communications and the disclosure of Dr. O'Steen's expert file. [DSSOF 42, 43]. During the stay, Plaintiffs amended their Complaint to add Constitutional claims. [DSSOF 44]. On June 6, 2018, defense counsel took the depositions of Dr. O'Steen and the witnesses on the limited topic of the *Lang* and discovery issues as permitted by the Court's stay order. [DSSOF 42, 45].

At deposition, Dr. O'Steen admitted that he initiated conversations about Decedent with both of the witnesses after he was retained by Plaintiffs' counsel. [DSSOF 46]. He admitted that he felt compelled to do so because Plaintiffs' counsel had asked him which witnesses would be willing to testify. *Id.* He testified that the witnesses told him they were concerned about professional liability with respect to their care of Decedent. *Id.* He did not advise the witnesses that they should have counsel present, or that their statements could have legal and professional ramifications. [DSSOF 50]. Dr. O'Steen further testified that Plaintiffs' counsel, at no time, instructed him to refrain from, or stop, speaking to former Corizon employees about the case. [DSSOF 24, 46].

## II. LEGAL ARGUMENT

### A. Dr. O'Steen's *ex parte* interviews of Defendants' former employees Darcee Bishop and Jakelin Valladares concerning Decedent are prohibited and unethical

#### i. *Lang v. Superior Court* and ER 4.2 prohibit ex-parte communications with Defendants' former employees

It is well-settled Arizona law that *ex parte* contact with the former employee of an opposing party, concerning the subject matter of the litigation, is prohibited. *Lang v. Superior Court, In & For Cty. of Maricopa*, 170 Ariz. 602, 826 P.2d 1228 (Ct. App. 1992). Arizona Rule of Professional Conduct ER 4.2 prohibits *ex parte* communications "about

the subject of the representation" with a represented party, and *Lang* explicitly applies the prohibition to former employees, where the acts or omissions of the former employee can be imputed to the former employer for purposes of civil liability. *Id; see also Kaiser v. AT&T*, 2002 WL 1362054 (D. Ariz. 2002)(Slip Op.) (prohibiting *ex parte* contacts between opposing counsel and former employees where former employee's actions are precisely those sought to be imputed to the corporation, and where the former employee "may make statements that will vitally affect the employer's legitimate interests.) "The prohibition is intended to (1) prevent unprincipled attorneys from exploiting the disparity in legal skills between attorneys and lay people, (2) preserve the integrity of the attorney-client relationship, (3) help to prevent the inadvertent disclosure of privileged information, and (4) facilitate settlement." *Lang*, 170 Ariz. at 604 (Ct. App. 1992). *See also* **Exhibit A**, Legal Ethics Expert Declaration of Lynda C. Shely.

**ii. Darcee Bishop and Jakelin Valladares are *Lang*-protected employees**

Plaintiffs do not allege that a discreet event or set of events underlies this lawsuit. Instead, Plaintiffs are claiming that a systemic breakdown of care, including nursing care, between November 25, 2014 and February 2, 2015 while Decedent was in the Infirmary led to his death. Ms. Valladares and Ms. Bishop both provided nursing care to Decedent during this critical time. Moreover, both provided care that Plaintiffs' experts criticize. Plaintiffs' nursing expert is critical of nursing staff for failing to elevate concerns (like medication refusals and elevated vital signs) up the chain of command. Ms. Valladares cited numerous instances of abnormal vital signs and declining weight and body mass index, particularly in the month of January of 2015 when Plaintiffs' allege that Decedents' deteriorating condition should have been "obvious to a lay person." According to Dr. O'Steen, Ms. Valladares told him that she left her position with Corizon in part because of concerns over Decedent's care – if these concerns were not elevated up the chain of command then this is exactly the scenario which Plaintiffs' nursing expert is critical of. Plaintiffs' nursing expert is also critical of Ms. Bishop, and cites to her care directly (with

respect to a medication refusal) as evidence upon which her standard of care opinion is based.

Dr. O'Steen's testimony is also critical of Ms. Valladares' care. Dr. O'Steen himself testified simply charting care concerns is not enough, staff (including nurses) have a duty to elevate care concerns up the chain of command. Dr. O'Steen also testified that he is critical of the Infirmary staff at large (including nurses and CNAs) for failing to call 911 during Decedent's final days in the Infirmary, when Decedent was in a critical condition. This includes Ms. Valladares, who cared for Decedent on January 29, 2015. Plaintiffs' claims concerning deviations from the standard of care impute liability for the actions (or inactions) of both Ms. Bishop and Ms. Valladares to Corizon.

Moreover, Dr. O'Steen solicited an admission of liability from Ms. Valladares when he asked her whether she believed she provided Decedent with the "right care." This is exactly the type of question which she should not have answered without the benefit of counsel. At no time did Dr. O'Steen advise the witnesses that a nursing expert had opined against the nursing care provided to Decedent. Nor did he advise the witnesses that their comments could have ramifications leading to liability attaching to their own actions. At no time did he caution the witnesses that they could be committing a HIPAA violation by speaking to him about Decedent's medical care. Moreover, Dr. O'Steen (perhaps unwittingly) was exploiting a power dynamic to Plaintiffs' counsels' benefit when he conducted these interviews. Both witnesses testified that Dr. O'Steen outranked them in the chain of command. Ms. Valladares in particular testified that the questions about Decedent by Dr. O'Steen made her feel uncomfortable, but because he was her boss she felt that she had to answer them.

Plaintiffs' counsel went through defense counsel to request the depositions of the witnesses, rather than noticing them directly. If Plaintiffs' counsel truly believed that the witnesses were not *Lang*-protected, why did they go through defense counsel to notice the depositions? Why not contact the witnesses directly? If Plaintiffs' counsel truly believed

that the witnesses were not *Lang*-protected, why did they not disclose the *ex parte* interviews as required under Rule 26.1?

Ms. Bishop and Ms. Valladares are the only two nurses of Decedent's entire Infirmary care team chosen to be deposed by Plaintiffs. In fact, Plaintiff has only taken four other depositions, all of physicians involved in Decedent's care. Ms. Bishop and Ms. Valladares are also the only two former Corizon employees identified and interviewed by Dr. O'Steen who were personally involved in Decedent's care. These facts in tandem suggest that Plaintiffs' counsel sought to depose these witnesses to tie their actions (or inactions) to Plaintiffs' allegedly inadequate care and death.

ER 4.2 and *Lang* prohibit *ex parte* communications about the subject matter of a case with former employees, where the acts or omissions of the former employee can be imputed to the former employer for purposes of civil liability. Because Ms. Bishop's and Ms. Valladares' actions can be imputed to Corizon for purposes of liability in this case, they fall into the category of protected former employees recognized by *Lang* and may not be spoken to about the case without counsel present. *See also* **Exhibit A**, Legal Ethics Expert Declaration of Lynda C. Shely.

**iii. Dr. O'Steen engaged in the interviews <u>after</u> he was retained by Plaintiff's counsel, with Plaintiffs' counsel's knowledge. Plaintiff's counsel took no action to stop or remedy the *Lang*-violations. Plaintiff's counsel ratified the ethical violation by failing to disclose the *ex parte* communications, and noticing the witnesses for deposition.**

It would be nonsensical to prohibit *Lang* communications by counsel and simultaneously permit counsel to allow their experts to undertake the prohibited task. Arizona Rule of Professional Conduct ER 5.3 directly addresses this issue, and requires a lawyer to adequately supervise a nonlawyer expert such as Dr. O'Steen:

> With respect to a nonlawyer … retained by or associated with a lawyer:
> (b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and

> (c) a lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if:
>
> (1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or
>
> (2) the lawyer … has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

Comment [3] to E.R. 5.3 provides that a lawyer who uses services outside the firm "must make reasonable efforts to ensure that the services are provided in a manner that is compatible with the lawyer's professional obligations." In *Allen v. Int'l Truck & Engine*, 2006 WL 2578896 (S.D. Ind. 2006) a magistrate found a violation of ethical rules 4.2, 4.3, 5.3 and 8.4 where a lawyer failed to caution an investigator from communicating directly with a represented party, and failed to take expeditious measures to remedy the violating communication. *See also Midwest Motor Sports v. Arctic Sales, Inc.,* 347 F.3d 693, (8th Cir. 2003).

Moreover, Arizona Rule of Professional Conduct ER 8.4(a) provides that "[i]t is professional misconduct for a lawyer to: (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another." Under ERs 5.3 and 8.4, Plaintiffs' counsel is under an ongoing obligation to make reasonable efforts to ensure Dr. O'Steen's conduct is compatible with the ethical rules, and to mitigate or avoid unethical behavior. Plaintiffs' counsel did not comply with its ethical responsibilities.

It is undisputed that Dr. O'Steen initiated case-specific conversations with both of the witnesses after his retention. Dr. O'Steen admitted as much at his deposition, and his testimony comports with that of the witnesses who both testified that Dr. O'Steen initiated conversations with them about Decedent, by name. At no time did Plaintiffs' counsel direct Dr. O'Steen to stop interviewing the witnesses or any other former Corizon employees. Plaintiffs' counsel also took no steps to remedy the violations once they occurred.

As early as May 14, 2017, Plaintiffs' counsel should have cautioned Dr. O'Steen against speaking with any former Corizon employees involved in the case when Plaintiffs' counsel was informed that Dr. O'Steen worked with a former Corizon CNA who he believed had cared for Decedent. Plaintiffs' counsel did not intervene.

On June 21, 2017, Plaintiffs' counsel should not have asked whether Dr. O'Steen knew of any witnesses (i.e. former Corizon employees) "willing to testify."

On June 25, 2017, when Dr. O'Steen explicitly informed counsel of his intent to speak with witnesses by the end of the week, Plaintiffs' counsel should have intervened to tell Dr. O'Steen not to speak with former Corizon employees who cared for Mr. Long about the case. Plaintiffs' counsel did not intervene.

On July 17, 2017, when Dr. O'Steen relayed the information he gained from his interviews and identified Ms. Valladares and Ms. Bishop by name (both of whom were listed as *Lang*-protected witnesses in Defendants' Initial Disclosure Statement), Plaintiffs' counsel should have 1) cautioned Dr. O'Steen against any further communications about the case with Ms. Valladares and Ms. Bishop, and 2) disclosed the information to Defendants. Plaintiffs' counsel did neither.

On August 27, 2017, when Dr. O'Steen listed the interviews on his bill, Plaintiffs' counsel should have cautioned him against speaking to former Corizon employees about the case. Plaintiffs' counsel did not intervene.

Instead, Plaintiffs' counsel acted on the knowledge gained from the *ex parte* interviews by noticing the witnesses for deposition. This constitutes ratification of Dr. O'Steen's conduct by Plaintiffs' counsel. *See also* **Exhibit A**, Legal Ethics Expert Declaration of Lynda C. Shely.

Common sense shows that Plaintiffs' counsel initiated or even directed the *ex parte* communications by asking Dr. O'Steen "which witnesses would be willing to testify." In order to answer that question, Dr. O'Steen necessarily had to initiate a conversation with the witnesses themselves. How else would Dr. O'Steen be able to determine whether a person was "willing" but by asking them directly? Instead, Plaintiff's counsel should have

1) cautioned Dr. O'Steen not to speak with any former Corizon employees about the case; and 2) asked Dr. O'Steen for a list of names of individuals he had already spoken to about Corizon/Decedent so Plaintiffs' counsel could evaluate the applicability of *Lang* and disclose the witnesses and the substance of any conversations that had already occurred to Defendants.

Dr. O'Steen is not a lawyer. Plaintiffs' counsel should have acted with caution the moment it was discovered that he was speaking with Defendants' former staff about the case. At no time did Plaintiffs' counsel intervene to tell Dr. O'Steen to stop conversing with the witnesses. Both of the witnesses testified that Dr. O'Steen initiated more than one conversation about Decedent and his care. If Plaintiffs' counsel had intervened, some or all of those conversations might have been prevented.

**B. The improper *ex parte* communications were not disclosed to Defendants, in violation of Rule 26.1.**

Under Ariz. R. Civ. P. 26.1(a)(4), Plaintiffs have a duty to promptly disclose the name of any person with information relevant to the subject matter of the action, as well as, a fair description of the nature of the information. When Dr. O'Steen interviewed Defendants' employees concerning their personal recollections of the subject matter of the suit, Dr. O'Steen turned himself into a witness with relevant, new information. Plaintiffs were obligated to disclose this information to defense counsel within 30 days of receipt (i.e. at the latest by August 16, 2017). Ariz. R. Civ. P. 26.1(d)(2). They did not, and instead acted on the information by noticing the witnesses for deposition. Moreover, some of the information Plaintiffs' counsel withheld was exculpatory– Dr. O'Steen reported to Plaintiffs' counsel that Ms. Bishop would likely testify in support of Defendant's defense that Decedent was uncooperative with treatment attempts. This conduct, in and of itself and regardless of the *Lang* violations, is unethical and sanctionable.

**C. Plaintiffs' *Lang*, ethics, and disclosure violations are sanctionable**

When a party fails to timely disclose information of a witness as required under Rule 26.1, that party may not, unless such failure is harmless, use that information or

witness at trial. Ariz. R. Civ. P. 37(c)(1). The failing party may be subject to further sanctions including but not limited to imposing payment of reasonable costs and attorneys' fees, and/or dismissal of the action. Ariz. R. Civ. P. 37(c)(3). Where, as here, a party has failed to disclose unfavorable information, the Court is further justified in imposing serious sanctions up to and including disqualification of Plaintiffs' counsel and dismissal of the action in whole or in part. Ariz. R. Civ. P. 37(d)(1).

Plaintiffs' counsel's ethical and *Lang* violations justify serious sanctions as well, including disqualification of Plaintiffs' counsel and even dismissal of the action. *See Camden v. Maryland*, 910 F. Supp. 1115, 1124 (D. Md. 1996) (lawyer disqualified for contacting a former employee of the opposing party in violation of 4.2 and gaining confidential information); s*ee also* **Exhibit A**, Legal Ethics Expert Declaration of Lynda C. Shely.

Dr. O'Steen's improper *ex parte* communications with Defendants' employees, and Plaintiffs' failure to disclose that contact, have irreparably tainted this case. Defendants therefore request the following sanctions:

i. That John O'Steen, M.D. be stricken as an expert, including any of his opinions disclosed to date. The information he gained, *ex parte*, in violation of *Lang* is a bell that cannot be unrung, and has to be assumed to have been a foundational basis of his opinion, and further elements of Plaintiff's case.

ii. That Plaintiffs' counsel be disqualified for engaging in unethical conduct.

iii. That Defendants be awarded monetary sanctions including the payment of reasonable expenses and attorneys' fees related to the filing of this motion.

iv. Dismissal of the case with prejudice.

## III. CONCLUSION

Defendants respect that Plaintiffs' counsel be sanctioned, as noted herein, for ethical and rules violations.

**RESPECTFULLY SUBMITTED** this 9th day of July, 2018.

QUINTAIROS, PRIETO, WOOD & BOYER, P.A.

By: /s/ Anthony Fernandez
Anthony J. Fernandez
Rebecca E. Stanton
*Attorneys for Defendants*

**ORIGINAL** efiled via AZ TurboCourt on this 9th day of July, 2018 with:

**The Clerk of the Court**

The Honorable Rosa Mroz
**MARICOPA COUNTY SUPERIOR COURT**
East Court Building - 414
101 Jefferson
Phoenix, AZ 85003-2243

**COPIES** mailed this same day to:

Joel B. Robbins
Anne E. Findling
**ROBBINS & CURTIN, PLLC**
301 E. Bethany Home Road, Suite B100
Phoenix, AZ 85012-0001
*Attorneys for Plaintiffs*

Krista Carman
**CARMAN LAW FIRM**
246 S. Cortez Street
Prescott, AZ 86303
*Attorneys for Plaintiffs*

By /s/ Nelly Preca

# EXHIBIT A

**Declaration of Lynda C. Shely**

Lynda C. Shely
6501 E. Greenway Parkway
Suite 103-406
Scottsdale, Arizona 85254
Lynda@Shelylaw.com
480-905-7237

I, Lynda C. Shely, have been asked by Anthony Fernandez, counsel to the State of Arizona and Corizon Health Inc. ("Defendants") to provide this Declaration in *Long v. State of Arizona, Corizon Health Inc.,* No. CV2016-007692 in the Superior Court for the State of Arizona in Maricopa County ("*the Case")*.

A. Lynda Shely Qualifications as a Legal Ethics Expert.

1. I am admitted to practice in Arizona, the District of Columbia, and Pennsylvania (inactive). I have been a member of the State Bar of Arizona since 1994 (AZ Bar No. 015549) and, since that time, have devoted most of my practice to providing professional responsibility and risk management advice to lawyers. I opened my own firm in June, 2003, The Shely Firm, P.C., through which I provide only ethics and risk management advice to lawyers, as well as serving as an expert witness on ethics issues. I currently represent over 1500 law firms in Arizona and Washington, D.C.

2. I was employed by the State Bar of Arizona from 1993 to 2003 as the Director of Lawyer Ethics, with my primary responsibility as providing ethics advice to members of the State Bar, and judges. Prior to working for the State Bar of Arizona, I was in private practice in Washington, D.C., at Morgan, Lewis & Bockius from 1987 to 1991, practicing in intellectual property, franchise and antitrust litigation. During my ten years at the State Bar of Arizona as the Director of Lawyer Ethics, I answered approximately 8000 telephonic ethics inquiries each year from lawyers and judges. I also drafted numerous written informal and formal advisory Opinions and served as staff counsel to the State Bar of Arizona Committee on the Rules of Professional Conduct. I also supervised the unauthorized practice of law ("UPL") department, the Client Protection Fund, the Peer Review Program, and the Fee Arbitration Program, including reviewing all fee arbitration awards. I also worked with the Lawyer Regulation Department of the State Bar of Arizona in reviewing dispositions of charges against lawyers.

3. I currently serve on the ABA Standing Committee on Ethics and Professional Responsibility, the State Bar of Arizona's Convention Committee, and as an Arizona Delegate in the ABA House of Delegates. I present numerous professional responsibility continuing legal education seminars around the country for the ABA, state bar associations, professional organizations, and law firms. The seminars include such topics as compliance with the Rules of Professional Conduct, avoiding unauthorized practice of law, avoiding conflicts of interest, law firm dissolutions, risk management procedures for law firms, advertising and social media ethics compliance, ethical billing practices, professional responsibility obligations in fee arrangements, and professionalism issues.

4. I was the 2015-2016 President of the Association of Professional Responsibility Lawyers. I am a past chair of the ABA Standing Committee on Client Protection and served on the ABA Model Definition of the Practice of Law Task Force and ABA Standing Committee on Professionalism. I also was a member of the State Bar of Arizona's Multijurisdictional Task Force, which drafted the 2004 amendments to Ethical Rule 5.5, the State Bar's Ethical Rules Review Group, which prepared the amendments to the Rules of Professional Conduct adopted in December, 2003, and the State Bar's Unauthorized Practice of Law Committee. I am a past president of the Scottsdale Bar Association and prior chairman of the Maricopa County Bar Association CLE Committee. I have received several awards for my contributions to the legal community, including the State Bar of Arizona Member of the Year Award (2007), the Scottsdale Bar Association's 2010 Award of Excellence, and the 2015 AWLA-Maricopa Chapter Ruth V. McGregor award.

5. I have taught Professional Responsibility as an adjunct professor at all three Arizona law schools.

Attached hereto is a true and correct copy of my *curriculum vitae*.

B. I have reviewed the following documents:

1. Defendants' Expedited Rule 37 Motion to Compel Disclosure and For Sanctions, Feb. 20, 2018
2. Defendants' Fourth Supplemental Rule 26.1 Disclosure Statement, March 7, 2018
3. Plaintiff's One-Page Statement on Discovery Dispute, March 7, 2018
4. Defendants' Statement of Discovery Dispute, March 7, 2018
5. Plaintiffs' 18th Supplemental Disclosure Statement, March 23, 2018
6. March 8, 2018 Minute Entry
7. Emails between Robbins & Curtin and Dr. John O'Steen, as produced by Plaintiffs
8. Time entries of Dr. O'Steen
9. June 6, 2018 deposition of Dr. O'Steen
10. June 6, 2018 deposition of Gary O'Steen (FKA/Gary Norris)
11. June 6, 2018 deposition of Jakelin Valladares
12. June 6, 2018 deposition of Darcee Bishop

C. My understanding of the facts is based upon my review of the documents listed above and discussions with Counsel as follows:

1. Plaintiffs, Kenneth and Cora Long ("Plaintiffs") are suing the Defendants for the death of their son, Nicholas Long ("decedent") in May, 2015, while he was incarcerated in an Arizona prison.
2. Plaintiffs are represented by Joel B. Robbins, Anne E. Findling, and Krista Carman (collectively "Plaintiffs' counsel").
3. Defendant Corizon provided medical services to the Arizona Department of Corrections facilities where the decedent was incarcerated.

4. Plaintiffs claim Defendants' systemic lack of care of the decedent caused decedent's death, including the lack of nursing care, the failure of medical professionals to identify and treat decedent's condition in a timely manner, and even the Defendants' failure to call 911 when decedent's medical condition worsened.

5. Plaintiffs' counsel contacted Dr. John O'Steen in March, 2017, through Gary Norris (aka Gary O'Steen), regarding serving as an expert witness for Plaintiffs.

6. Plaintiffs' counsel acknowledge that they were aware at the time they retained Dr. O'Steen that he had had conversations about the decedent's care with former employees of Corizon.

7. In a May, 2017 letter to Plaintiffs' counsel Dr. O'Steen stated that he had conversations with former employees of Corizon who were familiar with the decedent's care and the former Corizon employees left employment at Corizon due, in part, to their concerns for personal liability due to the lack of care of inmates.

8. Dr. O'Steen's conversations about the decedent's care were with former Corizon employees who at the time of their conversations with Dr. O'Steen worked at the same Florence correctional facility as Dr. O'Steen, for CoreCivic.

9. Dr. O'Steen is the head of clinical operations and medical director of the CoreCivic facility.

10. Dr. O'Steen's conversations about the care of the decedent with former Corizon employees included Jakelin Valladares, CNA and Darcee Bishop, RN.

11. Ms. Bishop in her deposition stated that Dr. O'Steen approached her and asked about the decedent – she did not mention the decedent to Dr. O'Steen.

12. Dr. O'Steen stated that he had "seen Ms. Bishop's name" in the decedent's medical records once he was retained as an expert witness.

13. Ms. Bishop stated that Dr. O'Steen informed her he was involved with the decedent's case but he never cautioned her to not talk about a patient that he had not treated nor did he advise her to speak with a lawyer.

14. Dr. O'Steen asked Ms. Bishop about the frequency of Dr. Vukevic's visits with the decedent.

15. Ms. Bishop expressed concern about her personal liability for the decedent's care.

16. Ms. Valladares worked at Corizon for approximately 5 months and then went to CoreCivic in 2015.

17. Both Ms. Valladares and Ms. Bishop indicated that they left Corizon due to understaffing.

18. Ms. Valladares stated in her deposition that Dr. O'Steen asked her why she left Corizon, what her duties were at Corizon, whether there were doctors who performed rounds, how Corizon handled health care, and eventually he asked her about the decedent's care.

19. Dr. O'Steen asked Ms. Valladares about whether the decedent was examined by specialists and what medical condition the decedent had.

20. Dr. O'Steen did not warn Ms. Valladares not to discuss a former patient with him if he had not treated the patient.

21. Ms. Valladares estimated that Dr. O'Steen questioned her about ten times, some of which occurred before Dr. O'Steen was retained as an expert witness, and only after she answered his questions did he tell her he was involved in this case and his opinion about the decedent's care.

22. Ms. Valladares testified in her deposition that she felt uncomfortable when questioned by Dr. O'Steen about her treatment of specific inmates at Corizon.  (Deposition of Valladares at p. 45).

23. In a July 7, 2017 email from Dr. O'Steen to a paralegal employed by Plaintiffs' counsel Dr. O'Steen disclosed he had communicated with both Ms. Bishop and Ms. Valladares about the decedent.

24. Dr. O'Steen's email was sent in response to an email from the paralegal, asking if he had identified any "witnesses, nurses, that would be willing to testify."

25. Gary O'Steen stated in his deposition that Dr. O'Steen inquired of the "nurses" after receiving the June 26th email from Plaintiffs' law firm, asking about potential witnesses.

26. Dr. O'Steen's conversations with Ms. Bishop were sometime in 2017 while he was medical director at CoreCivic and he indicated she might be able to testify about the lack of care of the decedent and the lack of staffing at the facility while she was employed there.
27. Dr. O'Steen's conversations with Ms. Valladares were in 2015 when she first arrived at CoreCivic and in 2017 after Dr. O'Steen was retained as an expert witness for the Plaintiffs.
28. Dr. O'Steen's time records indicate that up to August 27, 2017 he spent 22 hours on "Reviewed Medical Records of Nicholas Long, Review of the Medical Literature concerning this matter, and Preparation of Documents."
29. Dr. O'Steen explained that he did not bill his time attributable to interviewing the nurses but on p. 70 of his deposition he acknowledged that his invoice did include a description for interviewing the former Corizon employees, even though he did not charge for that time.
30. Dr. O'Steen had conversations about the decedent with other former Corizon employees, in addition to Ms. Bishop and Ms. Valladares both before and after he was retained as an expert witness in this matter.
31. Dr. O'Steen stated that both Ms. Bishop and Ms. Valladares expressed concern about their own personal liability for the lack of medical care at Corizon.
32. Dr. O'Steen at p. 74 of his deposition noted with respect to the decedent's care by Corizon, that "anybody on staff could have called 911 if they thought he was in critical condition" and Dr. O'Steen appeared critical of the fact that no staff, including the nursing staff, had called 911.
33. At no time did Plaintiffs' counsel instruct Dr. O'Steen to advise Ms. Bishop, Ms. Valladares or any of the other former Corizon employees that he spoke to about this case to retain their own counsel, nor did Plaintiffs' counsel inform Dr. O'Steen that the former employees would *not* be liable in this case.
34. Dr. O'Steen also does not recall having Plaintiffs' counsel ever instruct him to *not* interview the former Corizon employees.
35. Plaintiffs have listed an expert witness on the nurses' standard of care not being sufficient as the nurses did not report their concerns up the nursing chain of command and Dr. O'Steen stated in his deposition that nurses would have a duty to report concerns about patient care through the chain of command at a facility and that simply noting a patient's condition in the chart may not have been sufficient care but he did not testify specifically as to the nursing care of the decedent.
36. Dr. O'Steen's expert report found that the care the decedent received in the infirmary was not sufficient.
37. Both Ms. Bishop and Ms. Valladares cared for the decedent in the infirmary.
38. Defendants disclosed approximately 80 current and former employees of Corizon who could be witnesses in the case.
39. Plaintiffs noticed depositions for only 2 non-doctor witnesses, out of the approximately 75 total non-doctor witnesses on Corizon's list, and those deposition notices were for Ms. Bishop and Ms. Valladares.
40. Plaintiffs served the deposition notices for Ms. Bishop and Ms. Valladares on Defense Counsel, and not directly on the two witnesses.
41. Plaintiffs' counsel did not disclose to Defense counsel that they were aware that Dr. O'Steen had communicated with former employees of Corizon about this case until after Defense counsel independently learned about the contacts.
42. In Plaintiff's 18th Disclosure Statement Plaintiffs stated that Dr. O'Steen engaged in conversations with former employees of Corizon about the care provided to inmates by Corizon as far back as 2015 or 2016.
43. Dr. O'Steen testified that up until his June 6, 2018 deposition he had not received any instructions from Plaintiffs' counsel to refrain from communicating with any former employees of Corizon.
44. The court's March 8, 2018 Minute Entry requested additional information regarding the application of *Lang v. Superior Court,* 170 Ariz. 602 (App. 1992) and application of Arizona Rule of Professional Conduct, Ariz.R.S.Ct. 42, ER 5.3.

D. In forming my opinions, I have kept the following standards in mind:

Experts do not resolve factual disputes, they simply assist the trier of fact.  The purpose of expert testimony is to assist the trier of fact but not to provide opinions as to matters of law, which is solely the purview of the court.  I may, however, reference my assumptions about general legal principles. The Arizona Rules of Professional Conduct, Ariz. R. S.Ct. 42 ("ERs") are intended to be interpreted and applied in a context including all laws and legal principles applicable to a lawyer's conduct.

E.      My opinions are as follows:

1.    Lawyers are responsible for assuring that nonlawyer employees, agents, and others who assist in a representation comport their conduct to the lawyer's ethical obligations.  As ER 5.3 provides:

> With respect to a nonlawyer employed or retained by or associated with a lawyer:
>
> (a) a partner, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer;
> (b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and
>  (c) a lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if:
> (1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or
> (2) the lawyer is a partner or has comparable managerial authority in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

Comment [3] to ER 5.3 further explains, "[. . .] When using such services outside the firm, a lawyer must make reasonable efforts to ensure that the services are provided in a manner that is compatible with the lawyer's professional obligations [. . .]"  For instance, if a lawyer retains an investigator or expert witness the lawyer has a duty to assure that the agent's conduct in investigating a matter is consistent with the lawyer's ethical obligations.  If the lawyer comes to learn that an expert witness engaged in conduct that the lawyer could not have engaged in, and the lawyer then "ratifies" what a nonlawyer employee/agent does, the lawyer is responsible for the conduct of the nonlawyer.

The *Restatement (Third) of the Law Governing Lawyers* §11(4)(b)(i) (2000) discusses a lawyer's responsibility for a nonlawyer's unethical conduct if the lawyer learns of the unethical conduct and does not take corrective measures. Knowledge of the nonlawyer's misconduct and failure to correct it will likely be considered ratification. *E.g., State ex rel. Oklahoma Bar Ass'n v. Taylor*, 4 P.3d 1242 (Okla. 2000) (lawyer knew about unauthorized endorsements but did not take any action to correct).

In this case, Plaintiffs' counsel knew that Dr. O'Steen spoke with former employees of the Defendants before they retained Dr. O'Steen, which suggests an intent to ratify his conduct by using the information he had learned from the former employees.  Even if that was not the intent of Plaintiffs' counsel, once they retained Dr. O'Steen they had a duty to assure that he would not have *any further* communications with former employees that Plaintiffs' counsel could not speak to directly.  However, I understand from the emails sent to Dr. O'Steen that

not only did Plaintiffs' counsel fail to warn Dr. O'Steen to refrain from such communications, but instead appeared to ask that he find *more* possible witnesses.  Moreover, Plaintiffs' counsel did not disclose this impermissible contact with former Corizon employees until *after* Defense counsel raised the issue.   Plaintiffs' counsel ratified Dr. O'Steen's impermissible contacts by failing to disclose the communications to Defense counsel and using the information to determine which employees they would depose. I understand from Dr. O'Steen's deposition that he never received any instruction from Plaintiffs' counsel, as required by ER 5.3, to refrain from speaking with former employees of Corizon whose acts or omissions may be imputed to Corizon.

Regardless of whether or not Plaintiffs' counsel retained Dr. O'Steen specifically because they knew he already had communicated with the former employees, Plaintiffs' counsel had an ethical obligation both to caution Dr. O'Steen *against* communicating with the former employees about the case once he was retained, *and* to take corrective actions when they learned that he had conversations with the former employees, in violation of ER 4.2.

2. ER 4.2 and *Lang* apply to Ms. Bishop and Ms. Valladares because Plaintiffs' experts are attributing their actions (or inactions as alleged by Plaintiffs) to Defendants' for establishing liability.  While Dr. O'Steen did not provide an expert opinion specifically about the quality of the nursing care decedent received, Dr. O'Steen did fault the infirmary staff for not calling 911 and noted that simply charting the decedent's condition would not be sufficient and the nursing staff would have a duty to report their concerns about the decedent's deteriorating condition to their supervisors (Dr. O'Steen deposition at p. 42).  Moreover, the Plaintiffs have identified an expert witness to opine about the nursing care the decedent received, which further indicates the Plaintiffs are looking at the nurses actions or inactions to apply liability to Corizon.

The *Lang* decision extends ER 4.2 to prohibit an opposing counsel (and agents of the opposing counsel) from communicating directly with certain *former* employees of a represented party, when "the acts or omissions of the former employee gave rise to the underlying litigation or the former employee has an ongoing relationship with the former employer in connection with the litigation."  170 Ariz. at 607.  In this case the Plaintiffs have claimed there was a systemic breakdown of care of the decedent, and the Plaintiffs have identified an expert witness to testify about whether the nursing care provided to the decedent fell below the standard of care, such that Corizon is liable for the decedent's death.  Ms. Bishop and Ms. Valladares provided nursing care to the decedent and are the only two non-doctor witnesses Plaintiffs have sought to depose.  It appears Plaintiffs are citing to Ms. Bishop's and Ms. Valladares' actions (or inactions) to impute liability to Corizon.

The federal courts in Arizona have further clarified the extent to which certain former employees of a represented party are off-limits for direct contact from opposing counsel (or opposing counsel's agents):  "Rule 4.2 is intended to "(1) prevent unprincipled attorneys from exploiting the disparity in legal skills between attorneys and lay people, (2) preserve the integrity of the attorney-client relationship, (3) help to prevent the inadvertent disclosure of privileged information, and (4) facilitate settlement." *Richards v. Holsum Bakeries,* Slip Copy, 2009 WL 3740725 (D. Ariz. 2009).  Similarly, In *Kaiser v. AT&T, 2002 WL 1362054 (D. Ariz. 2002)(Slip Op.)* the court explained which former employees are protected by ER 4.2:

> With respect to former employees, court authorization or opposing counsel's consent to ex parte contact should be required if the former employee was highly-placed in the company (such as a former officer or director) or *if the former employee's actions are precisely those sought to be imputed to the corporation*. These restrictions do not prohibit communication with all former employees, but, in the interests of fairness, they allow corporate counsel to be present in situations where the corporation's former

constituents may make statements that will vitally affect the company's legitimate interests. (emphasis added)

Plaintiffs sought depositions of Ms. Baker and Ms. Valladares (by serving deposition notices on Corizon's counsel), plaintiffs retained a nursing standard of care expert, and Dr. O'Steen referenced the obligation of nursing staff to report up the chain of command if they were concerned about a patient's condition.  All of which demonstrates that Plaintiffs are attributing Ms. Bishop and Ms. Valladares' actions to find Corizon liable.  Thus, Ms. Baker and Ms. Valladares are protected from having to speak with Plaintiffs' counsel – or counsel's agents – including Dr. O'Steen – pursuant to ER 4.2.

 3. Ethical Rule 5.3's obligation for lawyers to adequately supervise nonlawyers extends to contract paralegals, agents, experts, investigators, and outside consultants. *See, e.g., Midwest Motor Sports v. Arctic Cat Sales Inc.*, 347 F.3d 693 (8th Cir. 2003)(lawyer who knew outside investigator was contacting employees of opposing party directly to obtain admissions precluded from using evidence); DC Op. 321 (1995).  For instance, in *Allen v. Int'l Truck & Engine,* 2006 WL 2578896 (S.D. Ind. 2006) the magistrate found that the lawyers violated ERs 4.2, 4.3, and 5.3 when they failed to caution an outside investigator from communicating directly with a represented party and "counsel should not only have detected the improper conduct but should have taken reasonable steps to remedy it more expediently."

Once a lawyer learns that a nonlawyer agent has engaged in conduct that the lawyer could not have undertaken, the lawyer has a duty to notify opposing counsel.  Failure to notify opposing counsel and refrain from using the information learned from the improper contact constitutes ratification of the nonlawyer's actions.

In this case not only have Plaintiffs' counsel acknowledged that they retained Dr. O'Steen in part because they knew he had spoken with former employees of the Defendant, but they then asked if Dr. O'Steen knew of any "witnesses, nurses that may be willing to testify" thereby intentionally encouraging this expert to speak with other former employees of the Defendants.  I have not seen any indication that Plaintiffs' counsel cautioned Dr. O'Steen to refrain from speaking with former employees of the Defendants who were covered by *Lang v. Superior Court,* 170 Ariz. 602, 607, 826 P.2d 1228, 1233 (App.1992).  Dr. O'Steen noted from his conversations with Ms. Bishop that she left employment at Corizon, in part, because of her concern about her own potential liability.  Such a statement conveyed to counsel would have alerted Plaintiffs' Counsel that Ms. Bishop was a former employee whose acts or omissions may have given rise to the litigation and therefore she could *not* be contacted without going through Defense counsel, as required by the *Lang* application of ER 4.2.

I also note that Ms. Bishop and Ms. Valladares may have felt obligated to answer Dr. O'Steen's questions, given that Dr. O'Steen is the director of the facility where Ms. Baker and Ms. Valladares work.   His supervisory role further exacerbated his impermissible discussions with them since that role may have compelled them to answer his questions.

4. While it may be obvious, Ethical Rule 8.4(a) further clarifies that if a lawyer could not do something directly, they cannot have someone else engage in the misconduct to avoid liability.  ER 8.4(a) provides:

It is professional misconduct for a lawyer to:

> (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

Thus, if a lawyer could not communicate directly with former employees of a represented party, an investigator, agent, or expert witness may not communicate directly with the former employees. If Plaintiffs' counsel could not contact Ms. Bishop or Ms. Valladares directly to ask about their knowledge about the care provided to the decedent, Plaintiffs' counsel could not do so indirectly through Dr. O'Steen. Moreover, as explained above, Plaintiffs' counsel had a duty to notify any such outside agents, such as Dr. O'Steen, that he could not do what counsel could not do directly. Failure to caution such consultants would be a breach of the lawyers' ethical obligations under ER 5.3.

5. Once a lawyer comes into possession of information learned through an improper contact with a person protected by ER 4.2, the remedies include excluding the evidence, disqualifying the expert witness, disqualifying all counsel who viewed or heard the information, or dismissing the case. As explained in *Pinal Creek Group v. Newmont Mining Corp*., 312 F. Supp. 2d 1212, 1222 (D. Ariz. 2004), an expert witness may be disqualified for a conflict of interest:

> The court's power to disqualify experts is based, in part, on "the court's inherent power to preserve the public confidence in the fairness and integrity of the judicial proceedings." *Paul,* 123 F.R.D. at 277-78 (citing *Williams v. TWA, Inc.,* 588 F. Supp. 1037 (W.D.Mo.1984)). Thus, the court can disqualify an expert based on the fundamental unfairness such expert's conflict of interest creates. See, *Sells v. Wamser,* 158 F.R.D. 390 (S.D.Ohio 1994) (applying *Paul* to disqualify expert based on court's inherent power to disqualify when a conflict of interest existed, despite the fact that the expert did not have the ability to disclose confidential information to adverse party.).

Similarly, if a lawyer obtains information in violation of ER 4.2, they can be disqualified as counsel. *See, e.g.*, *Camden v. Maryland*, 910 F. Supp. 1115, 1124 (D. Md. 1996) (lawyer disqualified for contacting a former employee of the opposing party and obtained confidential information).

I submit this declaration under penalty of perjury, under the laws of Arizona and the United States. I reserve the absolute right to alter, amend or supplement my opinions as I deem necessary or proper at any time whatsoever.

EXECUTED this 26th day of June, 2018.

Lynda C. Shely

Shely Declaration
Page **9** of **9**

**LYNDA C. SHELY, ESQ.**

6501 E. Greenway Parkway Suite 103-406
Scottsdale, Arizona 85254
480-905-7237
Lynda@Shelylaw.com

***January, 2018***

## ***Education***

- B.A. Government, Franklin & Marshall College, Lancaster, Pennsylvania 1983
- J.D., Columbus School of Law, Catholic University, Washington, DC 1987, top 5%
- Bar Admissions: Arizona, District of Columbia, and Pennsylvania

## ***Employment***

- *The Shely Firm, PC*, June 2003 – present
  Providing ethics and risk management advice to lawyers on the Rules of Professional Conduct, discipline matters, fee arbitration, conflicts of interest, advertising, fee agreements, billing, staff supervision, docketing, law firm management, and unauthorized practice of law. Also serving as an expert witness on various legal ethics and risk management topics including legal fees, conflicts of interest, standard of care, and unauthorized practice issues.

- *State Bar of Arizona*, Director of Lawyer Ethics, May 1993 – June 2003
  Supervised ethics, fee arbitration, client protection fund, peer review, and unauthorized practice of law departments. Provided over 8000 telephonic and 20 written ethics advisory opinions, *each year,* to members of the State Bar. Staff counsel to Ethics, Fee Arbitration, and Peer Review Committees and Client Protection Fund Board of Trustees. Reviewed all Fee Arbitration Awards, Client Protection Fund claims, and Peer Review referrals for assignment to committees.

- *Morgan, Lewis & Bockius,* Associate, Washington, DC, Sept. 1987 – March, 1991
  Intellectual property and antitrust representations of clients before the U.S. Patent and Trademark Office, Department of Justice, and Federal Trade Commission. Litigation of franchise disputes in federal district courts.

## ***Teaching Positions***

*Arizona Summit Law School (f/k/a Phoenix School of Law),* Adjunct Professor Law Office Management Module of General Practices Course - Fall 2006, Fall 2007 – Fall 2014

*Sandra Day O'Connor School of Law, Arizona State University,* Adjunct Professor of Professional Responsibility – Fall 2008, Spring 2012

*James E. Rogers College of Law, University of Arizona,* Adjunct Professor of Professional Responsibility – Fall - 2012, 2013, 2014

***Professional Associations & Committees***

- ***American Bar Association Committees:***

  * Center for Professional Responsibility Coordinating Council, Member 2000-2003 and 2015-2016
  * Standing Committee on Client Protection, *Chairman* 2000-2003, Member 2003 - 2004
  * Standing Committee on Professionalism, Member 2004 – 2007
  * Center for Professional Responsibility Strategic Committee, Member 2007 - 2010
  * American Bar Foundation, Fellow, 2002 - present
  * Task Force on a Model Definition of the Practice of Law, Member 2002-2003
  * Consortium on the Delivery of Legal Services, Member 2000-2003
  * Task Force on Access to Lawyers, Member 2002 - 2003
  * Planning Committee, National Conference on Prof. Responsibility, 2003 - 2006
  * Center for Professional Responsibility & Law Practice Management Section, 2003 – present
  * ABA Working Group on the Advancement of Lawyer Well-Being, APRL Liaison – August, 2017 - present
  * ABA House of Delegates, State Bar of Arizona Delegate 2016 – present
  * Standing Committee Ethics and Professional Responsibility, APRL Liaison – August 2016 – 2017; Member August, 2017 - present

- ***State Bar of Arizona Committees:***

  * Task Force on the Future of the Profession, Member 2000 to 2001
  * Multijurisdictional Practice Task Force, Member 2002 to 2003
  * Ethical Rules Review Group, Member 2001 to 2003
  * Professionalism Task Force and Committee, Member 2003 to present
  * Convention Planning Working Group, Member 2004 to present
  * Convention Planning Committee, Co-chair 2006 - 2007
  * Unauthorized Practice of Law Advisory Opinion Council, Member 2003 to 2013 (Chairman 2008 – 2010)
  * Consumer Education and Information Task Force, May 2008 to 2009
  * Continuing Legal Education Committee, Member 2011 to 2014
  * Task Force on Lawyer Succession Planning September, 2013 to 2015

- ***Additional Committees/Task Forces:***

  * APRL/NOBC/ABA CoLAP Joint Committee on Aging Lawyers, Member 2013 - present
  * National Task Force on Lawyer Well-Being, Member 2016 - present
  * Maricopa County Bar Assn. CLE Committee, Chair 2014-2016

- ***Awards/Recognitions:***

  * 2002 Attorney Law-Related Education Award, Arizona Foundation for Legal Services and Education
  * 2004 State Bar of Arizona Continuing Legal Education Award
  * 2007 State Bar of Arizona "Member of the Year" Award
  * 2010 Scottsdale Bar Association Award of Excellence
  * June 2015 *Attorney at Law Magazine Greater Phoenix Edition,* Attorney of the Month
  * 2015 Arizona Women Lawyers' Association, Maricopa Chapter, Ruth V. McGregor Award
  * *Best Lawyers In America, Ethics and Professional Responsibility* 2013 – present
  * *AV Rated* – Martindale Hubbell

- ***Bar Admissions:***

  **** Pennsylvania State Bar, Member 1987 – present (inactive)***
  **** District of Columbia Bar Association, Member 1988 – present***
  **** State Bar of Arizona, Member 1994 – present***

- ***Memberships:***

  * Association of Professional Responsibility Lawyers, Member 2003 – present (Board of Directors 2010 – present, Treasurer 2012 – 2013, Secretary 2013 – 2014, President-Elect 2014-2015, President 2015-2016)

  * Scottsdale Bar Association: Member Fall 2003 – present (Board of Directors March, 2005 – 2014, President 2008 - 2009)

  * Sandra Day O'Connor Inn of Court, Member 1997 – present
  * Maricopa County Bar Association, Member 2002- present
  * Arizona Women Lawyers' Assn., Member 2003 – present
  * National Client Protection Organization, Vice President Southwest 2000-2003
  * National Organization of Bar Counsel, Associate Member 1998 – 2010

***<u>Representative Seminars & Publications - 2010 - 2017</u>***

"*Avoiding Internal and External Fraud"* – May 19, 2010, Omega Legal, Scottsdale

"*Ethics Tips for Bankruptcy Practitioners"* – May 20, 2010, Bankruptcy Trustee, Tempe

"*Restrictions on Lawyer's Right to Practice"* – June, 2010, American Bar Association, Seattle

"*Annual Ethics Game Show"* – June 10, 2010, State Bar of Arizona, Glendale

"*Ancillary Businesses"* - August 6, 2010, APRL, San Francisco

"*Ethics Considerations for Estate Planning Lawyers"* – September 10, 2010, National Elder Law Assn, Phoenix

"*Representing Bernie Madoff"* - September 23, 2010, ABA LPL Section, Scottsdale

"*Judicial Ethics Update"* - October 22, 2010, Maricopa County Superior Court Education Conference, Mesa

"*Earning and Billing Fees Ethically"* - October 27, 2010, State Bar of Arizona, Phoenix

"*Avoiding the Unauthorized Practice of Law"* - November 3, 2010, State Bar of Arizona, Phoenix

"*Social Media and Lawyers," and "Ethics Tips for Billing"* - November 18 and 19, 2010, State Bar of Arizona Solo Conference, Scottsdale

"*Law Firm Dissolutions"* - December 2, 2010, State Bar of Arizona, Phoenix

*"Tribute to Dan McAuliffe Ethics Seminar"* – April 27, 2011, State Bar of Arizona, Phoenix

"*Arizona Attorney General's Office Conflict Seminar"* – May 2, 2011, Arizona Attorney General's Office, Phoenix

"*Avoiding Malpractice and Bar Complaints"* – May 20, 2011, CNA Insurance, Phoenix

"*Ethics Update and Avoiding Common Bar Complaints"* – June 7, 2011, Maricopa County Bar Association, Phoenix

"*Annual Ethics Game Show"* – June 16, 2011, State Bar of Arizona Convention, Tucson

"*File Retention"* – October 19, 2011, ABA Webinar

"*Judicial Ethics Game"* – October 28, 2011, Maricopa Superior Court Judicial Conference, Mesa

"*Ethics Update For Construction Law Section"* – October 28, 2011, State Bar of Arizona, Scottsdale

"*Ten Deadly Sins of Conflicts"* – November 9, 2011, State Bar of Arizona, Phoenix

*"Ethical Billing Practices"* – November 17, 2011, ABA/ALI Teleseminar

"*Social Media Ethics Update"* – November 18, 2011, East Valley Bar Assn, Mesa

*"Annual Scottsdale Bar Ethics Game"* – December 13, 2011, Scottsdale Bar Assn, Scottsdale

*"Branding a Firm"* - January 18, 2012, State Bar of Arizona, Phoenix

"*Family Law Section Ethics Update"* - January 20, 2012, State Bar of Arizona, Scottsdale

"*Conflicts and Other Ethics Issues for Estate Planners"* - February 23, 2012, Estate Planning, Scottsdale

"*Ethics Update and Game"* - February 29, 2012, AWLA, Phoenix

"*Social Media Risk Management Tips"* – March 15, 2012, State Bar of Arizona, Phoenix

"*Dressing for Success – Bar Leadership Institute"* – March 23, 2012, State Bar of Arizona, Phoenix

"*Ethics Issues in Public Lawyer Matters"* – April 19, 2012, State Bar of Arizona, Phoenix

"*Ethics When Representing Non-English Speaking Clients"* – April 26, 2012, Los Abogados, Phoenix

"*Trust Account Basics"* – May 2, 2012, State Bar of Arizona, Phoenix

"*Ethics Issues in Condemnation Law"* – May 4, 2012, Phoenix Biltmore

"*Ethics Update!"* – May 9, 2012, Volunteer Lawyers Program, Tucson

"*Avoiding Malpractice and Bar Complaints,"* – May 14 and 15, 2012, CNA Insurance, Phoenix and Tucson

"*50 Ways to Avoid a Complaint/Claim"* – June 13, 2012, Maricopa County Bar Assn, Phoenix

"*Annual Ethics Game Show"* – June 21, 2012, State Bar of Arizona Convention, Phoenix

"*Professionalism in Family Law"* – June 22, 2012, State Bar of Arizona Convention, Phoenix

"*Avoiding Conflicts in LLC Representations"* – July 20, 2012, State Bar of Arizona, San Diego

*"Branding Your Firm – Trade names for Law Firms"* – Sept. 20, 2012, State Bar of Arizona, Phoenix

*"Ethics Tips for Supreme Court and Court of Appeals Judicial Staff"* – Sept. 28, 2012, Arizona Supreme Court, Phoenix

*"Ethics Tips for New Lawyers"* – November 2, 2012, State Bar of Arizona, Tucson

"*Billing and Fee Agreement Ethics Requirements to Get Paid"* – Nov. 7, 2012, ALI teleseminar

"*Ethics Update on Social Media and Electronic Records"* – Nov. 14, 2012, North Phoenix Bar Association, Phoenix

"*Ethical Billing in Gaming Matters"* – Nov. 16, 2012, State Bar of Nevada Gaming Conference, Las Vegas

"*Ethical Landmines for Family Law Lawyers"* – Jan. 11, 2012, State Bar of Arizona Family Law Conference, Scottsdale

"*Ethics Issues in Estate Planning"* – Feb.23, 2012, State Bar of Arizona, Scottsdale

"*2012 Ethics Update"* – February 29, 2012 Arizona Women Lawyers' Assn., Phoenix

"*Ethical Use of Technology"* – March 15, 2012, State Bar of Arizona, Phoenix

*"Selling a Law Firm"* – April 11, 2012, State Bar of Arizona, Phoenix

"*Public Lawyer Conflicts and Client Identity"* – April 19, 2012, State Bar of Arizona, Phoenix

"*Ethics Issues when Representing Clients Through Translators"* - April 26, 2012 Los Abogados, Phoenix

"*Condemnation Cases and Ethics Considerations"* - May 4, 2012 Phoenix

"*Trust Account Basics"* – May 2, 2012 State Bar of Arizona, Phoenix

"*Ethics Considerations in Limited Scope Representations"* – May, 2012, Volunteer Lawyers Program, Tucson

*"CNA Risk Management"* – May 14 and 15, 2012, CNA Phoenix, Tucson

"*50 Ways to Avoid Discipline and Malpractice Claims"* - June 13, 2012, MCBA, Phoenix

"*Annual Ethics Game Show"* – June 21, 2012, State Bar of Arizona Convention, Phoenix

"*CLE By the Sea – Ethics Issues When Representing LLCs"* - July, 2012, State Bar of Arizona, San Diego.

"*Updates on Recent ABA Model Rule Changes,"* – November 14, 2012, North Phoenix Bar Assn., Phoenix

"*Ethical Billing in Gaming Law"* – November 16, 2012, Nevada Bar Assn., Las Vegas

"*Teleseminar on Billing and Fee Agreement Requirements"* – September 27, 2012, ALI

"*Professionalism and Ethics Tips for New Lawyers"* - November 2, 2012, State Bar of Arizona, Tucson

"*Medicare Set-Aside Seminar*" - December 7, 2012, NBI, Phoenix

*"Family Law Ethics Update"* – January 11, 2013, State Bar of Arizona Conference, Scottsdale

"*Character & Fitness Criteria – What Keeps Out Applicants?"* – February 8, 2013, Association of Professional Responsibility Lawyers, Dallas

"*Ethics Game 2013"* – February 12, 2012, Scottsdale Bar Assn., Scottsdale

"*Ethics Considerations When Working With Impaired Clients"* – February 15, 2013, Arizona Educators Assn., Phoenix

"*E-Discovery Professional Responsibility Tips"* – March 13, 2013, ASU, Tempe

"*Quantum Meruit, Damron Morris Agreements and Other Ethics Issues"* – March 22, 2013, Arizona Trial Lawyers Assn., Phoenix

"*DUI Law and Ethics"* – May 3, 2013, AACJ, Tucson

"*Government Lawyer Ethical Landmines"* – May 8, 2013, Public Lawyer Conference, Prescott

"*Technology and Ethics"* – April 4, 2013, Minority Bar Convention, Phoenix

*"Public Sector Privilege"* - April 17, 2013, Law Seminars, Scottsdale

"*Employment Law Ethics Update"* – April 15, 2013, State Bar Employment Law Section, Phoenix.

"*Advertising Ethics!"* – May 2, 2013, State Bar of Arizona, Phoenix

"*Ethics for Law Firm Staff"* - May 22, 2013, Maricopa County Bar Assn., Phoenix

*"CNA Insurance Risk Management Conference"* – June 6, 2013, CAN, Phoenix

"*Annual Ethics Game Show"* – June 20, 2013, State Bar of Arizona Convention, Phoenix

"*Ethics and Social Media"* – July, 2013, State Bar of Arizona, San Diego

*"HIPAA Compliant – New Requirements"* - September 2013, State Bar of Arizona, Tucson

"*Legal Ethics for Supervised and Supervisors"* - October 11, 2013, ABA Law Practice Management Section, Phoenix

*"Ethics and Gun Laws"* – November 6, 2013, Arizona State University, Tempe

"*Ten Deadly Sins of Conflicts"* - November 7, 2013, State Bar of Arizona, Phoenix

*"Ethics Update for Probate Lawyers"* – December, 2013, State Bar of Arizona, Phoenix

*"Ethics Changes Affecting Family Law Practitioners"* - January, 2014, State Bar of Arizona Family Law conference, Scottsdale

*"Ethics and E-Discovery"* - March 13, 2014, Arizona State University Law School, Tempe

"*Ethics and Email"* – April 11, 2014, ABA Litigation Section Conference, Phoenix

"*Ethical Update"* – April 17, 2014, Volunteer Lawyers Program, Tucson

"*Ethics and Technology"* – May 9, 2014, DRI – Employment Law, Paradise Valley

*"Ethics in Family Law Discovery Issues"* – May 14, 2014, State Bar of Arizona, Phoenix

"*Ethics Update, Billing Tips, and Supervision"* - May 15, 2014, Arizona State University Law School, Tempe

"*Ethics Considerations with Aging Lawyers"* – May 30, 2014, ABA Center for Professional Responsibility Conference, Long Beach CA

"*Ethical Marketing – Can I really do that?"* – June 3, 2014, State Bar of Arizona, Phoenix

*"CNA Risk Management Review"* – June 5, 2014, Health Agencies of the Southwest, Phoenix

"*Bar Convention Annual Ethics Game Show"* – June, 2014, State Bar of Arizona, Phoenix

*"Do You Know the New Amendments?"* – October 1, 2015, State Bar of Arizona Workers Compensation Section, Prescott

"*Succession Planning for All Firms"* – September 11, 2015, MCBA, Phoenix

*"Managing the Message: Communicating with the Media"* – November 4, 2015, MCBA, Phoenix

*"Do You Know the New Amendments?"* – November 20, 2015, State Bar of Arizona Real Property Section, Phoenix

*"Professionalism for New Lawyers"* – November 20, 2015, State Bar of Arizona, Phoenix

*"Do You Know the New Amendments?"* – December 4, 2015, MCBA, Phoenix

"*Annual Ethics Update Quiz"* – January 20, 2015, Scottsdale Bar Association, Scottsdale

"*Annual Ethics Update Quiz"* – January 28, 2015, Arizona Women Lawyers Association, Phoenix

"*Scandal Scarred: Representing High Profile Clients and Managing Their Legal/Media Crisis*" - February 7, 2015, Assn. Professional Responsibility Lawyers, Houston

"*Ethics Update and Reminders"* - March 11, 2015, State Bar Real Estate Section, Tucson

"*Professionalism and Risk Management for Firm Staff,"* – March 12, 2015, NALS, Phoenix

"*Using the Internet – Ethically"* - March 19, 2015, DRI Litigation Section, Las Vegas

"*Lawyers Without Borders – Avoiding UPL"* - March 28, 2015, Am. College Real Estate Lawyers, Scottsdale

"*Spotting and Preventing Evil in Your Firm"* - April 1, 2015, State Bar of Arizona, Phoenix

*"Recent Changes to the Ethical Rules"* – April 8, 2015, North Phoenix Bar Assn, Phoenix

"*Old, New and Proposed Changes to the Rules"* – April 21, 2015, State Bar of Arizona, Phoenix

"*Ethics Reminders for Employment Law Lawyers"* - April 27, 2015, State Bar of Arizona, Phoenix

"*Overwhelmed by Email?"*- May 5, 2015, United States Fifth Circuit Judicial Conference, New Orleans

"*Risk Management and Ethics Update"* - May 1, 7- 8, 2015, Ahern Insurance, Phoenix, Tucson

"*Ethics Landmines for DUI Lawyers"* – May 7, 2015, AACJ, Tucson

"*What Keeps Partners Awake At Night"* – June 16, 2015, MCBA, Phoenix

"*Annual Ethics Game Show"* – June, 2015, State Bar of Arizona Convention, Phoenix

"*Client Files: Yours, Mine and Ours?"* – July 9, 2015, American Bar Assn, teleseminar
*"Ethics in Elder Law"* – September 11, 2015, AzNAELA, Phoenix

*"Recent Amendments to Arizona Ethical Rules"* - September 18, 2015, East Valley Bar Assn., Mesa

"*Tips to Avoid Discipline for Family Law Lawyers"* – September 24, 2015, MCBA, Phoenix

"*Ethical Use of Technology"* – October 5, 2015, Bar Assn. of the Fifth Federal Circuit, New Orleans

"*Ten Deadly Sins of Conflicts"* – November 6, 2015, State Bar of Arizona, Phoenix

"*Risk Management and Legal Ethics"* – November 13, 2015, CNA and Health Agencies of the Southwest, Tucson

*"New Lawyer Bootcamp"* – November 20, 2015, State Bar of Arizona, Phoenix

"*2016 Amendments to the Ethical Rules,"* – December 10, 2015, MCBA, Phoenix

"*For Better or For Worse Ethics Review"* – January 22, 2016, State Bar Family Law Section Conference, Phoenix

"*2016 Amendments to the Ethical Rules Game Show"* – January 27, 2016, Arizona Women Lawyers' Assn., Phoenix

"*Outsourcing of Legal Work"* – February 5, 2016, National Conference of Bar Presidents, San Diego

*"To Serve or Be Served: Best Practices for Expert Witnesses"* – March 8, 2016, ABA, Teleseminar

"*Spring Training Convention - Technology Ethics Update"* – March 31, 2016, State Bar of Arizona, Phoenix

"*Liability to Non-clients"* – April 27, 2016, State Bar of Arizona, Phoenix

"*The Ethics Hour: Attorney-Client Privilege and Practicing Across State Lines"* – April 29, 2016, DRI Employment and Labor Law, Austin, TX

"*Trends in Lawyer Discipline"* – May 19, 2016, Federal Bar Assn., Tucson

"*Professionalism Is More than Just Pantyhose"* – May 20, 2016, Arizona Paralegal Assn., Phoenix

"*Advertising Ethics Changes"* – June 3, 2016, ABA Center for Professional Responsibility Conference, Philadelphia
"*Professionalism and Ethics for Judicial Interns"* – June 7, 2016, Maricopa County Superior Court, Phoenix

"*Ethics Trends for Estate Planning Attorneys"* – June 9, 2016, MCBA, Phoenix

"*Annual Ethics Game Show"* – June, 2016, State Bar of Arizona Convention, Chandler

"*Ethical Use of Technology in Law Firms"* – July 13, 2016, State Bar of Arizona, San Diego

"*Can You Hear Me Now? Advertising Regulation in the U.S."* – August 5, 2016, National Conference of Bar Presidents, San Francisco

*"Getting Paid Ethically: Five Tips You Should Know"* – Sept/Oct. 2016 ABA *Law Practice Magazine*

*"Advertising Ethically"* – Jan. 12, 2017, State Bar of Arizona, Phoenix

"*Family Law Ethics Update"* – Jan. 20, 2017, State Bar of Arizona, Phoenix

"*Ethics of Serving on Nonprofit Boards"* – February 10, 2017, State Bar of Arizona, Phoenix

"*Litigation Funding"* – February 20, 2017, IADC, Scottsdale

*"How to Get Paid Ethically"* – March 1, 2017, State Bar of Arizona, Phoenix

"*Ethics Issues Unique to Intellectual Property Practice"* – March 24, 2017, State Bar of Arizona, Phoenix

"*CNA Legal Malpractice Risk Management"* – May 5, 2017, CNA, Phoenix

"*DUI Ethics Quiz"* – May 5, 2017, AACJ, Tucson

"*Advertising Changes"* – June, 2017, PilotLegis, Oakland, CA

"*Common Ethics Issues in Family Law"* – July 10, 2017, State Bar of Arizona, Coronado, CA

"*Lawyer Wellness"* – August 12, 2017, APRL/NOBC Joint Session, New York, NY

"*Changing Times"* – Sept. 2017, ABA National Legal Malpractice Conference, Colorado Springs

"*10 Deadly Sins of Conflicts"* – October 19, 2017, State Bar of Arizona, Phoenix

"*Ethics Update for Employment Law Lawyers"* – October 20, 2017, State Bar of Arizona, Sedona

**From:** CustomerService=turbocourt.com@smtp.turbocourt.com on behalf of TurboCourt Customer Service
**To:** Nelly Preca
**Subject:** AZTurboCourt E-Filing Courtesy Notification
**Date:** Monday, July 09, 2018 11:33:50 AM

PLEASE DO NOT REPLY TO THIS EMAIL.

A party in this case requested that you receive an AZTurboCourt Courtesy Notification.

AZTurboCourt Form Set #2696375 has been DELIVERED to Maricopa County - Superior Court.

You will be notified when these documents have been processed by the court.

Here are the filing details:
Case Number: CV2016-007692 (Note: If this filing is for case initiation, you will receive a separate notification when the case # is assigned.)
Case Title: Long, Et.Al. Vs. State Of Arizona, Et.Al.
Filed By: Nelly Preca
AZTurboCourt Form Set: #2696375
Keyword/Matter #: 92015 - AJF - LONG
Delivery Date and Time: Jul 09, 2018 11:33 AM MST

Forms:
Summary Sheet (This summary sheet will not be filed with the court. This sheet is for your personal records only.)

Attached Documents:
Motion: DEFENDANTS' RULE 37 MOTION FOR SANCTIONS
Exhibit/Attachment (Supporting): EX A TO D RULE 37 MTN FOR SANCTIONS

**From:** CustomerService=turbocourt.com@smtp.turbocourt.com on behalf of TurboCourt Customer Service
**To:** Nelly Preca
**Subject:** E-Filing Status: Form Set # 2696375 Filed
**Date:** Tuesday, July 10, 2018 10:10:42 AM

---

PLEASE DO NOT REPLY TO THIS EMAIL.

Your AZTurboCourt Form Set #2696375 has been accepted and FILED at Maricopa County - Superior Court and is part of the official court record.

Here are your filing details:
Case Number: CV2016-007692
Case Title: Long, Et.Al. Vs. State Of Arizona, Et.Al.
Filed By: Nelly Preca
AZTurboCourt Form Set: #2696375
Keyword/Matter #: 92015 - AJF - LONG
Filing date and time: Jul 09, 2018 11:33 AM MST

Forms:
Summary Sheet (This summary sheet will not be filed with the court. This sheet is for your personal records only.)

Attached Documents:
Motion: DEFENDANTS' RULE 37 MOTION FOR SANCTIONS
Exhibit/Attachment (Supporting): EX A TO D RULE 37 MTN FOR SANCTIONS

Fees Paid:

Total Filing Fees: $0.00
Provider Fee: $6.50
Total Amount Paid: $6.70

YOU MUST log back on to http://turbocourt.com/ to view and/or print a copy of your file stamped copy.

If you have questions about your filing, please contact AOC Support Services, phone number 602-452-3519 or 1-800-720-7743, or e-mail pasupport@courts.az.gov. Please have your AZTurboCourt Form Set # available.

To view the link above:
Click on the link OR
1) Highlight the website address "URL" above, then Right Click on highlighted "URL" and select Copy.
2) Open a NEW internet browser window.
3) Right Click inside the address field in the new internet browser window and select Paste.

Thank you for using TurboCourt!

Anthony J. Fernandez (Bar No. 018342)
Rebecca E. Stanton (Bar No. 032291)
QUINTAIROS, PRIETO, WOOD & BOYER, P.A.
2390 E. Camelback Road, Suite 440
Phoenix, Arizona 85016
Telephone: (602) 954-5605
Facsimile: (602) 954-5606
afernandez@qpwblaw.com
rebecca.stanton@qpwblaw.com
*Attorneys for Defendants*

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

KENNETH and CORA LONG, husband and wife, individually, and as statutory beneficiaries for Nicholas Long, deceased; and on behalf of the Estate of NICHOLAS LONG,

Plaintiff,

v.

STATE OF ARIZONA, a body politic, CORIZON HEALTH, INC., an Missouri Corporation, doing business in the State of Arizona,

Defendants.

Case No. CV2016-007692

**DEFENDANTS' SEPARATE STATEMENT OF FACTS IN SUPPORT OF DEFENDANTS' RULE 37 MOTION FOR SANCTIONS**

(Assigned to the Honorable Rosa Mroz)

Defendants State of Arizona and Corizon Health, Inc. (collectively "Defendants" herein), by and through undersigned counsel, hereby submit this Statement of Facts in support of Defendants' Motion for Sanctions pursuant to Arizona Rules of Civil Procedure 37(c), filed concurrently.

1. At all relevant times, Decedent Nicholas Long ("Decedent") was an incarcerated individual in the custody of the Arizona Department of Corrections. *See* Plaintiff's Complaint, attached at **Exhibit A**.

2. At all relevant times, Defendant Corizon was the contracted provider of medical services to inmates within certain Arizona Department of Corrections facilities, including, at all relevant times, the prison facility housing Decedent. *See* Defendants' Answer.
3. From November 25, 2014 through February 2, 2015 ("relevant care period") Decedent was housed at the Arizona State Prison Complex – Florence ("ASPC-Florence"), in the prison Infirmary ("Infirmary"), to receive treatment for ulcerative colitis. *See* Plaintiffs' 18th Supplemental Rule 26.1 Disclosure Statement, attached in relevant part at **Exhibit B**, Section VII "Course of Treatment," pages 38-43. *See also* Declaration Under Oath of Lori Milus, ¶ 6, attached at **Exhibit C**.
4. The medical care Decedent received from Defendant Corizon (through its employees) during the relevant care period in the Infirmary, is the subject of the suit. *See* Plaintiff's 1st Amended Complaint generally, attached at **Exhibit D**, and at ¶ 52.
5. Decedent received nursing care from Darcee Bishop, RN (registered nurse) and Jakelin Valladares, CNA (certified nursing assistant) while he was in the Infirmary during the relevant care period. *See* Decedent's Corizon medical charting by Darcee Bishop, RN, attached at **Exhibit E**; and *see* Declaration of Darcee Bishop, RN, attached at **Exhibit F**, ¶¶ 3-4. *See* Decedent's Corizon medical charting by Jakelin Valladares, CNA, attached at **Exhibit G**; and *see* Declaration of Jakelin Valladares, CNA, attached at **Exhibit H**, at ¶¶ 3-4.
6. Both Ms. Bishop and Ms. Valladares were Corizon employees during the relevant care period when they provided nursing care to Decedent. Declaration of Darcee Bishop, RN, at Exhibit F, at ¶ 4; Declaration of Jakelin Valladares, CNA, at Exhibit H, at ¶ 4.
7. On May 25, 2015, Decedent expired following several months of hospitalization. Plaintiff's 1st Amended Complaint, at Exhibit D, at ¶ 52; and *see* Plaintiffs' 18th Supplemental Rule 26.1 Disclosure Statement, at Exhibit B, pages 43:10-44:7.

8.  On May 18, 2016, Plaintiffs Cora and Kenneth Long (Decedents' parents) filed a medical negligence/wrongful death Complaint in Maricopa County Superior Court naming the State of Arizona and Corizon as defendants, concerning Decedent's death. *See generally* Plaintiff's Complaint, at Exhibit A.

9.  Defendants Answered the Complaint on September 1, 2016, and discovery ensued. *See generally* Defendants' Answer to Plaintiffs' Complaint.

10. On October 24, 2016, Defendants submitted their Rule 26.1 Initial Disclosure Statement to Plaintiffs. In it, Defendants disclosed Ms. Bishop and Ms. Valladares (collectively "the witnesses") as members of Decedent's Corizon care team. Defendants disclosed that the witnesses were Corizon employees at the relevant time, and, as such, were only to be contacted through defense counsel. *See* Defendants' Initial Disclosure Statement, dated October 24, 2016, attached in relevant part at **Exhibit I**, pages 21 – 23.

11. Defendants disclosed Decedent's Corizon medical records (Bates nos. ADOC – Long 00001 to 02210) with the Initial Disclosure Statement on October 24, 2016. *See* Defendants' Initial Disclosure Statement, at Exhibit I, Section VII(2)(a), page 27. The disclosed Corizon medical records contained charting on Decedent by Ms. Bishop and Ms. Valladares. *See* Corizon charting of Jakelin Valladares, CNA, at Exhibit G; and *see* Corizon charting of Darcee Bishop, RN, at Exhibit E.

12. Ms. Bishop's charting reflects that she cared for Decedent from December 16, 2014 to January 18, 2015 in the Infirmary. *See* Corizon charting of Darcee Bishop, RN, at Exhibit E. On January 18, 2015, Ms. Bishop documented that she had declined to assist Decedent in making soup, and that she declined to assist him with his pillow while he adjusted his position. *Id.* at ADOC-Long-00877. Decedent reported to her that he fell twice to his knees the evening prior. *Id.*   RN Bishop did not forward the note to a provider for review. *Id.* at ADOC-Long-00880. RN Bishop also documented two medication refusals by Decedent. *Id.* at ADOC-Long-01745 and 01747.

13. Ms. Valladares' charting reflects that she cared for Decedent from December 5, 2014 to January 29, 2015 in the Infirmary. *See* Corizon charting of Jakelin Valladares, CNA, at Exhibit G. Ms. Valladares' charting shows a number of instances of elevated heart rate, abnormal body temperature, and declining weight/Body Mass Index. *Id.*

14. On March 30, 2017, Plaintiffs retained John O'Steen, MD as a standard of care expert witness. *See* Dr. O'Steen Expert File, attached at **Exhibit J**, at Bates No. Item No. 7 – 000055.

15. Throughout Dr. O'Steen's retention, Plaintiffs' counsel communicated with Dr. O'Steen at times through Dr. O'Steen's husband and business manager Gary Norris (a.k.a. Gary O'Steen). Deposition of John O'Steen, M.D., attached at **Exhibit K**, at 56:15 – 57:6.

16. Dr. O'Steen is the Medical Director of Central Arizona Florence Correctional Complex (formerly known as Central Arizona Detention Center, hereinafter referred to as "CADC"), a detention center in Florence, Arizona. He has held the position of Medical Director for the last fifteen (15) years. Deposition of John O'Steen, M.D., at Exhibit K, at 4:18 – 5:15.

17. Ms. Valladares terminated her employment with Corizon in February of 2015, and thereafter began working at CADC, as a certified nursing assistant.  Deposition of Jakelin Valladares, CNA, attached at **Exhibit L**, at 22:2 – 7.

18. Ms. Valladares testified that Dr. O'Steen was (and currently is) her boss at CADC, and that he was (and currently is) above her in the chain of command. Deposition of Jakelin Valladares, CNA, at Exhibit L, at 6:11 - 20.

19. Darcee Bishop, RN terminated her employment with Corizon in May of 2015, and thereafter began working at CADC, as a registered nurse.  Declaration of Darcee Bishop, RN, at Exhibit F, at ¶¶ 3, 5.

20. Ms. Bishop testified that Dr. O'Steen was above her in the chain of command while she worked there. Deposition of Darcee Bishop, RN, attached at **Exhibit M**, at 6:1-10.

21. On May 14, 2017, Dr. O'Steen sent a letter Plaintiffs' counsel detailing his initial expert opinion. *See* Dr. O'Steen Expert File, at Exhibit J, at Bates No. Item No. 7 – 000044-50. In the letter, Dr. O'Steen disclosed that he worked with several people who had previously been employed by Corizon, and that he had had discussions with those people about their work at Corizon. *Id.* at Bates No. Item No. 7 – 000049. In particular, he claimed that "about two years" prior he had spoken with a former Corizon CNA (who had worked in the ASPC-Florence Infirmary) specifically about a patient he believed to be Decedent. *Id.*

22. On June 21, 2017, Plaintiffs' counsel (Paralegal Kimberly Gonzalez) emailed Dr. O'Steen's business manager Gary Norris and asked:

> *"Is Dr. O'Steen able to provide names of any witnesses, nurses that may be willing to testify?"*

Dr. O'Steen Expert File, at Exhibit J, at Bates No. Item No. 7 – 000041.

23. On June 25, 2017, Gary Norris responded on behalf of Dr. O'Steen:

> *"Dr. O'Steen said that he will speak to a number of potential witnesses at his place of employment this week to see if they would be willing to testify. It will be towards the end of the week before he can speak with all of them."*

*Id.*

24. At no time did Plaintiffs' counsel instruct Dr. O'Steen not to interview former Corizon employees about the case. *See* Deposition of John O'Steen, M.D., at Exhibit K, at 27:18 – 28:5.

25. On July 17, 2017, Dr. O'Steen emailed Plaintiff's counsel and disclosed that he had spoken to former Corizon employees Ms. Valladares and Ms. Bishop about Decedent. He reported each woman's expected testimony concerning their personal

recollections of Decedent, his condition and his medical care, as well as conditions working at Corizon generally. He also disclosed that he had spoken to two additional former Corizon employees (Dr. Stephen Graham and Yarira Lizarraga, RN) who had made negative remarks about Corizon but who were not involved in Decedent's care. *See* Dr. O'Steen Expert File, at Exhibit J, at Bates No. Item No. 7-000034.

26. With respect to Ms. Bishop, Dr. O'Steen disclosed to Plaintiffs that Ms. Bishop recalled caring for Decedent. *Id.*

27. Dr. O'Steen also disclosed that "[Ms. Bishop] might testify to [Decedent's] lack of cooperation with treatment which of course is the defense that Corizon will be using." *Id.*

28. With respect to Ms. Valladares, Dr. O'Steen disclosed to Plaintiffs that "[Ms. Valladares] resigned her position with Corizon [] because of what she perceived to be a lack of proper care for [Decedent]." He reported that she had told him that she watched Decedent "deteriorate with 'nothing being done.'" *Id.*

29. Plaintiffs did not disclose the information reported by Dr. O'Steen in the July 17, 2017 email to Defendants. *See* Defendants' Good Faith Consultation Certificate of Defense Counsel Rebecca E. Stanton, attached at **Exhibit N**, dated February 20, 2018.

30. Plaintiffs did not disclose the fact that the *ex parte* communications between Dr. O'Steen and Ms. Bishop and/or Ms. Valladares took place. *Id.*

31. At no time did Defendants consent to *ex parte* communications with their former employees. *Id.*

32. On August 27, 2017, Dr. O'Steen submitted an invoice to Plaintiffs' counsel, including a line-item for

> *"Interview of Staff Members at CoreCivic involved [i]n this matter."*
>
> Dr. O'Steen Expert File, at Exhibit J, at Bates No. Item No. 7-000030-31.

33. Plaintiffs' counsel paid Dr. O'Steen's invoice without contest. Deposition of John O'Steen, M.D., at Exhibit K, at 71:8-21.

34. On January 8, 2018, Plaintiffs requested the depositions of Ms. Bishop and Ms. Valladares. *See* Email from Plaintiffs' counsels' paralegal Kimberly Gonzalez to defense counsel dated January 8, 2018, attached at **Exhibit O**. At that time, Plaintiffs had only taken four (4) other depositions, all of Corizon physicians. *See* deposition notices of Dr. Vukcevic, Dr. Johnson, Dr. Riaz and Dr. Anderson, attached at **Exhibit P**.

35. Rather than contacting the Ms. Bishop and/or Ms. Valladares directly, Plaintiffs' counsel sought to arrange the depositions through defense counsel. *See* Email from Plaintiffs' counsels' paralegal Kimberly Gonzalez to defense counsel dated January 8, 2018, at Exhibit O.

36. At no time did Plaintiffs disclose the information gained and reported by Dr. O'Steen about the expected testimony of the witnesses, or disclose the fact that Plaintiff's expert had conducted *ex parte* interviews of the witnesses. *See* Defendants' Good Faith Consultation Certificate of Defense Counsel Rebecca E. Stanton, at Exhibit N.

37. On January 31, 2018, Defense counsel made contact with Ms. Bishop. During the contact on January 31, 2018, Defense counsel learned that Ms. Bishop had been interviewed by Dr. O'Steen about Decedent and his medical care. *Id.*

38. In the days following, defense counsel made contact with Ms. Valladares and discovered that she had also been interviewed by Dr. O'Steen. *Id.*

39. Ms. Valladares and Ms. Bishop signed affidavits detailing the *ex parte* interviews conducted by Dr. O'Steen. *See generally* Declaration of Jakelin Valladares, CNA, at Exhibit H; and Declaration of Darcee Bishop, RN, at Exhibit F.

40. On February 16, 2018, Defense counsel conducted a telephonic meet and confer with Plaintiffs' counsel about the *ex parte* communications. *See* Defendants' Good

Faith Consultation Certificate of Defense Counsel Rebecca E. Stanton, at Exhibit N.

41. On February 20, 2018, defense counsel disclosed the affidavits of Ms. Valladares and Ms. Bishop, and filed a motion for sanctions arguing that 1) the *ex parte* interviews of former Corizon employees by Plaintiffs' expert violated *Lang v. Superior Court* and the ethical rules; and 2) Plaintiffs' failure to disclose the contacts within 30 days of discovering them was a violation of Rule 26.1. *See* Defendants' Expedited Rule 37 Motion to Compel and for Sanctions, dated February 20, 2018, attached at **Exhibit Q** (without exhibits).

42. On March 8, 2018, the Court ordered a four-month stay in the case, and permitted discovery and depositions to investigate the *Lang* and disclosure issues. *See* Court's March 8, 2018 Order, attached at **Exhibit R**.

43. The Court also ordered that by March 23, 2018 the parties make a complete disclosure of the conversations between Dr. O'Steen and Defendants' former employees, and that Plaintiffs turn over Dr. O'Steen's expert file. The Court also ordered that Defendants' Motion for Sanctions be filed by July 9, 2018. *Id.*

44. On June 13, 2018, Plaintiffs filed an Amended Complaint adding constitutional claims. *See* Plaintiff's 1st Amended Complaint, at Exhibit D.

45. On June 6, 2018, Defense counsel took the depositions of Dr. O'Steen, Jakelin Valladares, and Darcee Bishop. *See* depositions of John O'Steen, M.D., at Exhibit K, Jakelin Valladares, CNA, at Exhibit L, and Darcee Bishop, RN, at Exhibit M.

46. At deposition, Dr. O'Steen testified as follows:

- Dr. O'Steen admitted that he initiated conversations about Decedent and this case with Ms. Valladares and Ms. Bishop <u>after</u> he had been retained by plaintiff's counsel. *See* Deposition of John O'Steen, M.D., at Exhibit K, at 13:1 – 7; 22:25 – 23:3; 83:6 – 11.

- Dr. O'Steen testified that he "felt compelled" to talk to the witnesses when Plaintiffs' counsel asked him whether he knew of any witnesses who would be willing to testify. *Id*. at 24:21 – 25:2. *See also Id.* at 66:19-24.

- Dr. O'Steen testified that both Ms. Valladares and Ms. Bishop expressed to him that they thought they were potentially professionally liable for Decedent's medical care. *Id*. at 19:4 – 16.

- Dr. O'Steen testified that licensed healthcare providers have a duty to elevate concerns about patient healthcare up the chain of command, and that this duty to report extends beyond simply charting care concerns. *Id*. at 36:7 – 15; 38:11 – 39:8; 41:10 – 20; 42:19 – 43:4.

- Dr. O'Steen testified that he was critical of Corizon staff's general failure to call 911 (or have Decedent transferred on an emergent basis to the hospital) when Decedent was deteriorating in the Infirmary. *Id*. at 72:25 – 75:15.

- Dr. O'Steen testified that Plaintiffs' counsel never instructed him to stop interviewing Corizon employees. *Id.* at 27:18 – 28:5.

47. At deposition, Jakelin Valladares, CNA testified as follows:

- She had approximately five (5) conversations with Dr. O'Steen about Decedent. Deposition of Jakelin Valladares, at Exhibit L, at 10:17 – 19.

- The conversations were always initiated by Dr. O'Steen. *Id.* at 10:20 – 22.

- Dr. O'Steen questioned her about Decedent by name. *Id.* at 10:17 – 11:3.

- Ms. Valladares disputes Dr. O'Steen's claim that she had told him about Decedent by reference prior to Dr. O'Steen asking about Decedent by name. At no time did Ms. Valladares initiate a conversation about Decedent (whether by name, description or otherwise) with Dr. O'Steen. *Id.* at 34:13-35:2; 39:12 – 40:17; 45:21 – 46:8.

- When Dr. O'Steen asked her specific questions about Decedent, it made her feel uncomfortable. *Id.* at 11:22 – 12:4.

- Ms. Valladares did not feel like she could decline to answer Dr. O'Steen's questions about Decedent because Dr. O'Steen was her boss and she did not feel like she could refuse to talk to him. *Id.*

- Dr. O'Steen asked Ms. Valladares questions about Decedent's care and condition including 1) to describe Decedent's medical condition and why he was in the Infirmary; 2) whether Decedent refused meals and 3) whether she was concerned about Decedent's care while she took care of him. *Id.* at 14:1 – 15:8; 43:13 – 17; and 44:17.

- Dr. O'Steen asked Ms. Valladares whether she believed she had personally provided Decedent with the "right care." *Id.* at 44:13 – 15.

48. At deposition, Darcee Bishop, RN testified as follows:

- Dr. O'Steen approached Darcee Bishop and asked her whether she remembered Decedent. Dr. O'Steen identified Decedent by name ("Nicholas Long"). Deposition of Darcee Bishop, RN, at Exhibit M, at 9:7 – 14.

- Prior to that encounter, she had never discussed Decedent with Dr. O'Steen. She testified she may have generally discussed her work at Corizon with Dr. O'Steen prior to his initial inquiry about Decedent. *Id*. at 9:7-21.

- Dr. O'Steen initiated "more than one conversation" about Decedent with Ms. Bishop. *Id*. at 25:15 – 24.

- Dr. O'Steen asked Ms. Bishop how often Dr. Vukcevic saw Decedent. *Id*. at 26:11 – 12.

- Ms. Bishop told Dr. O'Steen that she remembered Decedent and that he was conversing and ambulatory at the time she cared for him. *Id*. at 12:20 – 13:4.

49. At deposition, Plaintiffs' counsel asked Ms. Bishop: "You know sitting here today that your care is not in question, correct?" Plaintiff's counsel thereafter withdrew the question. Deposition of Darcee Bishop, RN, at Exhibit M, at 23:18- 34:6; 33:16 – 24.

50. During his conversations with Ms. Bishop and Ms. Valladares, Dr. O'Steen never advised them that their care could be an issue, that they should get a lawyer, or that

they could be violating HIPAA. Deposition of Jakelin Valladares, CNA, at Exhibit L, at 15:19 – 16:10; Deposition of Darcee Bishop, RN, at Exhibit M, at 11:22 – 14:5; Deposition of John O'Steen, M.D., at Exhibit K, at 20:21 – 22:12; 78:23 – 79:1.

51. Plaintiffs do not allege that a discrete event caused the injuries alleged in this suit:

- Plaintiffs allege that Mr. Long deteriorated over several months' time while he was in the ASPC-Florence Infirmary between November 25, 2014 and February 2, 2015, leading to his eventual death. *See generally* Plaintiffs' 18th Supplemental Rule 26.1 Disclosure Statement, at Exhibit B, Section VII "Course of Treatment," pages 36-44.

- Plaintiffs allege "[f]rom November 26, 2014 to February 2, 2015, [Decedent's] medical and physical condition deteriorated as he became malnourished and cachectic." Plaintiffs' 1st Amended Complaint, at Exhibit D, ¶ 52.

- Plaintiffs allege that Decedent's vital signs throughout the month of January of 2015 show that he was in an undeniably critical condition. Plaintiffs' 18th Supplemental Rule 26.1 Disclosure Statement, at Exhibit B, page 41.

- Plaintiffs allege that between January 7 to January 21, "[Decedent] remained weak, cachectic, and tachycardic without significant medical intervention… [and that his] deterioration would be obvious to a lay person." Plaintiffs' 18th Supplemental Rule 26.1 Disclosure Statement, at Exhibit B, page 44:17-22.

52. Plaintiffs generally allege "Defendant Corizon and its employees and agents failed to properly recognize, assess, diagnose or treat [Decedent's] serious medical condition resulting in his death." Plaintiffs' 1st Amended Complaint, at Exhibit D, ¶ 65.

53. Plaintiff alleges Defendant Corizon and its employees fell below the standard of care in treating Decedent, resulting in his death. Plaintiffs' 1st Amended Complaint, at Exhibit D, ¶ 66-70.

54. Plaintiffs allege that Decedent's care team failed in providing a multi-disciplinary approach to healthcare including care by nurses (RNs) and nursing assistants (CNAs) generally. *See generally* Plaintiffs' Expert Affidavit of Michael Champion, MD, attached at **Exhibit S**.

55. On February 8, 2018, Plaintiffs disclosed the nursing standard of care expert opinions of Lori Milus, RN. *See* Declaration Under Oath of Lori Milus, RN, MSN, BC, at Exhibit C. Her opinions were as follows:

- The focus of Ms. Milus' opinion concerned the nursing care received by Decedent while he was housed in the ASPC-Florence Infirmary from November 25, 2014 to February 2, 2015. *See* Declaration Under Oath of Lori Milus, at Exhibit C, ¶ 6.

- Ms. Milus opined that the nursing standard of care requires a nurse to advocate for a patient, including taking quality of care concerns up the chain of command, when necessary. *See* Declaration Under Oath of Lori Milus, at Exhibit C, ¶ 7.

- Ms. Milus opined that the Corizon nurses generally were "unable, or unwilling, to elevate concerns with patient care within an established chain of command…. [and that there] are numerous medication refusals documented in the file, but no indication that a nursing supervisor ever interceded." *See* Declaration Under Oath of Lori Milus, at Exhibit C, ¶ 36.

- Ms. Milus explicitly identified care provided by Darcee Bishop, RN in her statement of facts upon which her opinion is based (specifically with respect to a medication refusal). *See* Declaration Under Oath of Lori Milus, at Exhibit C, ¶ 19.

- Ms. Milus also opined that nursing staff violated the standard of care by allowing their personal feelings about Decedent to interfere with care provided. *See* Declaration Under Oath of Lori Milus, at Exhibit C, ¶ 38.

RESPECTFULLY SUBMITTED this 9th day of July, 2018.

QUINTAIROS, PRIETO, WOOD & BOYER, P.A.

By: /s/ Anthony Fernandez
Anthony J. Fernandez
Rebecca E. Stanton
*Attorneys for Defendants*

**ORIGINAL** efiled via AZ TurboCourt
on this 9th day of July, 2018 with:

**The Clerk of the Court**

The Honorable Rosa Mroz
**MARICOPA COUNTY SUPERIOR COURT**
East Court Building - 414
101 Jefferson
Phoenix, AZ 85003-2243

**COPIES** mailed this same day to:

Joel B. Robbins
Anne E. Findling
**ROBBINS & CURTIN, PLLC**
301 E. Bethany Home Road, Suite B100
Phoenix, AZ 85012-0001
*Attorneys for Plaintiffs*

Krista Carman
**CARMAN LAW FIRM**
246 S. Cortez Street
Prescott, AZ 86303
*Attorneys for Plaintiffs*

By /s/ Nelly Preca

# EXHIBIT A

Joel B. Robbins (011065)
Anne E. Findling (010871)
ROBBINS & CURTIN, P.L.L.C.
301 E. Bethany Home Road, Suite B-100
Phoenix, Arizona 85012-0001
Telephone: (602) 285-0100
Facsimile: (602) 265-0267
joel@robbinsandcurtin.com
anne@robbinsandcurtin.com

Krista Carman (021700)
Warnock, MacKinlay & Carman, PLLC
246 S. Cortez Street
Prescott, AZ 86303
Telephone: (928) 445-8056
Facsimile: (928) 445-8046
kcarman@lawwmc.com

*Attorneys for Plaintiffs*

COPY

MAY 1 9 2016

MICHAEL K. JEANES, CLERK
N. COTTON
DEPUTY CLERK

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**
**IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| KENNETH and CORA LONG, husband and wife, individually, and as statutory beneficiaries for Nicholas Long, deceased; and on behalf of the estate of NICHOLAS LONG,<br><br>Plaintiffs,<br><br>vs.<br><br>STATE OF ARIZONA, a body politic, CORIZON HEALTH, INC., an Missouri corporation, doing business in the State of Arizona,<br><br>Defendants. | Case No. CV 2016-007692<br><br>**COMPLAINT**<br><br>(Wrongful Death)<br><br>**(Jury Trial Requested)** |

RECEIVED
By Barbara McKinley at 7:04 am, Aug 15, 2016

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 • Fax: (602) 265-0267

Plaintiffs Kenneth Long and Cora Long, for their complaint on behalf of themselves and the estate of Nicholas Long against Defendants State of Arizona and Corizon Health, Inc., allege as follows:

**PARTIES**

1. Plaintiffs Kenneth Long and Cora Long ("Plaintiffs") are residents of the State of Arizona. They are the natural parents of decedent Nicholas Long.

2. Decedent Nicholas Long was a resident of the State of Arizona. Although incarcerated with the Arizona Department of Corrections at the time of his death, Mr. Long's residence was in Yavapai County, Arizona prior to his incarceration. He died on May 25, 2015.

3. Defendant State of Arizona is a governmental entity organized under the Constitution of the United States. Its subdivisions or agencies include the Arizona Department of Corrections (ADC).

4. Defendant State of Arizona is liable for the acts and omissions of its employees within the scope of their employment, including the Director, officers and other employees of the ADC under the doctrine of *respondeat superior*.

5. Pursuant to A.R.S. §31-201.01(F), any and all causes of action which may arise out of tort caused by the Director, prison officers, or employees of ADC, run only against the State.

6. Defendant State of Arizona has a non-delegable duty of care, custody, and control over the inmates within its custody, including the duty to provide medical care for the serious medical needs of the inmates.

7. Effective March 4, 2013, Defendant Corizon Health, Inc. ("Corizon") contracted with Arizona Department of Corrections to provide full service medical, mental health, and dental care (collectively "healthcare" to the

inmates housed at ASPC-Douglas, ASPC-Phoenix, ASPC-Eyman, ASPC-Safford, ASPC-Florence, ASPC-Tucson, ASPC-Lewis, ASPC-Winslow, ASPC-Perryville, ASPC-Yuma.

8. Defendant State of Arizona retained monitoring responsibility for Defendant Corizon's provision of health care to inmates within the Arizona Department of Corrections prison system.

9. Defendant State of Arizona requires inmates to be provided opportunities for reasonable and appropriate access to a community standard of health care and appropriate referrals for inmates who present for treatment.

10. Defendant State of Arizona remains ultimately liable for the acts and omissions of Defendant Corizon in providing healthcare to inmates within the ADC and the Arizona prison system.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 • Fax: (602) 265-0267

## JURISDICTION AND VENUE

11. The amount in controversy exceeds the jurisdictional threshold of the Court.

12. A timely notice of claim pursuant to A.R.S. § 12-821.01 was served on Defendant State of Arizona on November 20, 2015. More than sixty (60) days have passed since this Notice of Claim was served upon the Defendant. By operation of statute, the claim is deemed denied.

13. This is an action against the State of Arizona. Venue is proper in the Superior Court in and for Maricopa County.

## FACTUAL BACKGROUND

14. Nicholas Long was admitted to the Arizona Department of Corrections on March 12, 2014, to serve a sentence for selling six prescription pills to a neighbor to pay his cell phone bill. The maximum end date of his sentence was March 13, 2019.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 • Fax: (602) 265-0267

15. Nicholas was naïve and guileless. His disciplinary tickets in prison were for playing basketball when he was supposed to be working with the grounds crew and refusing to shave.

16. At intake, Nicholas (5'10") was reported to have weighed 153 lbs. He reported a history of Bipolar Disorder (a mood disorder) that had been previously treated with medication. He also reported stomach issues for which he requested Prilosec (omeprazole), a medication commonly used for Gastroesophageal Reflux Disease (GERD). Nicholas was transferred to ASPC-Yuma to serve his sentence.

17. On March 28, 2014, Nicholas submitted a Health Needs Request (HNR) to request Prilosec "for his stomach." A progress note of April 3, 2014 documents Nicholas's weight to be 160 lbs. Nicholas was assessed as having GERD and a prescription for Prilosec was ordered.

18. On June 28, 2014, Nicholas (at the time 180 lbs) was seen by a nurse for a chief complaint of 10/10 abdominal pain, intermittent, for one week. The pain was described as sharp. He was tachycardic. The record does not include referral to an appropriate provider or any GI work-up.

19. Nicholas's October 7, 2014 HNR for "really bad" stomach cramping, diarrhea, pain, and inability to sleep, and his October 10, 2014 HNR report of "severe pain" resulted in being placed on the "nurse's line" on October 12. Records document bloody stool, inability to urinate, anorexia, diarrhea, weakness, dizziness and vomiting. He described his pain as 9/10 to 10/10. His weight was down 24 pounds since his last assessment. His abdomen was described as tender, hyperactive bowel sounds present, guarding present, with confirmed blood in his stool. The record does not include referral to an appropriate provider or any GI work-up. No CT was done and no surgical consult was obtained.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 • Fax: (602) 265-0267

20. His condition deteriorated and on November 6, 2014 he was admitted to Yuma Regional Medical Center for possible acute colitis. He was discharged on November 11, with instructions to continue Levaquin. Nicholas was transferred to ASPC-Florence. He continued to have stomach cramps and diarrhea. He was weak and required supplemental nutrition.

21. Nicholas's GI symptoms continued. He had trouble eating. His stools were grossly abnormal, with bleeding and diarrhea.

22. On November 26, 2014, Nicholas was admitted to Tempe St. Luke's Hospital. A CT revealed circumferential large bowel mucosal thickening consistent with infectious or inflammatory colitis, likely ulcerative colitis. Nicholas was reported to having signed out against medical advice, apparently because he was unable to eat. There's no record of a mental health consult or contact with Nicholas's family. Protocols for addressing his condition were ignored.

23. Sometime during this period, someone labeled Nicholas as being on a "hunger strike." The label clearly infected the treatment he was given. Although the records show that he complained that he was unable to eat and that his medication was causing side effects, he was stigmatized and denied appropriate care apparently on someone's assumption that his conduct was willful. Again, the protocols for addressing these issues were disregarded.

24. It wasn't until late January that mental health became involved and it wasn't until Nicholas was critically ill and unable to understand his condition that he saw a psychiatrist. Still the protocols were ignored.

25. Nicholas was ultimately admitted to Mountain Vista Medical Center after becoming unresponsive from starvation and dehydration. Abdominal surgery revealed severe adhesions and perforations. He had

subtotal colectomy, placement of ileostomy, enterorrhaphy and lysis of adhesions.

26. Complications ultimately led to Nicholas's death on May 25, 2015.

**CLAIMS FOR RELIEF**

**Count One**

**NEGLIGENCE**

**(Defendant State of Arizona)**

27. Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

28. The State of Arizona has a non-delegable duty of care, custody, and control of inmates within the state prison system. This non-delegable duty includes providing appropriate medical care for serious medical needs.

29. The State of Arizona also has a duty to ensure, through appropriate monitoring, that reasonable and necessary medical care is being provided by contracted and subcontracted medical providers duly licensed and acting within the scope of those licenses according to the community standard of care to inmates within the ADC and the Arizona state prison system is delivered.

30. The State of Arizona breached its duty to Plaintiffs' decedent by failing to provide appropriate medical care for his serious medical needs.

31. The State of Arizona further breached its duty to Plaintiffs' decedent by failing to adequately monitor the contracted medical services being provided to Plaintiffs' decedent and others.

32. As a result of these breaches, Plaintiffs' decedent failed to receive competent medical care for his serious medical needs resulting in his death.

33. By virtue of the non-delegable duty set forth above, Defendant State of Arizona is vicariously liable for the medical negligence of Defendant Corizon Health, Inc. as set forth in Count Two of Plaintiffs' Complaint.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

## Count Two

## NEGLIGENCE
## (Defendant Corizon Health, Inc.)

34. Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

35. Defendant Corizon has a duty to provide reasonable healthcare in accordance with the community standard of care by appropriately licensed medical personnel acting within the scope of their respective licenses.

36. Defendant Corizon breached that duty by failing to provide necessary medical care to Plaintiffs' decedent within the community standard of care.

37. Defendant Corizon and its employees and agents failed to properly recognize, assess, diagnose or treat Plaintiffs' decedent's serious medical condition resulting in his death.

38. Defendant Corizon and its employees and agents failed to exercise that degree of care that a reasonable provider would exercise under the same or similar circumstances.

39. Defendant Corizon created policies and procedures that resulted in its employees failing to practice within the scope of their respective licenses.

40. Defendant Corizon's negligence includes:

a. Failing to properly assess Plaintiffs' decedent after he made his medical needs known;

b. Failing to establish proper policy, procedures, custom and practice for identifying inmates who require a higher level of care than can be provided at the prison complex;

c. Failing to provide appropriate personnel and to train that personnel in the recognition of conditions requiring a higher

level of medical care than can be provided at the prison complex;

d. Failing to properly assess Plaintiffs' decedent when his medical condition had obviously deteriorated;

e. Failing to investigate Plaintiffs' decedent's declining medical condition and waiting until his condition was life-threatening before taking action;

f. Failing to ascertain the source of Plaintiffs' decedent's complaints;

g. Failing to act on objective signs of an increasingly serious medical condition until it was too late for effective treatment.

41. Ordinary care required Defendant Corizon to refer Plaintiffs' decedent to a qualified and properly equipped medical professional who could conduct an adequate and proper medical examination, properly and competently diagnose Mr. Long's medical condition, and provide for competent and adequate treatment.

42. As a result of the breach of Defendant Corizon's duties to Plaintiffs' decedent as more fully set forth above, Defendant Corizon caused Plaintiffs' decedent to be denied timely, appropriate and competent medical care resulting in his death.

**Count Three**

**WRONGFUL DEATH**

**(All Defendants)**

43. Pursuant to A.R.S. § 12-611, et seq., Plaintiffs hereby assert a claim for damages for the wrongful death of Nicholas Long based on the wrongful acts and negligent conduct set forth in Counts One and Two of this complaint.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

44. As a result of the wrongful acts of Defendants as set forth above, Plaintiffs suffered damages including loss of love, companionship, and support.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

A. For special damages;

B. For lost wages, income, and other economic losses;

C. For other general damages, including but not limited to pain and suffering, loss of enjoyment of life and other emotional trauma;

D. For exemplary damages to the extent permitted by law;

E. For taxable costs and pre- and post-judgment interest to the extent permitted by law;

F. Such other relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED: May 18, 2016

ROBBINS & CURTIN, p.l.l.c.

By: [signature]
Joel B. Robbins
Anne E. Findling
*Attorneys for Plaintiffs*

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

# EXHIBIT B

Joel B. Robbins (011065)
Anne E. Findling (010871)
**ROBBINS & CURTIN, P.L.L.C.**
301 E. Bethany Home Road, Suite B-100
Phoenix, Arizona 85012-0001
Telephone: (602) 285-0100
Facsimile: (602) 265-0267
joel@robbinsandcurtin.com
anne@robbinsandcurtin.com

Krista Carman (021700)
CARMAN LAW FIRM
246 S. Cortez Street
Prescott, AZ 86303
E: kcarman@carmanlf.com

*Attorneys for Plaintiffs*

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ◆ Fax: (602) 265-0267

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

KENNETH and CORA LONG, husband and wife, individually, and as statutory beneficiaries for Nicholas Long, deceased; and on behalf of the estate of NICHOLAS LONG,

Plaintiffs,

vs.

STATE OF ARIZONA, a body politic, CORIZON HEALTH, INC., an Missouri corporation, doing business in the State of Arizona,

Defendants.

Case No. CV2016-007692

**PLAINTIFFS' EIGHTEENTH SUPPLEMENTAL RULE 26.1 DISCLOSURE STATEMENT**

(Assigned to the Honorable Rosa Mroz)

- Death Certificate;
- Plaintiff's 14th Supplemental Disclosure;
- Deposition Transcript of Zoran Vukcevic, MD;
- Deposition Transcript of Robert A. Anderson, DO;
- Deposition Transcript of Jawad Riaz, MD;
- Deposition Transcript of Christopher Johnson, MD.;
- Medical Chronology.

Ms. Milus is expected to testify consistent with her Declaration Under Oath attached as Exhibit "65."

*Plaintiffs reserve the right to supplement as discovery continues.*

## VII. COURSE OF TREATMENT

### A. Nicholas Long is Admitted to ADC and Housed at ASPC-Yuma from March 18, 2014 through November 10, 2014.

Nicholas Long was admitted to the Arizona Department of Corrections on March 12, 2014, to serve a sentence for selling six prescription pills to a neighbor to pay his cell phone bill. The maximum end date of his sentence was March 13, 2019, but a release date of October 27, 2017 was expected. Nicholas was a minimum custody inmate.

Nicholas was naïve and guileless. His disciplinary tickets in prison were for playing basketball when he was supposed to be working with the grounds crew or refusing to shave. Nicholas was a high school graduate but led a relatively sheltered life with his family in rural Arizona. He depended on and was close to his parents, particularly his mother. Nicholas' father had been incarcerated in California and missed significant time with Nick when he was younger.

At intake, Nicholas (5'10") was noted to weigh 153 lbs. (BMI est. 22), which is considered within the range of normal weight. He reported a history of Bipolar Disorder (a mood disorder) that had been previously treated with medication. He also reported stomach issues for which he requested Prilosec

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

(omeprazole), a medication commonly used for Gastroesophageal Reflux Disease (GERD). Nicholas was transferred from intake to ASPC-Yuma to serve his sentence.

On March 28, 2014, Nicholas submitted a Health Needs Request (HNR) to request Prilosec "for his stomach." A progress note of April 3, 2014 documents Nicholas's weight to be 160 lbs. (BMI 23). Nicholas was assessed as having GERD and a prescription for Prilosec was ordered.

Below is ADC Record in March 17, 2014 noting Nicholas' weight:

| | | | | | | |
|---|---|---|---|---|---|---|
| 03/17/2014 | 01:01 AM | | | | 5 ft 10 in | 160 lb |

*See Corizon Medical Records at 000679.*

On June 28, 2014, Nicholas (at the time 160 lbs.) was seen by a nurse for a chief complaint of 10/10 abdominal pain, intermittent, for one week. The pain was described as sharp. He was tachycardic. The record does not include referral to a provider or any GI work-up.

Nicholas' October 7, 2014 HNR for "really bad" stomach cramping, diarrhea, pain, and inability to sleep, and his October 10, 2014 HNR report of "severe pain" resulted in being placed on the "nurse's line" on October 12, 2014.

Records document bloody stool, inability to urinate, anorexia, diarrhea, weakness, dizziness and vomiting. He described his pain as 9/10 to 10/10. His weight was down 24 pounds (BMI 20) since his last assessment. His abdomen was described as tender, hyperactive bowel sounds present, guarding present, with confirmed blood in his stool. The record does not include referral to a provider or any GI work-up. No CT was performed, and no surgical consult was obtained.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ◆ Fax: (602) 265-0267

Nicholas' condition deteriorated and on November 6, 2014 he was admitted to Yuma Regional Medical Center (YRMC) for severe colitis, leukocytosis and fever. On November 7, he was evaluated to be at nutritional risk. Nick was treated with IV antibiotics and fluids. Stool cultures were negative, and his symptoms were reported as resolved after three days. Nicholas was discharged on November 10, 2014 with diagnoses of unspecified noninfectious gastroenteritis and colitis, dehydration, leukocytosis, and fever, with instructions to continue Levaquin.

B. <u>Nicholas Long is Transferred to ASPC-Florence, Central Unit on November 25, 2014</u>.

Two weeks after his hospitalization at YRMC, Nicholas was transferred from ASPC-Yuma to ASPC-Florence. *See Corizon Records.* He was admitted to the Infirmary under the care of Zoran Vukcevic, M.D. On admission, he was febrile (T 101.3), tachycardia (P 137), and weighed 115 lbs. *See Tempe St. Luke's 11/26/2014.*

| | | | | | | |
|---|---|---|---|---|---|---|
| <u>11/26/2014</u> | 05:52 AM | 101.3 F | 137 | 24 | 5 ft 10 in | 115 lb |

On November 26, 2014, Nicholas was admitted to Tempe St. Luke's Hospital for severe protein malnutrition, fever, and severe abdominal pain with bloody stool. A CT revealed circumferential large bowel mucosal thickening consistent with infectious or inflammatory colitis, likely ulcerative colitis.

Gastroenterologist Florin Gaidici performed a partial colonoscopy. He stopped the colonoscopy after he discovered severe disease. He did not continue with the procedure out of fear that he would perforate Nicholas' colon. He was, however, able to make the diagnosis of active chronic colitis

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

with ulceration. Dr. Gaidici concluded that Nicholas would "very likely" require a biologic[1] substance due to the severity of his disease but didn't feel that Nicholas would need surgery with total colectomy.

Nicholas was reported to having signed out against medical advice, apparently because he was unable to eat. There's no record of a mental health consult or contact with Nicholas's family. Nick returned to ADC on November 30, 2014 and was readmitted to the Infirmary. Nicholas was quoted as saying:

> "I could not tolerate diet in the hospital, I did not need another colonoscopy, as I know my diagnosis."

Nick remained in the infirmary. On December 9, 2014, Nicholas submitted an HNR for medical care:

> I would like to see the doctor for a check-up and about my med's as soon as possible please.
> Thank you.

On December 10, 2014, Nicholas' medications were changed to Prilosec, Phenergan, and Zantac. Nick's prior prescription for steroids was discontinued.

On December 12, 2014, Nicholas was readmitted to Tempe St. Luke's. *See Tempe St. Luke's Records.* Dr. Muhammad Vasiq, Corizon's representative at the hospital, was the admitting and attending physician. The admitting assessment was lower GI bleeding related to chronic ulcerative colitis. Discharge instructions included continued medication with mesalamine (5-ASA). Id.

Nicholas again returned to ASPC-Florence Central Unit Infirmary under Dr. Vukcevic's care. Medication was changed from mesalamine to Balsalazide.

---

1 The term "biologics" refer to medications such as Humira, which can be prescribed for ulcerative colitis.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

On December 15, 2014, Flagyl was added to Nick's mediations. Nick poorly tolerated the balsalazide, reporting that it made him nauseous.

On December 29, 2014, Nicholas was tachycardiac and refusing the balsalazide. By January 6, 2015, Nicholas was reporting poor tolerance to mesalamine. As a result, he was receiving no medication for ulcerative colitis. He continued to be tachycardiac and febrile. Labs were ordered with abnormal values for hematocrit (below lower panic level), hemoglobin (below lower panic level), and red blood cells (below lower panic level). MCH, MCHC, Absolute Neutrophil CT, GPLT, RDW, and White Blood Count were also abnormal. Nicholas is described as cachectic.

Nicholas' condition continued to deteriorate on return to the prison. Although he was in the "infirmary," little was done to address the ulcerative colitis disease process. At one point, Dr. Vukcevic apparently sought authority to send Nicholas out to Maryvale Hospital for a GI consult, but Corizon only authorized a "routine" consultation resulting in a planned appointment in mid-February. From January 7 to January 21, Nicholas lost another four pounds and weighed just 109 lbs. (BMI 11.4). Throughout this period, Nicholas remained weak, cachectic, and tachycardic without significant medical intervention. A nutritional consult was ordered, but there is no indication that one was completed.

Nicholas' deterioration would be obvious to a lay person. His 5' 10" frame had reduced by 50% He was described as weak and cachectic (physical wasting and loss of muscle mass). He needed help to walk.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

Medically, the objective evidence that Nicholas was critical was undeniable:

| VITAL SIGNS | | | | | |
|---|---|---|---|---|---|
| DATE | TEMP | PULSE | RESP | BP | BMI charted |
| 3/12/2014 | 99 | 66 | 18 | 124/67 | [22] [est.] |
| 11/26/2014 | 101.3 | 137 | 24 | 112/56 | 16.5 |
| 1/7/2015 | 99.3 | 128 | 18 | 106/66 | 16.2 |
| 1/8/2015 | 94.8 | 133 | 20 | 138/100 | 15.8 |
| 1/19/2015 | 97.2 | 127 | 20 | 116/76 | 15.8 |
| 1/23/2015 | 97.5 | 130 | 16 | 122/60 | 15.1 |
| | | | | *Percentage Change in BMI* | *-31%* |

MSSS031B

Lab Test
Order/Procedure

Friday May 25, 2015 10:41:01 AM

Ordered Date: 01/21/2015 Time: 11:00:00 AM
Encounter Type: Lab Test (Unsolicited)
Location: ASPC-F CENTRAL/U MED [A23] Staff: Vukcevic, Zoran, MD
Ordering Practitioner:

**Lab Test Results**

| Observation Code | Result | Unit | Abnormal Flag | Reference | Result Status |
|---|---|---|---|---|---|
| BUN-BLOOD, UREA, NITROGEN SERUM | 16 | MG/DL | Normal | 7-18 | Final Results |
| CHLORIDE, SERUM | 94 | MEQ/L | Below Low Normal | 98-107 | Final Results |
| CARBON DIOXIDE (CO2) | 28 | MEQ/L | Normal | 22-33 | Final Results |
| CREATININE, TOTAL-SERUM | 0.24 | MG/DL | Below Lower Panic Levels | 0.7-1.3 | Final Results |
| GFR (NON-AFRICAN AMERICAN) | 520 | mL/MIN | HH | 50-300 | Final Results |
| GFR (AFRICAN AMERICAN) | 631 | mL/MIN | HH | 50-300 | Final Results |
| GGLU | 59 | MG/DL | Below Low Normal | 70-105 | Final Results |

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

| | | | | | |
|---|---|---|---|---|---|
| POTASSIUM, SERUM | 4.9 | MEQ/L | Normal | 3.5-5.1 | Final Results |
| SODIUM, SERUM | 128 | MEQ/L | Below Low Normal | 136-145 | Final Results |

On January 23, 2015, Nicholas was again transferred to Tempe St. Luke's. *See Exhibit 4 – Tempe St. Luke's Records.* On admission Dr. Vasiq noted Nicholas' condition and reported that he called the prison medical director to see if there were court orders to treat. He records that he was told there were no court orders for treatment.

> IMPRESSION:
> 1. Abdominal pain with likely ulcerative colitis exacerbation.
> 2. Extreme cachexia with severe protein-calorie malnutrition.
>
> PLAN: We were admitting the patient to the hospital including the GI evaluation. GI is here to see the patient. We ordered the TPN, PICC line placement, CT of the abdomen and pelvis, and initiated the further workup, but the patient is not willing to stay in the hospital and wants to leave against the medical advice. I personally called and spoke to the prison medical director to see if they have any court orders to hold him in the hospital to try to feed him because he is extremely cachectic and he is still refusing to eat, but the prison authorities does not have any court orders, hence we cannot hold him against his wishes. He will be discharged back to the prison with a continuous watch under the Department of Corrections' medical services and further management as an outpatient.

Dr. Nadim Zyadeh saw Nicholas for a GI consult. Nicholas was severely malnourished. His labs were abnormal and Dr. Zyadeh assessed him as having:

> 1. Acute abdomen with severe leukocytosis, likely secondary to severe ulcerative colitis flare-up; however, toxic megacolon has to be excluded.
>
> 2. Ulcerative colitis.
>
> 3. Severe protein-calorie malnutrition.

Nicholas was again returned to the prison infirmary. His physical condition continued to deteriorate. On February 2, 2015, psychiatrist Robert

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

Anderson was told to see Nicholas. Dr. Anderson had been given limited information and told to see Nicholas for a capacity evaluation. *See Depo. of Robert Anderson, D.O. (9/8/2017) 46:25 to 47:16.* He was "absolutely" shocked when he saw that Nicholas was emaciated and cachectic. *Id.* Nicholas was not able to meaningfully participate in a capacity evaluation and was, in fact, emaciated and cachectic with "labs suggestive of a man whose life is in critical danger if supportive medical services are not applied, within the near future." Dr. Anderson concluded that it was "highly questionable" that Nicholas was even "able to cognitively process information present to him."

Nicholas was ultimately admitted to Mountain Vista Medical Center after becoming unresponsive from starvation and dehydration on February 3, 2015. *See Florence Hospital & Mountain Vista Hospital.* Abdominal surgery revealed severe adhesions and perforations. He had subtotal colectomy, placement of ileostomy, enterorrhaphy and lysis of adhesions.

Nicholas underwent further procedures at Mountain Vista with gastrostomy tube placement, abdominal lavage, vacuum assisted wound closure, and porcine graft closure of the abdominal wall. Postoperative course was complicated by failure to be weaned from ventilator requiring tracheostomy on February 21, 2015, and by the growth of vancomycin-resistant enterococci from his urine. Nicholas was eventually discharged to Promise Hospital for continued care on February 24, 2015. *See Promise Hospital Records.*

On May 25, 2015, Nicholas arrived via EMS to Banner Desert Medical Center from Promise Hospital at approximately 9:27 a.m. *See Banner Hospital Records.* On arrival Nicholas is completely unresponsive.

History of Present Illness
The patient presents in respiratory arrest, This is a 21 y/o male who was transferred to the ED from outside facility after being found in respiratory arrest and hypoxia. Per EMS; pt began c/o SOB last night and was being given breathing treatments. EMS state that pt went into respiratory arrest today , became hypoxic, multiple intubation attempts in the care facility were not successful. Pt has hx of tracheotomy secondary to respiratory arrest , but I'm not able to obtain any further information in terms of patient's medical history otherwise this time .Tracheotomy was removed 6 weeks ago and per case staff, pt has been immobile and refusing anticoagulation. Per carestaff, pt was dx with IV line sepsis yesterday. Pt arrives to ED with LMA in place. Patient apparently had an abdominal surgery, but I do not have any details of what surgery that was and why he had it.. The onset was just prior to arrival. Witnessed arrest unknown. Pre-arrival Treatment Oxygen intubated (unsuccessful). Preceding symptoms shortness of breath.

Review of Systems
Additional review of systems information: Unable to obtain due to: Clinical condition.

Complications ultimately led to Nicholas's death on May 25, 2015 at 10:10 a.m.

## VIII. INJURIES & DAMAGES

This claim is brought pursuant to A.R.S. § 12-611, which provides:

> When death of a person is caused by wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action to recover damages in respect thereof, then, and in every such case, the person who or the corporation which would have been liable if death had not ensued shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death was caused under such circumstances as amount in law to murder in the first or second degree or manslaughter.

**A.R.S. § 12-611.**

The measure of damages is found in A.R.S. § 12-613:

> In an action for wrongful death, the jury shall give such damages as it deems fair and just with reference to the injury resulting from the death to the surviving parties who may be entitled to recover, and also having regard to the mitigating or aggravating circumstances attending the wrongful act, neglect or default. The amount recovered in such action shall not be subject to debts or liabilities of the deceased, unless the action is brought on behalf of the decedent's estate.

**A.R.S. § 12-613.**

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

## XI. PRIVILEGE LOG

| BATES | DESCRIPTION | OBJECTION |
|---|---|---|
| Item 6, 7 | Dr. O'Steen's social security number, which is used as his taxpayer identification number. | Dr. O'Steen has requested that this social security number be redacted from the materials produced. |
| Item 6, pp. 10, 13, 13, 359, 359, | The name of a case that Dr. O'Steen reviewed has been redacted. Dr. O'Steen has not been named as a testifying expert in that case. | Objection; not discoverable pursuant to Rule 26(4)(B). |

*Plaintiffs reserve the right to supplement as discovery continues.*

**RESPECTFULLY SUBMITTED**: March 23, 2018

ROBBINS & CURTIN, p.l.l.c.

By: [signature]
Joel B. Robbins
Anne E. Findling
*Attorneys for Plaintiffs*

# EXHIBIT C

Joel B. Robbins (011065)
Anne E. Findling (010871)
**ROBBINS & CURTIN, P.L.L.C.**
301 E. Bethany Home Road, Suite B-100
Phoenix, Arizona 85012-0001
Telephone: (602) 285-0100
Facsimile: (602) 265-0267
joel@robbinsandcurtin.com
anne@robbinsandcurtin.com

Krista Carman (021700)
**CARMAN LAW FIRM**
246 S. Cortez Street
Prescott, AZ 86303
Telephone: (928) 445-8056
Facsimile: (928) 445-8046
kcarman@carmanlf.com

*Attorneys for Plaintiffs*

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**
**IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| KENNETH and CORA LONG, husband and wife, individually, and as statutory beneficiaries for Nicholas Long, deceased; and on behalf of the estate of NICHOLAS LONG,<br><br>Plaintiffs,<br><br>vs.<br><br>STATE OF ARIZONA, a body politic, CORIZON HEALTH, INC., an Missouri corporation, doing business in the State of Arizona;<br><br>Defendants. | Case No. CV2016-007692<br><br>**DECLARATION UNDER OATH OF LORI MILUS, RN, MSN, BC** |

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

Lori Milus, RN, makes the following declaration under oath:

1. I am a registered nurse licensed in the State of Arizona and am qualified to express the opinions contained in this affidavit. A copy of my CV is attached.

2. I am familiar with the standard of care for registered nurses in the care of individuals with medical and mental health care needs.

3. I am also familiar with the standard of care for psychiatric nursing with patients who are assessed as non-compliant with medications and/or at risk for self-harm behaviors.

4. I am currently the corporate director for psychiatric services with Iasis Healthcare. I have extensive experience in supervising registered nurses.

5. I have reviewed the Corizon medical record for Nicholas Long.

6. The focus of my opinions is the nursing care, psychiatric nursing care, and supervision of nurses as provided to Nicholas Long by Corizon at ASPC-Florence Central Unit Infirmary ("Infirmary") from November 25, 2014 to February 2, 2015.

7. Whether the setting is a correctional facility or a setting in the community, the standard of care for nursing requires that the nurse be an advocate for their patient, including taking quality of care concerns up the chain of command, when necessary.

8. Whether the setting is a correctional facility or a setting in the community, registered nurses must follow the nursing practice act and must practice within the scope of that nurse's license.

9. An organization providing nursing care should encourage and enable nurses to report problems and advocate for patients. A system that does not have a functioning chain of command and frequent interaction between nursing staff and nursing supervisors and administrators puts patients at risk. Frequent and open communication allows nursing staff to voice care issues without fear of reprisals.

10.     The standard of care applicable within a correctional facility is the community standard of care. Although the settings may change, the basic standard of care remains the same.

11.     The following statement summarizes the care provided to Nicholas Long during the relevant period and is not intended to be a complete summary of the records. I reserve the right to supplement my opinions as more information becomes available.

12.     The Nursing Admission Tool (11/25/2014) indicates an infirmary admission to ASPC-F Central/U Med. On admission, Mr. Long was identified as a "sub-acute" admission. ADOC-Long-00173. He had cramping pain and was nauseated. His nutrition was identified as very poor. The chart notes an unplanned weight loss of 30 pounds. Comments include "Inmate has colitis and has lost from 11/21/14 122.4 to today which weight is 115."

13.     The infirmary admission includes the following Plan Notes:

> Inmate came from Yuma. Inmate has colitis, diarrhea with bleeding. Inmate needs to be seen by provider [text missing] med renewal and possible more in-depth assessment. Inmate has lost about 6 lbs. in the last 4 days. [Inmate] [text missing] bowel movements approx. every 15-20 minutes. Inmate states that he is unable to keep anything down [text missing] for a supplement. Didn't eat much tonight. Inmate needs additional supplements to diet. Inmate looks like [text missing] and very thin.

ADOC-Long-00180. Provider Review was noted on 12/03/2014 by Vukcevic, Zoran, MD.

14.     Orders on November 26, 2014 included direct admission to Tempe St. Luke's Hospital. Inmate return from hospital stay was documented on November 30, 2014.

15.     The Corizon records for ASPC-F Central/U Med list the following mental health encounters including two encounters from an individual who was designated as a psychiatric nurse (ADOC-Long-00022):

    a.  December 1, 2014, MH-Intake (Roun, Mahlon) (ADOC-Long-01181-01187)

    b.  January 14, 2015, MH-Psychiatric Nurse – Scheduled (Anderson, Jennifer) (ADOC-Long-01188-01192)

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax:   (602) 265-0267

c.  January 25, 2015, MH-Individual Counseling (Roun, Mahlon) (ADOC-Long-01195-01198)

d.  January 26, 2015, MH- Individual Counseling (King, Michael S) (ADOC-Long-01200-01203)

e.  January 27, 2015, MH-Psychiatrist – Scheduled (Riaz, Jawad) (ADOC-Long-01204-01211)

f.  January 28, 2015, MH-Psychiatric Nurse – Scheduled (Anderson, Jennifer) (ADOC-Long-01212-01216)

g.  January 29, 2015, MH-Segregation Visit (Roun, Mahlon) (ADOC-Long-01218-01223)

h.  January 30, 2015, MH-Segregation Visit (Newman, Nicole M) (ADOC-Long-01224-01229)

i.  January 30, 2015, MH-Treatment Plan (Newman, Nicole M) (ADOC-Long-01230-01234)

j.  February 1, 2015, MH-Segregation Visit (Roun, Mahlon) (ADOC-Long-01235-01240)

k.  February 2, 2015, MH-Segregation Visit (Roun, Mahlon) (ADOC-Long-01241-01246)

l.  February 4, 2015, MH-Psychiatrist-Unscheduled (Anderson, Robert) (ADOC-Long-01247-01251)

16.  There is also a S.O.A.P. note (ADOC-Long-01127-01129) by Robert A. Anderson, D.O. dated February 2, 2015.

17.  The medical record also contains Mental Health Disposition – Correction Officer Watch Orders: ADOC-Long 01217, 01193, 01194.

a.  January 24, 2015, Mental Health Disposition – Correctional Officer Watch Orders, [signature illegible] RN; reason for watch "self-harm behavior"; notes: "Inmate to be placed on watch for self-harming behavior in HU10." Authorization verbal, Dr. Johnson. Continuous suicide watch, discontinued by King on January 26, 2015.

b.  January 26, 2015, Mental Health Disposition – Correctional Officer Watch Orders, [King]; reason for watch [illegible], no notes. 10" SW (Random Checks), Sack Meals Only.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

c. January 29, 2015, Mental Health Disposition – Correctional Officer Watch Orders, [signature illegible] Psych Associate; reason for watch – "not eating"; notes: "no options." 30" MHW (Random Checks).

18. The records document a Health Needs Request (HNR) dated 12/9/2014 in which Mr. Long requests to receive a check up and medications "as soon as possible."

19. On December 22, 2014, RN Bishop documented that Mr. Long refused medication (ADC-Long-1745). The reason for refusal was reported:

those risks and consequences. I also understand, however, that if at any time I change my mind, I may seek treatment again.
have refused for last 3 days Can I get a diff [illegible]

REASON FOR REFUSAL: Meds give me stomach cramps, fever, no appetite

20. Additional medication refusals were documented on December 24, 2014 (01746); December 28, 2014 (01747); December 29, 2014 (01748); January 3, 2015 (01748); January 7, 2015 (01750); January 13, 2015 (01751); January 13, 2015 (01752); January 14, 2015 (01753); January 14, 2015 (01754); and January 14, 2015 (01755). Mr. Long consistently reports problems with medications.

21. On January 14, 2015, 3:00 PM, Registered Nurse Anderson documents a health services encounter for "MH Psychiatric Nurse Follow-Up." (ADOC-Long-01188-01192). The subjective note indicates that "Inmate seen per request of Medical." RN Anderson notes that Mr. Long is not taking his medication as prescribed. She notes no side effects present and marks "N" to "Rx effective." She further notes sleep & appetite disturbance, no mood disturbance, and new stressors. The record is not completely clear, but it appears that she noted that Mr. Long was not receiving his medication as ordered.

22. RN Johnson documents:

> Inmate not prescribed any psychiatric medications. Inmate reports sleep and appetite issues secondary to medical problem (currently in HU10). Inmate presents as euthymic but ill. Writer was asked to see inmate due to refusal of one of his medical medications. Per inmate it is "making me loose (sic) my appetite even more and I'm underweight." "It's making me sicker, I want to get better."

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

23. RN Johnson documents: hygiene, appearance WNL; no abnormal movements; mood euthymic; alert; eye contact/motor coordination WNL; concentration fair; no hallucinations or delusions; speech & thought process WNL. She documents no self-destructive ideation and no violent ideation. ADOC-Long-01189.

24. RN Johnson's assessment is:

> Denies DTO/DTS, AVH. Future oriented, discussed desire to "gain weight and get better" to go home [missing text] polite, appropriate for setting with good eye contact. Appears goal oriented in relation to current illness.

25. RN Johnson's nursing diagnosis is:

***Non-compliance with medical medications RT side effects.***

26. RN Johnson's plan is FU as scheduled or HNR. Patient education is noted as: "Educated Re medication compliance, safety plan, HNR process." ADOC-Long-01191-01192. No treatment plan is evident from the record.

27. The stated purpose of RN Johnson's encounter with Mr. Long was to address "refusal of one of his medical medications." Records document Mr. Long's refusal of mesalamine on:

a. January 13, 2015 at 3:15 PM ("I/M states medication causes lack of appetite & he is trying to gain weight") (01752);

b. January 13, 2015 at 9:30 PM ("loss of appetite") (01751);

c. January 14, 2015 at 8:00 AM ("I/M states medication takes away appetite & I/M is trying to gain weight.") (01753); and

d. January 14, 2015 at 3:00 PM ("I/M states medication takes away appetite & I/M is trying to gain weight") (01754).

28. Stephanie Oplinger, RN, documented nurse – infirmary rounds on January 14, 2015, 2:10 AM. She charts: "I/M states he's feeling better and has appetite back tonight actually ate dinner. Asked CNA for 'pullups' as [text missing] problem getting to restroom on time due to disease." ADOC-Long-00833-00840. She notes that his abdomen is tender and documents:

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

| GI: | | |
|---|---|---|
| Abdomen soft, non-distended, non-tender: | Y | ◉ N |
| Bowel sounds present in all four quadrants: | ◉ Y | N |
| Appetite normal: | Y | ◉ N |
| BM normal: | Y | ◉ N |
| Comments: I/M has loose stools. Appetite is poor. Ensure given. | | |

29. Barbara Hansen, RN documented a daily assessment on January 14, 2015, 10:11 AM. Mr. Long was febrile (100.3), tachycardic (137), with respirations of 22, his blood pressure was 120/60. He was "up several times with loose stools." She notes that he was having loose stools and decreased appetite and documents:

| GI: | | |
|---|---|---|
| Abdomen soft, non-distended, non-tender: | ◉ Y | N |
| Bowel sounds present in all four quadrants: | ◉ Y | N |
| Appetite normal: | Y | ◉ N |
| BM normal: | Y | ◉ N |
| Comments: Having loose stools and decreased appetite. | | |

Mr. Long was reported to be wearing a brief because he "was not always able to make it to the restroom in time." ADOC-Long-00841-00848.

30. In my opinion, to a reasonable degree of nursing probability, RN Johnson's care of Nicholas Long did not meet the standard of care for psychiatric nursing. Mr. Long required a multi-disciplinary approach to his medical and mental health conditions. A psychiatric nurse, with both medical and psychiatric training and experience, should be the nursing staff member in the best position to understanding the significance of both the medical and mental health symptoms that Mr. Long was exhibiting.

31. The standard of care for a psychiatric registered nurse under these circumstances required RN Johnson to do more than document an encounter. Given Mr. Long's physical condition, as evidenced by contemporaneous records, the standard of care required that she directly communicate concerns to a provider or elevate the concerns through the chain of command. The psychiatric nurse follow-up note plan of "FU as

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

scheduled" was below the standard of care, especially considering other available options of referring to psychiatry for early FU and/or staffing with psychiatry.

32. On January 28, 2015, 11:35 AM, RN Johnson saw Nicholas Long for a psychiatric nursing scheduled encounter. ADOC-Long-01212 – 01216. Mr. Long was seen "while on a 10 Minute Watch." RN Johnson documented subjective as: "I'm doing pretty good." "I'm eating my lunch." She again noted that he was not taking medication as prescribed; noted no side effects present / Rx not effective; sleep & appetite disturbance, and new stressors."

33. RN Johnson notes:

> Inmate prescribed psychiatric medications 1/27/2015. They have not yet arrived per I/M. Inmate states he has "more appetite" than previously. Inmate currently on watch. Inmates states his mood is "good" however, appears slightly dysphoric."

Hygiene, appearance noted to be WNL; mood noted as "other"; concentration is fair; with no self-destructive ideations and no violent ideations. Nursing diagnosis is: "Ineffective coping RT medical condition" unchanged. No psychiatric nurse plan of care is noted in the record.

34. Contemporaneous records include:

a. 01/26/2015 11:00 AM Provider – Infirmary Rounds (ADOC-Long-00997-1000)

Continues to "fail to thrive." Wt. = 104.8; BMI = 15. Appears weak, depressed. Labs (1/21/2015): Alb 1.5; TP 5.0; H/H: 7.4/28.6.

Returned from hospital AMA: refused PICC placement. Afebrile. FS BG (random) this AM 82.

Critically ill. Depressed, refusing treatments.

Psychiatric consult ASAP.

b. 01/26/2015 4:01 PM Provider – Infirmary Rounds (ADOC-Long-01009-01012)

Appears weak, cahectic (sic), tired. Hemodynamically stable. Erythema of the sacral skin (decubitus) reported. Afebrile.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

c. 01/27/2015 3:47 AM Nurse – Infirmary Rounds (ADOC-Long-01013-01020) Stephanie Oplinger, RN.

"I/M asked if I could try to get IV again to get rest of fluids and he wants his Immodium (sic) medication."

[No Vital Signs Noted]

I/M laying in bed. Total care with bedpan.

**Skin/Musculoskeletal:**

| | Y | N |
|---|---|---|
| Skin pink, warm, and dry: | ○ | ● |
| Moves all extremities independently: | ● | ○ |
| Full, spontaneous ROM: | ● | ○ |
| Independent bed mobility, transfers: | ○ | ● |
| Steady gait, ambulates without assistive device: | ○ | ● |
| Absence of joint swelling or tenderness: | ● | ○ |

Comments: barrier cream on Coccyx.

**Cardiovascular:**

| | Y | N |
|---|---|---|
| Heart rhythm regular: | ○ | ● |
| Brisk capillary refill: | ○ | ● |
| Absence of edema: | ○ | ● |
| Peripheral pulses present by palpation: | ● | ○ |

Comments: Pulse low, pedal pulses faint, feet have +1 edema

**GI:**

| | Y | N |
|---|---|---|
| Abdomen soft, non-distended, non-tender: | ○ | ● |
| Bowel sounds present in all four quadrants: | ● | ○ |
| Appetite normal: | ○ | ● |
| BM normal: | ○ | ● |

Comments: abd tender, has diarrhea, I/M does not really feel when he has a BM it is loose diarrhea.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

GU:

Urine clear, yellow to amber: ○ Y ◉ N

Voiding without difficulty: ○ Y ◉ N

If dialysis, mark days: ☐ M ☐ T ☐ W ☐ Th ☐ F ☐ Sa ☐ Su

Comments: no urine output this shift.

VS noted. IM still having uncontrolled diarrhea. IV order for 175 ml/hr. NS hand IV blew on 1/25 was able to start 20g in left lower arm ran IV at 125 ml/hr. starting at 2300. Checked every hour IV infusing no S/S of infiltration. IM wants Imodium but refuses Mesalamine order for colitus (sic) states "it hurts my stomach". IM drank 1 ensure. Uses bedpan. Helped I/M use pillow to lift hip off of bed.

d. 01/27/2015 10:25 AM MH – Psychiatrist – Scheduled (ADOC-Long-01204-01211).

Scheduled psychiatric follow-up.

Subjective Notes. Case discussed with Dr. Vukcevic (medical provider) who said that patient has been refusing to eat and [missing text] treatment. Provider believes that IM is attempting to harm himself and informed me that plan is to take IM [missing text] cour-committment (sic) medications.

Current housing: general population; routine follow-up exam; telemedicine

Current symptoms: IM see as per medical referral. He is moved to Florence 3 months ago. Was taking mirtazapine at Yuma for "sleep problems". He denies any complaints. Has diagnosis of bipolar disorder "when younger". Reports having good appetite and eating alright. Denies current mood symptoms. No anxiety or depression is noted. Denies having any thoughts of harming himself or others. He denies any psychosis. He has an IV line. When asked why he is refusing a PIC line. He kept saying "I won't do it" but was unable to give me any reasonable explanation. He seemed very disinterested in talking with this provider and kept saying he is hurting and would want to go back to his cell. He did say that his appetite is good and he is gaining weight.

IM reports poor sleep, denies other symptoms. Agrees to take mirtazapine. Understands risk/benefits of taking medication. Will order mirtazapine. RTC = 3 months or as needed.

Psychiatrist Progress Note: Referral to psychiatrist (routine).

35. In my opinion, the psychiatric nursing care provided to Nicholas Long by RN Anderson on January 28, 2015 fell below the applicable standard of care for a psychiatric nurse. Mr. Long's condition had continued to deteriorate while in the infirmary. Since the last time that RN Anderson had seen Mr. Long, he had been placed on various watches, none of which appeared appropriate to his condition. Although Mr. Long had been seen via telemedicine by a psychiatrist, the standard of care required RN Anderson to continue to advocate for Mr. Long, including elevating concerns about his condition to the on-site provider and up the chain of command.

36. The nursing records from Nicholas Long's care at ASPC-Florence also show a systemic problem with nurses being unable, or unwilling, to elevate concerns with patient care within an established chain of command. There is no indication in the records that any nursing administrators were involved in the care provided to Nicholas Long. There are numerous medication refusals documented in the file, but no indication that a nursing supervisor ever interceded to assist the nursing staff in advocating for Mr. Long. Concerns that were communicated to the provider remained unaddressed, with nursing staff left to care for a patient who was not receiving appropriate medical care for his serious medical condition.

37. Registered nurses are trained in basic nutrition, but do not necessarily have the specific training of a registered dietician. In this case, providing for Mr. Long's nutritional needs would be beyond the scope of practice for registered nurse without additional training or education.

38. Nurses working directly with the patients, especially with patients seen to be difficult patients, can and do become frustrated. The standard of care for registered nursing requires that the nurse put aside those frustrations and provide reasonable and necessary care. It is important that negative views of the patient not influence care provided. If a nurse suspects that a patient is exaggerating or feigning symptoms, the standard of care requires an objective description of behaviors, not subjective statements of the patient's

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

character or truthfulness. To the extent that certain nurses allowed their personal feelings about Mr. Long to interfere with care provided, the applicable standard of care is not met. Nursing administration must ensure that all nurses are providing appropriate care without the taint of bias or prejudice.

Subject to the penalty of perjury, I attest that this declaration is true and accurate to the best of my knowledge.

DATED: February 8th, 2018.

Lori Milus RN, MSN, BC

LORI MILUS, RN, MSN, BC

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

# EXHIBIT D

RECEIVED
By Nelly Preca at 10:50 am, Jun 20, 2018

Chris DeRose, Clerk of Court
*** Electronically Filed ***
R. Sotelo, Deputy
6/13/2018 8:50:00 AM
Filing ID 9427816

Joel B. Robbins (011065)
Anne E. Findling (010871)
**ROBBINS & CURTIN, P.L.L.C.**
301 E. Bethany Home Road, Suite B-100
Phoenix, Arizona 85012-0001
Telephone: (602) 285-0100
Facsimile: (602) 265-0267
joel@robbinsandcurtin.com
anne@robbinsandcurtin.com

Krista Carman (021700)
CARMAN LAW FIRM
246 S. Cortez Street
Prescott, AZ 86303
E: kcarman@carmanlf.com

*Attorneys for Plaintiffs*

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**
**IN AND FOR THE COUNTY OF MARICOPA**

KENNETH and CORA LONG, husband and wife, individually, and as statutory beneficiaries for Nicholas Long, deceased; and on behalf of the estate of NICHOLAS LONG,

Plaintiffs,

vs.

STATE OF ARIZONA, a body politic; CORIZON HEALTH, INC., a Missouri corporation, doing business in the State of Arizona; CHRISTOPHER LEE JOHNSON, D.O., an individual,

Defendants.

Case No. CV2016-007692

**FIRST AMENDED COMPLAINT**

(Wrongful Death)

**(Jury Trial Requested)**

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

Plaintiffs Kenneth Long and Cora Long, for their complaint on behalf of themselves and the estate of Nicholas Long against Defendants State of Arizona and Corizon Health, Inc., allege as follows:

**PARTIES**

1. Plaintiffs Kenneth Long and Cora Long ("Plaintiffs") are residents of the State of Arizona. They are the natural parents of decedent Nicholas Long.

2. Decedent Nicholas Long was a resident of the State of Arizona. Although incarcerated with the Arizona Department of Corrections at the time of his death, Mr. Long's residence was in Yavapai County, Arizona prior to his incarceration. He died on May 25, 2015.

3. Plaintiff Cora Long is the duly appointed Personal Representative of the Estate of Nicholas Long, deceased, Yavapai Superior Court No. V1300PB201580054.

4. Defendant State of Arizona is a governmental entity organized under the Constitution of the United States. Its subdivisions or agencies include the Arizona Department of Corrections (ADC).

5. Defendant State of Arizona is liable for the acts and omissions of its employees within the scope of their employment, including the Director, officers and other employees of the ADC under the doctrine of *respondeat superior*.

6. Pursuant to A.R.S. §31-201.01(F), any and all causes of action which may arise out of tort caused by the Director, prison officers, or employees of ADC, run only against the State.

7. Defendant State of Arizona has a non-delegable duty of care, custody, and control over the inmates within its custody, including the duty to provide medical care for the serious medical needs of the inmates.

8.     Effective March 4, 2013, Defendant Corizon Health, Inc. ("Corizon") contracted with Arizona Department of Corrections to provide full service medical, mental health, and dental care (collectively "healthcare") to the inmates housed at ASPC-Douglas, ASPC-Phoenix, ASPC-Eyman, ASPC-Safford, ASPC-Florence, ASPC-Tucson, ASPC-Lewis, ASPC-Winslow, ASPC-Perryville, ASPC-Yuma. Plaintiffs are informed and believe that Defendant Corizon was, and is, a for-profit corporation.

9.     Defendant Corizon was, and is, a state actor as that term is used within the jurisprudence of federal civil rights law.

10.    Defendant State of Arizona retained monitoring responsibility for Defendant Corizon's provision of health care to inmates within the Arizona Department of Corrections prison system.

11.    Defendant State of Arizona requires inmates to be provided opportunities for reasonable and appropriate access to a community standard of health care and appropriate referrals for inmates who present for treatment.

12.    Defendant State of Arizona remains ultimately liable for the acts and omissions of Defendant Corizon in providing healthcare to inmates within the ADC and the Arizona prison system.

13.    Defendant Chris Johnson DO was the medical director for ASPC-Florence Central Unit for approximately two years beginning in approximately June 2014. Defendant Johnson's identity and participation in the constitutional violation asserted herein were discovered on September 9, 2017, when Zoran Vukcevic, M.D. identified Defendant Johnson as a moving force in the treatment decisions made with respect to Nicholas Long.

14.    At the time that Defendant Johnson was made medical director of ASPC-Florence Central Unit, he had been licensed to practice medicine in

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707  ♦  Fax:  (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

Arizona for less than one month and had no experience as a primary care physician, in correctional medicine, or in the direction of a complex health care delivery system.

15. Defendant Johnson was, and is, a state actor as that term is used within the jurisprudence of federal civil rights law.

## JURISDICTION AND VENUE

16. The amount in controversy exceeds the jurisdictional threshold of the Court.

17. A timely notice of claim pursuant to A.R.S. § 12-821.01 was served on Defendant State of Arizona on November 20, 2015. More than sixty (60) days have passed since this Notice of Claim was served upon the Defendant. By operation of statute, the claim is deemed denied.

18. This is an action against the State of Arizona. Venue is proper in the Superior Court in and for Maricopa County.

19. Plaintiffs hereby amend their complaint to add claims arising under 42 U.S.C. § 1983, Civil action for deprivation of rights. This Court has general jurisdiction over the claims asserted.

## FACTUAL BACKGROUND

***State of Arizona / Department of Corrections***

20. The Arizona Department of Corrections promulgates department orders that govern an inmate's access to constitutionally mandated health care.

21. Upon information and belief, the contract between the State of Arizona and Corizon requires that Corizon comply with ADC's department orders.

22. Corizon's responsibility to inmates extends to ensuring "all efforts are taken to maintain the inmate's life while on the prison complex." Inmates

retain the right to refuse treatment, but if the inmate's decision is life-threatening, Corizon must follow Department Order § 1101.11 (1.2.1), which initiates the chain of command to ensure that the inmate is mentally competent and makes a knowing, fully informed decision, including seeking court authority for treatment.

23. ADC policy requires notification to the Facility Health Administrator (FHA), the ADC Contract Monitor, and the Warden. A significant incident report must be completed, and the Department's General Counsel must be contacted. Contact with General Counsel initiates the involvement of the Office of the Attorney General in petition for court mandated treatment.

24. Corizon's responsibility to inmates extends to inmates that ADC and/or Corizon consider to be on a "hunger strike." ADC policy requires that "hunger strikes" be reported through the chain of command including reporting to the Attorney General to seek court orders for treatment.

25. Even if an inmate refuses needed medical treatment, Corizon's responsibility extends to ensuring "that every possible avenue is explored to encourage cooperation by inmates in completion of their own care."

26. ADC policy also requires Corizon to initiate a multi-disciplinary panel in the event that there is a life-threatening failure of treatment.

***Parsons v. Ryan***

27. On or about March 22, 2012, a prisoner civil rights complaint was filed in the United States District Court, District of Arizona, alleging systemic policies and practices with the Arizona Department of Corrections that resulted in the denial of the constitutional rights of inmates with ADC. Defendant Corizon is also a defendant in the *Parsons v. Ryan* case.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

28. Plaintiffs are informed and believe that Defendant Corizon was, and is, subject to potential civil penalties for non-compliance with certain performance measures related to staffing and referral of inmates for medically indicated care to non-employee ("outside") medical providers, specialists, and hospitals.

29. Plaintiffs are further informed and believe that Defendant Corizon was, and is, subject to potential contractual penalties for non-compliance with certain performance measures related to staffing and referral of inmates for medically indicated referrals to non-employee medical providers, specialists, and hospitals.

30. Plaintiffs are informed and believe that the potential for such penalties has created a financial disincentive for Corizon to initiate policy-mandated procedures.

***Nicholas Long***

31. Nicholas Long was admitted to the Arizona Department of Corrections on March 12, 2014, to serve a sentence for selling six prescription pills to a neighbor to pay his cell phone bill. The maximum end date of his sentence was March 13, 2019.

32. Nicholas was naïve and guileless. His disciplinary tickets in prison were for playing basketball when he was supposed to be working with the grounds crew and refusing to shave.

33. At intake, Nicholas (5'10") was reported to have weighed 153 lbs. He reported a history of Bipolar Disorder (a mood disorder) that had been previously treated with medication. He also reported stomach issues for which he requested Prilosec (omeprazole), a medication commonly used for Gastroesophageal Reflux Disease (GERD). Nicholas was transferred to ASPC-Yuma to serve his sentence.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

34. On March 28, 2014, Nicholas submitted a Health Needs Request (HNR) to request Prilosec "for his stomach." A progress note of April 3, 2014 documents Nicholas's weight to be 160 lbs. Nicholas was assessed as having GERD and a prescription for Prilosec was ordered.

35. On June 28, 2014, Nicholas (at the time 180 lbs) was seen by a nurse for a chief complaint of 10/10 abdominal pain, intermittent, for one week. The pain was described as sharp. He was tachycardic. The record does not include referral to an appropriate provider or any GI work-up.

36. Nicholas's October 7, 2014 HNR for "really bad" stomach cramping, diarrhea, pain, and inability to sleep, and his October 10, 2014 HNR report of "severe pain" resulted in being placed on the "nurse's line" on October 12. Records document bloody stool, inability to urinate, anorexia, diarrhea, weakness, dizziness and vomiting. He described his pain as 9/10 to 10/10. His weight was down 24 pounds since his last assessment. His abdomen was described as tender, hyperactive bowel sounds present, guarding present, with confirmed blood in his stool. The record does not include referral to an appropriate provider or any GI work-up. No CT was done, and no surgical consult was obtained.

37. His condition deteriorated and on November 6, 2014 he was admitted to Yuma Regional Medical Center for possible acute colitis. He was discharged on November 11, with instructions to continue Levaquin.

38. Nicholas was transferred to ASPC-Florence on or about November 25, 2014. He continued to have stomach cramps and diarrhea. He was weak and required supplemental nutrition.

39. Nicholas's GI symptoms continued. He had trouble eating. His stools were grossly abnormal, with bleeding and diarrhea.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ◆ Fax: (602) 265-0267

40. Sometime after his arrival at ASPC-Florence Central Unit, Nicholas Long came under the primary care of Zoran Vukcevic, M.D.

41. On November 26, 2014, Nicholas was admitted to Tempe St. Luke's Hospital. A CT revealed circumferential large bowel mucosal thickening consistent with infectious or inflammatory colitis, likely ulcerative colitis. Nicholas was reported to having signed out against medical advice, apparently because he was unable to eat. There's no record of a mental health consult or contact with Nicholas's family. Protocols for addressing his condition were ignored.

42. Nicholas was readmitted to Tempe St. Luke's Hospital on December 11, 2014, and again on January 23, 2015. Nicholas was released against medical advice.

43. At the time of his discharge back to the prison, Nicholas was described as extremely weak and cachectic, with increasing weight loss. He was refusing to eat. The attending physician from Tempe St. Luke's personally called and spoke with the medical director, now identified as Defendant Chris Johnson, D.O.

44. Sometime during this period, someone labeled Nicholas as being on a "hunger strike." The label clearly infected the treatment he was given. Although the records show that he complained that he was unable to eat and that his medication was causing side effects, he was stigmatized and denied appropriate care apparently on someone's assumption that his conduct was willful. Again, the protocols for addressing these issues were disregarded.

45. Policy required that Nicholas Long be seen by a psychiatrist before initiation of the process of obtaining court ordered treatment. Plaintiffs are informed and believe that Defendant Corizon and/or Defendant Johnson

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

refused a request by primary care physician Vukcevic for an urgent behavioral health consultation.

46. At relevant times, Robert Anderson, D.O. worked for Defendant Corizon at ASPC-Florence as a psychiatrist. As a psychiatrist, Dr. Anderson's responsibility was primarily mental health and not providing medical care.

47. On February 2, 2015, Dr. Anderson saw Nicholas Long emergently for a capacity evaluation at the prison. Dr. Anderson had not been informed of the critical nature of Nicholas Long's medical condition. Dr. Anderson was given virtually no information on Nicholas Long before being asked to see him.

48. Dr. Anderson observed a "young man lying in bed . . . extremely lean, in a condition that visually for me said this man is in peril of perhaps perishing if medical services aren't provided very quickly." Nicholas Long was unable to communicate in any meaningful way.

49. A capacity evaluation requires "that the individual [be] able to be verbal, responsive, clear, aware of their environment, responsive, nonpsychotic." Dr. Anderson saw "an individual who could provide nothing [to] do a competent capacity evaluation."

50. From available laboratory reports, based on his experience in family practice, Dr. Anderson concluded that Nicholas Long was a risk of dying if he did not receive emergent medical care.

51. Dr. Anderson assessed that Nicholas Long was suffering from delirium due to malnutrition and dehydration. Dr. Anderson was shocked and disturbed by Nicholas Long's condition.

52. From November 26, 2014 to February 2, 2015, Nicholas Long's medical and physical condition deteriorated as he became malnourished and cachectic. Although he reported that the medications he was being given were

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 • Fax: (602) 265-0267

ineffective and, in fact, making him worse, providers failed to provide available alternative treatment.

53. Nicholas was ultimately admitted to Mountain Vista Medical Center after becoming unresponsive from starvation and dehydration. Abdominal surgery revealed severe adhesions and perforations. He had subtotal colectomy, placement of ileostomy, enterorrhaphy and lysis of adhesions.

54. Complications ultimately led to Nicholas's death on May 25, 2015.

**CLAIMS FOR RELIEF**

**Count One**

**NEGLIGENCE**

**(Defendant State of Arizona)**

55. Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

56. The State of Arizona has a non-delegable duty of care, custody, and control of inmates within the state prison system. This non-delegable duty includes providing appropriate medical care for serious medical needs.

57. The State of Arizona also has a duty to ensure, through appropriate monitoring, that reasonable and necessary medical care is being provided by contracted and subcontracted medical providers duly licensed and acting within the scope of those licenses according to the community standard of care to inmates within the ADC and the Arizona state prison system is delivered.

58. The State of Arizona breached its duty to Plaintiffs' decedent by failing to provide appropriate medical care for his serious medical needs.

59. The State of Arizona further breached its duty to Plaintiffs' decedent by failing to adequately monitor the contracted medical services being provided to Plaintiffs' decedent and others.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

60. As a result of these breaches, Plaintiffs' decedent failed to receive competent medical care for his serious medical needs resulting in his death.

61. By virtue of the non-delegable duty set forth above, Defendant State of Arizona is vicariously liable for the medical negligence of Defendant Corizon Health, Inc. as set forth in Count Two of Plaintiffs' Complaint.

**Count Two**

**NEGLIGENCE**
**(Defendant Corizon Health, Inc.)**

62. Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

63. Defendant Corizon has a duty to provide reasonable healthcare in accordance with the community standard of care by appropriately licensed medical personnel acting within the scope of their respective licenses.

64. Defendant Corizon breached that duty by failing to provide necessary medical care to Plaintiffs' decedent within the community standard of care.

65. Defendant Corizon and its employees and agents failed to properly recognize, assess, diagnose or treat Plaintiffs' decedent's serious medical condition resulting in his death.

66. Defendant Corizon and its employees and agents failed to exercise that degree of care that a reasonable provider would exercise under the same or similar circumstances.

67. Defendant Corizon created policies and procedures that resulted in its employees failing to practice within the scope of their respective licenses.

68. Defendant Corizon's negligence includes:

a. Failing to properly assess Plaintiffs' decedent after he made his medical needs known;

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 • Fax: (602) 265-0267

b. Failing to establish proper policy, procedures, custom and practice for identifying inmates who require a higher level of care than can be provided at the prison complex;

c. Failing to provide appropriate personnel and to train that personnel in the recognition of conditions requiring a higher level of medical care than can be provided at the prison complex;

d. Failing to properly assess Plaintiffs' decedent when his medical condition had obviously deteriorated;

e. Failing to investigate Plaintiffs' decedent's declining medical condition and waiting until his condition was life-threatening before taking action;

f. Failing to ascertain the source of Plaintiffs' decedent's complaints;

g. Failing to act on objective signs of an increasingly serious medical condition until it was too late for effective treatment;

h. Failing to provide adequate nutrition and hydration.

69. Ordinary care required Defendant Corizon to refer Plaintiffs' decedent to a qualified and properly equipped medical professional who could conduct an adequate and proper medical examination, properly and competently diagnose Mr. Long's medical condition, and provide for competent and adequate treatment.

70. As a result of the breach of Defendant Corizon's duties to Plaintiffs' decedent as more fully set forth above, Defendant Corizon caused Plaintiffs' decedent to be denied timely, appropriate and competent medical care resulting in his death.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

**Count Three**

**WRONGFUL DEATH**

**(All Defendants)**

71.   Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

72.   Pursuant to A.R.S. § 12-611, et seq., Plaintiffs hereby assert a claim for damages for the wrongful death of Nicholas Long based on the wrongful acts and negligent conduct set forth in Counts One and Two of this complaint.

73.   As a result of the wrongful acts of Defendants as set forth above, Plaintiffs suffered damages including loss of love, companionship, and support.

**Count Four**

**42 U.S.C. § 1983**

**(Federal Civil Rights – Defendant Corizon)**

74.   Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

75.   The Eighth Amendment to the United States Constitution prohibits the infliction of cruel and unusual punishment.

76.   The Fourteenth Amendment protects familial and associational relationships from interference without due process of law.

77.   As set forth herein, Nicholas Long presented with a serious medical need. Specifically, he was suffering from chronic and acute malnutrition, chronic and acute mental illness, and chronic and acute ulcerative colitis.

78.   Defendant Corizon knew that Nicholas Long presented with a serious medical need and knew that failure to treat that serious medical need could result in further significant injury (including death) and unnecessary and wanton infliction of pain.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

79. Defendant Corizon knew that Nicholas Long likely required treatment with a biologic substance, which would be much more costly than the treatment provided by Defendant Corizon.

80. Defendant Corizon's response to Nicholas Long's serious medical need demonstrated deliberate indifference.

81. Defendant Corizon purposefully acted and/or failed to respond to Nicholas Long's medical need resulting in needless pre-death pain and suffering.

82. Upon information and belief, Defendant Corizon's decision not to follow ADC's policies, as it was required to do, was the product of a conscious choice motivated by financial considerations.

83. The nature and extent of Defendant Corizon's indifference to Nicholas Long's serious medical condition was revealed on September 6, 2017, when primary care provider Vukcevic, who characterized himself as a "whistle blower", testified that he attempted to, but "failed to let's say blow whistle enough or know enough to save [Nicholas Long's] life."

84. Dr. Vukcevic testified that specialist care / outside care was required including parenteral feeding, noting that correctional medicine cannot feed people intravenously.

85. Dr. Vukcevic testified that he attempted to initiate the process for court ordered treatment but was blocked by Defendant Corizon from doing so.

86. Dr. Anderson testified that staffing at ASPC-Florence made it "impossible" to deliver required psychiatric services. Resources for mental health were limited or not available to meet the mental health needs of patients such Nicholas Long.

87. The severity of Nicholas Long's medical and mental health conditions were documented in his medical record.

88. As a direct result of the deliberate indifference of Defendant Corizon, Nicholas Long suffered further injury and suffering, and the unnecessary and wanton infliction of pain, including pre-death pain and suffering.

89. As a further direct result of the deliberate indifference of Defendant Corizon, Nicholas Long died.

90. As a further and direct result of the deliberate indifference of Defendant Corizon, Plaintiffs Cora Long and Kenneth Long experienced grief and suffering as set forth herein.

91. The conduct of Corizon as described herein was shocking and disturbing to its own providers.

**Count Five**

**42 U.S.C. § 1983**

**(Federal Civil Rights – Defendants Johnson)**

92. Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

93. On or about November 24, 2014, Nicholas Long was transferred from ASPC-Yuma to ASPC-Florence Central Unit.

94. Defendant Johnson was the site medical director for ASPC-Florence Central Unit.

95. Defendant Johnson was responsible for clinical supervision of the medical providers at ASPC-Florence.

96. Defendant Johnson knew that Nicholas Long was transferred to ASPC-Florence Central Unit with a diagnosis of colitis and diarrhea with bleeding. Defendant Johnson further knew that Nicholas Long had lost substantial weight, including six pounds in the four days preceding his transfer.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

97. Defendant Johnson knew that Nicholas Long was sent out to the hospital and returned to the prison against medical orders. Defendant Johnson knew that Nicholas Long was refusing treatment and that his health was deteriorating. Defendant Johnson knew as early as January 6, 2015, that Dr. Vukcevic was specifically concerned that Nicholas Long needed a psychiatric evaluation.

98. Defendant Johnson further knew that Nicholas Long's medical condition had so deteriorated that he required court ordered treatment.

99. The severity of Nicholas Long's medical and mental health conditions were documented in his medical record.

100. As a direct result of the deliberate indifference of Defendant Johnson, Nicholas Long suffered further injury and suffering, and the unnecessary and wanton infliction of pain, including pre-death pain and suffering.

101. As a further direct result of the deliberate indifference of Defendant Johnson, Nicholas Long died.

102. As a further and direct result of the deliberate indifference of Defendant Johnson, Plaintiffs Cora Long and Kenneth Long experienced grief and suffering as set forth herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

A. For special damages;

B. For lost wages, income, and other economic losses;

C. For general damages for the predeath pain and suffering experienced by Nicholas Long;

D. For other general damages, including but not limited to pain and suffering, loss of enjoyment of life and other emotional trauma;

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

E. For exemplary damages to the extent permitted by law;

F. For taxable costs and pre- and post-judgment interest to the extent permitted by law;

G. Such other relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED: June 13, 2018

**ROBBINS & CURTIN, p.l.l.c.**

By: /s/Anne E. Findling
Joel B. Robbins
Anne E. Findling
*Attorneys for Plaintiffs*

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

# EXHIBIT E

CHSS027C

# Health Services Encounter

Friday May 29, 2015 12:45:30 PM

**Encounter Header**

Date*: 12/16/2014
End Date*: 12/16/2014
Category: Nursing
Type*: Nurse - Infirmary Rounds
Location*: ASPC-F CENTRAL/U MED [A23]
Setting*: Clinic
Staff Member*: Bishop, Darcee
Title: Nurse
Form Type: Nursing Rounding Tool

Start Time*: 11:43:19 AM
End Time*: 11:57:25 AM
Encounter Close Date: 12/16/2014
Encounter Close Time: 11:57:25 AM

**Subjective**

**Related Health Service Requests**

| Request Date | Area of Interest | Request Type |
|---|---|---|
| No Rows Found | | |

**Subjective Notes**

I/M was laying in bed resting during daily rounds.

**Nursing Rounding Tool Subjective**

**New Problems:** N Y

Rev #: 443

**Objective**

**Vital Signs** (1 - 2 of 2)

| Taken By | Time | Temp | Pulse | Resp | Height | Weight | BP Systolic | BP Diastolic | Blood Sugar | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| Daou, Philip Brandon | 09:30 AM | 97.8 | 105 | 20 | 5 10 | | 100 | 62 | NA | |
| Somerton, Lisa | 12:08 AM | 98.4 | | | 5 10 | | | | NA | re-check on temp. down from 101... |

**Objective Notes**

None

**Nursing Rounding Tool Objective**

**Acuity:** ( ) Acute (•) Sub-acute ( ) Chronic

**Isolation:** (•) N ( ) Y: Type:

**Negative Pressure Room:** ( ) Y (•) N ( ) N/A

**Comorbidities:** ( ) N (•) Y: [ ] Seizures [ ] Asthma [ ] CAD [ ] Dyslipidemia [ ] DM [ ] COPD [ ] HTN [x] Other: ulcerative colitis

**Pt left unit for:** [ ] Outside Dr. Appt [ ] Hospital [ ] Radiology [ ] Dialysis [ ] Other:

**Time out:** **Time Returned:**

**Skin/Musculoskeletal:**

Skin pink, warm, and dry: (•) Y ( ) N

Moves all extremities independently: (•) Y ( ) N

~~Full, spontaneous ROM: (•) Y ( ) N~~

Independent bed mobility, transfers: (•) Y ( ) N

Steady gait, ambulates without assistive device: (•) Y ( ) N

Absence of joint swelling or tenderness: (•) Y ( ) N

Comments: small bump on left forearm on vein-no warmth or redness.

**Neurological:**

Alert, oriented X 3: (•) Y ( ) N

Follows command: (•) Y ( ) N

Speach clear and appropriate: (•) Y ( ) N

Motor response, moves all extremities: (•) Y ( ) N

Comments:

**Cardiovascular:**

Heart rhythm regular: (•) Y ( ) N

Brisk capillary refill: (•) Y ( ) N

Absence of edema: (•) Y ( ) N

Peripheral pulses present by palpation: (•) Y ( ) N

Comments:

**Pulmonary:**

Respirations even: (•) Y ( ) N

Resipration rate 16-24: (•) Y ( ) N

Respirations unlabored: (•) Y ( ) N

Lung sounds clear: (•) Y ( ) N

No cough: (•) Y ( ) N

Comments:

**GI:**

Abdomen soft, non-distended, non-tender: (•) Y ( ) N

Bowel sounds present in all four quadrants: (•) Y ( ) N

Appetite normal: (•) Y ( ) N

BM normal: (•) Y ( ) N

Comments:

**GU:**

Urine clear, yellow to amber: ( ) Y ( ) N

Voiding without difficulty: ( ) Y ( ) N

If dialysis, mark days: [ ] M [ ] T [ ] W [ ] Th [ ] F [ ] Sa [ ] Su

Comments:

**IV Site Assessment (1-2 sites)**

[ ] N/A

| | IV #1 | IV #2 |
|---|---|---|
| Location: | | |
| *Venous access type/size: | | |
| **Fluid frequency: | | |
| Fluid rate: | | |
| ***Phlebitis scale: | | |
| Dressing intact: | ( ) Y ( ) N | ( ) Y ( ) N |
| Dressing change due date: | | |

| *Venous access type | **Fluid frequency | ***Phlebitis scale |
|---|---|---|
| C=Central line | HL=Hep Lock | 0=No pain/swelling |
| P=Peripheral line | I=Intermittent | 1=Pain at site |
| PC=PICC line | B=Bolus | 2=Pain, redness, swelling |

| I=Implanted device | C=Continuous | 3=Pain, redness, swelling, palpable cord <3 |
|---|---|---|
| | | 4=Pain, redness, swelling, palpable cord >3 |

Comments:

Rev #: 443

**Assessment**

**Medical Diagnosis/Complaint**

| ICD-9 Code | Diagnosis/Complaint |
|---|---|
| No Rows Found | |

**Active Allergies/Health Problems/Conditions** (1 - 7 of 7)

| ID Number | Category | Type | Diagnosis Code | Status |
|---|---|---|---|---|
| 001 | Allergies - Medication | onions | | Assessed |
| 002 | Allergies - Medication | Tomatoes | | Assessed |
| 003 | Allergies - Other than Medications | Avacodo | | Assessed |
| 004 | Other Diagnosis | Other Diagnosis | Diarrhea [787.91] | Assessed |
| 005 | Mental Health | Mental Health | Bipolar disorder NOS [296.80] | Assessed |
| 006 | Other Diagnosis | Other Diagnosis | Other ulcerative colitis [556.8] | Assessed |
| 007 | Other Diagnosis | Nonsp rea skn test wo tb | Nonsp rea skn test wo tb [795.51] | Assessed |

**Related Allergies/Health Problems/Conditions**

| ID Number | Category | Type | Diagnosis Code | Status |
|---|---|---|---|---|
| No Rows Found | | | | |

**Assessment Notes**

Lung sounds clear bilaterally. Bowel sounds present 4 quadrants. Pedal/radial pulses +present. I/M reports blood in stool last night. Will continue to monitor.

**Plan**

**Treatment Orders**

| Category | Type | Frequency | For Days | Specify Comments |
|---|---|---|---|---|
| No Rows Found | | | | |

**Drug Prescription Orders**

| Prescription/Medication | Effective Date | Dosage | Frequency | Expiration | Status |
|---|---|---|---|---|---|
| No Rows Found | | | | | |

**Lab Test Orders**

| Lab Test Type | Priority | Status | Results | Value |
|---|---|---|---|---|

No Rows Found

X-Ray Orders

| X-Ray Body Area | Priority | S |
|---|---|---|
| No Rows Found | | |

Consultation Request

| Request Type | Service Type | Priority | |
|---|---|---|---|
| No Rows Found | | | |

Follow-up Appointments

| Date | Time | Type | Staff | Locatio |
|---|---|---|---|---|
| No Rows Found | | | | |

Patient Transfer Holds (1 - 1 of 1)

| Type | Expiration Date | St |
|---|---|---|
| Medical Hold | 04/15/2015 | Placed |

Other Actions/Procedures

| Group | Type | Approximate Begin Date | Approximate End Date | Specify Comm |
|---|---|---|---|---|
| No Rows Found | | | | |

Plan Notes

None

Nursing Rounding Tool Interventions/Treatments

**Musculoskeletal:**

Ice pack X 15 minutes: Y N N/A

ROM: Y N N/A

**Fall Risk:**

Side rails up: Y N N/A

Bed low and locked: Y N N/A

Uncluttered environment: Y N N/A

Call for assistance: Y N N/A

**Neurological:**

Seizure precautions (bed padded, airway available: Y N N/A

**Cardiovascular:**

Anti-embolitic device/stockings: Y N N/A

**Pulmonary:**

| | | | |
|---|---|---|---|
| Incentive spirometry: | Y | N | N/A |
| Aspiration precautions: | Y | N | N/A |
| Trach care: | Y | N | N/A |
| Suctioning: | Y | N | N/A |
| Elevate head of bed: | Y | N | N/A |

**New Problems:**

| | | | |
|---|---|---|---|
| NET completed: | Y | N | N/A |
| Practitioner contacted: | Y | N | N/A |
| Seen by practitioner: | Y | N | N/A |
| Continue current orders: | Y | N | N/A |
| New orders: | Y | N | N/A |
| Mental health referral completed in eOMIS: | Y | N | N/A |
| Other (see nursing notes): | Y | N | N/A |

**Nursing Notes:**

Rev #: 443

**Patient Education**

**Patient Education Notes**

None

**Health Classification**

Medical: 3

Mental: 2-Previously received MH services

Prognosis: Improvable Condition

SMI: N-No

Dental: U-Unknown (Conversion)

**Classification and Security Notes**

None

**Encounter Orders Review**

Review Type*: No Review Required

Review Staff: Unknown

**Review Notes**

None

**Scanned Documents/Photos**

| Type | Title | Source | Content Type |
|---|---|---|---|
| No Rows Found | | | |

**Standard Forms**

| Type | Staff |
|---|---|
| No Rows Found | |

CHSS027C

# Health Services Encounter

Friday May 29, 2015 12:41:47 PM

**Encounter Header**

Date*: 12/21/2014
Start Time*: 12:12:50 PM
End Date*: 12/21/2014
End Time*: 12:30:33 PM
Category: Nursing
Type*: Nurse - Infirmary Rounds
Encounter Close Date: 12/21/2014
Location*: ASPC-F CENTRAL/U MED [A23]
Encounter Close Time: 12:30:34 PM
Setting*: Clinic
Staff Member*: Bishop, Darcee
Title: Nurse
Form Type: Nursing Rounding Tool

**Subjective**

**Related Health Service Requests**

| Request Date | Area of Interest | Request Type |
|---|---|---|
| No Rows Found | | |

**Subjective Notes**

I/M was sitting up in bed eating during daily rounds.

**Nursing Rounding Tool Subjective**

**New Problems:** (•) N ( ) Y

Rev #: 443

**Objective**

**Vital Signs** (1 - 2 of 2)

| Taken By | Time | Temp | Pulse | Resp | Height | Weight | BP Systolic | BP Diastolic | Blood Sugar | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| Evans, Alyssa | 07:25 AM | 99.6 | 112 | 16 | 5 10 | | 110 | 52 | NA | |
| Miller, Yelena | 12:35 AM | 98.6 | | | 5 10 | 121 | | | NA | |

**Objective Notes**

None

**Nursing Rounding Tool Objective**

**Acuity:** ( ) Acute (•) Sub-acute ( ) Chronic

**Isolation:** (•) N ( ) Y: Type:

**Negative Pressure Room:** ( ) Y (•) N ( ) N/A

**Comorbidities:** ( ) N ( ) Y: [ ] Seizures [ ] Asthma [ ] CAD [ ] Dyslipidemia [ ] DM [ ] COPD [ ] HTN [x] Other: Ulcerative colitis

**Pt left unit for:** [ ] Outside Dr. Appt [ ] Hospital [ ] Radiology [ ] Dialysis [ ] Other:

**Time out:** **Time Returned:**

**Skin/Musculoskeletal:**

Skin pink, warm, and dry: (•) Y ( ) N

Moves all extremities independently: (•) Y ( ) N

Full, spontaneous ROM: (•) Y ( ) N

Independent bed mobility, transfers: (•) Y ( ) N

Steady gait, ambulates without assistive device: (•) Y ( ) N

Absence of joint swelling or tenderness: (•) Y ( ) N

Comments:

**Neurological:**

Alert, oriented X 3: (•) Y ( ) N

Follows command: (•) Y ( ) N

Speach clear and appropriate: (•) Y ( ) N

Motor response, moves all extremities: (•) Y ( ) N

Comments:

**Cardiovascular:**

Heart rhythm regular: (•) Y ( ) N

Brisk capillary refill: (•) Y ( ) N

Absence of edema: (•) Y ( ) N

Peripheral pulses present by palpation: (•) Y ( ) N

Comments:

**Pulmonary:**

Respirations even: (•) Y ( ) N

Resipration rate 16-24: (•) Y ( ) N

Respirations unlabored: (•) Y ( ) N

Lung sounds clear: (•) Y ( ) N

No cough: (•) Y ( ) N

Comments:

**GI:**

Abdomen soft, non-distended, non-tender: (•) Y ( ) N

Bowel sounds present in all four quadrants: (•) Y ( ) N

Appetite normal: (•) Y ( ) N

BM normal: (•) Y ( ) N

Comments: often nauseous. Has promethazine PRN.

**GU:**

Urine clear, yellow to amber: (•) Y ( ) N

Voiding without difficulty: (•) Y ( ) N

If dialysis, mark days: [ ] M [ ] T [ ] W [ ] Th [ ] F [ ] Sa [ ] Su

Comments:

**IV Site Assessment (1-2 sites)**

[ ] N/A

| | IV #1 | IV #2 |
|---|---|---|
| Location: | right anticubital | |
| *Venous access type/size: | P | |
| **Fluid frequency: | I | |
| Fluid rate: | | |
| ***Phlebitis scale: | 0 | |
| Dressing intact: | (•) Y ( ) N | ( ) Y ( ) N |
| Dressing change due date: | | |

| *Venous access type | **Fluid frequency | ***Phlebitis scale |
|---|---|---|
| C=Central line | HL=Hep Lock | 0=No pain/swelling |
| P=Peripheral line | I=Intermittent | 1=Pain at site |
| PC=PICC line | B=Bolus | 2=Pain, redness, swelling |
| I=Implanted | C=Continuous | 3=Pain, redness, swelling, palpable cord <3 |

C=Continuous

device

4=Pain, redness, swelling, palpable cord >3

Comments: I/M request IV removed but will allow it intact til 12/22/14 eve.

Rev #: 443

I=Implanted device

**Assessment**

**Medical Diagnosis/Complaint**

| ICD-9 Code | Diagnosis/Complaint |
|---|---|
| No Rows Found | |

**Active Allergies/Health Problems/Conditions** (1 - 7 of 7)

| ID Number | Category | Type | Diagnosis Code | Status |
|---|---|---|---|---|
| 001 | Allergies - Medication | onions | | Assessed |
| 002 | Allergies - Medication | Tomatoes | | Assessed |
| 003 | Allergies - Other than Medications | Avacodo | | Assessed |
| 004 | Other Diagnosis | Other Diagnosis | Diarrhea [787.91] | Assessed |
| 005 | Mental Health | Mental Health | Bipolar disorder NOS [296.80] | Assessed |
| 006 | Other Diagnosis | Other Diagnosis | Other ulcerative colitis [556.8] | Assessed |
| 007 | Other Diagnosis | Nonsp rea skn test wo tb | Nonsp rea skn test wo tb [795.51] | Assessed |

**Related Allergies/Health Problems/Conditions**

| ID Number | Category | Type | Diagnosis Code | Status |
|---|---|---|---|---|
| No Rows Found | | | | |

**Assessment Notes**

I/M states he feels better since refusing Balsalazide. Will continue to monitor.

**Plan**

**Treatment Orders**

| Category | Type | Frequency | For Days | Specify Comments |
|---|---|---|---|---|
| No Rows Found | | | | |

**Drug Prescription Orders**

| Prescription/Medication | Effective Date | Dosage | Frequency | Expiration | Status |
|---|---|---|---|---|---|
| No Rows Found | | | | | |

**Lab Test Orders**

| Lab Test Type | Priority | Status | Results | Value |
|---|---|---|---|---|

| No Rows Found |
|---|

X-Ray Orders

| X-Ray Body Area | Priority | S |
|---|---|---|
| No Rows Found | | |

Consultation Request

| Request Type | Service Type | Priority | |
|---|---|---|---|
| No Rows Found | | | |

Follow-up Appointments

| Date | Time | Type | Staff | Locatio |
|---|---|---|---|---|
| No Rows Found | | | | |

Patient Transfer Holds (1 - 1 of 1)

| Type | Expiration Date | St |
|---|---|---|
| Medical Hold | 04/15/2015 | Placed |

Other Actions/Procedures

| Group | Type | Approximate Begin Date | Approximate End Date | Specify Comm |
|---|---|---|---|---|
| No Rows Found | | | | |

Plan Notes

| None |
|---|

Nursing Rounding Tool Interventions/Treatments

**Musculoskeletal:**

Ice pack X 15 minutes: ○ Y ○ N ○ N/A

ROM: ○ Y ○ N ○ N/A

**Fall Risk:**

Side rails up: ○ Y ○ N ○ N/A

Bed low and locked: ○ Y ○ N ○ N/A

Uncluttered environment: ○ Y ○ N ○ N/A

Call for assistance: ○ Y ○ N ○ N/A

**Neurological:**

Seizure precautions (bed padded, airway available: ○ Y ○ N ○ N/A

**Cardiovascular:**

○ Y ○ N ○ N/A

Anti-embolitic device/stockings: Y N N/A

**Pulmonary:**

| | | | |
|---|---|---|---|
| Incentive spirometry: | Y | N | N/A |
| Aspiration precautions: | Y | N | N/A |
| Trach care: | Y | N | N/A |
| Suctioning: | Y | N | N/A |
| Elevate head of bed: | Y | N | N/A |

**New Problems:**

| | | | |
|---|---|---|---|
| NET completed: | Y | N | N/A |
| Practitioner contacted: | Y | N | N/A |
| Seen by practitioner: | Y | N | N/A |
| Continue current orders: | Y | N | N/A |
| New orders: | Y | N | N/A |
| Mental health referral completed in eOMIS: | Y | N | N/A |
| Other-(see nursing notes): | Y | N | N/A |

**Nursing Notes:**

Rev #: 443

**Patient Education**

**Patient Education Notes**

None

**Health Classification**

Medical: 3

Mental: 2-Previously received MH services Prognosis: Improvable Condition

SMI: N-No

Dental: U-Unknown (Conversion)

**Classification and Security Notes**

None

**Encounter Orders Review**

Review Type*: No Review Required Review Staff: Unknown

**Review Notes**

None

**Scanned Documents/Photos**

| Type | Title | Source | Content Type |
|---|---|---|---|
| No Rows Found | | | |

**Standard Forms**

| Type | Staff |
|---|---|
| No Rows Found | |

CHSS027C

# Health Services Encounter

Friday May 29, 2015 12:34:41 PM

**Encounter Header**

Date*: 01/06/2015
Start Time*: 02:32:23 PM
End Date*: 01/06/2015
End Time*: 02:39:32 PM
Category: Nursing
Type*: Nurse - Infirmary Rounds
Encounter Close Date: 01/07/2015
Location*: ASPC-F CENTRAL/U MED [A23]
Encounter Close Time: 09:34:59 AM
Setting*: Clinic
Staff Member*: Bishop, Darcee
Title: Nurse
Form Type: Nursing Rounding Tool

**Subjective**

**Related Health Service Requests**

| Request Date | Area of Interest | Request Type |
|---|---|---|
| No Rows Found | | |

**Subjective Notes**

I/M was laying in bed resting during daily rounds.

**Nursing Rounding Tool Subjective**

**New Problems:** (•) N ( ) Y

Rev #: 443

**Objective**

**Vital Signs** (1 - 1 of 1)

| Taken By | Time | Temp | Pulse | Resp | Height | Weight | BP Systolic | BP Diastolic | Blood Sugar | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| Valladares, Jakelin | 06:45 AM | 100.2 | 124 | 16 | 5 10 | | 118 | 58 | NA | V/s, passed ice |

**Objective Notes**

None

**Nursing Rounding Tool Objective**

**Acuity:** ( ) Acute (•) Sub-acute ( ) Chronic

**Isolation:** ( ) N ( ) Y: Type:

**Negative Pressure Room:** ( ) Y (•) N ( ) N/A

**Comorbidities:** ( ) N (•) Y: [ ] Seizures [ ] Asthma [ ] CAD [ ] Dyslipidemia [ ] DM [ ] COPD [ ] HTN [x] Other: ulcerative colitis

**Pt left unit for:** [ ] Outside Dr. Appt [ ] Hospital [ ] Radiology [ ] Dialysis [ ] Other:

**Time out:** **Time Returned:**

**Skin/Musculoskeletal:**

Skin pink, warm, and dry: (•) Y ( ) N

Moves all extremities independently: (•) Y ( ) N

Full, spontaneous ROM: (•) Y ( ) N

Independent bed mobility, transfers: (•) Y ( ) N

Steady gait, ambulates without assistive device: (•) Y ( ) N

Absence of joint swelling or tenderness: (•) Y ( ) N

Comments: I/M in bed majority of day.

**Neurological:**

Alert, oriented X 3: (•) Y ( ) N

Follows command: (•) Y ( ) N

Speach clear and appropriate: (•) Y ( ) N

Motor response, moves all extremities: (•) Y ( ) N

Comments:

**Cardiovascular:**

Heart rhythm regular: (•) Y ( ) N

Brisk capillary refill: (•) Y ( ) N

Absence of edema: (•) Y ( ) N

Peripheral pulses present by palpation: (•) Y ( ) N

Comments:

**Pulmonary:**

Respirations even: (•) Y ( ) N

Respiration rate 16-24: (•) Y ( ) N

Respirations unlabored: (•) Y ( ) N

Lung sounds clear: (•) Y ( ) N

No cough: (•) Y ( ) N

Comments:

**GI:**

Abdomen soft, non-distended, non-tender: (•) Y ( ) N

Bowel sounds present in all four quadrants: (•) Y ( ) N

Appetite normal: (•) Y ( ) N

BM normal: (•) Y ( ) N

Comments:

**GU:**

Urine clear, yellow to amber: (•) Y ( ) N

Voiding without difficulty: (•) Y ( ) N

If dialysis, mark days: [ ] M [ ] T [ ] W [ ] Th [ ] F [ ] Sa [ ] Su

Comments:

**IV Site Assessment (1-2 sites)**

[ ] N/A

| | IV #1 | IV #2 |
|---|---|---|
| Location: | | |
| *Venous access type/size: | | |
| **Fluid frequency: | | |
| Fluid rate: | | |
| ***Phlebitis scale: | | |
| Dressing intact: | ( ) Y ( ) N | ( ) Y ( ) N |
| Dressing change due date: | | |

| *Venous access type | **Fluid frequency | ***Phlebitis scale |
|---|---|---|
| C=Central line | HL=Hep Lock | 0=No pain/swelling |
| P=Peripheral line | I=Intermittent | 1=Pain at site |
| PC=PICC line | B=Bolus | 2=Pain, redness, swelling |
| I=Implanted device | C=Continuous | 3=Pain, redness, swelling, palpable cord <3 |
| | | 4=Pain, redness, swelling, palpable cord >3 |

Comments:

CHSS027C - Health Services Encounter Page 4 of 8

Comments:

Rev #: 443

https://azehr.eomis-cloud.com/eomis/servlet/com.marquis.eomis.EomisControllerServlet?t... 5/29/2015

ADOC-Long-00695

**Assessment**

**Medical Diagnosis/Complaint**

| ICD-9 Code | Diagnosis/Complaint |
|---|---|
| No Rows Found | |

**Active Allergies/Health Problems/Conditions** (1 - 7 of 7)

| ID Number | Category | Type | Diagnosis Code | Status |
|---|---|---|---|---|
| 001 | Allergies - Medication | onions | | Assessed |
| 002 | Allergies - Medication | Tomatoes | | Assessed |
| 003 | Allergies - Other than Medications | Avacodo | | Assessed |
| 004 | Other Diagnosis | Other Diagnosis | Diarrhea [787.91] | Assessed |
| 005 | Mental Health | Mental Health | Bipolar disorder NOS [296.80] | Assessed |
| 006 | Other Diagnosis | Other Diagnosis | Other ulcerative colitis [556.8] | Assessed |
| 007 | Other Diagnosis | Nonsp rea skn test wo tb | Nonsp rea skn test wo tb [795.51] | Assessed |

**Related Allergies/Health Problems/Conditions**

| ID Number | Category | Type | Diagnosis Code | Status |
|---|---|---|---|---|
| No Rows Found | | | | |

**Assessment Notes**

Lung sounds clear bilaterally. Bowel sounds present 4 quadrants. Pedal/radial pulses + present. I/M c/o abdominal cramping and believes it is from the Mesalamine-has been refusing but took this am. Wants to have the mg reduced from 800 to 400. Will speak to Dr. Vuk and continue to monitor.

**Plan**

**Treatment Orders**

| Category | Type | Frequency | For Days | Specify Comments |
|---|---|---|---|---|
| No Rows Found | | | | |

**Drug Prescription Orders**

| Prescription/Medication | Effective Date | Dosage | Frequency | Expiration | Status |
|---|---|---|---|---|---|
| No Rows Found | | | | | |

**Lab Test Orders**

| Lab Test Type | Priority | Status | Results | Value |
|---|---|---|---|---|
| No Rows Found | | | | |

**X-Ray Orders**

| X-Ray Body Area | Priority | S |
|---|---|---|
| No Rows Found | | |

**Consultation Request**

| Request Type | Service Type | Priority | |
|---|---|---|---|
| No Rows Found | | | |

**Follow-up Appointments**

| Date | Time | Type | Staff | Locatio |
|---|---|---|---|---|
| No Rows Found | | | | |

**Patient Transfer Holds** (1 - 1 of 1)

| Type | Expiration Date | St |
|---|---|---|
| Medical Hold | 04/15/2015 | Placed |

**Other Actions/Procedures**

| Group | Type | Approximate Begin Date | Approximate End Date | Specify Comm |
|---|---|---|---|---|
| No Rows Found | | | | |

**Plan Notes**

None

**Nursing Rounding Tool Interventions/Treatments**

**Musculoskeletal:**

Ice pack X 15 minutes: ○ Y ○ N ○ N/A

ROM: ○ Y ○ N ○ N/A

**Fall Risk:**

Side rails up: ○ Y ○ N ○ N/A

Bed low and locked: ○ Y ○ N ○ N/A

Uncluttered environment: ○ Y ○ N ○ N/A

Call for assistance: ○ Y ○ N ○ N/A

**Neurological:**

Seizure precautions (bed padded, airway available: ○ Y ○ N ○ N/A

**Cardiovascular:**

| | | | |
|---|---|---|---|
| Anti-embolitic device/stockings: | Y | N | N/A |

**Pulmonary:**

| | | | |
|---|---|---|---|
| Incentive spirometry: | Y | N | N/A |
| Aspiration precautions: | Y | N | N/A |
| Trach care: | Y | N | N/A |
| Suctioning: | Y | N | N/A |
| Elevate head of bed: | Y | N | N/A |

**New Problems:**

| | | | |
|---|---|---|---|
| NET completed: | Y | N | N/A |
| Practitioner contacted: | Y | N | N/A |
| Seen by practitioner: | Y | N | N/A |
| Continue current orders: | Y | N | N/A |
| New orders: | Y | N | N/A |
| Mental health referral completed in eOMIS: | Y | N | N/A |
| Other (see nursing notes): | Y | N | N/A |

**Nursing Notes:**

Rev #: 443

**Patient Education**

**Patient Education Notes**

None

**Health Classification**

Medical: 3

Mental: 2-Previously received MH services

Prognosis: Improvable Condition

SMI: N-No

Dental: U-Unknown (Conversion)

**Classification and Security Notes**

None

**Encounter Orders Review**

Review Type*: No Review Required

Review Staff: Unknown

**Review Notes**

None

**Scanned Documents/Photos**

| Type | Title | Source | Content Type |
|---|---|---|---|
| No Rows Found | | | |

**Standard Forms**

| Type | Staff |
|---|---|
| No Rows Found | |

CHSS027C

# Health Services Encounter

Friday May 29, 2015 12:17:48 PM

**Encounter Header**

Date*: 01/18/2015
End Date*: 01/18/2015
Category: Nursing
Type*: Nurse - Infirmary Rounds
Location*: ASPC-F CENTRAL/U MED [A23]
Setting*: Clinic
Staff Member*: Bishop, Darcee
Title: Nurse
Form Type: Nursing Rounding Tool

Start Time*: 11:51:26 AM
End Time*: 11:59:44 AM
Encounter Close Date: 01/18/2015
Encounter Close Time: 03:46:35 PM

**Subjective**

**Related Health Service Requests**

| Request Date | Area of Interest | Request Type |
|---|---|---|
| | No Rows Found | |

**Subjective Notes**

I/M was resting in bed during daily rounds.

**Nursing Rounding Tool Subjective**

**New Problems:** (•) N ( ) Y

Rev #: 443

**Objective**

**Vital Signs** (1 - 2 of 2)

| Taken By | Time | Temp | Pulse | Resp | Height | Weight | BP Systolic | BP Diastolic | Blood Sugar | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| Evans, Alyssa | 07:10 AM | 100.8 | 152 | 16 | 5 10 | | 120 | 64 | NA | 0730- Patient ate 1 bowl of cereal and ensure. 1325- patient ate 2 egg |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | sandwi... |
| Somerton, Lisa | 05:38 AM | | | | 5 10 | | | | NA | assisted to the rest room again new brief change is able to wear youth s... |

**Objective Notes**

None

**Nursing Rounding Tool Objective**

**Acuity:** ( ) Acute (•) Sub-acute ( ) Chronic

**Isolation:** (•) N ( ) Y: Type:

**Negative Pressure Room:** ( ) Y (•) N ( ) N/A

**Comorbidities:** ( ) N (•) Y: [ ] Seizures [ ] Asthma [ ] CAD [ ] Dyslipidemia [ ] DM [ ] COPD [ ] HTN [x] Other: ulcerative colitis

**Pt left unit for:** [ ] Outside Dr. Appt [ ] Hospital [ ] Radiology [ ] Dialysis [ ] Other:

**Time out:** **Time Returned:**

**Skin/Musculoskeletal:**

Skin pink, warm, and dry: (•) Y ( ) N

Moves all extremities independently: (•) Y ( ) N

Full, spontaneous ROM: (•) Y ( ) N

Independent bed mobility, transfers: (•) Y ( ) N

Steady gait, ambulates without assistive device: (•) Y ( ) N

Absence of joint swelling or tenderness: (•) Y ( ) N

Comments: weak, wt loss, c/o left foot numbness (pedal pulse present)

**Neurological:**

Alert, oriented X 3: (•) Y ( ) N

Follows command: (•) Y ( ) N

Speach clear and appropriate: (•) Y ( ) N

Motor response, moves all extremities: (•) Y ( ) N

Comments:

**Cardiovascular:**

Heart rhythm regular: (•) Y ( ) N

Brisk capillary refill: (•) Y ( ) N

Absence of edema: (•) Y ( ) N

Peripheral pulses present by palpation: (•) Y ( ) N

Comments:

**Pulmonary:**

Respirations even: (•) Y ( ) N

Resipration rate 16-24: (•) Y ( ) N

Respirations unlabored: (•) Y ( ) N

Lung sounds clear: (•) Y ( ) N

No cough: (•) Y ( ) N

Comments:

**GI:**

Abdomen soft, non-distended, non-tender: (•) Y ( ) N

Bowel sounds present in all four quadrants: (•) Y ( ) N

Appetite normal: (•) Y ( ) N

BM normal: (•) Y ( ) N

Comments:

**GU:**

Urine clear, yellow to amber: (•) Y ( ) N

Voiding without difficulty: (•) Y ( ) N

If dialysis, mark days: [ ] M [ ] T [ ] W [ ] Th [ ] F [ ] Sa [ ] Su

Comments:

**IV Site Assessment (1-2 sites)**

[ ] N/A

| | **IV #1** | **IV #2** |
|---|---|---|
| Location: | | |
| *Venous access type/size: | | |
| **Fluid frequency: | | |
| Fluid rate: | | |
| ***Phlebitis scale: | | |
| Dressing | ( ) Y ( ) N | ( ) Y ( ) N |

Intact:

Dressing change due date:

| *Venous access type | **Fluid frequency | ***Phlebitis scale |
|---|---|---|
| C=Central line | HL=Hep Lock | 0=No pain/swelling |
| P=Peripheral line | I=Intermittent | 1=Pain at site |
| PC=PICC line | B=Bolus | 2=Pain, redness, swelling |
| I=Implanted device | C=Continuous | 3=Pain, redness, swelling, palpable cord <3 |
| | | 4=Pain, redness, swelling, palpable cord >3 |

Comments:

Rev #: 443

Dressing intact:

Assessment

Medical Diagnosis/Complaint

| ICD-9 Code | Diagnosis/Complaint |
|---|---|
| No Rows Found | |

Active Allergies/Health Problems/Conditions (1 - 7 of 7)

| ID Number | Category | Type | Diagnosis Code | Status |
|---|---|---|---|---|
| 001 | Allergies - Medication | onions | | Assessed |
| 002 | Allergies - Medication | Tomatoes | | Assessed |
| 003 | Allergies - Other than Medications | Avacodo | | Assessed |
| 004 | Other Diagnosis | Other Diagnosis | Diarrhea [787.91] | Assessed |
| 005 | Mental Health | Mental Health | Bipolar disorder NOS [296.80] | Assessed |
| 006 | Other Diagnosis | Other Diagnosis | Other ulcerative colitis [556.8] | Assessed |
| 007 | Other Diagnosis | Nonsp rea skn test wo tb | Nonsp rea skn test wo tb [795.51] | Assessed |

Related Allergies/Health Problems/Conditions

| ID Number | Category | Type | Diagnosis Code | Status |
|---|---|---|---|---|
| No Rows Found | | | | |

Assessment Notes

Lung sounds clear bilaterally. Bowel sounds present 4 quadrants. I/M c/o diarrhea - gave immodium as prescribed. I/M say left foot numb but can feel sensation (pedal pulse present). I/M can walk unassisted to restroom. I/M calls out numerous times during shift for "nurse" from his bed. He requested his pillow to be held while he positions self in bed/soup to be made/bowl to be washed out/help to restroom/ and for meds. Nurses declined making soup/washing out bowl but shadowed him to restroom. Nurse did assist I/M in AM with his pillow but declined later in day. I/M stated he fell twice last night (was not reported to nurses-I/M said did not fall to floor but to his knees).

Plan

Treatment Orders

| Category | Type | Frequency | For Days | Specify Comments |
|---|---|---|---|---|
| No Rows Found | | | | |

Drug Prescription Orders

| Prescription/Medication | Effective Date | Dosage | Frequency | Expiration | Status |
|---|---|---|---|---|---|

No Rows Found

**Lab Test Orders**

| Lab Test Type | Priority | Status | Results |
|---|---|---|---|
| No Rows Found | | | |

**X-Ray Orders**

| X-Ray Body Area | Priority | S |
|---|---|---|
| No Rows Found | | |

**Consultation Request**

| Request Type | Service Type | Priority |
|---|---|---|
| No Rows Found | | |

**Follow-up Appointments**

| Date | Time | Type | Staff | Locatio |
|---|---|---|---|---|
| No Rows Found | | | | |

**Patient Transfer Holds** (1 - 1 of 1)

| Type | Expiration Date | St |
|---|---|---|
| Medical Hold | 04/15/2015 | Placed |

**Other Actions/Procedures**

| Group | Type | Approximate Begin Date | Approximate End Date | Specify Comm |
|---|---|---|---|---|
| No Rows Found | | | | |

**Plan Notes**

None

**Nursing Rounding Tool Interventions/Treatments**

**Musculoskeletal:**

Ice pack X 15 minutes: Y N N/A

ROM: Y N N/A

**Fall Risk:**

Side rails up: Y N N/A

Bed low and locked: Y N N/A

Uncluttered environment: Y N N/A

Call for assistance: Y N N/A

**Neurological:**

Seizure precautions (bed padded, airway available: ( Y ( N ( N/A

**Cardiovascular:**

Anti-embolitic device/stockings: ( Y ( N ( N/A

**Pulmonary:**

Incentive spirometry: ( Y ( N ( N/A

Aspiration precautions: ( Y ( N ( N/A

Trach care: ( Y ( N ( N/A

Suctioning: ( Y ( N ( N/A

Elevate head of bed: ( Y ( N ( N/A

**New Problems:**

NET completed: ( Y ( N ( N/A

Practitioner contacted: ( Y ( N ( N/A

Seen by practitioner: ( Y ( N ( N/A

Continue current orders: ( Y ( N ( N/A

New orders: ( Y ( N ( N/A

Mental health referral completed in eOMIS: ( Y ( N ( N/A

Other (see nursing notes): ( Y ( N ( N/A

**Nursing Notes:**

Rev #: 443

**Patient Education**

**Patient Education Notes**

None

**Health Classification**

Medical: 3

Mental: 2-Previously received MH services

Prognosis: Improvable Condition

SMI: N-No

Dental: U-Unknown (Conversion)

**Classification and Security Notes**

None

**Encounter Orders Review**

Review Type*: No Review Required

Review Staff: Unknown

**Review Notes**

None

**Scanned Documents/Photos**

| Type | Title | Source | Content Type |
| --- | --- | --- | --- |
| No Rows Found | | | |

**Standard Forms**

| Type | Staff |
| --- | --- |
| No Rows Found | |

MSSS032B

# Vital Signs

Friday May 29, 2015 11:43:10 AM

Encounter Date: 12/16/2014 Time: 12:00:00 PM
Type:
Taken by Staff*: Bishop, Darcee Reason: Other

**Primary**

Weight: 0 Height: 5 ft. 10 in. Body Mass Index:
Body Temperature: Scale: Method:
Pulse Rate: **/Minute** Method:
BP - Systolic: Diastolic: Position:
Respiration Rate: **/Minute** Peak Flow:

**Oxygen**

O2 Saturation: **%** Source:
Liters: **/minute** Via:

**Glucose**

Blood Sugar Level: 224 mg/dl RBS -Random Blood Sugar

**Vision**

Uncorrected - Right: 20/ Left: 20/ Both: 20/
Corrected - Right: 20/ Left: 20/ Both: 20/
Vision Test- Not Applicable

**Comments**

None

**Prior Page**

Show Last Updated Information

RIZONA DEPARTMENT OF CORR ONS

ADC

efusal to Submit to Treatment

been advised that it is necessary for me to undergo the following:

Evaluation

- [ ] Dental examination
- [ ] Nursing assessment
- [ ] Mental Health assessment/treatment
- [ ] Medical Provider evaluation
- [ ] Emergency assessment for
- [ ] Outside medical appointment
- [ ] NPO/PREP for
- [ ] Other

Treatment *(Check box and specify)*

- [ ] Dental procedure
- [ ] Nursing procedure
- [ ] Medical procedure
- [x] Medication Balsalazide Disodium
- [ ] Injection
- [ ] Emergency treatment
- [ ] Lab
- [ ] X-ray

elated to (diagnosis or procedure)

onsequences of Refusal *(Check all that might apply)*

- [ ] Pain
- [ ] Stomach (GI) Distress
- [ ] Infection
- [ ] Permanent loss of mobility
- [ ] Stroke and/or Heart attack
- [ ] ~~Irreversible coma~~
- [ ] Death
- [ ] ability to fully evaluate, treat or diagnosis
- [ ] Other
- [ ] Worsening of this disease
- [ ] Permanent loss of control: Bowel and/or Bladder
- [ ] Permanent need for life sustaining machinery or equipment *(Dialysis, Ventilator, Oxygen, Tracheotomy)*
- [ ] Loss of sense(s): *(please circle)* hearing sight touch taste smell
- [ ] Impaired skin integrity: *(bed sores, scars, etc.)*
- [ ] Loss of body part(s) *(specify)*
- [ ] Deterioration of Mental Status

- [x] Patient education has been provided by nursing staff at the time of the refusal to ensure the inmate is making an informed refusal.
- [ ] ADC Health Services may seek reimbursement directly from the inmate for any money lost to outside clinics or hospitals for late cancellations as a result of this refusal.
- [ ] It has been fully explained to me the effect and nature of this treatment. Although my failure to follow this advice may seriously imperil my life or health, I nevertheless refuse to submit to recommended treatment. I assume full responsibility for the risks and consequences involved in my decision and specifically release the Arizona Department of Corrections from any and all liability for those risks and consequences. I also understand, however, that if at any time I change my mind, I may seek treatment again.

have refused for last 3 days Can I get a diff one.

- [x] REASON FOR REFUSAL: Meds give's me stomach cramps, Fever, No Appetite

| ate Signature | Initials | Date | Time |
|---|---|---|---|
| Long, Nicholas | NL | 12-22-14 | 12:30 |

| ess's Signature | Date | Time |
|---|---|---|
| N. Bushing RN | 12-22-14 | 12:30pm |
| ess's Signature *(Needed if inmate refuses to sign)* | | |

RUCTIONS: Make a checkmark in the box or boxes which apply to the refusal. Where there ircle the most appropriate answer. If none of the choices or boxes are appropriate, HER the reason which applies. Under the consequences section, check ALL areas might apply as a consequence of refusing. Consequences not listed can be written in the lines marked "OTHER". Complete a SOAP note documenting all education given to the . IF THE CHARGE SECTION DOES NOT APPLY WRITE N/A. A single witness is d unless I/M refuses to sign form, then two witnesses are needed. The second witness may -medical ADC staff.

| Inmate Name *(Last, First M.I.)* | ADC Number |
|---|---|
| Long, Nicholas | 289178 |

| Date of Birth | Facility/Unit |
|---|---|
| 7-24-93 | ASPC Central - HU10 |

1101-4

RIZONA DEPARTMENT OF CORR ONS ADC

efusal to Submit to Treatment

been advised that it is necessary for me to undergo the following:

Evaluation
- [ ] Dental examination
- [ ] Nursing assessment
- [ ] Mental Health assessment/treatment
- [ ] Medical Provider evaluation
- [ ] Emergency assessment for
- [ ] Outside medical appointment
- [ ] NPO/PREP for
- [ ] Other

Treatment *(Check box and specify)*
- [ ] Dental procedure
- [ ] Nursing procedure
- [ ] Medical procedure
- [x] Medication Iron
- [ ] Injection
- [ ] Emergency treatment
- [ ] Lab  [ ] X-ray

elated to (diagnosis or procedure)

onsequences of Refusal *(Check all that might apply)*
- [ ] Pain
- [ ] Stomach (GI) Distress
- [ ] Infection
- [ ] Permanent loss of mobility
- [ ] Stroke and/or Heart attack
- [ ] Irreversible coma
- [ ] Death
- [ ] ability to fully evaluate, treat or diagnosis
- [ ] Other
- [ ] Worsening of this disease
- [ ] Permanent loss of control: Bowel and/or Bladder
- [ ] Permanent need for life sustaining machinery or equipment *(Dialysis, Ventilator, Oxygen, Tracheotomy)*
- [ ] Loss of sense(s): *(please circle)* hearing sight touch taste smell
- [ ] Impaired skin integrity: *(bed sores, scars, etc.)*
- [ ] Loss of body part(s) *(specify)*
- [ ] Deterioration of Mental Status

- [x] Patient education has been provided by nursing staff at the time of the refusal to ensure the inmate is making an informed refusal.
- [ ] ADC Health Services may seek reimbursement directly from the inmate for any money lost to outside clinics or hospitals for late cancellations as a result of this refusal.
- [ ] It has been fully explained to me the effect and nature of this treatment. Although my failure to follow this advice may seriously imperil my life or health, I nevertheless refuse to submit to recommended treatment. I assume full responsibility for the risks and consequences involved in my decision and specifically release the Arizona Department of Corrections from any and all liability for those risks and consequences. I also understand, however, that if at any time I change my mind, I may seek treatment again.
- [x] REASON FOR REFUSAL: Cramping - refusing iron meds.

| | | | |
|---|---|---|---|
| ate Signature [signature] | Initials NL | Date 12-28-14 | Time 16:48 |
| ess's Signature D. Bulzyk RN | Date 12/28/14 | | Time 1645 |
| ess's Signature *(Needed if inmate refuses to sign)* | Date | | Time |

UCTIONS: Make a checkmark in the box or boxes which apply to the refusal. Where there circle the most appropriate answer. If none of the choices or boxes are appropriate, THER the reason which applies. Under the consequences section, check ALL areas might apply as a consequence of refusing. Consequences not listed can be written in the lines marked "OTHER". Complete a SOAP note documenting all education given to the . IF THE CHARGE SECTION DOES NOT APPLY WRITE IN N/A. A single witness is d unless I/M refuses to sign form, then two witnesses are needed. The second witness may -medical ADC staff.

SCANNED

| Inmate Name *(Last, First M.I.)* | ADC Number |
|---|---|
| Long, Nichols | 289178 |
| Date of Birth 7/24/93 | Facility/Unit Central HU10 |

1101-4

# EXHIBIT F

Anthony J. Fernandez (Bar No. 018342)
Vincent J. Montell (Bar No. 014236)
**QUINTAIROS, PRIETO, WOOD & BOYER, P.A.**
2390 E. Camelback Road, Suite 440
Phoenix, Arizona 85016
Telephone: (602) 954-5605
Facsimile: (602) 954-5606
afernandez@qpwblaw.com
vmontell@qpwblaw.com
*Attorneys for Defendants*

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

KENNETH and CORA LONG, husband and wife, individually, and as statutory beneficiaries for Nicholas Long, deceased; and on behalf of the Estate of NICHOLAS LONG,

Plaintiff,

v.

STATE OF ARIZONA, a body politic, CORIZON HEALTH, INC., an Missouri Corporation, doing business in the State of Arizona,

Defendants.

Case No. CV2016-007692

**DECLARATION OF DARCEE BISHOP, RN IN SUPPORT OF DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S EXPERT**

(Assigned to the Honorable Rosa Mroz)

I, Darcee Bishop, RN make the following declaration under penalty of perjury.

1. I am over the age of 18 and competent to assert the information set forth in this Declaration.
2. I make and base this Declaration upon my personal knowledge.
3. I was employed as a Registered Nurse by Corizon from approximately March of 2014 to approximately May of 2015, at the Arizona State Prison Complex – Florence.
4. In my capacity as a Corizon employee, between approximately December of 2014 and February of 2015, I provided care to Nicholas Long.

5. Following my term of employment with Corizon, I became employed by Corrections Corporation of America, at the Central Arizona Detention Center, also in Florence, Arizona. I am no longer employed there.
6. John O'Steen, M.D. worked with me at the Central Arizona Detention Center.
7. Jakelin Valladares was also my colleague at Central Arizona Detention Center.
8. While I was at work at Central Arizona Detention Center, Dr. O'Steen approached me and asked me if I recalled having Nicholas Long as a patient when I worked for Corizon.
9. I told Dr. O'Steen that I did recall Nicholas Long.

I declare under penalty of perjury that the above statements are true and correct to the best of my knowledge.

DATED this 14th day of February, 2018.

Darcee Bishop RN

Darcee Bishop, RN Declarant

# EXHIBIT G

MSSS032B

# Vital Signs

Friday May 29, 2015 11:54:48 AM

Encounter Date: 12/05/2014 Time: 06:48:00 AM

Type:

Taken by Staff*: Valladares, Jakelin Reason: Infirmary Rounds

**Primary**

| | | | | | |
|---|---|---|---|---|---|
| Weight: | 0 | Height: | 5 ft. 10 in. | Body Mass Index: | |
| Body Temperature: | 99.7 | Scale: | Fahrenheit | Method: | Auricular |
| Pulse Rate: | 112 **/Minute** | Method: | Radial | | |
| BP - Systolic: | 128 | Diastolic: | 60 | Position: | Sitting - Left Arm |
| Respiration Rate: | 20 **/Minute** | Peak Flow: | | | |

**Oxygen**

| | | | |
|---|---|---|---|
| O2 Saturation: | 98.00 **%** | Source: | Room Air |
| Liters: | **/minute** | Via: | |

**Glucose**

Blood Sugar Level: mg/dl Blood Sugar Level - Not Applicable

**Vision**

| | | |
|---|---|---|
| Uncorrected - Right: 20/ | Left: 20/ | Both: 20/ |
| Corrected - Right: 20/ | Left: 20/ | Both: 20/ |

Vision Test- Not Applicable

**Comments**

v/s, passed ice, temp recheck @1046 101.6 @1133 101.4,

Prior Page

Show Last Updated Information

MSSS032B

# Vital Signs

Friday May 29, 2015 11:52:06 AM

Encounter Date: 12/09/2014 Time: 06:45:00 AM
Type:
Taken by Staff*: Valladares, Jakelin Reason: Infirmary Rounds

**Primary**

Weight: 0 Height: 5 ft. 10 in. Body Mass Index:
Body Temperature: 98.4 Scale: Fahrenheit Method: Auricular
Pulse Rate: 124 **/Minute** Method: Radial
BP - Systolic: 120 Diastolic: 78 Position: Sitting - Right Arm
Respiration Rate: 18 **/Minute** Peak Flow:

**Oxygen**

O2 Saturation: 99.00 **%** Source: Room Air
Liters: **/minute** Via:

**Glucose**

Blood Sugar Level: mg/dl Blood Sugar Level - Not Applicable

**Vision**

Uncorrected - Right: 20/ Left: 20/ Both: 20/
Corrected - Right: 20/ Left: 20/ Both: 20/
Vision Test- Not Applicable

**Comments**

V/s, passed ice and water, showered

**Prior Page**

Show Last Updated Information

MSSS032B

# Vital Signs

Friday May 29, 2015 11:38:56 AM

Encounter Date: 12/23/2014
Type:
Taken by Staff*: Valladares, Jakelin

Time: 06:48:00 AM
Reason: Infirmary Rounds

**Primary**

Weight: 0
Height: 5 ft. 10 in.
Body Mass Index:

Body Temperature: 100.4
Scale: Fahrenheit
Method: Auricular

Pulse Rate: 115 **/Minute**
Method: Radial

BP - Systolic: 110
Diastolic: 70
Position: Sitting - Left Arm

Respiration Rate: 18 **/Minute**
Peak Flow:

**Oxygen**

O2 Saturation: 98.00 **%**
Source: Room Air
Liters: **/minute**
Via:

**Glucose**

Blood Sugar Level: mg/dl
Blood Sugar Level - Not Applicable

**Vision**

Uncorrected - Right: 20/ Left: 20/ Both: 20/
Corrected - Right: 20/ Left: 20/ Both: 20/
Vision Test- Not Applicable

**Comments**

V/s, breakfast, passed ice, temp recheck 1707 101.2

**Prior Page**

Show Last Updated Information

MSSS032B

# Vital Signs

Friday May 29, 2015 11:36:23 AM

Encounter Date: 12/28/2014 Time: 06:45:00 AM
Type:
Taken by Staff*: Valladares, Jakelin Reason: Infirmary Rounds

**Primary**

Weight: 0 Height: 5 ft. 10 in. Body Mass Index:
Body Temperature: 99.0 Scale: Fahrenheit Method: Auricular
Pulse Rate: 97 /Minute Method: Radial
BP - Systolic: 108 Diastolic: 54 Position: Sitting - Right Arm
Respiration Rate: /Minute Peak Flow:

**Oxygen**

O2 Saturation: 98.00 % Source: Room Air
Liters: /minute Via:

**Glucose**

Blood Sugar Level: 90 mg/dl Finger Stick

**Vision**

Uncorrected - Right: 20/ Left: 20/ Both: 20/
Corrected - Right: 20/ Left: 20/ Both: 20/
Vision Test- Not Applicable

**Comments**

V/s, AM accu check, ate 100 breakfast, passed ice, PM accu check @1600 106, dinner 100

Prior Page

Show Last Updated Information

MSSS032B

# Vital Signs

Friday May 29, 2015 11:35:28 AM

Encounter Date: 12/30/2014 Time: 06:45:00 AM
Type:
Taken by Staff*: Valladares, Jakelin Reason: Infirmary Rounds

**Primary**

| | | | | | |
|---|---|---|---|---|---|
| Weight: | 0 | Height: | 5 ft. 10 in. | Body Mass Index: | |
| Body Temperature: | 101.0 | Scale: | Fahrenheit | Method: | Auricular |
| Pulse Rate: | 120 /Minute | Method: | Radial | | |
| BP - Systolic: | 112 | Diastolic: | 66 | Position: | Supine - Left Arm |
| Respiration Rate: | 20 /Minute | Peak Flow: | | | |

**Oxygen**

O2 Saturation: 94.00 % Source: Room Air
Liters: /minute Via:

**Glucose**

Blood Sugar Level: mg/dl Blood Sugar Level - Not Applicable

**Vision**

Uncorrected - Right: 20/ Left: 20/ Both: 20/
Corrected - Right: 20/ Left: 20/ Both: 20/
Vision Test- Not Applicable

**Comments**

V/s, breakfast 100, passed ice, in and output, lunch 100, I/M requested sugars to be checked 96, dinner 100.

Prior Page

Show Last Updated Information

MSSS032B

# Vital Signs

Friday May 29, 2015 11:30:30 AM

Encounter Date: 01/06/2015 Time: 06:45:00 AM
Type:
Taken by Staff*: Valladares, Jakelin Reason: Infirmary Rounds

**Primary**

| | | | | | |
|---|---|---|---|---|---|
| Weight: | 0 | Height: | 5 ft. 10 in. | Body Mass Index: | |
| Body Temperature: | 100.2 | Scale: | Fahrenheit | Method: | Auricular |
| Pulse Rate: | 124 **/Minute** | Method: | Radial | | |
| BP - Systolic: | 118 | Diastolic: | 58 | Position: | Supine - Left Arm |
| Respiration Rate: | 16 **/Minute** | Peak Flow: | | | |

**Oxygen**

O2 Saturation: 97.00 % Source: Room Air
Liters: **/minute** Via:

**Glucose**

Blood Sugar Level: mg/dl Blood Sugar Level - Not Applicable

**Vision**

Uncorrected - Right: 20/ Left: 20/ Both: 20/
Corrected - Right: 20/ Left: 20/ Both: 20/
Vision Test- Not Applicable

**Comments**

V/s, passed ice

**Prior Page**

Show Last Updated Information

MSSS032B

# Vital Signs

Friday May 29, 2015 11:28:09 AM

Encounter Date: 01/08/2015 Time: 06:45:00 AM
Type:
Taken by Staff*: Valladares, Jakelin Reason: Infirmary Rounds

**Primary**

| | | | | | |
|---|---|---|---|---|---|
| Weight: | 0 | Height: | 5 ft. 10 in. | Body Mass Index: | |
| Body Temperature: | 98.7 | Scale: | Fahrenheit | Method: | Auricular |
| Pulse Rate: | 138 /Minute | Method: | Radial | | |
| BP - Systolic: | 104 | Diastolic: | 60 | Position: | Supine - Right Arm |
| Respiration Rate: | 20 /Minute | Peak Flow: | | | |

**Oxygen**

O2 Saturation: 97.00 % Source: Room Air
Liters: /minute Via:

**Glucose**

Blood Sugar Level: mg/dl Blood Sugar Level - Not Applicable

**Vision**

Uncorrected - Right: 20/ Left: 20/ Both: 20/
Corrected - Right: 20/ Left: 20/ Both: 20/
Vision Test- Not Applicable

**Comments**

V/s, passed ice and water, bodily fluids on linen, changed linen, I/M showered, I/m has brief on

Prior Page

Show Last Updated Information

MSSS032B

# Vital Signs

Friday May 29, 2015 11:25:07 AM

Encounter Date: 01/14/2015 Time: 06:42:00 AM
Type:
Taken by Staff*: Valladares, Jakelin Reason: Infirmary Rounds

**Primary**

| | | | | | |
|---|---|---|---|---|---|
| Weight: | 0 | Height: | 5 ft. 10 in. | Body Mass Index: | |
| Body Temperature: | 100.3 | Scale: | Fahrenheit | Method: | Auricular |
| Pulse Rate: | 137 /Minute | Method: | Radial | | |
| BP - Systolic: | 120 | Diastolic: | 60 | Position: | Supine - Right Arm |
| Respiration Rate: | 22 /Minute | Peak Flow: | | | |

**Oxygen**

O2 Saturation: 97.00 % Source: Room Air
Liters: /minute Via:

**Glucose**

Blood Sugar Level: mg/dl Blood Sugar Level - Not Applicable

**Vision**

| | | |
|---|---|---|
| Uncorrected - Right: 20/ | Left: 20/ | Both: 20/ |
| Corrected - Right: 20/ | Left: 20/ | Both: 20/ |

Vision Test- Not Applicable

**Comments**

V/s,

Prior Page

Show Last Updated Information

MSSS032B

# Vital Signs

Friday May 29, 2015 11:22:04 AM

Encounter Date: 01/20/2015 Time: 09:24:01 AM
Type:
Taken by Staff*: Valladares, Jakelin Reason: Refused Vitals

**Primary**

Weight: 0 Height: 5 ft. 10 in. Body Mass Index:
Body Temperature: Scale: Method:
Pulse Rate: **/Minute** Method:
BP - Systolic: Diastolic: Position:
Respiration Rate: **/Minute** Peak Flow:

**Oxygen**

O2 Saturation: **%** Source:
Liters: **/minute** Via:

**Glucose**

Blood Sugar Level: mg/dl Blood Sugar Level - Not Applicable

**Vision**

Uncorrected - Right: 20/ Left: 20/ Both: 20/
Corrected - Right: 20/ Left: 20/ Both: 20/
Vision Test- Not Applicable

**Comments**

*****REFUSED VITALS*****
passed ice and water

**Prior Page**

Show Last Updated Information

MSSS032B

# Vital Signs

Friday May 29, 2015 11:20:42 AM

Encounter Date: 01/21/2015 Time: 06:45:00 AM
Type:
Taken by Staff*: Valladares, Jakelin Reason: Infirmary Rounds

**Primary**

| | | | | | |
|---|---|---|---|---|---|
| Weight: | 107 lb. | Height: | 5 ft. 10 in. | Body Mass Index: | 15.4 |
| Body Temperature: | 97.2 | Scale: | Fahrenheit | Method: | Auricular |
| Pulse Rate: | 111 /Minute | Method: | Radial | | |
| BP - Systolic: | 104 | Diastolic: | 66 | Position: | Supine - Left Arm |
| Respiration Rate: | 20 /Minute | Peak Flow: | | | |

**Oxygen**

| | | | |
|---|---|---|---|
| O2 Saturation: | 97.00 % | Source: | Room Air |
| Liters: | /minute | Via: | |

**Glucose**

Blood Sugar Level: mg/dl Blood Sugar Level - Not Applicable

**Vision**

| | | |
|---|---|---|
| Uncorrected - Right: 20/ | Left: 20/ | Both: 20/ |
| Corrected - Right: 20/ | Left: 20/ | Both: 20/ |

Vision Test- Not Applicable

**Comments**

V/s, daily wt, I/M refused ensure, 0 breakfast, lunch 0, dinner 0

Prior Page

Show Last Updated Information

MSSS032B

# Vital Signs

Friday May 29, 2015 11:20:04 AM

Encounter Date: 01/22/2015 Time: 06:00:00 AM
Type:
Taken by Staff*: Valladares, Jakelin Reason: Other

**Primary**

Weight: 0 Height: 5 ft. 10 in. Body Mass Index:
Body Temperature: Scale: Method:
Pulse Rate: **/Minute** Method:
BP - Systolic: Diastolic: Position:
Respiration Rate: **/Minute** Peak Flow:

**Oxygen**

O2 Saturation: **%** Source:
Liters: **/minute** Via:

**Glucose**

Blood Sugar Level: mg/dl Blood Sugar Level - Not Applicable

**Vision**

Uncorrected - Right: 20/ Left: 20/ Both: 20/
Corrected - Right: 20/ Left: 20/ Both: 20/
Vision Test- Not Applicable

**Comments**

0600-Inmate resting quietly, bed side rails up, bed side table within reach. Area remains uncluttered. Toileting and bed side assistance offered and given Q 2hr. Bed Alarm ON.

0800-Inmate resting quietly, bed side rails up, bed side table within reach. Area remains uncluttered. Toileting and bed side assistance offered and given Q 2hr.Bed Alarm ON.

1000-Inmate resting quietly, bed side rails up, bed side table within reach. Area remains uncluttered. Toileting and bed side assistance offered and given Q 2hr.Bed Alarm ON.

1200-Inmate resting quietly, bed side rails up, bed side table within reach. Area remains uncluttered. Toileting and bed side assistance offered and given Q 2hr.Bed Alarm ON.

1400-Inmate resting quietly, bed side rails up, bed side table within reach. Area remains uncluttered. Toileting and bed side assistance offered and given Q 2hr.Bed Alarm ON.

1600-Inmate resting quietly, bed side rails up, bed side table within reach. Area remains uncluttered. Toileting and bed side assistance offered and given Q 2hr.Bed Alarm ON.

1800-Inmate resting quietly, bed side rails up, bed side table within reach. Area remains uncluttered. Toileting and bed side assistance offered and given Q 2hr.Bed Alarm ON.

**Prior Page**

Show Last Updated Information

MSSS032B

# Vital Signs

Friday May 29, 2015 11:19:52 AM

| | | | |
|---|---|---|---|
| Encounter Date: | 01/22/2015 | Time: | 06:45:00 AM |
| Type: | | | |
| Taken by Staff*: | Valladares, Jakelin | Reason: | Infirmary Rounds |

**Primary**

| | | | | | |
|---|---|---|---|---|---|
| Weight: | 105 lb. | Height: | 5 ft. 10 in. | Body Mass Index: | 15.1 |
| Body Temperature: | 97.0 | Scale: | Fahrenheit | Method: | Auricular |
| Pulse Rate: | 72 **/Minute** | Method: | Radial | | |
| BP - Systolic: | 110 | Diastolic: | 58 | Position: | Supine - Left Arm |
| Respiration Rate: | 18 **/Minute** | Peak Flow: | | | |

**Oxygen**

| | | | |
|---|---|---|---|
| O2 Saturation: | 99.00 **%** | Source: | Room Air |
| Liters: | **/minute** | Via: | |

**Glucose**

| | | |
|---|---|---|
| Blood Sugar Level: | mg/dl | Blood Sugar Level - Not Applicable |

**Vision**

| | | |
|---|---|---|
| Uncorrected - Right: 20/ | Left: 20/ | Both: 20/ |
| Corrected - Right: 20/ | Left: 20/ | Both: 20/ |

Vision Test- Not Applicable

**Comments**

V/s, Breakfast 0, I/m got up @0955 to get weighed, refused to shave & shower, I/M got up and used RR without asking for assistance, I/m ate egg salad sandwhich, dinner 30

**Prior Page**

Show Last Updated Information

MSSS032B

# Vital Signs

Friday May 29, 2015 11:16:20 AM

Encounter Date: 01/27/2015 Time: 06:45:00 AM
Type:
Taken by Staff*: Valladares, Jakelin Reason: Infirmary Rounds

**Primary**

| | | | | | |
|---|---|---|---|---|---|
| Weight: | 111 lb. | Height: | 5 ft. 10 in. | Body Mass Index: | 15.9 |
| Body Temperature: | 98.2 | Scale: | Fahrenheit | Method: | Auricular |
| Pulse Rate: | 105 /Minute | Method: | Radial | | |
| BP - Systolic: | 102 | Diastolic: | 50 | Position: | Supine - Right Arm |
| Respiration Rate: | 18 /Minute | Peak Flow: | | | |

**Oxygen**

| | | | |
|---|---|---|---|
| O2 Saturation: | 98.00 % | Source: | Room Air |
| Liters: | /minute | Via: | |

**Glucose**

Blood Sugar Level: mg/dl Blood Sugar Level - Not Applicable

**Vision**

| | | |
|---|---|---|
| Uncorrected - Right: 20/ | Left: 20/ | Both: 20/ |
| Corrected - Right: 20/ | Left: 20/ | Both: 20/ |

Vision Test- Not Applicable

**Comments**

V/s, I/M used bed pan x3, intake, breakfast, a cookie, chips and milk, I/M showered, changed linen, linen was solid with feces, passed ice

Prior Page

Show Last Updated Information

MSSS032B - Vital Signs Page 1 of 1

MSSS032B

# Vital Signs

Friday May 29, 2015 11:15:20 AM

Encounter Date: 01/29/2015 Time: 06:43:00 AM
Type:
Taken by Staff*: Valladares, Jakelin Reason: Infirmary Rounds

**Primary**

| | | | | | |
|---|---|---|---|---|---|
| Weight: | 0 | Height: | 5 ft. 10 in. | Body Mass Index: | |
| Body Temperature: | 97.7 | Scale: | Fahrenheit | Method: | Auricular |
| Pulse Rate: | 112 **/Minute** | Method: | Radial | | |
| BP - Systolic: | 122 | Diastolic: | 60 | Position: | Supine - Right Arm |
| Respiration Rate: | 18 **/Minute** | Peak Flow: | | | |

**Oxygen**

O2 Saturation: 99.00 % Source: Room Air
Liters: **/minute** Via:

**Glucose**

Blood Sugar Level: mg/dl Blood Sugar Level - Not Applicable

**Vision**

Uncorrected - Right: 20/ Left: 20/ Both: 20/
Corrected - Right: 20/ Left: 20/ Both: 20/
Vision Test- Not Applicable

**Comments**

V/s, pass ice, drank half pitcher of water, showered, assisted to the bathroom 3 xs today,

**Prior Page**

Show Last Updated Information

https://azehr.eomis-cloud.com/eomis/servlet/com.marquis.eomis.EomisControllerServlet?t... 5/29/2015

ADOC-Long-01697

# EXHIBIT H

Anthony J. Fernandez (Bar No. 018342)
Vincent J. Montell (Bar No. 014236)
**QUINTAIROS, PRIETO, WOOD & BOYER, P.A.**
2390 E. Camelback Road, Suite 440
Phoenix, Arizona 85016
Telephone: (602) 954-5605
Facsimile: (602) 954-5606
afernandez@qpwblaw.com
vmontell@qpwblaw.com
*Attorneys for Defendants*

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

KENNETH and CORA LONG, husband and wife, individually, and as statutory beneficiaries for Nicholas Long, deceased; and on behalf of the Estate of NICHOLAS LONG,

Plaintiff,

v.

STATE OF ARIZONA, a body politic, CORIZON HEALTH, INC., an Missouri Corporation, doing business in the State of Arizona,

Defendants.

Case No. CV2016-007692

**DECLARATION OF JAKELIN VALLADARES, CNA IN SUPPORT OF DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S EXPERT**

(Assigned to the Honorable Rosa Mroz)

I, Jakelin Valladares, CNA make the following declaration under penalty of perjury.

1. I am over the age of 18 and competent to assert the information set forth in this Declaration.
2. I make and base this Declaration upon my personal knowledge.
3. I was employed as a Certified Nursing Assistant by Corizon from October 6, 2014 to February 19, 2016, at the Arizona State Prison Complex – Florence.
4. In my capacity as a Corizon employee, between December of 2014 and February of 2015, I provided care to Nicholas Long.
5. Following my term of employment with Corizon, I became employed by Corrections Corporation of America, at what is now known as Central Arizona Correctional

Complex, Core Civic ("Core Civic") in Florence, Arizona (formerly known as Central Arizona Detention Center).

6. John O'Steen, M.D. also works at Core Civic.
7. Darcee Bishop was also my colleague at Core Civic. To my knowledge, Ms. Bishop no longer works at Core Civic.
8. While at Core Civic, Dr. O'Steen approached me and asked me if I recalled having Nicholas Long as a patient when I worked for Corizon.
9. I told Dr. O'Steen that I did recall Nicholas Long.
10. Dr. O'Steen asked me additional questions about Mr. Long's care and treatment, including questions regarding the adequacy of his treatment, which I answered.
11. Dr. O'Steen also asked me questions about Corizon's operations, including my thoughts regarding Corizon's staffing during Mr. Long's incarceration.
12. I answered Dr. O'Steen's questions about Corizon's operations.

I declare under penalty of perjury that the above statements are true and correct to the best of my knowledge.

DATED this 20 day of February, 2018.

[signature] CNA

Jakelin Valladares, CNA Declarant

# EXHIBIT I